1                 IN THE UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

3

4    United States of America,

5                         Plaintiff,

6    vs.                         Criminal Action No. 3:19-cr-29

7    Michael Kennedy,

8                         Defendant.

9

10          Proceedings had in the Bench Trial in the

11   above-styled action on October 7th, 2019, before the Honorable

12   Gina M. Groh, Chief Judge, at Martinsburg, West Virginia.

13

14                 VOLUME ONE OF TWO VOLUMES

15   APPEARANCES:

16   On behalf of the United States of America:

17          Jarod J. Douglas
            Assistant United States Attorney
18          United States Attorney's Office
            P.O. Box 591
19          Wheeling, WV  26003

20          Christine M. Siscaretti
            United States Department of Justice
21          601 D Street
            Washington, DC  20530

22

23   The defendant was present in person.

24   Proceedings reported by means of stenotype; transcript produced
     by official court reporter.
25

                    Kate A. Slayden, CCR, RPR
       217 West King Street, Room 214, Martinsburg, WV  25401
                         304-267-5688

```
 1   APPEARANCES (Continued)

 2

 3   On behalf of the Defendant:

 4            Byron Craig Manford, Esq.
             P.O. Box 3021
 5           Martinsburg, WV  25402

 6            Garry G. Geffert, Esq.
             114 S. Maple Avenue
 7           P.O. Box 2281
             Martinsburg, WV  25402
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            INDEX TO WITNESSES

2              VOLUME ONE

3                                              Page

4   TESTIMONY OF LUTHER EDWARD BROWN

5      Direct Examination by Mr. Douglas        6

6      Cross Examination by Mr. Manford         12

7      Redirect Examination by Mr. Douglas      17

8      Recross Examination by Mr. Manford       17

9   TESTIMONY OF ANDREW GALLOTTI

10     Direct Examination by Mr. Douglas        19

11  TESTIMONY OF RYAN KOLB

12     Direct Examination by Mr. Douglas        25

13     Cross Examination by Mr. Manford         45

14     Redirect Examination by Mr. Douglas      56

15     Recross Examination by Mr. Manford       59

16  TESTIMONY OF DAVID LEE

17     Direct Examination by Ms. Siscaretti     61

18     Cross Examination by Mr. Manford         80

19     Redirect Examination by Ms. Siscaretti   89

20     Recross Examination by Mr. Manford       90

21  TESTIMONY OF AUSTIN ENNIS

22     Direct Examination by Mr. Douglas        91

23     Cross Examination by Mr. Manford         124

24     Redirect Examination by Mr. Douglas      133

25

1                  INDEX TO WITNESSES

2                                                      Page

3 TESTIMONY OF DAVID RITCHIE

4    Direct Examination by Ms. Siscaretti       136

5    Cross Examination by Mr. Manford         164

6 TESTIMONY OF DEREK WALKER

7    Direct Examination by Ms. Siscaretti       166

8    Cross Examination by Mr. Manford         200

9 TESTIMONY OF WILBUR JOHNSON

10    Direct Examination by Mr. Douglas        213

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          EXHIBIT LIST

2                                                    Page

3

4   Government's Exhibit No. 4    Video        21

5   Government's Exhibit No. 5    Video        23

6   Government's Exhibit No. 8    Video        33

7   Government's Exhibit No. 6    PowerPoint   69

8   Government's Exhibit No. 2    Video        98

9   Government's Exhibit No. 3    Video        141

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S

 2               (October 7, 2019, at 9:00 A.M.)

 3                           -  -  -

 4          THE COURT:  Are we ready to proceed, Counsel?

 5          MR. DOUGLAS:  The United States is ready, Your Honor.

 6          MR. MANFORD:  Defense is ready, Your Honor.

 7          THE COURT:  All right.  We'll call our case.

 8          THE CLERK:  This is the case of the United States of

 9   America versus Michael Kennedy.  Criminal number 3:19-cr-29,

10   defendant 1.

11      The Government is represented by counsel, Jarod Douglas and

12   Christine Siscaretti.  The defendant is present in person and

13   by counsel, Craig Manford and Garry Geffert.

14      Are the parties ready to proceed?

15          MR. DOUGLAS:  The United States is ready, Your Honor.

16          MR. MANFORD:  Defendant is ready, Your Honor.

17          THE COURT:  All right.  Counsel, we're set in today

18   for a bench trial in this matter.  Is either side asking for a

19   rule on witnesses?

20          MR. DOUGLAS:  Your Honor, the Government has gone

21   ahead and sequestered those witnesses.

22          THE COURT:  Okay.

23          MR. DOUGLAS:  There are none other than the case

24   agent who are on the witness list --

25          MR. MANFORD:  We have no -- we have no witnesses for
```

EDWARD BROWN – DIRECT EXAMINATION

1  the defense in the courtroom, Your Honor.

2          THE COURT:  Okay.  Sounds good.  Thank you,

3  Mr. Douglas, for working ahead.

4      All right, Counsel, since we're a bench trial instead of a

5  jury trial, you can still make opening statements if you prefer

6  or we can launch into the evidence.  It's counsels' preference.

7          MR. DOUGLAS:  The Government is prepared to make an

8  opening statement.

9          THE COURT:  All right.  You may proceed when you're

10  ready, Mr. Douglas.

11      (Opening statements noted; not transcribed.)

12          THE COURT:  Mr. Douglas, we're ready for the

13  Government's first witness.

14          MR. DOUGLAS:  Thank you, Your Honor.  The Government

15  calls Luther Edward Brown.

16      (The witness was sworn in.)

17          THE WITNESS:  I do.

18          THE CLERK:  You may have a seat in the witness chair,

19  and please watch your step.

20                          DIRECT EXAMINATION

21  BY MR. DOUGLAS:

22  Q.  Sir, please introduce yourself to the Court and spell your

23  name for the court reporter.

24  A.  My name is Luther Edward Brown, Jr.  L-U-T-H-E-R.  Edward,

25  E-D-W-A-R-D.  Brown, B-R-O-W-N, Jr.

EDWARD BROWN – DIRECT EXAMINATION

1  Q.  How are you employed, sir?

2  A.  I'm a paramedic with the Berkeley County Emergency

3  Ambulance Authority.

4  Q.  How long have you been employed by the Ambulance Authority?

5  A.  Since December 2006.

6  Q.  Did you obtain particular training to become employed by

7  the Ambulance Authority?

8  A.  Yes.  I received my EMT training prior to joining out in

9  Three Forks, Montana.  And when we moved here, I joined the

10  local fire department.  Became an EMT there.  Then I was hired

11  by the Ambulance Authority shortly afterwards.  And then after

12  that, I received training at Blue Ridge Technical Community

13  College to be a paramedic.

14  Q.  Mr. Brown, I want to direct your attention to just after

15  midnight on November 19, 2018.  Were you on duty for the

16  Ambulance Authority at that time?

17  A.  Yes, sir.

18  Q.  And where was your base during that shift?

19  A.  Hedgesville Volunteer Fire Department.

20  Q.  During your shift, did you respond to a crash scene off of

21  Williamsport Pike also known as Route 11?

22  A.  Yes, sir.

23  Q.  What caused you to respond to that scene?

24  A.  The Berkeley County Dispatch dispatched our unit to the

25  scene for additional resources.

EDWARD BROWN – DIRECT EXAMINATION

1  Q.  Did you ultimately respond to that scene?

2  A.  Yes, sir.

3  Q.  Can you approximate how much time it took between dispatch

4  and the time that you arrived at scene?

5  A.  I'd estimate somewhere in the neighborhood of 10 to 12

6  minutes probably.

7  Q.  Okay.  Now, as you're arriving on the scene, could you

8  describe what it looked like?

9  A.  When we approached the scene, of course there was fire

10  trucks and flashing lights everywhere.  We contacted the local

11  community.  They gave us an alternate route into the scene.

12  Which we went through an industrial park to come up closer to

13  where our patient was located.

14  Q.  How did you know who your patient was?

15  A.  When I arrived on the scene, our duty officer, Captain

16  Bevis, was already there.  We made contact with him, and he

17  directed us to the patient.

18  Q.  When you first saw your patient, could you describe what he

19  looked like?

20  A.  It was a young gentleman.  He was sitting on the ground

21  with handcuffs on.  He was probably I guess maybe about 5'8",

22  140 pounds.

23  Q.  And when you saw your patient, did you notice whether he

24  had any injuries when you first saw him?

25  A.  Yes.  He had some bleeding from his face.  If I remember

EDWARD BROWN - DIRECT EXAMINATION

1  right, it was on the left side.

2  Q.  Okay.  And at that time, did you notice any other

3  injuries?

4  A.  Not at that time, no.

5  Q.  Okay.  For the purpose of medical diagnosis or treatment,

6  did you ask the patient what happened?

7  A.  Yes.  He said he was in a car wreck.

8  Q.  Did he describe that car wreck and how he felt afterwards?

9  A.  His complaint at the time of that -- when I asked him about

10  what was going on, he said he had a headache.

11  Q.  Okay.  Did he mention whether he lost consciousness or use

12  any words that made you think he may have lost consciousness?

13  A.  Yeah.  I was gathering that he had lost consciousness of

14  the fact he said he woke up in the passenger seat of the

15  vehicle.

16  Q.  Did he use the phrase "woke up"?

17  A.  Yes.  That's the first thing he remembered was being in the

18  passenger seat of the vehicle.

19  Q.  Did you do anything to treat the injury on the patient's

20  head?

21  A.  Yes.  We bandaged his head with gauze and cleaned.

22  Q.  Did you take any further precautions regarding the patient,

23  including the neck area?

24  A.  Yes.  We assessed his cervical spine and his back, and we

25  placed a C-collar on it to protect the cervical spine.

EDWARD BROWN – DIRECT EXAMINATION

1  Q.  Did you then inspect the patient further for injuries?

2  A.  Yes.  We disrobed him and found some contusions to the left

3  side.  I believe it was the left arm.  The bleeding on his face

4  was matted by the time we got there so we just, you know,

5  covered that up.  Checked him over for injuries.  That was all

6  we found.  You know, assessed his abdomen, his P.M.S, which is,

7  you know, the sensory motor function in all four limbs.

8  Q.  How do you find the contusions?

9  A.  We just disrobed him and actually inspected --

10  Q.  You mean you cut his shirt off or what do you mean --

11  A.  Yes.

12  Q.  -- by disrobed him?

13  A.  Yes.

14  Q.  Okay.  And where were those contusions located?

15  A.  I believe it was left hip and left elbow.

16  Q.  Also for the purposes of medical diagnosis and treatment,

17  did you learn the patient's age?

18  A.  Yes.  Yes.  I asked him how old he was and his date of

19  birth.

20  Q.  What was his age?

21  A.  Sixteen.

22  Q.  And because he's a minor, we're not going to ask you his

23  name.  But can you tell us the initials of your patient?

24  A.  J.H.

25  Q.  Was J.H. transported to a hospital?

EDWARD BROWN - CROSS EXAMINATION

1  A.  Yes.  We transported him to Berkeley Medical Center.

2  Q.  Did you ride in the back of the ambulance with him?

3  A.  I did.

4  Q.  Was anyone else with you and J.H. in the back of the

5  ambulance?

6  A.  No, sir.

7  Q.  During that ride, did J.H. provide you with more

8  information that you assessed as part of a medical diagnosis

9  and treatment about what happened?

10  A.  Well, he complained about the headache.  And then we asked

11  him his pain scale.  He said he didn't have any.  He told me he

12  woke up in the passenger's seat, and then he said he got tossed

13  on the ground.  He said he got tossed on the ground.  That was

14  the extent of our conversation.  He did complain about his

15  handcuffs being too tight which I assessed for that.  There was

16  plenty of room.  He had good P.M.S. there.  Good capillary

17  refills so they weren't cutting off the circulation.

18  Q.  Thank you, sir.

19          MR. DOUGLAS:  No further questions.

20          THE COURT:  Mr. Manford.

21          MR. MANFORD:  Thank you, Your Honor.

22                   CROSS EXAMINATION

23  BY MR. MANFORD:

24  Q.  Good morning, Mr. Brown.  How are you, sir?

25  A.  I'm doing fine.  How about you, sir?

EDWARD BROWN - CROSS EXAMINATION

1  Q.  Hey, thanks for asking.  I'm doing good.  I have some

2  follow-up questions real quick.  It won't take too long.

3      So when you got there, J.H. was sitting on the ground?

4  A.  Sitting or kneeling.  I'm not exactly sure.

5  Q.  Okay.  As opposed to being prone and lying out flat?

6  A.  Yeah.  He was not laying down.

7  Q.  Okay.  So he was sitting up?

8  A.  Uh-huh.

9  Q.  Did he appear to be in any distress at that time other than

10 he was mad about he was cuffed?

11 A.  Just the cuffs.  That was the only --

12 Q.  Okay.

13 A.  -- thing he was upset about.

14 Q.  I read your grand jury testimony.  You even said he seemed

15 very frustrated that he was cuffed at the time; is that

16 correct?

17 A.  Yes, he was.

18 Q.  Okay.  Of course, how many times have you shown up for a

19 motor vehicle accident and had to attend to people?  Just a

20 wild guess.  What do you think?

21 A.  Maybe a thousand times.

22 Q.  Okay.  You've seen lots of accidents where people are

23 involved in serious motor vehicle accidents where the car is

24 all messed up; correct?

25 A.  Yes.  Yes, sir.

EDWARD BROWN – CROSS EXAMINATION

1   Q.   Okay.   From reading your prior testimony, I would ask you

2   this.   Did you notice all of the injuries to J.H. were on his

3   left side of his body?   The majority of them?

4   A.   Yes.

5   Q.   Okay.   And I believe you even said they were consistent

6   with other patients you've seen in similar motor vehicle

7   accidents; correct?

8   A.   Yes, sir.

9   Q.   Okay.   Now, Mr. Douglas asked you a couple of times, for

10  purposes of medical diagnosis, what did you do?   Did you ask

11  the victim or J.H. if he was on any medication or drugs or

12  anything like that?

13  A.   Yes, he denied being on anything.

14  Q.   Oh, really?   Are you sure?

15  A.   No, I take that back.   I believe he said he had smoked some

16  marijuana earlier in the day.   He denied any medications or

17  anything like that.

18  Q.   Do you recall in your grand jury testimony he admitted to

19  you he smoked it within an hour of the accident?

20  A.   That sounds correct.

21  Q.   Would you like to see your grand jury testimony and not

22  take my word for it?   You tell me what you feel comfortable

23  with because you're under oath.

24  A.   Sure.   I can see the testimony.

25          MR. MANFORD:  May I approach, Your Honor?

EDWARD BROWN - CROSS EXAMINATION

1          THE COURT:  Yes, sir.  You don't have to ask every

2    time, but I appreciate your courtesy.

3          MR. MANFORD:  Thank you, Judge.

4    BY MR. MANFORD:

5    Q.  Okay.  So here is your transcript from the grand jury and

6    here's page 11.  And I will direct you somewhere around line

7    20.  So the procedure is you read it, and then I'll ask you if

8    that refreshes your recollection.

9    A.  Okay.

10   Q.  Okay.  I'll take it back now.  So does that refresh your

11   recollection --

12   A.  Yes.

13   Q.  -- as to the timeframe when he had used the marijuana?

14   A.  Yes.

15   Q.  And so was it, in fact, an hour before?

16   A.  That's what he testi -- or he told me.

17   Q.  Thank you, sir.  Okay.  He had told you he had actually

18   woke up in the passenger's seat of the car; correct?

19   A.  That's what he told me.

20   Q.  So would that lead you to the conclusion he was

21   unrestrained at the time?

22   A.  I would believe he was unrestrained.

23   Q.  Okay.  So as I understand your testimony, he was frustrated

24   at the cuffs, he was complaining about a headache, but

25   otherwise no other complaints of pain?

EDWARD BROWN - CROSS EXAMINATION

1   A.   That's correct, sir.

2   Q.   And based on all that, you were concerned he might have

3   suffered a concussion in the accident?

4   A.   Well, I would be concerned, you know, that that would be

5   a possibility based on him not -- waking up in the

6   passenger's seat.   That would be what I would be concerned

7   with.

8   Q.   Okay.

9   A.   Some type of head injury.

10  Q.   And the contusions you say you saw were of his left elbow

11  and left hip?

12  A.   Yes, sir.

13  Q.   And of course he had all the problems with his face as

14  well; is that correct?

15  A.   Yes, sir.

16  Q.   Okay.  And they were -- what do you call them?  Abrasions?

17  They were scrapes --

18  A.   Yeah, he had abrasions there.

19  Q.   Okay.  So tell us what an abrasion is real quick.

20  A.   So it's when the skin gets damaged, and it starts bleeding.

21  He had capillary blood there.

22          MR. MANFORD:  Just one second, Your Honor.

23      No further questions.  Thank you, Mr. Brown.

24          THE COURT:  Redirect?

25          MR. DOUGLAS:  Very briefly, Your Honor.

EDWARD BROWN - REDIRECT AND RECROSS EXAMINATION

1                        REDIRECT EXAMINATION

2  BY MR. DOUGLAS:

3  Q.  Mr. Brown, in your experience, is it possible that

4  someone who is injured one day will feel more pain in the

5  coming days?

6  A.  Yes.  I tell my patients all the time, especially when they

7  decline to be treated, that they're going to feel worse usually

8  the next two days afterwards.  It's a lot worse, you know.

9              MR. DOUGLAS:  Thank you.  No further questions.

10             THE COURT:  Recross?

11             MR. MANFORD:  Thank you.

12                        RECROSS EXAMINATION

13  BY MR. MANFORD:

14  Q.  So in this particular case, if you had a young man who used

15  marijuana an hour before, we would expect him to have more

16  pain --

17             MR. DOUGLAS:  Objection, Your Honor.  There is no

18  basis for the witness having some expertise in effect of

19  marijuana.  And, in fact, this line of questioning is contrary

20  to the Court's motion in limine ruling that it would even be

21  brought up.

22             MR. MANFORD:  He opened the door.  Twice he said

23  based on medical procedures, what did you do?  What did you

24  ask?  So that opened the door for me to ask about it I think.

25  And now they're saying, well, hey, don't you have pain the next

EDWARD BROWN - CROSS EXAMINATION

1    day?  And I think it would be relevant if someone is

2    intoxicated, they might not feel the pain at the time.  And I

3    don't think you need to be an expert to know that.  That's

4    common knowledge, Your Honor.

5              THE COURT:  Mr. Manford, I am not so certain that

6    Mr. Douglas opened the door on that.

7              MR. MANFORD:  Okay.

8              THE COURT:  And this questioning was contrary to the

9    Court's ruling so I'm going to sustain the objection.

10        Any further questions?

11             MR. MANFORD:  No.  No thank you, Your Honor.

12             THE COURT:  All right.

13             MR. DOUGLAS:  Nothing further.

14             THE COURT:  Is this witness free to go?

15             MR. DOUGLAS:  Yes, Your Honor.

16             THE COURT:  Thank you, sir.  You're excused.

17        (Witness excused.)

18             THE COURT:  Next witness.

19             MR. DOUGLAS:  United States calls Andy Galotti.

20             THE COURT:  Could you spell that last name for the

21    court reporter.

22             MR. DOUGLAS:  G-A-L-L-O-T-T-I.

23             THE COURT:  Thank you.

24             MR. DOUGLAS:  Your Honor, may I go ahead and just

25    drop a couple of exhibits up to the --

ANDREW GALOTTI - DIRECT EXAMINATION

1          THE COURT:  Sure.

2          MR. DOUGLAS:  Thank you.

3      (The witness was sworn in.)

4          THE WITNESS:  I do.

5          THE CLERK:  You may have a seat in the witness chair,

6    and please watch your step.

7                        DIRECT EXAMINATION

8    BY MR. DOUGLAS:

9    Q.  Sir, please introduce yourself to the Court and spell your

10   name for the court reporter.

11   A.  My name is Andrew Galotti.  A-N-D-R-E-W  G-A-L-O-T-T-I.

12   Q.  Mr. Golotti, could you pull that microphone up so that

13   you're speaking right into it.  Thank you.

14       Sir, how are you employed?

15   A.  I am employed by the FBI.

16   Q.  How long have you worked for the FBI?

17   A.  I've worked for the FBI -- for the government for

18   approximately nine years.  Before that I was a contractor for

19   about six for the FBI also.

20   Q.  Okay.  What is your current position for the FBI?

21   A.  My title is supervisory electronics engineer, but I work

22   primarily in the field of audio/video forensics.

23   Q.  And how long have you been employed in that position?

24   A.  As supervisor for two years and before that I was a

25   forensic examiner.

ANDREW GALOTTI - DIRECT EXAMINATION

1  Q.  Did your job responsibilities include magnification of

2  video evidence?

3  A.  Magnification is one particular step within the field of

4  video processing.

5  Q.  Do you have experience magnifying video evidence?

6  A.  I do.

7  Q.  How much?

8  A.  Over the course of 12, 14 years, I've probably applied the

9  effects a hundred times.  And that's just an estimate.

10  Q.  Could you please describe the process of how you magnify

11  video evidence?

12  A.  It's a pretty standard effect.  We all do it every day with

13  our phones when we kind of swipe to look at an image.  The

14  effect that we apply is very close to the exact same effects

15  that we do every day.  It's as simple as just dragging the

16  effect on top of the video and applying the filter by choosing

17  a slider bar to increase the magnification for the particular

18  image.

19  Q.  Well, let me ask you a few questions about the reliability

20  of that process.  Does that process distort in any way the

21  original video evidence?

22  A.  It can distort but it's a process for which you're

23  continually maintaining the effect.  So as you're applying it,

24  you're visually looking at it, and you can immediately tell if

25  it starts to distort.  So it's not a process that you apply,

ANDREW GALOTTI - DIRECT EXAMINATION

1   and then you wait and come back an hour later and then have to

2   analyze it.  It's an immediate return as you're applying that

3   effect.

4   Q.  Is the magnification applied evenly to the section that you

5   are magnifying?

6   A.  It can be.  And in this case it was.  So in some instances

7   you can apply effect and you don't constrain the proportions.

8   In this case I did.  So if you go up five percent, the whole

9   image goes up five percent by constraint.

10  Q.  Okay.  I'm going to direct your attention to where you're

11  sitting there.  There should be a CD that is marked

12  Government's Exhibit No. 4.  Do you recognize that CD?

13  A.  I do.

14  Q.  How do you recognize it?

15  A.  Initials.  My initials.

16  Q.  Does that CD contain the video clip that you were sent and

17  requested to magnify?

18  A.  It does.

19        MR. DOUGLAS:  Your Honor, pursuant to the parties'

20  stipulation, the Government moves to admit Government's Exhibit

21  No. 4.

22        THE COURT:  Mr. Manford?

23        MR. MANFORD:  No objection.

24        THE COURT:  It's admitted.

25     (Government's Exhibit No. 4 was admitted.)

ANDREW GALOTTI - DIRECT EXAMINATION

1   BY MR. DOUGLAS:

2   Q.  Mr. Golotti, I'm going to have that video brought up,

3   Exhibit 4, on your screen that's right in front of you.  And

4   I'm just going to have it paused at the first frame.  Okay.  So

5   it's paused at zero zero on the clip.

6       Is this the video that you were asked to magnify?

7   A.  It appears to be so, yes.

8   Q.  Could you use your finger and circle on your monitor the

9   area that you were asked to magnify.

10  A.  There's an arrow.

11  Q.  Okay.  That's fine.  An arrow.  All right.  So on the left

12  side of the screen then?

13  A.  Yes, sir.

14  Q.  Thank you.

15          MR. DOUGLAS:  You can take that down, please.

16  BY MR. DOUGLAS:

17  Q.  There should also be, Mr. Galotti, a thumb drive laying in

18  front of you that is marked Government's Exhibit No. 5.  Do you

19  see that laying in front of you?

20  A.  I do.

21  Q.  Do you recognize Government Exhibit No. 5, that thumb

22  drive?

23  A.  I do.

24  Q.  How do you recognize it?

25  A.  Also my initials.

ANDREW GALOTTI - DIRECT EXAMINATION

1  Q.  So you've watched the video that's on that thumb drive?

2  A.  I have.

3  Q.  Is it the result of your magnification?

4  A.  It is.

5  Q.  Did you apply that same reliable process in creating that

6  magnification?

7  A.  I did.

8  Q.  And is that file that's on that thumb drive a fair and

9  accurate copy of the result of your magnification?

10  A.  Yes.

11          MR. DOUGLAS:  Your Honor, we would move to admit

12  Government's Exhibit No. 5.

13          MR. MANFORD:  No objection.

14          THE COURT:  Admitted.

15     (Government's Exhibit No. 5 was admitted.)

16  BY MR. DOUGLAS:

17  Q.  Mr. Galotti, I'm going to have brought on the screen there

18  in front of you Government's Exhibit No. 5, and I'm also going

19  to have it just brought up to the first frame and pause.

20     Could you describe the layout of this screen?

21  A.  On the left-hand portion of the screen labeled "original"

22  was the original video that you'd previously shown with a box

23  of area of interest.  So the area of interest was for myself to

24  show that that's what I'm presenting on the right-hand side of

25  the screen.  On the right-hand side of the screen is the

ANDREW GALOTTI - DIRECT EXAMINATION

1  contents of that bounding box magnified or scaled to 250

2  percent.

3  Q.  And is the original video side of the screen still the same

4  size as it was as you received it?

5  A.  It is.  The right -- the increased size of area of interest

6  is just overlaid over top of that original video.

7  Q.  And you've added this box and titled it "area of interest"?

8  A.  I did.

9          MR. DOUGLAS:  No further questions, Your Honor.

10         THE COURT:  Cross.

11         MR. MANFORD:  No thank you, Your Honor.

12         THE COURT:  Thank you, sir.  You're excused.

13         THE WITNESS:  Thank you, Your Honor.

14         THE COURT:  You can return those exhibits to

15  Mr. Douglas.

16     (Witness excused.)

17         MR. DOUGLAS:  And I'll tender them to the clerk, Your

18  Honor.

19         THE COURT:  Thank you, sir.  Next witness.

20         MR. DOUGLAS:  The United States calls Ryan Kolb,

21  spelled K-O-L-B.

22     (The witness was sworn in.)

23         THE WITNESS:  I do.

24         THE CLERK:  Please have a seat in the witness chair,

25  and please watch your step.

RYAN KOLB – DIRECT EXAMINATION

1                          DIRECT EXAMINATION

2    BY MR. DOUGLAS:

3    Q.   Sir, please introduce yourself to the Court and spell your

4    name for the court reporter.

5    A.   Deputy Ryan Kolb.   R-Y-A-N K-O-L-B.

6    Q.   Sir, if you can speak into that microphone and tell us how

7    you're employed.

8    A.   I'm employed with the Berkeley County Sheriff's Office.

9    Q.   In what capacity?

10   A.   As a deputy.

11   Q.   Since when have you been a deputy for the Berkeley County

12   Sheriff's Office?

13   A.   Since December 2017.

14   Q.   And did you have to attend the West Virginia State Police

15   Academy to become a deputy for the sheriff's office?

16   A.   Yes, sir.

17   Q.   When did you graduate?

18   A.   June 20, 2018.

19   Q.   Did your training at the academy include use-of-force

20   training?

21   A.   Yes, sir.

22   Q.   What did you learn about the purpose of an officer using

23   force against a subject?

24   A.   The minimum necessary.

25   Q.   Necessary for what?

RYAN KOLB - DIRECT EXAMINATION

1   A.  Whoever you're handling or whatever scene you're on.

2   Q.  What did you learn about how an officer should decide the

3   level of force?

4   A.  Usually it's one level higher than what the suspects use.

5   Q.  What did you learn about when a subject no longer poses a

6   threat if you should use force?

7   A.  No use.

8   Q.  Sir, do you know deputies Christopher Merson, Austin Ennis,

9   and David Ritchie?

10  A.  Yes, sir.

11  Q.  How do you know them?

12  A.  They're my friends as well as coworkers.

13  Q.  So they're also deputies at the Berkeley County Sheriff's

14  Office?

15  A.  Yes, sir.

16  Q.  Do you also know state troopers Derek Walker and Michael

17  Kennedy?

18  A.  Yes, sir.

19  Q.  How do you know them?

20  A.  They're employed with the West Virginia State Police.

21  Q.  Are you able to identify all those officers by appearance

22  --

23  A.  Yes, sir.

24  Q.  -- from your experience with them?

25  A.  Yes, sir.

RYAN KOLB - DIRECT EXAMINATION

1  Q.  Is Michael Kennedy in the courtroom today?

2  A.  Yes, sir.

3  Q.  Can you describe what he is wearing and where he is?

4  A.  He's at the defendant booth wearing a gray suit.

5          MR. DOUGLAS:  Your Honor, may the record reflect that

6  the witness has identified the defendant as Michael Kennedy.

7          THE COURT:  The record will so reflect.

8  BY MR. DOUGLAS:

9  Q.  Deputy Kolb, I'm going to direct your attention to just

10 after midnight on November 19, 2018.  Were you on call or on

11 duty then?

12 A.  Yes, sir.

13 Q.  What was your shift?

14 A.  The 1500 to 01.

15 Q.  So 3:00 P.M. into 1:00 A.M.?

16 A.  Yes, sir.

17 Q.  Who was on your shift that night?

18 A.  Deputy Ennis, Deputy Ritchie, Deputy Merson, and Corporal

19 Schoppert.

20 Q.  Towards the end of your shift, did you respond to a call at

21 Jack Rabbit's Bar on Williamsport Pike --

22 A.  Yes, sir.

23 Q.  -- also known as Route 11?

24 A.  Yes, sir.

25 Q.  What was the nature of that call?

RYAN KOLB - DIRECT EXAMINATION

1  A.  There was a male using the 911 line falsely.  False

2  reporting.

3  Q.  And were there other deputies who responded with you out to

4  Jack Rabbit's Bar?

5  A.  Yes, sir.

6  Q.  Who responded with you?

7  A.  Deputy Merson and Deputy Ritchie and Deputy Ennis.

8  Q.  Did you each respond in your own cruiser?

9  A.  Yes, sir.

10 Q.  Did you ultimately reach Jack Rabbit's Bar that evening?

11 A.  Yes, sir.

12 Q.  Upon your arrival, did you notice that there were also a

13 couple of state troopers who had responded to the scene?

14 A.  Yes, sir.

15 Q.  Who were they?

16 A.  Trooper Kennedy and Trooper Walker.

17 Q.  Okay.  Once you arrived in the parking lot, what did you

18 hear next?

19 A.  I heard a loud boom.  A crash.

20 Q.  What do you mean by a crash?

21 A.  Deputy Merson was getting ready to pull in and got

22 rear-ended.

23 Q.  What did you see?  After you heard the sound, what's the

24 first thing you saw?

25 A.  I seen a vehicle go around his car and proceed north on

RYAN KOLB – DIRECT EXAMINATION

1  Williamsport Pike.

2  Q.  Did you see what Deputy Merson did next?

3  A.  He pursued the vehicle.

4  Q.  Did you join in that pursuit as well?

5  A.  Yes, sir.

6  Q.  Can you recall sort of the sequence of the vehicles, of the

7  cruisers who were participating in that pursuit?

8  A.  It was everybody in the parking lot.

9  Q.  Okay.  Were you receiving radio calls from Deputy Merson

10  during the pursuit?

11  A.  Yes, sir.

12  Q.  What types of calls?

13  A.  Just where the vehicle was headed, what road they were

14  passing.

15  Q.  So was he noting the crossroads as he was passing the

16  crossroads?

17  A.  Yes, sir.

18  Q.  Did he mention a Railroad Drive?

19  A.  Yes, sir.

20  Q.  And when you heard Railroad Drive, what did you think?

21  A.  I thought they continued down Railroad Drive.

22  Q.  So you thought they'd turned off Route 11 on to Railroad

23  Drive?

24  A.  Yes, sir.

25  Q.  Okay.  Did you then turn on to Railroad Drive?

RYAN KOLB - DIRECT EXAMINATION

1    A.  Yes, sir.

2    Q.  Did you realize that the pursuit did not go down Railroad

3    Drive?

4    A.  Yes, sir.

5    Q.  How did you learn that?

6    A.  There was nobody there.

7    Q.  Okay.  Well, did you hear -- continue to hear radio calls

8    from Deputy Merson?

9    A.  Yes, sir.

10   Q.  About additional --

11   A.  Yes, sir.

12   Q.  -- crossroads he was crossing?

13   A.  Yes, sir.

14   Q.  Okay.  So what did you do next then once you realized you

15   had turned down the wrong road?

16   A.  I turned around and joined the pursuit.

17   Q.  Did you hear a radio call from Deputy Merson regarding the

18   vehicle he was chasing crashing?

19   A.  Yes, sir.

20   Q.  What did you hear?

21   A.  Said the vehicle signal 6 which is --

22   Q.  What does signal 6 mean?

23   A.  Another term for a crash.

24   Q.  Okay.  Did you continue on to the crash scene?

25   A.  Yes, sir.

RYAN KOLB – DIRECT EXAMINATION

1  Q.  Approximately how long after Deputy Merson radioed signal 6

2  did you arrive at the crash scene?

3  A.  A couple minutes.

4  Q.  When you arrived, were there already officers there?

5  A.  Yes, sir.

6  Q.  Which officers were already there?

7  A.  Deputy Merson, Deputy Ennis, Deputy Ritchie, and then

8  Trooper Kennedy, Trooper Walker.

9  Q.  Okay.  And could you describe where the subject's vehicle

10  was?

11  A.  It was on the left-hand side of the road just off to the

12  left-hand side of Deputy Merson's patrol car.

13  Q.  Were those two vehicles facing each other?

14  A.  Yes, sir.

15  Q.  Okay.  What did the subject's vehicle look like?

16  A.  Totaled.  Mangled.

17  Q.  Did you then see the person you assume to be the driver of

18  that vehicle, the subject?

19  A.  Yes, sir.

20  Q.  Could you describe the subject's appearance?

21  A.  Small.  Probably weighed about 100 pounds.  I don't believe

22  he was wearing a shirt at the time.

23  Q.  When you arrived and saw the subject, what was happening

24  with the subject?

25  A.  He was getting moved from the front of Deputy Merson's

RYAN KOLB - DIRECT EXAMINATION

1  patrol vehicle to a snowbank by the road.  Just off the road.

2  Q.  What do you mean by snowbank?

3  A.  Just like a four-foot pile of snow.

4  Q.  Who was moving the subject?

5  A.  Trooper Kennedy.

6  Q.  Was anyone else helping him?

7  A.  I don't think so.

8  Q.  Okay.  Was the subject handcuffed at that time that he was

9  being moved?

10  A.  I believe so, yes.

11  Q.  Cuffed behind his back?

12  A.  Yes.

13  Q.  What was the state of the subject's clothing at that time?

14  A.  He had his pants kind of pulled down where his boxers were

15  showing.

16  Q.  Did you notice any injuries on the subject when you first

17  saw him?

18  A.  I didn't notice any physical injuries.  He just had blood

19  coming from his face.

20  Q.  Can you recall more particularly where on his head the

21  blood appeared to be coming from?

22  A.  All over his face.

23  Q.  Okay.  Were you aware that Deputy Merson's cruiser was

24  equipped with a dashboard camera that night?

25  A.  Yes, sir.

RYAN KOLB – DIRECT EXAMINATION

1  Q.   And have you actually reviewed some of that footage?

2  A.   Yes, sir.

3         MR. DOUGLAS:  Your Honor, may I approach the witness?

4         THE COURT:  Yes, sir.

5  BY MR. DOUGLAS:

6  Q.   Deputy Kolb, I'm handing you a CD that has been marked as

7  Government's Exhibit No. 8.  Do you recognize that CD?

8  A.   Yes, sir.

9  Q.   Do you recognize your initials on that CD?

10 A.   Yes, sir.

11 Q.   Does that contain a clip from Deputy Merson's dashboard

12 camera from that evening?

13 A.   Yes, sir.

14         MR. DOUGLAS:  Your Honor, pursuant to the parties'

15 stipulation, the Government moves to admit its Exhibit No. 8.

16         THE COURT:  Mr. Manford?

17         MR. MANFORD:  If I can beg indulgence one second,

18 Your Honor.

19     No objection, Your Honor.

20         THE COURT:  It's admitted.

21     (Government's Exhibit No. 8 was admitted.)

22 BY MR. DOUGLAS:

23 Q.   Deputy Kolb, I'm going to have Exhibit 8 now brought up on

24 your screen, on your monitor there, and I'm going to have it

25 brought to the first frame and pause which it is.  It's paused

RYAN KOLB – DIRECT EXAMINATION

1  currently at zero zero on the clip.  Could you describe this

2  scene?  What we're looking at here.  Orient us to this.

3  A.  This is Deputy Merson's dashcam.  You can also see the

4  suspect's vehicle in it.

5  Q.  Where do you see the suspect's vehicle?

6  A.  Off to the left-hand side.

7  Q.  And that roadway that Deputy Merson's vehicle was facing,

8  what is that roadway?

9  A.  Just a crossroad.  I don't know the exact --

10  Q.  A crossroad on Route 11?

11  A.  Yes, sir.

12  Q.  Okay.  Now, Deputy Kolb, I'm going to start to play the

13  video, and we're going to play through about 33 seconds.  And

14  for these 33 seconds, I'm going to have it stopped when an

15  officer appears on the screen.  And I'm going to ask you if you

16  can identify that person.  Okay?

17  A.  Yes, sir.

18  Q.  All right.

19          MR. DOUGLAS:  Can we go ahead and press play.  Thank

20  you.  Stop there, please.  The video is paused at 6 seconds in.

21  BY MR. DOUGLAS:

22  Q.  Do you recognize that person on the screen?

23  A.  Yes, sir.

24  Q.  Who is that?

25  A.  Deputy Merson.

RYAN KOLB – DIRECT EXAMINATION

1          MR. DOUGLAS:  Please continue.  Please pause.  It's
2    paused at ten seconds.
3    BY MR. DOUGLAS:
4    Q.  Do you recognize the second officer who has appeared on the
5    screen?
6    A.  Yes, sir.
7    Q.  Who is that?
8    A.  Trooper Walker.
9          MR. DOUGLAS:  Please continue.  Pause.  It's paused
10   at 27 seconds.
11   BY MR. DOUGLAS:
12   Q.  A third officer has entered the screen.  Can you identify
13   him?
14   A.  Yes, sir.
15   Q.  Who is that?
16   A.  Trooper Kennedy.
17         MR. DOUGLAS:  Please continue.  Please pause.  It's
18   paused at 33 seconds.
19   BY MR. DOUGLAS:
20   Q.  A fourth officer has entered the screen.  Can you identify
21   him?
22   A.  Deputy Ennis.
23   Q.  Now, Deputy Kolb, I'm going to have the Exhibit 8 just
24   moved over to 2 minutes and 4 seconds.  To be clear, you
25   weren't here at this time that we just watched; right?

RYAN KOLB - DIRECT EXAMINATION

1   A.  No, sir.

2   Q.  Okay.  So it's actually at 2:03.  I'm going to have it

3   played here, and I'm going to ask you if you can identify

4   yourself entering this screen.  Okay?

5           MR. DOUGLAS:  Please play.  Please stop.  It's paused

6   at 220.

7   BY MR. DOUGLAS:

8   Q.  And there's a person on the right side of the screen.  Can

9   you identify that person?

10  A.  Myself.

11  Q.  Thank you.  We're going to take that exhibit down now.

12          THE COURT:  I have a question.

13          MR. DOUGLAS:  Yes, Your Honor.

14          THE COURT:  If we could put that back up.

15          MR. DOUGLAS:  Yes.  At that location?

16          THE COURT:  Let's put it back up at that location.

17          MR. DOUGLAS:  Okay.  That was at I think -- we'll

18  just play it at 204 again.

19     (Play video.)

20          MR. DOUGLAS:  And 220 I think is where it was at the

21  end there, Your Honor.

22          THE COURT:  Okay.  So we had stopped the video --

23  Mr. Douglas stopped the video after we saw Deputy Ennis enter

24  the picture, and then we moved forward a bit.  A couple of

25  minutes.  Before we see you walk across that screen, Deputy,

RYAN KOLB - DIRECT EXAMINATION

1   who was the other person in the screen that walked around the

2   car with the flashlight?

3      If we can back -- let's back it up a little bit.

4         MR. DOUGLAS:  Okay.  Back to 20 --

5         THE COURT:  Back to where --

6         MR. DOUGLAS:  -- 204.

7         THE COURT:  Back to where we see the -- yeah, the

8   very beginning from --

9         MR. DOUGLAS:  Yes, Your Honor.

10        THE COURT:  -- where you skipped, and then you

11  started at the beginning.

12        MR. DOUGLAS:  Okay.  Technically 203 I think is where

13  we started.  That's fine there.

14     (Play video.)

15        THE COURT:  So here in the left-hand part of the

16  vehicle, now going around to the rear of the vehicle with a

17  flashlight, who is that?

18        THE WITNESS:  Appears to be Trooper Walker, Your

19  Honor.

20        THE COURT:  Okay.  Thank you.

21        MR. DOUGLAS:  Thank you, Your Honor.  So we're going

22  to go ahead and take that exhibit down.

23  BY MR. DOUGLAS:

24  Q.  So as you were walking across sort of the hood, the front

25  of Deputy Merson's cruiser, what were you seeing happening?

RYAN KOLB – DIRECT EXAMINATION

1   A.   I observed Deputy Merson laying on the ground.

2   Q.   Okay.

3   A.   Appeared to be in some sort of pain.  And then observed the

4   suspect being carried to the snowbank off the road.

5   Q.   Did you see him be placed down on the snow pile?

6   A.   Yes, sir.

7   Q.   Did you see the subject pull away or resist in any way as

8   Trooper Kennedy was moving the subject to the snowbank?

9   A.   Not from where I'm at, no, sir.

10  Q.   Well, did you have an obstructed view or could you see?

11  A.   I could see.

12  Q.   Okay.  And did you see any resistance?

13  A.   No, sir.

14  Q.   Once the subject was at the snowbank, did you see any force

15  used on him?

16  A.   Yes, sir.

17  Q.   What did you see?

18  A.   I seen the suspect struck in the face.

19  Q.   Did you see any force before him being struck in the face

20  in contact between Trooper Kennedy and the subject?

21  A.   No, sir.

22  Q.   Did you hear Trooper Kennedy saying anything to the

23  subject?

24  A.   They were both talking to each other.  I don't know what

25  was said, sir.

RYAN KOLB - DIRECT EXAMINATION

1  Q.  Could you describe the volume of voice that Trooper Kennedy

2  was using?

3  A.  It was just a loud tone from both, sir.

4  Q.  Sir, as you're sitting there, do you recall -- do you not

5  recall remembering some of the content of what Trooper Kennedy

6  said?

7  A.  I believe so, yes, sir.

8  Q.  Okay.  Did you appear before the grand jury back in January

9  of 2019?

10  A.  Yes, sir.

11  Q.  And would that have been obviously closer in time to the

12  actual incident?

13  A.  Yes, sir.

14  Q.  Would that have been a better recollection of recalling the

15  context of what Trooper Kennedy said?

16  A.  Yes, sir.

17  Q.  Okay.

18          MR. DOUGLAS:  Your Honor, may I approach the

19  witness?

20          THE COURT:  Yes, sir.

21  BY MR. DOUGLAS:

22  Q.  I'm showing you your grand jury transcript, and I have it

23  turned to page 18.  If you can just read to yourself lines 6 to

24  14 --

25  A.  Yes, sir.

RYAN KOLB - DIRECT EXAMINATION

1  Q.  -- to yourself silently.

2     Do you now recall some of the content of what Trooper

3  Kennedy was saying to the subject?

4  A.  Yes, sir.

5  Q.  Now that your recollection has been refreshed, what was the

6  content?

7  A.  I heard Trooper Kennedy tell the suspect that he could have

8  paralyzed him from the accident.

9  Q.  Based on being someone who was there, who did you conclude

10 that Trooper Kennedy was talking about?

11 A.  Deputy Merson.

12 Q.  Is Trooper Kennedy good friends with Deputy Merson?

13 A.  I believe so, yes, sir.

14 Q.  How far away from the snowbank was it that Deputy Merson

15 was lying on the ground approximately?

16 A.  Five feet.

17 Q.  How far away were you from the snowbank when you saw

18 Trooper Kennedy strike the subject?

19 A.  Maybe two or three feet.

20 Q.  Where did Trooper Kennedy strike the subject?  Where on his

21 body?

22 A.  In the face.

23 Q.  What did he use to strike him?

24 A.  His hand.

25 Q.  Just before and during these strikes, did you see any

RYAN KOLB – DIRECT EXAMINATION

1   threat posed by the subject?

2   A.  No, sir.

3   Q.  Did you see any reason for the strikes from where you were

4   standing two or three feet away?

5   A.  No, sir.

6   Q.  After the strikes, did you see blood on Trooper Kennedy's

7   face?

8   A.  Yes, sir.

9   Q.  What did that look like?

10  A.  Just a small speck of blood.

11  Q.  Did you tell Trooper Kennedy he had a small speck of blood

12  on his face?

13  A.  Yes, sir.

14  Q.  What did he do?

15  A.  He wiped it off.

16  Q.  When Trooper Kennedy wiped off the blood from his face, did

17  you notice whether Trooper Kennedy had any injuries on his

18  face?

19  A.  No, sir.

20  Q.  Deputy Kolb, I'm going to have brought up what has been

21  admitted as Government's Exhibit No. 4 on your screen in front

22  of you.  And I'm just going to have it brought up to the first

23  frame and pause.  So currently Exhibit 4 is showing to you and

24  it's paused at zero zero.  Okay.

25      First of all, you just described the perspective of this

RYAN KOLB – DIRECT EXAMINATION

1  video angle?

2  A.  Yes, sir.

3  Q.  What roadway are we looking at?

4  A.  Williamsport Pike.

5  Q.  Which direction?

6  A.  Northbound.

7  Q.  And can you just -- can you see any part of Deputy Merson's

8  cruiser on the screen?

9  A.  Yes, sir.

10 Q.  Where do you see it?

11 A.  Just off to the left-hand side.

12 Q.  Okay.  And if depicted, could you please circle or at least

13 touch the screen -- it might cause an arrow to come up -- where

14 Trooper Kennedy had placed the subject.  Where the snowbank is.

15 A.  (Complied.)

16 Q.  Okay.  Is this where you saw Trooper Kennedy yelling at the

17 subject about possibly injuring Deputy Merson?

18 A.  Yes, sir.

19 Q.  Is this where you saw Trooper Kennedy strike the subject in

20 the face?

21 A.  Yes, sir.

22 Q.  Was the subject still cuffed behind his back when he was

23 being stricken in the face by Trooper Kennedy?

24 A.  Yes, sir.

25          MR. DOUGLAS:  If we can take down Exhibit No. 4.

RYAN KOLB – DIRECT EXAMINATION

1   BY MR. DOUGLAS:

2   Q.  Now I'm going to show you -- now, I'm going to show you

3   what has been admitted as Government's Exhibit No. 5.  First

4   just have a pause.  Is this boxed-in area of interest the

5   location where you saw Trooper Kennedy striking the subject?

6   A.  Yes, sir.

7   Q.  Okay.  And you've seen this video before, including the

8   magnification on the right; correct?

9   A.  Yes, sir.

10  Q.  So I'm going to have the video played, and I'm going to ask

11  you to have us pause the video if you see any striking or

12  contact between Kennedy and the subject as you saw firsthand.

13  Okay?

14  A.  Yes, sir.

15          MR. DOUGLAS:  Please play.

16  A.  Pause right here.

17  BY MR. DOUGLAS:

18  Q.  Okay.  So shortly before we paused it at 9 seconds?

19  Somewhere in the 7 to 8 range you saw contact?

20  A.  Yes, sir.

21          MR. DOUGLAS:  Please play.

22  A.  Pause.

23  BY MR. DOUGLAS:

24  Q.  It's paused at 13 so around the 12-second range?

25  A.  Yes, sir.

RYAN KOLB – DIRECT EXAMINATION

1  Q.  You saw depicted on the video contact from Kennedy to the

2  subject that you saw firsthand?

3  A.  Yes, sir.

4         MR. DOUGLAS:  Please play.

5  BY MR. DOUGLAS:

6  Q.  Are you able to recognize any of the other officers who are

7  walking around there?

8  A.  Not really, sir.

9  Q.  Okay.

10  A.  Pause it there.

11  Q.  It's paused at 49 so shortly before pausing at 49, you saw

12  some additional contact --

13  A.  Yes, sir.

14  Q.  -- that you saw firsthand?

15         MR. DOUGLAS:  Please play.

16  BY MR. DOUGLAS:

17  Q.  Okay.  You see at the bottom it says replay.  Is it your

18  understanding that this video just now loops and plays again?

19  A.  Yes.

20         MR. DOUGLAS:  Okay.  We can stop there.

21  BY MR. DOUGLAS:

22  Q.  Deputy Kolb, when you were standing over there at the

23  snowbank and Trooper Walker was using force against the

24  subject, did you see anyone else use force against the subject

25  over there?

RYAN KOLB – CROSS EXAMINATION

1   A.   You mean Trooper Kennedy, sir?

2   Q.   Anyone other than Trooper Ken -- yes.  Sorry.  Anyone other

3   than Trooper Kennedy use force?

4   A.   No, sir.

5   Q.   Did you see any reason for yourself to use force?

6   A.   No, sir.

7   Q.   Did you use force?

8   A.   No, sir.

9         MR. DOUGLAS:  Can I have one moment, Your Honor?

10        THE COURT:  Yes, sir.

11        MR. DOUGLAS:  No further questions, Your Honor.

12        THE COURT:  Mr. Manford.

13        MR. MANFORD:  Thank you.

14                    CROSS EXAMINATION

15   BY MR. MANFORD:

16   Q.   Good morning, Officer Kolb.  How are you doing?  It's Kolb;

17   right?

18   A.   Yes, sir.

19   Q.   Not Kolb.  Sorry.  Okay.  So when asked about the use of

20   force, okay, you remember your grand jury testimony?

21   A.   Yes, sir.

22   Q.   Okay.  When asked --

23        MR. DOUGLAS:  Your Honor, this is not proper

24   impeachment to just come out with the grand jury testimony.  He

25   has to have made some type of statement that's inconsistent

RYAN KOLB - CROSS EXAMINATION

1   with the grand jury testimony and then you impeach him with the

2   grand jury testimony.

3           MR. MANFORD:  All right.  I'll do it that way.

4           THE COURT:  Thank you.

5   BY MR. MANFORD:

6   Q.  All right.  Let's see.  What did you actually say?  You

7   said, oh, it's one level higher --

8   A.  Yes, sir.

9   Q.  -- in your testimony today; correct?

10  A.  Yes, sir.

11  Q.  Okay.  You gave more of an explanation, and it's sort of a

12  different explanation for the grand jury; correct?

13  A.  Yes, sir.

14  Q.  Okay.  Would you like to see what you said or shall I just

15  repeat it?  What do you prefer?

16  A.  You can repeat it, sir.

17  Q.  Okay.  You told the grand jury regarding use of force

18  whenever -- whoever you're dealing with dictates that use of

19  force; is that correct?

20  A.  That's also correct, yes, sir.

21  Q.  You said there were no -- there is no set use of force

22  unless you're dealing with somebody.  They dictate the

23  situation and what force to use.  Is that correct?

24  A.  That's correct.

25  Q.  Okay.  You also told -- excuse me.  The reason for that is

RYAN KOLB - CROSS EXAMINATION

1  you want to keep the upper hand in the situation; correct?

2  A.  Yes, sir.

3  Q.  And that would be because when you're dealing with an

4  arrestee, you don't know if they're armed and dangerous, they

5  might flee, all that type of stuff; correct?

6  A.  Yes, sir.

7  Q.  Okay.  So when you approached the -- you are part of the

8  pursuit; is that correct?

9  A.  Yes, sir.

10 Q.  But you made a wrong turn, but you caught up late; right?

11 A.  Yes, sir.

12 Q.  Were you able to see the multiple explosions of the

13 transformer?

14 A.  You could see the sky, yes, sir.

15 Q.  Okay.  Lit up like daytime; right?

16 A.  Absolutely.

17 Q.  Do you remember telling the grand jury a little something

18 different regarding the suspect's weight?

19         MR. DOUGLAS:  Your Honor, this is still not --

20 improper procedure for impeachment.

21         MR. MANFORD:  All right.  We'll try --

22         MR. DOUGLAS:  He's making statements he's saying are

23 inconsistent before even asking him questions.

24         THE COURT:  Now, you sound like me during these

25 trials, Mr. Douglas.

RYAN KOLB - CROSS EXAMINATION

1     Mr. Douglas is insisting that we follow the rules and

2  that's appropriate.  So, Mr. Manford, if you could ask him a

3  question.  If he answers differently than prior testimony, then

4  we'll proceed in that fashion so it's all proper according to

5  our rules of procedure and Cleckley.

6          MR. MANFORD:  Yeah.  Since we weren't in front of a

7  jury, I was just trying to move things along, but we can do it

8  that way, Your Honor.  Of course.

9          THE COURT:  Thank you.

10  BY MR. MANFORD:

11  Q.  So you just told the Court a minute ago -- a few minutes

12  ago that he weighed 100 pounds?

13  A.  Yes, sir.

14  Q.  And that's not what you told the grand jury; correct?

15  A.  I don't know his exact weight, sir.

16  Q.  Okay.  You told the grand jury 120 pounds?

17  A.  Yes, sir.

18  Q.  Not that it matters but just inconsistent; right?

19  A.  Yes, sir.

20  Q.  Okay.  Now, when you arrived, who was transporting J.H. to

21  the snowbank?  Do you recall?

22  A.  Trooper Kennedy.

23  Q.  Okay.  Was there anyone else?

24  A.  Not that I can recall.

25  Q.  Okay.  Do you recall telling the grand jury something

RYAN KOLB – CROSS EXAMINATION

 1  different?

 2  A.  No, sir.

 3  Q.  Okay.  Do you recall telling the grand jury that they were

 4  transporting him?  Meaning plural.  More than one person other

 5  than Kennedy.

 6  A.  I don't remember that, sir.

 7  Q.  Okay.  So is it possible that Deputy Ennis was assisting

 8  Trooper Kennedy in moving the victim to the snow pile?  Do you

 9  recall that?

10  A.  I don't recall that.

11  Q.  Okay.  Well, if that actually happened -- well, you don't

12  know if it happened because you don't recall; correct?

13  A.  Yes, sir.

14  Q.  Okay.  Is it -- I heard throughout the investigation,

15  officers get tunnel vision.  It seems to be a term of art with

16  law enforcement.  Did you experience that yourself that night?

17  A.  Not that I can recall, no, sir.

18  Q.  Have you heard other officers use it?  Is it a term that

19  you're familiar with?

20  A.  Yes, sir.

21  Q.  Okay.  So just so I understand, it's your recollection from

22  your testimony today that only Trooper Kennedy was transporting

23  J.H. from the general area of where the crash was to the

24  snowbank?

25  A.  Yes, sir.

RYAN KOLB - CROSS EXAMINATION

1  Q.   Okay.  Now, you said that -- well, what did you say

2  regarding your direct testimony between conversation between

3  these two individuals, Trooper Kennedy and J.H., when he's

4  being placed in the snowbank?  Was there a conversation?

5  A.   Yes, sir.

6  Q.   Okay.  And was it both individuals talking to each other?

7  A.   I believe so, yes, sir.

8  Q.   Okay.  And you've already told us that Trooper Kennedy was

9  speaking in a louder voice or a loud tone; is that correct?

10  A.   Yes, sir.

11  Q.   What about the victim?

12  A.   He was also using a loud voice.

13  Q.   Okay.  So -- and you've had an opportunity to review the

14  video in this case, the Merson video; right?

15  A.   Yes, sir.

16  Q.   And everything that you testified to happened after the

17  Merson video, but the things that are depicted on the Merson

18  video, you're there after he's being -- he being J.H. -- is

19  being removed from that area to the snowbank; is that correct?

20  A.   Yes, sir.

21  Q.   Okay.  So even after then, J.H. has -- is exhibiting a tone

22  with Officer Kennedy?

23  A.   I don't understand your question.

24  Q.   Okay.  What did -- he was talking loud to Officer Kennedy;

25  is that your testimony?

RYAN KOLB – CROSS EXAMINATION

1  A.  Yes, sir.

2  Q.  Okay.  Loud as in confrontational or just loud because

3  there was so much noise going on he had to talk loud?

4  A.  It could have been confrontational.  I don't know for

5  certain.

6  Q.  Okay.  Well, you were two or three feet away; right?

7  A.  Yes, sir.

8  Q.  Okay.  So all you remember was loud?

9  A.  Yes, sir.

10  Q.  Okay.  And was it your understanding the reason he was

11  being transported from that area over to the snowbank so that

12  he would be more accessible to the medics that were on the way?

13  A.  Yes, sir.

14  Q.  Okay.  So we played the video a minute ago.  You paused it

15  when there was contact; is that correct?

16  A.  Yes, sir.

17  Q.  Okay.  So every time that you told the operator to pause it

18  that wasn't a strike.  That was just contact.  Is that correct?

19  A.  Yes, sir.

20  Q.  Okay.  Contact -- I mean I see maybe the officer pick him

21  up by both hands and talking to him.  Is that part of the

22  contact that we're talking about?

23  A.  Yes, sir.

24  Q.  Okay.  Isn't it true that J.H. kept trying to sit up and

25  Trooper Kennedy kept pushing him back down and said quit?  You

RYAN KOLB – CROSS EXAMINATION

1  know, be compliant, quit resisting, stay here, the ambulance is

2  on the way?

3  A.  Yes, sir.

4  Q.  Okay.  And you were right there, two or three feet away,

5  and you can confirm that for us; correct?

6  A.  Yes, sir.

7  Q.  Okay.  But J.H. wouldn't do that, would he?

8  A.  Not that I recall, sir.

9  Q.  Okay.  How many times do you think he had -- he kept

10  sitting up and wouldn't listen to instructions of the

11  officer?

12  A.  A good amount, sir.

13  Q.  Okay.  More than four or five?

14  A.  I believe so.

15  Q.  Okay.  If you had a subject like that, would that cause you

16  concern if he kept getting up and wouldn't follow your

17  instructions?

18  A.  Yes, sir.

19  Q.  Why would you be concerned?

20  A.  He can get up, escape, strike you.

21  Q.  Okay.  How can he strike you if he's come from behind?

22  A.  With his head.

23  Q.  Headbutt?

24  A.  Yes, sir.

25  Q.  Okay.  Could trip you?  Stuff like that?

RYAN KOLB - CROSS EXAMINATION

1   A.   Yes, sir.

2   Q.   Okay.  Given the events that night, was there any reason to

3   fear he might flee?

4   A.   Absolutely.

5   Q.   I believe you also said in your testimony that you saw

6   Trooper Kennedy strike J.H. in the face twice; is that correct?

7   A.   Yes, sir.

8   Q.   Okay.  And would that be on the subject's right side of his

9   face with Trooper Kennedy using his left hand?

10  A.   I don't know which side --

11  Q.   Don't --

12  A.   -- exactly.

13  Q.   Don't know exactly?

14  A.   No, sir.

15  Q.   Okay.  All right.  Do you recall from the video if the

16  strikes were being made with the left hand or right hand by

17  Trooper Kennedy?

18  A.   I can't really tell on the video, sir.

19  Q.   Weren't looking for it probably until I brought it up?

20  A.   Yes, sir.

21  Q.   Okay.  Were you able to see the injuries to the -- to J.H.

22  who was injured on the left side of his body, his face; is that

23  right?

24  A.   I just know he was bleeding.  I didn't know where his

25  injuries were, sir.

RYAN KOLB – CROSS EXAMINATION

1  Q.  Otherwise, you didn't see J.H. to be injured; correct?

2  A.  No, sir.

3  Q.  I mean despite the accident and the crash and all that that

4  you saw when you got to the scene; right?

5  A.  Yes, sir.

6  Q.  Okay.  All right.  I'm almost done.  Just let me finish up

7  some stuff here.

8      The pursuit that you were part of eventually, it was a

9  high-speed pursuit; right?

10  A.  Yes, sir.

11  Q.  On Williamsport Pike, Route 11?

12  A.  Yes, sir.

13  Q.  A highly-traveled thoroughfare in Berkeley County?

14  A.  Yes, sir.

15  Q.  Okay.  Takes you up to Spring Mills; right?  It's a pretty

16  densely-populated area now?

17  A.  Yes, sir.

18  Q.  Okay.  So in the video, somewhere around the 25-second

19  mark, I see another officer walk right past where Trooper

20  Kennedy and J.H. are.  Do you believe that's you?

21  A.  I don't remember, sir.

22  Q.  You don't remember.  Okay.  Do you believe any other

23  officer being in close proximity at that time?

24  A.  It was either me or Deputy Ennis.

25  Q.  Okay.  Got it.  So when you were watching Trooper Kennedy

RYAN KOLB – CROSS EXAMINATION

1  interact with J.H., if this is the snow pile right here at the

2  podium, would you position me where you were looking at this.

3  Tell me to move to my left or my right.

4  A.  To your left.

5  Q.  Left.  Okay.  Am I this close?  Do I need to step back?  Am

6  I in the approximate location or what?

7  A.  To the left a little bit more, sir.

8  Q.  Okay.  How about this?

9  A.  Roughly around that area.

10  Q.  Okay.  Now, we're making a record so diagonally from me and

11  the podium, three or four feet or something like that?

12  A.  Yes, sir.

13  Q.  Okay.  Why can't we see you in the video then?

14  A.  I don't know, sir.

15  Q.  Did you see -- you said you didn't see yourself in the

16  video; right?

17  A.  No, sir.

18  Q.  I mean even -- you've seen the one that's enlarged,

19  enhanced; right?  You don't see yourself in that one either;

20  right?

21  A.  No, sir.

22  Q.  Okay.

23        MR. MANFORD:  Just one second, Your Honor, please.

24        THE COURT:  Sure.

25        MR. MANFORD:  One more question.

RYAN KOLB - REDIRECT EXAMINATION

1  BY MR. MANFORD:

2  Q.  All right.  So I take it from your testimony that you

3  didn't intercede with Trooper Kennedy at the time and say, hey,

4  lay off of him.  That's enough.  You're hurting him.  It's too

5  much.  Anything like that?

6  A.  No, sir.

7  Q.  Okay.  But at the academy, you were trained if you see

8  something like that, you've got to jump in there and stop it

9  from going on; right?

10  A.  Yes, sir.

11  Q.  Okay.  And last thing.  The only injury you saw was a cut

12  to the head to J.H.; is that right?

13  A.  I believe so, yes, sir.

14        MR. MANFORD:  No further questions.

15        THE COURT:  Mr. Douglas.

16        MR. DOUGLAS:  Thank you, Your Honor.

17                    REDIRECT EXAMINATION

18  BY MR. DOUGLAS:

19  Q.  Deputy Kolb, you testified on cross that you weren't sure

20  who helped move the subject to the snowbank; right?

21  A.  Yes, sir.

22  Q.  Are you certain who you saw striking the subject in the

23  face at the snowbank?

24  A.  Yes.

25  Q.  Who was that?

RYAN KOLB – REDIRECT EXAMINATION

1   A.   Trooper Kennedy, sir.

2   Q.   You were asked what sounded to me to be hypotheticals about

3   headbutting and tripping, weren't you?

4   A.   Yes, sir.

5   Q.   Did you see the subject trying to headbutt Trooper Kennedy?

6   A.   No, sir.

7   Q.   Did you see the subject trying to trip Trooper Kennedy?

8   A.   No, sir.

9   Q.   In fact, did you see Trooper Kennedy pull the subject's

10  face up close to his face when he was yelling, "You could have

11  hurt this officer"?

12  A.   Yes, sir.

13  Q.   If you're concerned about a headbutt, would you pull

14  somebody up to your face?

15  A.   No, sir.

16  Q.   Then you were asked on cross about raising the torso off

17  the ground; right?

18  A.   Yes, sir.

19  Q.   Is that a reason to strike a cuffed subject in the face?

20  A.   No, sir.

21  Q.   Then you were asked about why they can't see you on the

22  video.  On direct you testified that you saw officers on the

23  video other than Trooper Kennedy.  You just couldn't recognize

24  them; right?

25  A.   Yes, sir.

RYAN KOLB - REDIRECT EXAMINATION

1   Q.  Could you recognize Trooper Kennedy on the video because

2   what he was doing on the video?

3   A.  Yes, sir.

4   Q.  And match that with your own first-hand experience of

5   what's seen and what he was doing?

6   A.  Yes, sir.

7   Q.  Okay.  Then you were asked on cross examination why didn't

8   you intercede.  Do you remember that?

9   A.  Yes, sir.

10  Q.  Could you tell the Court why you didn't intercede?

11  A.  It's hard to get in someone else's use of force.

12  Q.  What do you mean by that?

13  A.  It's hard to stop someone from doing something when you're

14  on the scene.

15  Q.  Let me ask you, do you consider law enforcement as a

16  brotherhood?

17  A.  Yes, sir.

18  Q.  Does that affect your decision about whether to intercede

19  and call someone out on the scene?

20  A.  Yes, sir.

21  Q.  How does it affect that?

22  A.  It's hard to tell someone how to do their job when they

23  know how to do their job.

24          MR. DOUGLAS:  Thank you, Your Honor.  No further

25  questions.

RYAN KOLB - RECROSS EXAMINATION

1          THE COURT:  Recross?

2                    RECROSS EXAMINATION

3    BY MR. MANFORD:

4    Q.  Well, cops put their life on the line every day.  It's

5    certainly a brotherhood.  But isn't it true you wouldn't have

6    hesitated if you thought Trooper Kennedy had gone overboard?

7    Those were the words you used; right?

8    A.  Yes, sir.

9    Q.  There's going to be an objection, but you told the grand

10   jury you didn't intervene because he didn't go --

11          MR. DOUGLAS:  Objection --

12   Q.  -- overboard.

13          THE COURT:  Mr. Douglas?  Improper -- What's your

14   objection?

15          MR. DOUGLAS:  Improper impeachment.

16          THE COURT:  Mr. Manford, want to back up.  Sustained.

17   BY MR. MANFORD:

18   Q.  Do you recall telling the grand jury a different reason why

19   you didn't intercede?

20   A.  No, sir.

21   Q.  Okay.  Would you like to -- I'll show you your testimony.

22   Maybe it will refresh your recollection as soon as I can find

23   it.  I think I have it right here.  Okay.  Page 39, line 19.

24          MR. MANFORD:  Since you told me I can approach

25   without asking, I'll go ahead and do that, Your Honor.

RYAN KOLB – RECROSS EXAMINATION

1          THE COURT:  You may.

2    BY MR. MANFORD:

3    Q.  Let me direct your attention to your grand jury testimony

4    at line 20.  Read it first.

5    A.  Want me to read it out loud?

6    Q.  No.  Just read it to yourself.  That's fine.  Are you done?

7    A.  Yes, sir.

8    Q.  Okay.  Does that refresh your recollection as to what you

9    told the grand jury why you didn't intercede?

10   A.  Yes, sir.

11   Q.  And what did you tell them?

12   A.  Basically, if they're going completely overboard, you'd

13   want to step in.

14   Q.  Okay.  So can I conclude from that that he wasn't going

15   completely overboard?

16   A.  Not in my opinion.

17   Q.  Okay.  It's not something you would have done; is that what

18   your -- is that your thoughts?

19   A.  Yes, sir.

20   Q.  Okay.  But, nevertheless, it was in reaction to something

21   J.H. was doing; is that correct?

22   A.  Yes, sir.

23   Q.  Okay.

24          MR. MANFORD:  No further questions.

25          THE COURT:  Is that it for this witness, Mr. Douglas?

DAVID LEE – DIRECT EXAMINATION

1          MR. DOUGLAS:  That is it, Your Honor.

2          THE COURT:  All right.  Thank you, sir.

3          MR. DOUGLAS:  May he be excused?

4          THE COURT:  Yes, sir.  Thank you, sir.  You're free

5    to go.

6          THE WITNESS:  Thank you, Your Honor.

7       (Witness excused.)

8          THE COURT:  Next witness.

9          MS. SISCARETTI:  Your Honor, the Government calls

10   Captain David Lee.

11      (The witness was sworn in.)

12         THE WITNESS:  I do.

13         THE CLERK:  You may have a seat in the witness chair.

14   Please watch your step.

15                     DIRECT EXAMINATION

16   BY MS. SISCARETTI:

17   Q.  Good morning, sir.

18   A.  Good morning.

19   Q.  Sir, can you please introduce yourself to the Court, and

20   please spell your name for the court reporter.

21   A.  David Michael Lee.  D-A-V-I-D  M-I-C-H-A-E-L  L-E-E.

22   Q.  And, sir, where do you currently work?

23   A.  West Virginia State Police.

24   Q.  And what's your -- in what capacity are you employed there?

25   A.  I'm a captain with the West Virginia State Police and

DAVID LEE - DIRECT EXAMINATION

1  currently the director of training at the West Virginia State

2  Police Academy.

3  Q.  How long have you been employed with the West Virginia

4  State Police?

5  A.  Twenty-four years.

6  Q.  Before you became the director of training, what other

7  positions in the state police did you hold?

8  A.  I have held positions as a field trooper at the Hamlin

9  Detachment, at the Winfield detachment, and I was also an

10  investigator through the Bureau of Criminal Investigations in

11  Logan.

12     In 2001, I was transferred to the academy as the assistant

13  range officer and academy staff officer.  From 2003 -- and I

14  held that position until 2003.  From 2003 until 2011, I held

15  positions such as the master range officer, the training staff

16  coordinator, deputy director of training.  And then on July 2nd

17  of 2011, I was appointed to the director of training.

18  Q.  Let's talk about that a little bit more.  So you've been in

19  that position since 2011?

20  A.  Yes, ma'am.

21  Q.  And what are your duties and responsibilities as the

22  director of training for the West Virginia State Police?

23  A.  As the director of training, I oversee training conducted

24  at the academy.  That's both entry level training and advanced

25  training put on there.

DAVID LEE - DIRECT EXAMINATION

1   Q.  And so are you the person in the state of West Virginia who

2   reviews and approves the training programs given to troopers?

3   A.  For our people, yes, ma'am.

4   Q.  What do you mean by for our people?

5   A.  Well, at the academy.  They can take training away from the

6   academy.  They may go to a class or something like that.  But

7   any training done at the academy or through the West Virginia

8   State Police I approve, yes, ma'am.

9   Q.  Does that include the academy class for new cadets?

10  A.  Yes, ma'am.

11  Q.  And does that include approving presentation materials used

12  during classes taught at the academy?

13  A.  Yes, ma'am.

14  Q.  And are you the person as the director of training who is

15  responsible for verifying that all cadets and troopers in the

16  state of West Virginia are in compliance with their training

17  requirements?

18  A.  Yes, ma'am.

19  Q.  Do you currently give any trainings yourself?

20  A.  I do.  I teach classes such as police ethics, supervisory

21  support and relations, and also teach law enforcement

22  leadership.

23  Q.  And you also as director of training oversee or supervise

24  other officers who give trainings on other topics?

25  A.  I do, yes, ma'am.

DAVID LEE - DIRECT EXAMINATION

1   Q.   Let me direct your attention back to November of 2011.

2   Were you the director of training then?

3   A.   Yes, ma'am.

4   Q.   As the director of training, did you become familiar with a

5   person by the name of Michael Kennedy?

6   A.   Yes, ma'am.

7   Q.   And how did you become familiar with him back then?

8   A.   He was a member of the 62nd cadet class.

9   Q.   And when did that cadet class begin?

10  A.   That cadet class started in November of 2011.

11  Q.   So in your capacity of director of training, you certify

12  that Michael Kennedy participated in that academy class?

13  A.   Yes, ma'am.

14  Q.   When did Michael Kennedy complete that academy class?

15  A.   I believe that was May of 2012.

16  Q.   And can you describe a little bit more specifically what

17  your role was and how you worked at that academy class that

18  Michael Kennedy participated in?

19  A.   As the director of training, he and I were -- I was

20  responsible for the overall training, but I also interacted

21  with the class on a day-to-day basis.  I taught some of the

22  classes.  Like I said, supervisory, support and relations,

23  those type of things.  But I also see them on a daily basis and

24  interact -- maybe unofficially would be the right term --

25  daily.

DAVID LEE - DIRECT EXAMINATION

1   Q.  Let me ask you a little bit about the format of that

2   academy class.  Well, first, how long was it?

3   A.  The academy class is 25 weeks in length.

4   Q.  And can you describe what the format is?

5   A.  Yes, ma'am.  It's an in-residence training academy which

6   means the students stay there from the time they start.  They

7   report on Monday morning.  They stay the entire week.  Most

8   weekends they get to go home, but then they report back Sunday

9   night, and then they stay there that entire time.

10  Q.  And what's the purpose of doing an in-residence program

11  like that?

12  A.  We do an in-residence program.  We think that -- and we

13  also do stress inoculation.  The in-residence program we

14  believe helps with the cohesion of the class and get them

15  working together as a team.

16  Q.  You mention stress inoculation.

17  A.  Yes, ma'am.  We use a stressful environment.  That way --

18  well, our theory is that if a student can handle the stresses,

19  the artificial stresses put on in the environment of the

20  academy, tight timeframes, having to make their beds, having to

21  do tasks such as that, work details, if they can handle that

22  stress, then they would be able to handle the day-to-day

23  stresses of the law enforcement profession.

24  Q.  Now, as far as the actual classes and the teaching that was

25  done at the academy, can you describe the format for that?

DAVID LEE - DIRECT EXAMINATION

1  A.  Repeat that, please.

2  Q.  Sure.  What was the format of the teaching that was done at

3  the academy?

4  A.  Okay.

5  Q.  Lectures or practicals.  If you can explain that, please.

6  A.  Yes, ma'am.  I mean the training is conducted in various

7  methods.  You have lectures done in a classroom which would use

8  PowerPoint or different types of methods.  You also have

9  hands-on skills training which may be done in various

10  environments whether it be the gym or the range or the parking

11  lot for things like emergency driving.  We may have a

12  combination of those things put together.

13  Q.  And how are Michael Kennedy and the other cadets in this

14  class, how are they evaluated to make sure they understood the

15  material that was being taught?

16  A.  That's done in a variety of ways.  It may be through formal

17  testing where they're given either a written test or a skills

18  test.  It may be through quizzes.  It may just be through the

19  instructor asking questions.  If it's a skills-type training,

20  hands-on training, they may have to perform the task.

21  Q.  Let's move on to some of the substance that was taught at

22  the academy class.  What topics were covered during Michael

23  Kennedy's academy class?

24  A.  There's a vast array of things that are covered.  Things

25  such as criminal law, traffic law, search and seizure,

DAVID LEE - DIRECT EXAMINATION

1  defensive tactics, use of force, officers' survivability and

2  tactics, police ethics, all -- you know, that's not an

3  all-inclusive list, but those are some of the things that are

4  taught.

5  Q.  You mentioned use of force.

6  A.  Yes.

7  Q.  That's one of the topics covered?

8  A.  Yes, ma'am.

9  Q.  Was there specifically a lecture through Michael Kennedy's

10 academy class on the use of force?

11 A.  Yes, ma'am.

12 Q.  And was teaching about the use of force incorporated into

13 the academy class in other ways?

14 A.  Yes, ma'am.

15 Q.  Or in other areas?

16 A.  Yes, ma'am.

17 Q.  Okay.  Can you describe that?

18 A.  Well, that was done -- you know, we have scenario-based

19 training at the end of the training.  What we call officer

20 survivability and tactics.  And during that training, students

21 will be put in different scenarios using simunition weapons,

22 force-on-force style training where they would have to make

23 decisions based on the scenario and decide what force was

24 necessary for that scenario.

25 Q.  So Michael Kennedy would have had to engage in simulations

DAVID LEE - DIRECT EXAMINATION

1  to see that he absorbed the material that he was taught?

2  A.  Yes, ma'am.

3  Q.  Specifically around the use of force?

4  A.  Yes, ma'am.

5  Q.  Now, going back to that lecture on use of force, who

6  specifically taught that to Michael Kennedy during his academy

7  class?

8  A.  That would have been Lieutenant Petry.

9  Q.  And who did Lieutenant Petry report to?

10 A.  He would report to me as the director of training.

11 Q.  And did you approve materials used by Lieutenant Petry

12 during that class?

13 A.  Yes, ma'am.

14 Q.  And as the supervisor, would Lieutenant Petry come to you

15 if he had any problems with a cadet during his academy class?

16 A.  Yes, ma'am.

17 Q.  Did you learn about any problems or concerns that he had

18 with Michael Kennedy?

19 A.  I did not.

20 Q.  I would like to ask you more specifically about the

21 content of the use-of-force training that Michael Kennedy

22 received.

23        MS. SISCARETTI:  Your Honor, may I approach the

24 witness?

25        THE COURT:  Yes, ma'am.

DAVID LEE – DIRECT EXAMINATION

1  BY MS. SISCARETTI:

2  Q.  Captain, I'm handing you what's marked as Exhibit 6.  Do

3  you recognize that?

4  A.  Yes.

5  Q.  And what do you recognize that to be?

6  A.  This is a use-of-force PowerPoint used by Lieutenant Petry.

7  Q.  And was it specifically used by Lieutenant Petry during

8  Michael Kennedy's academy class?

9  A.  Yes.

10       MS. SISCARETTI:  Your Honor, pursuant to the

11  stipulation entered into by the parties, I move Exhibit 6 into

12  evidence.

13       MR. MANFORD:  No objection.

14       THE COURT:  Admitted.

15     (Government's Exhibit No. 6 was admitted.)

16       MS. SISCARETTI:  And if it may be brought up on the

17  screen.

18  BY MS. SISCARETTI:

19  Q.  Captain Lee, do you have that on the screen in front of

20  you?

21  A.  Yes, ma'am.

22  Q.  And you said that was the PowerPoint used during

23  use-of-force lecture?

24  A.  Yes, ma'am.

25  Q.  Captain Lee, during that use-of-force lecture given to

DAVID LEE – DIRECT EXAMINATION

1  Michael Kennedy, was the Fourth Amendment discussed?

2  A.  Yes, ma'am.

3  Q.  I would like to direct your attention to page 7 of

4  Exhibit 6.

5          MS. SISCARETTI:  If that could please be put up on

6  the screen.

7  BY MS. SISCARETTI:

8  Q.  Captain Lee, does page 7 refer to the Fourth Amendment?

9  A.  It does.  It talks about the Fourth Amendment covers the

10  use of force during any seizure.

11  Q.  It applies during any seizure?

12  A.  Yes.  Yes.

13  Q.  Thank you.  During the lecture on use of force that was

14  given to Michael Kennedy, were they taught about what the

15  standard was for determining the appropriate use of force

16  during a seizure?

17  A.  They were.

18  Q.  I would like to turn your attention now to page 12 of

19  Exhibit 6.

20          MS. SISCARETTI:  If that could please be brought up

21  on the screen.

22  BY MS. SISCARETTI:

23  Q.  And is that standard covered here, sir?

24  A.  It is.  It talks about the -- that the seizure be looked

25  at.  Was it objectively reasonable?

DAVID LEE - DIRECT EXAMINATION

1  Q.  That was the standard taught to Michael Kennedy?

2  A.  Yes.

3  Q.  Is that noted in the first bullet point on page 12?

4  A.  Yes.

5        MS. SISCARETTI:  If that first bullet point can be

6  enlarged, please.  Thank you.

7  BY MS. SISCARETTI:

8  Q.  We're going to move on to a different issue.  Did the

9  use-of-force lecture that was given to Michael Kennedy during

10  his academy class, did it cover something called pain

11  compliance techniques?

12  A.  It did, yes.

13  Q.  Can you first -- can you describe for the Court what are

14  pain compliance techniques?

15  A.  Any pain compliance technique is something that is done to

16  insert pain on an individual to gain compliance.

17  Q.  And can you describe what some of those actual techniques

18  are?

19  A.  That could be pressure points, joint locks.  It could also

20  be things such as pepper spray, a taser.  Those are things that

21  can be considered pain compliance.

22  Q.  Can a closed-fist strike be used as a pain compliance

23  technique?

24  A.  It could, yes.  Yes, it could.

25  Q.  During that use-of-force training that was giving during

DAVID LEE - DIRECT EXAMINATION

1   Michael Kennedy's class, was he taught that pain compliance

2   techniques could themselves be considered excessive depending

3   on the circumstances?

4   A.  Yes.

5   Q.  I would like to turn your attention to page 22 of

6   Exhibit 6.

7         MS. SISCARETTI:  If that last bullet point could be

8   enlarged.

9   BY MS. SISCARETTI:

10  Q.  Captain Lee, what did this lesson teach Michael Kennedy

11  about if and when pain compliance techniques could be

12  considered excessive?

13  A.  That pain compliance techniques, if they're used before a

14  subject posed any immediate threats to the existing officer,

15  that could be deemed as excessive force.

16  Q.  Now, during that use-of-force lecture, was Michael Kennedy

17  advised that he could be held liable for using force that was

18  considered excessive?

19  A.  Yes, ma'am.

20  Q.  And what types of liability could he face for that?

21  A.  That could be anything from sanctions from within the

22  department being held in violation of policy to being

23  criminally charged, criminal liability, and also civil

24  liability.

25  Q.  And are those types of liability covered on page 28 of the

DAVID LEE - DIRECT EXAMINATION

1  exhibit?

2        MS. SISCARETTI:  And we'll bring that up now, please.

3  A.  Yes, ma'am.

4  BY MS. SISCARETTI:

5  Q.  And, specifically, did that use-of-force training lecture,

6  did it advise that cadets such as Michael Kennedy could be held

7  liable federally?

8  A.  Yes, ma'am.

9  Q.  During the lecture, was Michael Kennedy, along with the

10  other cadets, were they advised about specific federal statutes

11  they could violate by using excessive force?

12  A.  They were, yes, ma'am.

13        MS. SISCARETTI:  I would ask to go to page 30 of

14  Exhibit 6.

15  BY MS. SISCARETTI:

16  Q.  Some of those statutes covered here?

17  A.  Yes, ma'am, they are.

18  Q.  And what are those statues?

19  A.  Conspiracy to rights, 18 U.S.C. 241; deprivation of rights

20  under color of law, 18 U.S.C. 242; misprision of felony,

21  18 U.S.C., Section 4; and tampering with a witness, victim, or

22  informant, 18 U.S.C., Section 1512.

23  Q.  Moving on to a different topic, was Michael Kennedy advised

24  during this lecture about ways that he could respond as an

25  officer when his subject does not respond to an officer's

DAVID LEE - DIRECT EXAMINATION

1    commands?

2    A.  He was, yes.

3    Q.  I'm going to direct your attention now to page 58 of

4    Exhibit 6.

5         Captain Lee, according to this lecture, what are some of

6    the ways that Michael Kennedy was taught he could or should

7    respond to a subject who is not responding to his commands?

8    A.  He could issue more verbal commands.  He could call for

9    assistance from other officers.  He could use, you know, an

10   escort position if that was something that was viable in that

11   situation.

12   Q.  Escort position that's mentioned in that last bullet point?

13   A.  Yes, ma'am.

14            MS. SISCARETTI:  Can we enlarge that for a moment.

15   BY MS. SISCARETTI:

16   Q.  Now, Captain Lee, can you describe what you mean by an

17   escort position?

18   A.  If you're talking about an escort position for a handcuffed

19   individual, you're wanting to keep control of that individual

20   so they don't -- one, they don't escape your control, but also

21   that you -- they're handcuffed.  We teach the handcuff behind

22   the back so they don't injure themselves.  You know, if they

23   would fall down, there would be, you know, potential for

24   injury.

25   Q.  Let me break that down a little bit.  You said you want to

DAVID LEE - DIRECT EXAMINATION

1  maintain control of someone who is handcuffed?

2  A.  Yes, ma'am.

3  Q.  And how do you actually teach at the academy the troopers,

4  cadets to actually physically hold someone who is handcuffed?

5  A.  Well, you would want to keep control.  You're controlling

6  mainly the upper body.  So, you know, you can grab an elbow,

7  and then a wrist down by the handcuff.  That way you've got

8  stable control of the individual as you're moving them from one

9  place to the next.

10  Q.  And can you describe why you hold them that specific way?

11  A.  Again, to keep control so they don't escape your custody.

12  But also, again, that they don't injure themselves if they

13  would fall down on uneven ground and that type of thing as

14  you're moving them from one place to another.

15  Q.  When you talk about safety and not injuring themselves, who

16  are you referring to in that scenario?

17  A.  Well, in that injury, if the -- primarily the individual in

18  handcuffs.  The subject.  But if they did get away, you could

19  risk injury to the officers as well.

20  Q.  And with regard to the safety of the handcuffed person, why

21  is that important for the officer to consider that?

22  A.  When they're in an officer's custody, we're responsible for

23  their safety.

24  Q.  During his academy training, was Michael Kennedy advised

25  about what factors an officer should consider before deciding

DAVID LEE - DIRECT EXAMINATION

1  use of force -- deciding to use force against a subject?

2  A.  Yes, ma'am.

3  Q.  I would like to direct your attention to page 65 of

4  Exhibit 6.  Does page 65 talk about some of those factors?

5  A.  It does, ma'am.

6          MS. SISCARETTI:  And we'll look at that first bullet

7  point.  Ms. Murray, if you can enlarge that.  Thank you.

8  BY MS. SISCARETTI:

9  Q.  Captain Lee, what -- can you describe what Michael Kennedy

10  was taught in terms of how you should consider age in the

11  determination to use force?

12  A.  Age could apply to either the officer or the individual

13  that's being dealt with.  An older age or a younger age may

14  come into play of how much force would be needed to use.

15  Q.  And how may it come into play?

16  A.  Well, there's factors that go in with the age.  You know,

17  what is also their physical capabilities.

18  Q.  So it's one of many factors you would look at; is that

19  correct?

20  A.  Yes, ma'am.  There's other factors to be considered.

21  Q.  And just focusing on age for a moment as a factor, what are

22  some ways -- say if someone is very young or very elderly as

23  you mentioned, how could that weigh in the analysis of whether

24  or not to use force?

25  A.  Again, to -- in combination with cadet, affect their

DAVID LEE - DIRECT EXAMINATION

1  ability, their physical ability, also their mental capabilities

2  to perceive what is happening.  That could come into play of

3  how much force to use.

4  Q.  So if someone is particularly young or particularly

5  elderly, perhaps they could be less of a threat?

6  A.  Could.  Not -- it could happen, yes.

7  Q.  But you need to consider all the factors; correct?

8  A.  All the factors would have to be considered.

9  Q.  Let's look at one of the other factors.

10       MS. SISCARETTI:  If we could reduce that and enlarge

11  the third bullet's size.

12  BY MS. SISCARETTI:

13  Q.  And can you describe what was meant in this lecture about

14  how size might come into play in determining whether or not to

15  use force?

16  A.  Yes, ma'am.  This is twofold as well.  The size of the

17  individual being dealt with and also the size of the officer

18  becomes an issue.  Is the subject particularly large?  And that

19  may require more force.  Or is the subject particularly small

20  and the officer is larger?  Could that have an effect on the

21  amount of force?  All those things have to be weighed together.

22  Q.  Okay.  Then let's move on to another factor that's

23  mentioned here.

24       MS. SISCARETTI:  If we can enlarge that 5th bullet

25  point.

DAVID LEE - DIRECT EXAMINATION

1  BY MS. SISCARETTI:

2  Q.  Could you describe what's meant here by multiple subjects,

3  officers, as a factor in whether or not to use force?

4  A.  Yes, ma'am.  If you have multiple subjects -- we'll start

5  with that first.  If you have multiple subjects, an officer may

6  have to use more force to get those individuals under control.

7  Especially if it's a single officer trying to bring those

8  people under control.  If it's multiple officers, it could take

9  less force.  But, again, that's part of looking at all these

10  things to determine a level of force needed.

11  Q.  And these were some of the factors that Michael Kennedy was

12  taught that he should evaluate in making use-of-force

13  determinations?

14  A.  Yes, ma'am.

15  Q.  Finally, Captain Lee, during this use-of-force lecture that

16  was given to Michael Kennedy, did it include specific examples

17  of objective reasonableness?

18  A.  It did.

19  Q.  And did some of those examples discuss what role, if any,

20  an officer's anger toward a subject should play in the

21  determination to use force?

22  A.  Yes, ma'am.  You know, we try to teach these individuals --

23  the officers that you have to take your emotion out of the

24  situation.  And when you act, it is based on the circumstances

25  and the facts.  Not on emotion which, you know, anger is an

DAVID LEE - DIRECT EXAMINATION

1  emotion.

2  Q.  Let me direct your attention specifically to page 17 of

3  Exhibit 6.  Is page 17, is this one of those examples of

4  objective reasonableness you just testified about?

5  A.  Yes, ma'am.

6  BY MS. SISCARETTI:

7  Q.  If we can enlarge, please, the last two sentences of that

8  page.

9  BY MS. SISCARETTI:

10  Q.  Captain Lee, can you describe what this lesson taught about

11  anger in particular?

12  A.  Yes, ma'am.  Again, it just kind of summarizes that anger

13  is not relevant to the analysis of the -- of what needs to take

14  place.  It's not objective.  You need to consider the situation

15  and the facts of that situation.

16  Q.  And could you read the last two lines of that page, please?

17  A.  Yes, ma'am.  The officer may be angry with the man because

18  he was just attacked -- he just attacked another officer.  This

19  anger is not relevant to the analysis because it is the

20  officer's subjective intent and not objective facts.

21  Q.  And that was included in the lecture that was given to

22  Michael Kennedy?

23  A.  Yes, ma'am.

24  Q.  And did Michael Kennedy successfully complete his academy

25  training?

DAVID LEE – CROSS EXAMINATION

1   A.  He did, ma'am.

2   Q.  Including on the use of force?

3   A.  Yes, ma'am.

4   Q.  Thank you, sir.

5           THE COURT:  Before we move on, can you take that box

6   down so I can read the whole thing, please.  Okay.  Thank you.

7           MS. SISCARETTI:  Thank you, Your Honor.  No further

8   questions.

9           THE COURT:  Cross, Mr. Manford?

10          MR. MANFORD:  Thank you, Your Honor.

11                          CROSS EXAMINATION

12  BY MR. MANFORD:

13  Q.  Good morning, Captain Lee.  How are you?

14  A.  I'm fine, sir.

15  Q.  Are you up from Charleston?

16  A.  Yes, sir, I am.

17  Q.  Okay.  Well, hope you had a good trip.

18  A.  I did.  Thank you.

19  Q.  Okay.  So we just left off about the subjective factors.

20  A.  Yes.

21  Q.  Is -- in any of these subjective factors, do we consider

22  continued noncompliance when other things have not worked?

23  A.  Can you repeat that, sir.

24  Q.  Okay.  What about continued noncompliance as far as

25  subjective factors?  Is that a factor an officer considers?

DAVID LEE – CROSS EXAMINATION

1   He's tried A.  It doesn't work.

2   A.   Right.

3   Q.   He has tried B.  So on and so forth?

4   A.   Yes, sir, that could be a factor.

5   Q.   Okay.  So the PowerPoint is an all-inclusive of everything

6   that an officer might see out in the real world?

7   A.   Yes, sir, that's correct.  We -- you couldn't put

8   everything in a PowerPoint.

9   Q.   Of course you can't.  And just so I understand, you did not

10  actually teach this course; someone under your command did?

11  A.   That's correct, sir.

12  Q.   Okay.  But you approved the curriculum; is that right?

13  A.   Yes, sir.

14  Q.   Okay.  Other subjective factors.  Do we take into

15  consideration if a person is mentally disabled?

16          MS. SISCARETTI:  Objection, Your Honor.  Are these

17  questions specifically related to the use-of-force lecture that

18  Captain Lee testified about?

19          THE COURT:  Mr. Manford.

20          MR. MANFORD:  Well, he's the expert.

21          MS. SISCARETTI:  He's not being offered as an expert,

22  Your Honor.

23          MR. MANFORD:  I'm sorry.  I'll let you know when I'm

24  done.  Okay.  So -- I mean he's just -- I'll move on.  That's

25  fine, Your Honor.  Thank you.

DAVID LEE – CROSS EXAMINATION

1    THE COURT:  Thank you.

2    BY MR. MANFORD:

3    Q.  All right.  And Mr. Kennedy would have received all this

4    back in 2011?

5    A.  Yes.

6    Q.  Okay.  So tell me about refresher courses.

7    A.  We have -- our standard is we have in-service training

8    which is done yearly for our troopers.

9    Q.  Okay.

10   A.  Which they -- we have a 15-week span from February to May

11   where they come back to the academy and receive approximately

12   24 hours of training.

13   Q.  Okay.  So the PowerPoint that we've been going over --

14   what?  It's a day lecture?

15   A.  I think so, yes.

16   Q.  Okay.  So I think you said Mr. Kennedy was there from

17   November to May?

18   A.  Yes, sir.

19   Q.  Basically boot camp; right?

20   A.  Yes, sir.  You could say that.

21   Q.  Okay.  And if they can deal with that, they can deal with

22   just about anything?

23   A.  Well, I mean that's a very broad statement.

24   Q.  Yeah.  But that's the term you used a minute ago.  Stress

25   inoculation?

DAVID LEE - CROSS EXAMINATION

1   A.  Yes, sir.

2   Q.  Okay.  I mean you're going to separate the wheat from the

3   chaff.  People are going to drop out that can't deal with it,

4   and the rest we have good officers; right?

5   A.  Yes, sir.  We try to -- we want individuals who make good

6   decisions.

7   Q.  Okay.  All right.  So from November to May -- November --

8   he was there -- I wrote down -- maybe I'm wrong.  Correct me if

9   I'm wrong.  He was the 67th cadet class.  He was in residence

10  for 25 weeks from November '11 to May of 2012.  Does that sound

11  right?

12  A.  Yes, sir.  Sixty-second.  Yes, sir.

13  Q.  Okay.  And we had one day on use-of-force training?

14  A.  Yes.  That's the PowerPoint part of it, yes, sir.

15  Q.  All right.  And then we had some hands-on stuff.  And that

16  was basically boxing; right?  Is that how we taught them?

17  A.  No, sir.  I mean we had -- I think you're referring -- we

18  do a boxing -- interpersonal violence.

19  Q.  Right.

20  A.  But there's other things as well.

21  Q.  Well, I mean when you're talking about pressure points and

22  stuff, you're talking about martial arts type of things;

23  correct?

24  A.  I mean you can call them martial arts, but they're part of

25  the system we used, defensive tactics, for officers to be able

DAVID LEE - CROSS EXAMINATION

1  to control individuals.

2  Q.  Okay.  How much training did they get on that?

3  A.  I think it's about 40 hours.

4  Q.  40 hours?

5  A.  Uh-huh.

6  Q.  So a whole week?

7  A.  Yes, sir.

8  Q.  Okay.  And does the instructor actually physically go

9  through how to do this stuff?

10  A.  Yes, sir.

11  Q.  Okay.

12        MR. MANFORD:  One second, Your Honor or one minute.

13  Sorry for the delay, Your Honor.  We had an exhibit before that

14  was unpaginated and now this morning, we have got one paginated

15  so I've got to figure out which page I'm going to ask about.

16  It will just be another second, Your Honor.

17        THE COURT:  That's fine.  If you need a break, we can

18  do that as well because it's about mid-morning.

19        MR. MANFORD:  Well, that sounds like a good idea,

20  Your Honor.

21        THE COURT:  All right.  Then what we're going to do

22  is I'm going to remind you, sir, that you'll remain under oath.

23  Don't discuss your testimony with anybody.  But we'll let you

24  step down when we take this about ten-minute break.

25        THE WITNESS:  Yes, ma'am.

DAVID LEE – CROSS EXAMINATION

1          THE COURT:  Okay.  Everyone else, we'll get back on

2    the record –- it's about a couple minutes after 11:00.  We'll

3    get back on the record by quarter after eleven.

4       Meanwhile, Mr. Manford and Mr. Douglas, could I see you for

5    just second?

6          THE COURT REPORTER:  On the record?

7          THE COURT:  Not on the record.

8          THE COURT REPORTER:  Off the record?

9          THE COURT:  Off, yeah.

10    (Off-the-record bench conference commenced/concluded.)

11          THE COURT:  All right, folks.  We'll see you back on

12    the record at quarter after eleven.

13    (Recess 11:00 A.M. – 11:20 A.M.)

14    (Witness resumed the witness stand.)

15          THE COURT:  Please be seated, everyone.

16       Just remind you, sir, you're still under oath.

17          THE WITNESS:  Yes, ma'am.

18          THE COURT:  Mr. Manford, are we ready for cross?

19          MR. MANFORD:  Yes, Your Honor.

20                CROSS EXAMINATION (Continued)

21    BY MR. MANFORD:

22    Q.  All right.  Hello again, Captain Lee.  How are you, sir?

23    A.  I'm good.

24    Q.  Okay.  We just put up page –- I believe 14 of the

25    PowerPoint that was used to train Mr. Kennedy.  One of the

DAVID LEE - CROSS EXAMINATION

1  considerations under the Graham versus Connor is whether or not

2  the subject is resisting seizure; would that be correct?

3  A.  Yes.

4  Q.  Okay.  We see page 15.  Well, maybe not.  Oh, goodness.

5           MR. MANFORD:  That's the wrong one.  I'm sorry.

6           THE COURT:  I think they might be different on the

7  copies.

8           MR. MANFORD:  May I just -- I've got the slides out,

9  Your Honor.  May I approach the witness and do it the

10 old-fashioned way?

11          THE COURT:  Sure.

12          MR. MANFORD:  Okay.

13     (Pause.)

14          MR. MANFORD:  Oh, I love it when things just kind of

15 --

16          THE COURT:  Okay.  Let's -- that's what?  Graham

17 versus Connor?

18          MR. MANFORD:  Yeah.

19          THE COURT:  What number do you have, Mr. Manford?

20          MR. MANFORD:  For that I now have 13.  Correct?

21          THE COURT:  Okay.  Mr. Douglas and Ms. Siscaretti,

22 that's what I have on the paper copy that was provided in

23 advance to me from the Government.  To move things along, what

24 if I just refer to the page numbers as Mr. Manford gives it to

25 me if yours are numbered this way as well as the paper version.

DAVID LEE - CROSS EXAMINATION

1   And then he can just do it the old-fashioned way with the

2   witness, and I'll just have it right here in front of me.  Does

3   that make sense?

4           MS. SISCARETTI:  That's fine, Your Honor.

5           MR. MANFORD:  Is that 15?

6           MR. DOUGLAS:  And just for the record, Your Honor, we

7   did provide the defense -- actually, we gave an opportunity

8   last week for them to come pick up the paginated version.  I

9   did give it -- when they did pick it up -- I gave it to them

10  this morning.  They have the paginated version.  He is just

11  trying to use the unpaginated version.

12          THE COURT:  Oh.  So yours don't have numbers on them

13  at all?

14          MR. MANFORD:  Okay.  I'm not complaining.  I just --

15          THE COURT:  No, I just want to follow it.

16          MR. MANFORD:  Yes.

17          THE COURT:  That's all.  I don't care how we do it.

18  Just so I'm following it so I can see what we're all looking

19  at.  What is the easiest way to do it?

20          MR. MANFORD:  I think we're good now.  Let me just

21  try --

22          THE COURT:  Okay.  How about page 15?  See if that is

23  -- oh, that's not it.  All right.  There we go.

24  BY MR. MANFORD:

25  Q.  So, again, some of the Graham factors would also be whether

DAVID LEE – CROSS EXAMINATION

1  the person is actively resisting arrest; would that be correct?

2  A.  Yes.

3  Q.  As we have on the screen.  Okay.

4  A.  Yes.

5  Q.  And a tense, uncertain, and/or rapidly evolving situation?

6  A.  That's correct.

7  Q.  Okay.

8       MR. MANFORD:  Now, I know for sure this is good.  Can

9  we have 20.

10  BY MR. MANFORD:

11  Q.  All right.  So under federal law, an officer is not

12  required to use the least amount of force available under

13  federal guidelines; is that correct?  Is that what --

14  A.  That's correct, yes.

15  Q.  Okay.  And it gives us an objective reasonable standard;

16  right?

17  A.  Yes, sir.

18  Q.  Okay.  And that's what we taught -- that would have been

19  taught to Officer Kennedy?

20  A.  Yes, sir.

21  Q.  Okay.  And, lastly, page 59.  Now, in -- on direct, I noted

22  you said an officer can use pressure points, joint

23  manipulations, but it also has here the officer may strike

24  muscle groups; correct?

25  A.  Yes.

DAVID LEE - REDIRECT EXAMINATION

1  Q.  Okay.  The large muscle groups like the back?

2  A.  It would be -- yeah, we try to gain compliance or move

3  on -- usually as a distraction so, yes, large muscle groups.

4  Q.  Okay.  Hips?

5  A.  Yeah, I guess.  Again, not bony areas but muscle groups.

6  Q.  Okay.  All right.

7         MR. MANFORD:  I think that's it.  No further

8  questions.  Thank you.

9         THE COURT:  Recross?

10         MS. SISCARETTI:  Just briefly, Your Honor.

11                     REDIRECT EXAMINATION

12  BY MS. SISCARETTI:

13  Q.  Hello, Captain Lee.  So Mr. Manford asked you on cross

14  about this one-day lecture on use of force; is that correct?

15  A.  Yes.

16  Q.  You recall that?  Can you -- other than this lecture, can

17  you describe the ways that teachings on use of force were

18  incorporated throughout Michael Kennedy's academy class

19  training?

20  A.  Yeah.  We did the 40 hours or so in the defensive tactics,

21  but then also the scenario-based training use of force would

22  have been discussed and evaluated through those scenario

23  trainings as well.  And then, you know, we also have classes

24  such as search and seizure and those type of things where other

25  instructors -- I can't say that they did, but it may have been

DAVID LEE - RECROSS EXAMINATION

1    talked about during those classes as well.

2    Q.  So it's incorporated to other areas?

3    A.  Yes, ma'am.

4    Q.  And that's throughout the academy class?

5    A.  Yes, ma'am.

6    Q.  And that lasted 25 weeks?

7    A.  Yes, ma'am.

8    Q.  Thank you, sir.

9              MS. SISCARETTI:  I have no further questions.

10             THE COURT:  Recross?

11                     RECROSS EXAMINATION

12   BY MR. MANFORD:

13   Q.  The scenario training lasts 25 weeks?

14   A.  No.  No.  It is the last -- the scenario training lasts --

15   is about the last week of the training.

16             MR. MANFORD:  All right.  No further questions.

17   Thank you.

18             THE COURT:  Is that it for this witness?

19             MS. SISCARETTI:  Yes, Your Honor.

20             THE COURT:  All right.  Thank you, sir.  You're free

21   to go.  Safe travels back to Charleston.

22      (Witness excused.)

23             THE COURT:  Next witness.

24             MR. DOUGLAS:  The United States calls Austin Ennis,

25   E-N-N-I-S.

AUSTIN ENNIS – DIRECT EXAMINATION

1    May I approach and lay this exhibit up there?

2         THE COURT:  Yes, sir.

3    (The witness was sworn in.)

4         THE WITNESS:  I do.

5         THE CLERK:  You may have a seat in the witness chair.

6    Please watch you step.

7                    DIRECT EXAMINATION

8    BY MR. DOUGLAS:

9    Q.  Sir, please speak into the microphone and introduce

10   yourself to the Court and spell your name for the court

11   reporter.

12   A.  Deputy Austin Ennis.  A-U-S-T-I-N.  Last name, E-N-N-I-S.

13   Q.  Sir, how are you employed?

14   A.  I'm a deputy for the Berkeley County Sheriff's Office.

15   Q.  How long have you been a deputy for the sheriff's office?

16   A.  Coming up on four years.

17   Q.  And did you have to attend the state police academy to

18   become a deputy?

19   A.  Yes.

20   Q.  When did you graduate from the academy?

21   A.  July 2016.

22   Q.  Did your training at the academy include use-of-force

23   training?

24   A.  Yes.

25   Q.  What did you learn about the purpose of an officer using

AUSTIN ENNIS - DIRECT EXAMINATION

1  force against a subject?  What's the purpose?

2  A.  The purpose -- well, typically would be to effect an

3  arrest.

4  Q.  Okay.  What did you learn about how an officer should

5  decide the level of force that's necessary?

6  A.  I have always been trained that it's that officer's

7  discretion; however, you would want to use the level of force

8  that you find to be necessary to conduct an arrest.

9  Q.  Is the level -- were you trained whether the level of force

10  is to be connected with the threat that's being posed by the

11  subject?

12  A.  Yes.

13  Q.  And when a subject no longer poses a threat, there is no

14  threat, what were you taught about using force?

15  A.  Well, if there is no threat whatsoever, you wouldn't use

16  force.

17  Q.  Sir, I'd like to direct your attention to just after

18  midnight on November 19, 2018.  Were you on call -- I keep

19  saying on call.  Were you on duty that evening?

20  A.  Yes.

21  Q.  What was your shift?

22  A.  3:00 P.M to 1:00 A.M. the next day.

23  Q.  Who else was on your shift?

24  A.  Corporal Schoppert was in charge, myself, Deputy Ritchie,

25  Deputy Kolb.  And that's all I can remember.

AUSTIN ENNIS - DIRECT EXAMINATION

1  Q.  What about Deputy Merson?

2  A.  Yes.  Deputy Merson.

3  Q.  Nearing the end of your shift, did you respond to a call at

4  Jack Rabbit's Bar on Route 11?

5  A.  Yes.

6  Q.  What was the nature of that call?

7  A.  We were receiving complaints earlier in the night in

8  reference to somebody who believed that he was being chased.

9  He said that someone chased him with a gun, and he ended up out

10 at Jack Rabbit's Bar.

11 Q.  So what was the reason to respond to Jack Rabbit's Bar at

12 that time?

13 A.  To -- well, he called and had a complaint so I went out

14 there and spoke to him about that.

15 Q.  Okay.  Did anyone else from your shift respond out to Jack

16 Rabbit's Bar?

17 A.  It would have been myself and Deputy Ritchie at that time.

18 Q.  And did Deputy Merson and Deputy Kolb also respond out to

19 Jack Rabbit's?

20 A.  Not at that time, no.

21 Q.  Did they eventually arrive out at Jack Rabbit's as well?

22 A.  Not on this occasion.  I'm speaking of an occasion before I

23 went there the second time.  I went there twice that night.

24 Q.  All right.  Just to clarify, you were there twice.  I'm

25 talking about the second time.  The time just after midnight on

AUSTIN ENNIS - DIRECT EXAMINATION

1  November 19, 2018.  Okay?

2  A.  Yes.

3  Q.  So regarding your second response, who else responded out

4  there?

5  A.  It would have been myself, Deputy Ritchie, Deputy Merson,

6  Deputy Kolb.

7  Q.  Did you respond out there each in your own cruiser?

8  A.  Yes.

9  Q.  Did Deputy Merson have a special cruiser that he was

10  operating that night?

11  A.  A special cruiser?

12  Q.  Yes.  Did he have a K-9?

13  A.  Yes.

14  Q.  Is his cruiser marked differently than yours?

15  A.  Yes.

16  Q.  How is it different?

17  A.  It is essentially all black.  It doesn't have any markings.

18  Not a light bar on top.

19  Q.  No light bar on top and no markings?

20  A.  Yes.

21  Q.  When you arrived at the Jack Rabbit's Bar, did you notice

22  whether there were also some state troopers who responded out

23  there on the second occasion?

24  A.  Yes.

25  Q.  Who was that?

AUSTIN ENNIS - DIRECT EXAMINATION

1   A.   Trooper Kennedy and Trooper Walker.

2   Q.   Did they also respond out in their own units, their own

3   cruisers?

4   A.   Yes.

5   Q.   Now, when you got to the Jack Rabbit's Bar parking lot, did

6   you exit the cruiser?

7   A.   Yes.

8   Q.   And did you see the roadway -- Deputy Merson is still on

9   the roadway?

10  A.   I know after the fact that he was.  I didn't know at that

11  time --

12  Q.   Well, what is the next thing you saw when you got out of

13  your cruiser?

14  A.   I saw -- I got out of my cruiser, and I saw Deputy Merson

15  leave with his lights and sirens on heading northbound on Route

16  11.

17  Q.   Okay.  So you did not see what caused Deputy Merson to take

18  that action?

19  A.   No.

20  Q.   All right.  So what did you do next then after you saw

21  Deputy Merson speed northbound on Route 11?

22  A.   Well, whenever I exited my vehicle, I was in the process of

23  turning on my portable radio.  So I was -- there was a brief

24  couple seconds there where I didn't have the -- I couldn't hear

25  what was going on the radio because I exited my vehicle and my

AUSTIN ENNIS - DIRECT EXAMINATION

1  other radio was turning on.  So I just saw Deputy Merson look

2  to be -- well, he was -- I saw his lights and sirens on as he

3  was driving northbound.  So I thought at that point that it

4  wasn't related to the call that we went for originally.

5  Q.  Okay.

6  A.  And then someone said that Merson is chasing a vehicle.  I

7  got into my car and helped the pursuit.

8  Q.  So you joined the pursuit?

9  A.  Yes.

10  Q.  Were you receiving certain radio traffic once you were in

11  your car and making pursuit?

12  A.  We were updated on locations of the vehicle and --

13  Q.  Who was providing updates of location?

14  A.  It would have been Deputy Merson.

15  Q.  Did Deputy Merson also ask about the condition of his

16  vehicle while driving during the pursuit?

17  A.  Yes.  At one point he asked the trooper that was behind

18  him.

19  Q.  Do you know which trooper was directly behind Deputy Merson

20  during the pursuit?

21  A.  At that time, I didn't.  But after, you know, reviewing the

22  video and whatnot, at a later date I found out it was

23  Kennedy -- or Walker.  Sorry.  Trooper Walker.

24  Q.  Okay.  Do you recall otherwise the sequence of the cars

25  that were in the pursuit -- the cruisers?

AUSTIN ENNIS - DIRECT EXAMINATION

1   A.  Yes.

2   Q.  What was the sequence?

3   A.  It was Deputy Merson first, Trooper Walker, Trooper

4   Kennedy, myself.

5   Q.  Now, after a couple of minutes into that pursuit, did

6   Deputy Merson radio that that vehicle he was pursuing had

7   crashed?

8   A.  Yes.

9   Q.  What did he say?  Do you recall how he indicated that?

10  A.  I can't quote it, but I understood the vehicle crashed.

11  Q.  Something indicated you knew the vehicle had crashed?

12  A.  Yes.

13  Q.  Okay.  Did you continue on to scene and find the crash at

14  the scene?

15  A.  Yes.

16  Q.  Can you estimate about how long after you heard the signal

17  that there had been a crash that you actually arrived to see

18  the crash?  Just an estimate.

19  A.  I was -- I just remember I was driving, and I saw a bright

20  light in the sky light up.  And a couple seconds after --

21  probably -- it's hard to say.  Maybe 25, 30 seconds after that,

22  I arrived on the scene.

23  Q.  Were you aware that Deputy Merson's vehicle was equipped

24  with a dashboard video camera?

25  A.  All vehicles in the Berkeley County Sheriff's Office are.

AUSTIN ENNIS - DIRECT EXAMINATION

1  Q.  Okay.  And have you had an opportunity to review some of

2  the footage from Deputy Merson's dashboard video from the

3  pursuit?

4  A.  Yes, I have.

5  Q.  Okay.  And would you be able to identify things such as

6  your vehicle, if depicted, driving into Jack Rabbit's parking

7  lot?

8  A.  Yes.

9  Q.  Would you be able to identify the route of the pursuit as

10 shown on the video?

11 A.  Yes.

12 Q.  Okay.  So there should be a CD laying right there in front

13 of you, and it's marked Government Exhibit No. 2.  Do you

14 recognize that CD --

15 A.  Yes.

16 Q.  -- as containing your initials?

17 A.  Yes.

18        MR. DOUGLAS:  Your Honor, we'd move to admit

19 Government's Exhibit No. 2.

20        MR. MANFORD:  No objection.

21        THE COURT:  It's admitted.

22    (Government's Exhibit No. 2 was admitted.)

23 BY MR. DOUGLAS:

24 Q.  I'm going to have Government Exhibit No. 2 now shown on

25 your monitor.  And as we first start to play it here, I'm going

AUSTIN ENNIS - DIRECT EXAMINATION

1  to ask if you can identify your vehicle arriving at Jack

2  Rabbit's.  Let me back up actually first.  What are we looking

3  at here?  What roadway is that?

4  A.  It's Williamsport Pike, Route 11.

5  Q.  And is this in the area of Jack Rabbit's?  Is that a sign

6  for Jack Rabbit's there on the right side?

7  A.  Yes.

8  Q.  Where is Jack Rabbit's located from this screen?

9  A.  It's that building off to the right.

10  Q.  Okay.  And are there two entrances into the Jack Rabbit's

11  parking lot?

12  A.  Yes.

13  Q.  Okay.  Is that one here right off to the right and then

14  there's another one down on the road where the other cars are?

15  A.  Yes.

16  Q.  Okay.  Which one did you take?

17  A.  The second one.

18  Q.  All right.  So I'm going to play that.  And if you can just

19  identify your vehicle, let us know.

20  A.  My vehicle is the one directly in front.

21  Q.  Okay.  So it's already the one directly in front of -- is

22  this out of Deputy Merson's?

23  A.  Yes.

24  Q.  So it's the one directly in front.  Okay.

25        MR. DOUGLAS:  Please go ahead and play it.

AUSTIN ENNIS - DIRECT EXAMINATION

1  BY MR. DOUGLAS:

2  Q.  Is that your vehicle there -- about 13 seconds -- the last

3  one turning in and arriving at the parking lot?

4  A.  Yes.

5  Q.  Is it about this point, 20, 21 seconds, you start to

6  realize he's -- trooper -- Deputy Merson is heading north with

7  his lights on?

8  A.  Yes.

9  Q.  What direction is this pursuit traveling?

10  A.  North.

11  Q.  Are there going to be some intersections that we come up on

12  during this pursuit?

13  A.  Yes.

14  Q.  What intersection?

15  A.  Go through Bedington Crossroads at one point.

16  Q.  Okay.  Could you describe that when it occurs.

17  A.  This is the intersection with Bedington Road here.

18  Q.  At 122 or so.  What landmarks or businesses are there near

19  the crash scene?

20  A.  This is the junkyard up here on the right.

21  Q.  Okay.  It's across from that where the crash occurs?

22  Across Route 11 from the junkyard?

23  A.  I wouldn't say directly across but in the area.

24  Q.  And this crossroad here that --

25          MR. DOUGLAS:  And if we can just stop it there.

AUSTIN ENNIS - DIRECT EXAMINATION

1    We're stopped at 204.

2    BY MR. DOUGLAS:

3    Q.  This crossroad here is what?

4    A.  Langston Boulevard.

5    Q.  And as we're paused at 204, is that the subject's vehicle

6    that's facing Deputy Merson's cruiser?

7    A.  Yes.

8    Q.  Is this the scene that you then arrived on?

9    A.  Yes.

10   Q.  This area.  Okay.  When you arrived, were there already

11   other officers who were there?

12   A.  Yes.

13   Q.  What other officers were already there?

14   A.  The three that were in front of me that I mentioned

15   earlier.

16   Q.  Merson, Walker, and Kennedy?

17   A.  Yes.

18   Q.  Okay.  So you were the fourth officer to arrive on the

19   scene then?

20   A.  Yes.

21   Q.  All right.  And did you exit your vehicle and approach

22   Langston Boulevard there?

23   A.  Yes.

24   Q.  What did you see as you were approaching?

25   A.  The suspect was on the ground, and I saw officers around

AUSTIN ENNIS - DIRECT EXAMINATION

1  him.

2  Q.  Can you describe what the subject looked like at that point

3  in time?

4  A.  No.

5  Q.  Okay.  And so was Deputy Merson engaged with the male at

6  that time --

7  A.  Yes.

8  Q.  -- when you were --

9  A.  Yes.

10  Q.  And what part of the body was Deputy Merson focused on?

11  A.  The head.

12  Q.  Were Troopers Walker and Kennedy engaged with the male at

13  that time?

14  A.  Yes.

15  Q.  What parts of the body were they engaged with?

16  A.  The lower part of his body.

17  Q.  And was this on Langston Boulevard?

18  A.  Yes.

19  Q.  The engagement.  Did you then join the three officers on

20  the ground to assist in cuffing?

21  A.  Yes.

22  Q.  I'm going to now bring up what's been admitted as

23  Government Exhibit No. 8.

24          MR. DOUGLAS:  And I'm just going to bring it to the

25  first frame.  Pause it there, please.

AUSTIN ENNIS - DIRECT EXAMINATION

1  BY MR. DOUGLAS:

2  Q.  Now, you've mentioned Deputy Merson, Trooper Walker,

3  Trooper Kennedy.  You can identify them by appearance?

4  A.  Yes.

5  Q.  Okay.  So first I'm just going to have the video played and

6  ask you to identify officers as they come up on the screen.

7  All right?

8  A.  Okay.

9        MR. DOUGLAS:  Go ahead and play.  Please pause there.

10 BY MR. DOUGLAS:

11 Q.  It's paused at 5 seconds.  Who is that officer?

12 A.  Deputy Merson.

13       MR. DOUGLAS:  Please continue.  Please pause.

14 BY MR. DOUGLAS:

15 Q.  It's paused at ten seconds.  Who is the second officer?

16 A.  Trooper Walker.

17       MR. DOUGLAS:  Please continue.  Please pause.

18 BY MR. DOUGLAS:

19 Q.  It's paused at 27 seconds.  Who was the third officer

20 entering the screen from the left?

21 A.  Trooper Kennedy.

22       MR. DOUGLAS:  Please play.  Please pause.

23 BY MR. DOUGLAS:

24 Q.  It's paused at 33 seconds.  Who is this additional officer

25 entering the scene?

AUSTIN ENNIS - DIRECT EXAMINATION

1  A.  That is me.

2  Q.  Okay.

3          MR. DOUGLAS:  Leave it there for a moment.

4  BY MR. DOUGLAS:

5  Q.  So as you're running up, what did you hear?

6  A.  I remember hearing verbal commands being given to the

7  suspect to give himself up.

8  Q.  Do you recall the general gist of those commands?

9  A.  It's been so long at this point, and I don't think I can

10  remember the exact words to quote them, but whatever words were

11  being said, I definitely understood that he was being told to

12  give himself up.

13  Q.  Do you recall whether the commands had anything to do with

14  hands, the subject's hands?

15  A.  I can't specifically say that they had anything to do with

16  hands, but it could have just been, you know, give yourself up.

17  You know, stay still.  Don't move.  Keep your hands -- could

18  have been anything like that.

19  Q.  When you or another officer says give yourself up in a

20  situation like this, what are you referring to?  What are you

21  wanting the subject to do?

22  A.  Stay still.  Keep his hands visible.

23  Q.  And what did you see as you were running up right here?

24  A.  As I'm running up?

25  Q.  Yes, sir.

AUSTIN ENNIS - DIRECT EXAMINATION

1   A.   I can't remember anything I specifically saw when I was

2   running up.

3   Q.   Okay.  What's the first thing you saw as you're beginning

4   to engage?

5   A.   Well, I come up to the head area of the suspect, and I

6   observed, and I was able to see a level of resistance at which

7   point I got down to my knees and attempted to assist with the

8   cuffing procedure and getting him to give himself up.

9   Q.   Okay.  So we're going to play the video again now.  We're

10  going to play it up probably about 20 seconds from here.  And I

11  want you just to focus on your own conduct, and I'm going to

12  ask you a few questions.  Okay?

13  A.   Yes.

14            MR. DOUGLAS:  Please play.  Please pause.

15  BY MR. DOUGLAS:

16  Q.   We're paused at around 40 -- at 40 seconds here.  What part

17  of the body are you focusing on regarding the subject?

18  A.   The head/shoulder area.

19  Q.   And what was your goal there regarding the subject's head?

20  A.   To secure it so he couldn't move.

21  Q.   Okay.  Are you saying if you can secure a subject's head,

22  then his body may not -- would make it more difficult to move?

23  What do you mean by that?

24  A.   Well, generally, if you have someone on the ground and if

25  their head stays on the ground, they're not going to be able to

AUSTIN ENNIS - DIRECT EXAMINATION

1   get up.  So that...

2           MR. DOUGLAS:  Okay.  We're going to go ahead and play

3   here from 40, and we're going to stop at 43.  There.

4   BY MR. DOUGLAS:

5   Q.  Just from about 40 to 43 seconds there, what did you do?

6   A.  After observing resistance, I executed closed-hand strikes

7   to the suspect.

8   Q.  What resistance were you observing?

9   A.  Well, I could feel that his body was very tense, and I

10  remember him saying something along the lines of, you know, get

11  off of me as well as he had a hand tucked underneath of his

12  body which we weren't able to get secured at that point.

13  Q.  What was the purpose of your strikes?

14  A.  Incompliance.

15  Q.  What do you mean by that?

16  A.  Show the suspect a slight amount of pain in hopes that he

17  will give himself up and comply with our verbal commands that

18  are being given.

19  Q.  Other than the subject having his hands under his body, was

20  he doing anything else with his hands?  Was there ever an

21  attempt to strike that you saw?

22  A.  Not that I saw, no.

23  Q.  The subject just was not complying and getting his hands

24  up?

25  A.  Yes.

AUSTIN ENNIS - DIRECT EXAMINATION

1  Q.  I'm going to play it from here and pause again at 46.

2  Let's focus on yourself.  What additional force did you use

3  between 43 and 46?

4  A.  I executed a much-less-than-full-force strike to the

5  suspect.

6  Q.  Why did you do that?

7  A.  Incompliance.

8  Q.  What was your goal?

9  A.  To get him to comply with whatever commands that were being

10 given to him.

11 Q.  To get him in cuffs?

12 A.  Yes.

13 Q.  So as you were engaged at the head area, could you see what

14 Trooper Kennedy was doing?

15 A.  I was only focused on my actions at that time.

16 Q.  Okay.

17         MR. DOUGLAS:  Go ahead and play it from here to 54

18 seconds and then pause.  Stop.

19 BY MR. DOUGLAS:

20 Q.  We're paused at 54 seconds.  You stood up.  Is that

21 correct?

22 A.  Yes.

23 Q.  Why did you stand up at this time?

24 A.  At this time, I remember seeing Deputy Merson get up next

25 to me.  And like I said before, I was so focused on what I was

AUSTIN ENNIS - DIRECT EXAMINATION

1  doing I wasn't really looking at anywhere else on the suspect's

2  body.  So in my mind at that time -- and, again, this -- I was

3  experiencing a -- you know, a bit of adrenaline rush, and I

4  guess you could say tunnel vision at that time.  But I was

5  under the impression that he was handcuffed at that time.

6  Q.  Okay.  So when you stood up, you thought the subject was

7  handcuffed?

8  A.  Yes.

9  Q.  When you stood up, did you observe the subject continuing

10  to resist in any way?  At the time of the disengaging.

11  A.  As soon as I stand up?  I can't remember specifically if I

12  looked as soon as I stood up.

13  Q.  But if he was still resisting, would you have been still

14  helping out?

15  A.  Yes.

16  Q.  And around this time -- we're paused at 54 seconds -- do

17  you recall seeing Trooper Kennedy talking to Deputy Merson

18  after everyone kind of stood up?

19  A.  Looking back I can remember them standing next to each

20  other.  What they were talking about I have no clue.

21  Q.  Does it appear to you that Trooper Kennedy was checking on

22  Deputy Merson?

23  A.  Could have been.

24  Q.  Was Deputy Merson at that time complaining about pain?

25  A.  Yes.

AUSTIN ENNIS - DIRECT EXAMINATION

1    Q.  What did he complain about, Deputy Merson?

2    A.  Back injury.

3    Q.  What was he saying?

4    A.  That his back hurt.

5    Q.  Was he telling everyone there that his back was hurting?

6    A.  I'm sure he was because, you know, I mean I knew about it

7    so I assume at some point.

8    Q.  All right.  I'm going to play it from 54 seconds to 101 and

9    pause.  Who is this additional officer who appears on the

10   screen?

11   A.  That's Deputy Ritchie.

12   Q.  So he's the fifth officer arriving on the scene there?

13   A.  Yes.

14   Q.  Okay.

15          MR. DOUGLAS:  Play it from here from 101 to 104 and

16   pause, please.

17   BY MR. DOUGLAS:

18   Q.  Is that you shining your light in the direction of Deputy

19   Merson's camera?

20   A.  Yes.

21   Q.  And you're walking -- getting ready to walk in the

22   direction of Deputy Merson's vehicle?

23   A.  That's what the video shows.

24   Q.  Why were you walking away from where the subject was?

25   A.  At this point, I was just trying to gather myself and wind

AUSTIN ENNIS - DIRECT EXAMINATION

1  down from that pretty intense situation.

2  Q.  Okay.  Did you believe the situation was under control?

3  That your assistance wasn't needed?

4  A.  Yes.  Well, like I said, at this point, I thought he was

5  cuffed which was wrong.

6  Q.  A few minutes later, did you see Trooper Kennedy using

7  force on the subject -- a few moments later?

8  A.  Yes.

9  Q.  So I'm going to have the video play here from 104, and I'm

10  going to ask you to have us pause the video when you believe

11  you had looked back over to the subject and saw Trooper Kennedy

12  using force against him.  Okay.

13          MR. DOUGLAS:  Please play.

14  A.  About right here.

15  BY MR. DOUGLAS:

16  Q.  Around 109, 108?

17  A.  Around 109 probably.

18  Q.  Okay.  So when you first looked --

19          MR. DOUGLAS:  Stop it there, please.

20  BY MR. DOUGLAS:

21  Q.  When you first looked over and saw the force being used by

22  Trooper Kennedy, did you see the subject resisting in any way?

23  A.  Whenever I first turned around, I could only see Trooper

24  Kennedy delivering strikes.

25  Q.  Did you see any resistance?

AUSTIN ENNIS - DIRECT EXAMINATION

1   A.  I couldn't see it, no.

2   Q.  And as we're getting ready to play, do you walk actually

3   over there right next to where they are?

4   A.  Yes.

5           MR. DOUGLAS:  Go ahead and play through, please.

6   BY MR. DOUGLAS:

7   Q.  That's you walking right over there at 113?

8           MR. DOUGLAS:  Please pause.

9   BY MR. DOUGLAS:

10  Q.  Is that you standing right next to Walker, Kennedy, and the

11  subject at 115?

12  A.  Yes.

13  Q.  And you're looking straight down --

14  A.  Yes.

15  Q.  -- to the ground?  Were you looking at the subject there?

16  A.  At this time, I think I'm just looking at everything, but

17  it appears I'm looking towards the suspect, yes.

18  Q.  Why did you walk back over?

19  A.  Because I saw force being used, and I wanted to see if my

20  assistance was needed.

21  Q.  Okay.  Ultimately, did you use force at this time?

22  A.  No.

23  Q.  So did you see any need for yourself to use force?

24  A.  At this moment, no, I didn't see anything.

25  Q.  When you're standing right next to them, did you see the

AUSTIN ENNIS – DIRECT EXAMINATION

1  subject resisting in any way as he's being stricken?

2  A.  I can't recall ever seeing any resistance at that point.

3  Q.  Okay.  Did you see any reason for Trooper Kennedy to be

4  striking him in the back?

5  A.  I, myself, did not.

6  Q.  And, in fact, here in a few seconds you walk back away;

7  right?

8  A.  Yes.

9            MR. DOUGLAS:  Go ahead and play through, please, to

10 119.

11 BY MR. DOUGLAS:

12 Q.  Is that you turning to walk back away?

13 A.  Yes.

14 Q.  Now, I'm going to play it through a few seconds here.  Do

15 you recall a moment when Trooper Walker fell to the ground?

16 A.  Yes.

17 Q.  Okay.  I'm going to play it through that section and pause

18 again.  Okay.

19            MR. DOUGLAS:  Please pause.

20 BY MR. DOUGLAS:

21 Q.  We're paused at 122.  Do you remember seeing part of that?

22 A.  Yes.

23 Q.  What was your impression of what just -- what happened

24 there based on being there yourself?

25 A.  Trooper Walker tried to pick him up and he fell.

113

AUSTIN ENNIS - DIRECT EXAMINATION

1  Q.  Did you see any resistance by the subject --

2  A.  I didn't see --

3  Q.  -- causing Trooper Walker to fall?

4  A.  I didn't see it.

5  Q.  Do you recall a time right after this where Trooper Kennedy

6  picked up the subject?

7  A.  Yes.

8       MR. DOUGLAS:  We're going to play it through that

9  part, and then we're going to pause it.  Pause there.

10  BY MR. DOUGLAS:

11  Q.  Is that you kind of following along while Trooper Kennedy

12  has the subject up in the air and walking?

13  A.  Yes.

14  Q.  So at this point in time, as Trooper Kennedy has the

15  subject by the collar of his shirt held off the ground, did you

16  hear Trooper Kennedy saying anything to the subject?  I'm not

17  asking you to quote.  But do you recall hearing Trooper Kennedy

18  saying anything?

19  A.  I believe I can remember some sort of words.

20  Q.  Can you describe the volume of Trooper Kennedy's voice?

21  A.  Well, I could hear it so I -- it was over a normal talking

22  I'd say.

23  Q.  Was it a raised voice?

24  A.  Raised voice, yes.

25  Q.  Do you recall the tone?

AUSTIN ENNIS - DIRECT EXAMINATION

1  A.  I wouldn't say it was an angry tone.  Not a normal, you

2  know, speaking voice.

3  Q.  Have you ever been trained to pick up a handcuffed arrestee

4  by the collar of his shirt holding him face to face while

5  moving him from one location to another?

6  A.  I can't say that I've ever been trained on that.

7  Q.  Have you ever seen somebody do this before?

8  A.  I can't say.  I can't remember if I have or not.  It

9  doesn't come to me if I have.

10  Q.  Did you see any reason, being a person who was there, a

11  trained officer, to move the subject in this manner?

12  A.  I can see why he was moved.  The manner of which I --

13  without speaking to Trooper Kennedy, himself, I can't say for

14  sure that it was necessary or not.

15  Q.  Did you, yourself, as being someone there, see any reason

16  for the subject to be moved in this manner?

17  A.  I definitely think there are better ways he could have been

18  moved.  And when you say this manner, I don't think I

19  understand exactly what -- I don't think I understand what

20  you're asking me.

21  Q.  As being an officer who is on the scene, did you see a

22  reason, even assuming he should be moved, for Trooper Kennedy

23  to pick up the kid by the collar of his shirt, hold him chest

24  to chest, face to face, and walk with him?  Did you see a

25  reason for that?

AUSTIN ENNIS - DIRECT EXAMINATION

1  A.  The specific way he did it --

2  Q.  That's what I am asking.

3  A.  -- was not the way that I would have done it personally.

4  Q.  Okay.

5         MR. DOUGLAS:  We're going to play it here two or

6  three more seconds through.  Stop there, please.

7  BY MR. DOUGLAS:

8  Q.  Did you see on the scene Trooper Kennedy toss the subject

9  to the ground?

10  A.  Yes.

11  Q.  Did you see any reason for Trooper Kennedy to toss the

12  subject to the ground?

13  A.  I didn't see it, no.

14  Q.  Have you ever been trained to toss an individual handcuffed

15  behind his back to the ground?  Right down onto his back?

16  A.  I have never been trained on that.

17  Q.  Okay.  We're going to play it through a couple seconds here

18  and stop at 131.

19      Is that you shining your light down on the subject?

20  A.  Yes.

21  Q.  Who is lying on Langston Boulevard there?

22  A.  Deputy Merson.

23  Q.  Who is kneeling down next to Deputy Merson?

24  A.  Deputy Ritchie.

25  Q.  What was going on with Deputy Merson at that time?

AUSTIN ENNIS – DIRECT EXAMINATION

1   A.   He was experiencing back pain.

2   Q.   How did you learn that?

3   A.   When he was laying down, and I know now that he was

4   experiencing back pain.

5   Q.   Okay.

6           MR. DOUGLAS:  We're going to play it through from

7   here to about 148.  Please pause.

8   BY MR. DOUGLAS:

9   Q.   Is that you turning again away from the subject and walking

10  in the direction of Deputy Merson's camera?

11  A.   Yes.

12  Q.   Why are you walking away from the subject again?

13  A.   The same reason I was before.  Just to separate myself from

14  the situation and try to gather myself and wind down.

15  Q.   Had you determined that your assistance was not needed?

16  A.   Yes.

17  Q.   Was the subject resisting in any way after he had been

18  tossed to the ground right there in this moment?

19  A.   No.

20  Q.   What was the subject doing when you walked away?  You

21  shined your light on him.  What was he doing?

22  A.   Just laying there.

23  Q.   At some point, you come back over and you and Trooper

24  Kennedy move the subject?

25  A.   Yes.

AUSTIN ENNIS - DIRECT EXAMINATION

1   Q.   We're going to play that through.  Is that you walking back

2   over, around 205, back to the subject?

3   A.   Yes.

4   Q.   And Trooper Kennedy picked up the subject about 208?

5   A.   Yes.

6   Q.   Is this you and him moving the subject?

7   A.   Yes.

8          MR. DOUGLAS:  Please pause it there.

9   BY MR. DOUGLAS:

10  Q.   Where did you move the subject to?

11  A.   To the roadside, Route 11.

12  Q.   Whose idea was it to move him?

13  A.   Trooper Kennedy's when we picked him up.  So I came --

14  assisted with carrying him.

15  Q.   How did you assist?

16  A.   I grabbed one of his arms.

17  Q.   How was it determined where he would then be placed?

18  A.   We were just walking towards the roadside, and Trooper

19  Kennedy said this -- is this a good spot for him; and we just

20  sat him down on a snow pile.

21  Q.   So Trooper Kennedy said this is a good spot for him?

22  A.   Yes.

23  Q.   What was the good spot for him?

24  A.   It was a snowbank on the roadside.

25  Q.   What did you think about placing the subject on a pile of

AUSTIN ENNIS - DIRECT EXAMINATION

1    snow?

2    A.  I didn't think anything of it.

3         MR. DOUGLAS:  We're going to play it through to 220

4    and pause it, please.

5    BY MR. DOUGLAS:

6    Q.  Can you recognize that officer?

7    A.  Deputy Kolb.

8    Q.  So now that's the 6th officer on the scene?

9    A.  Yes.

10        MR. DOUGLAS:  We're going to take down that exhibit,

11   and we're going to bring up what has been admitted as

12   Government's Exhibit No. 4.  We're going to bring it to the

13   first frame and pause it.

14   BY MR. DOUGLAS:

15   Q.  Could you describe the perspective of this camera?  First

16   of all, what roadway is that?

17   A.  The vehicle is sitting on Williamsport Pike.

18   Q.  What direction is this facing?

19   A.  North.

20   Q.  Is the crash scene to the left side of the road?

21   A.  Yes.

22   Q.  If depicted here, could you please use your finger on the

23   monitor to circle the location of the screen where the pile of

24   snow is where you and Trooper Kennedy placed the subject?

25   A.  You want me to --

AUSTIN ENNIS - DIRECT EXAMINATION

1   Q.  With your finger.

2   A.  (Complied.)

3   Q.  We're going to take down Exhibit 4, and now we're going to

4   show you Government Exhibit No. 5.  Have you seen this video

5   before?

6   A.  Yes.

7   Q.  So I'm going to have this video played.  Could you please

8   tell us to pause the video if you see you and Trooper Kennedy

9   carrying the subject and placing him down on the snowbank?

10  A.  Yes.  Pause.

11  Q.  It's paused at four seconds.  That was you and Trooper

12  Kennedy placing the subject down on the snowbank?

13  A.  Yes.

14  Q.  Was this immediately following you and Trooper Kennedy

15  carrying the subject out of the view of Deputy Merson's

16  dashboard camera?

17  A.  Yes.

18  Q.  There were no stops in between?

19  A.  No.

20  Q.  Okay.  And as you're helping to escort the subject, was he

21  resisting in any way?

22  A.  He wasn't walking.  We actually had to carry him.

23  Q.  So after being tossed to the ground, he wasn't walking?

24  A.  Yes.

25  Q.  After the subject was placed down on the snowbank, did you

AUSTIN ENNIS – DIRECT EXAMINATION

1  see Trooper Kennedy make contact and use force against the

2  subject?

3  A.  Yes.

4  Q.  What did you see?

5  A.  There's a point where Trooper Kennedy was face to face with

6  him.

7  Q.  How did he become face to face with the subject who had

8  been tossed down on his back on the snowbank?

9  A.  He bent down and kind of -- as he was laying -- as he was

10  on the snow pile, he brought his face up towards his and was

11  speaking to him.

12  Q.  What was he saying?

13  A.  I recall him saying things along the lines of you could

14  have hurt this officer.  Why would you do this?

15  Q.  What was the volume of voice?

16  A.  Raised voice.

17  Q.  What was the tone?

18  A.  Angry.

19  Q.  Based on being someone who was there, did you conclude who

20  he was talking about?  Which officer?

21  A.  He was talking about striking Deputy Merson's vehicle and

22  running.

23  Q.  So are you saying the first thing you saw was Kennedy

24  reengaging himself with the subject to grab and pull him off

25  the snowbank?

AUSTIN ENNIS - DIRECT EXAMINATION

1    A.   I remember seeing that.

2    Q.   You remember seeing that.  About how far away were you --

3    A.   A couple feet.

4    Q.   -- from Trooper Kennedy?

5    A.   Five, six, seven feet.  I can't say.

6    Q.   Did you have an unobstructed view?

7    A.   Yes.

8    Q.   At the snowbank, did you see Trooper Kennedy use additional

9    force against the subject?

10   A.   Yes.

11   Q.   What did you see?

12   A.   As the suspect was on the snow pile, he continuously tried

13   to get up and raise his body up off the snow.  And Trooper

14   Kennedy would use an open hand to force him back down to the

15   snow.

16   Q.   Are you saying just pushing or striking or how would you

17   describe it?

18   A.   Call it a light strike.

19   Q.   Okay.  Into the face did you say?

20   A.   Yes.

21   Q.   And the subject at the time -- the entire time at the

22   snowbank -- was still cuffed?

23   A.   Yes.

24   Q.   Behind his back?

25   A.   Yes.

AUSTIN ENNIS - DIRECT EXAMINATION

1  Q.  And when you say raising his body, like was he standing up

2  or was his torso -- what was happening there?

3  A.  If he wouldn't have been back into the snow, I think he

4  would have -- he would have tried to stand up.

5  Q.  I'm asking you to describe what he was, in fact, doing.

6  A.  He was laying on the snow pile, and from the middle of his

7  body, he was lifting his upper half of his body up.

8  Q.  Bending at the waist?

9  A.  Yes.

10  Q.  Okay.  At the snowbank did you notice any injuries on the

11  subject?

12  A.  He had a laceration to his head.  He had that since I got

13  on the scene in the first place.

14  Q.  Did you see the subject doing anything else other than

15  raising at the waist to be stricken in the face?

16  A.  That's all I remember seeing.

17  Q.  Did you see a reason to strike the subject in the face at

18  the snowbank?

19  A.  I saw a reason for force to be used.  Myself, I'm not sure

20  if I would have used that type of force, but whenever I was on

21  scene, it didn't strike me as excessive.  Just perhaps more

22  than I would myself.

23  Q.  I'm not asking you if it was excessive.  I'm asking if --

24  because that's for the Court to determine only.  You understand

25  that?

AUSTIN ENNIS - DIRECT EXAMINATION

1   A.   Yes.

2   Q.   Okay.  We're asking you if you saw a reason to strike a

3   cuffed subject in the face because he was raising his torso?

4   A.   Yes.  I saw a reason for force to be used.

5   Q.   And the question is whether the force would be striking

6   someone in the face with your hand?

7   A.   See, I don't understand the way you want me to answer this

8   question because I'm saying that it's not the level of force I

9   would have used.

10  Q.   Okay.

11  A.   But to -- and I said that it wasn't excessive in my opinion

12  but that's not the answer you want either.  So I'm not exactly

13  sure what you would like for me to say.

14  Q.   Did you, yourself, use any force at the snowbank?

15  A.   No.

16  Q.   Did you see any other officer other than Trooper Kennedy

17  use force at the snowbank?

18  A.   No.

19  Q.   Did you see any other officer other than Trooper Kennedy

20  use force against the subject after the subject was

21  handcuffed?

22  A.   No.

23          MR. DOUGLAS:  No further questions.

24          THE COURT:  Cross examination, Mr. Manford.

25          MR. MANFORD:  Thank you, Your Honor.

AUSTIN ENNIS - CROSS EXAMINATION

1                          CROSS EXAMINATION

2    BY MR. MANFORD:

3    Q.   Good afternoon.

4    A.   Hello.

5    Q.   Okay.  Well, we're on the snowbank.  Let's just stay there

6    for a minute.  Okay.  So when you assisted Trooper Kennedy in

7    moving J.H. from where he was tossed to the snowbank, you said

8    that you both picked him up.  He wasn't walking.  Is that

9    correct?

10   A.   Yes.

11   Q.   Okay.  And he wasn't walking because he was still

12   resisting; correct?

13   A.   I was under the impression that he was voluntarily choosing

14   not to use his legs.

15   Q.   Okay.  And would that be a form of resisting?

16   A.   Yes.

17   Q.   Okay.  So even after everything we've seen in the video,

18   the first part where four law enforcement officers are around,

19   and we see the tossing thing, even after that, the juvenile,

20   J.H., is still not being compliant?  Still resisting in your

21   opinion of what you saw?

22   A.   Yes.

23   Q.   Okay.  And over in the snow pile -- you got cut off by the

24   Government, but it was your opinion from what you saw or your

25   belief he might actually try to get up?  The -- J.H.

AUSTIN ENNIS – CROSS EXAMINATION

1   A.   I believe that's what he was going for.

2   Q.   Okay.  And this is based on your observations?

3   A.   Yes.

4   Q.   Okay.  How long have you been a cop?

5   A.   Coming up on four years.

6   Q.   Okay.  Ever had a situation before where people resist

7   arrest?

8   A.   Yes.

9   Q.   Ever had a situation before where people try to escape

10   after you've effected handcuffing?

11   A.   Yes.

12   Q.   Okay.  So in the Merson video, I see at some point in time

13   you had used some closed-fist compliance strikes yourself; is

14   that right?

15   A.   Yes, sir.

16   Q.   Okay.  Did you deem them necessary to gain compliance?

17   A.   Yes.

18   Q.   Did you deem them reasonable to gain compliance?

19   A.   Yes.

20   Q.   You also had a knee strike?

21   A.   Yes.

22   Q.   And, again, did you deem that necessary to gain compliance?

23   A.   Yes.

24   Q.   And did you deem that to be reasonable?

25   A.   Yes.

AUSTIN ENNIS - CROSS EXAMINATION

1   Q.  So as I understand it, your testimony is upon you arriving

2   on the scene and the other officers are interacting with J.H.,

3   you clearly heard them giving commands to stop resisting or put

4   your hands up or do something; is that correct?

5   A.  I can't quote the exact words but things -- words that

6   would lead me to believe that, yes.

7   Q.  Okay.  Raised voices?

8   A.  Yes.

9   Q.  Of course.  I mean they weren't happy; right?  The

10  officers.  They wanted him to comply with their commands?

11  A.  True.

12  Q.  Is it also true that you saw J.H. moving his hands around,

13  not trying to give himself up, yourself?

14  A.  Yes.

15  Q.  Okay.  And this is -- this is back in the Merson video when

16  you first get there; correct?

17  A.  When I first get there or when I first engage?

18  Q.  When you first engage.  I apologize.

19  A.  Yes.

20  Q.  Okay.  Is it also true from your experience that if someone

21  doesn't want to be handcuffed, it's a pretty difficult

22  situation?

23  A.  Yes.

24  Q.  Now, you directed your engagement to the head of the

25  individual; right?

AUSTIN ENNIS - CROSS EXAMINATION

1    A.   Yes.

2    Q.   Okay.  And you actually put your hand on his head trying to

3    gain compliance; right?

4    A.   Yes.

5    Q.   You could feel him resisting at that point; right?

6    A.   Yes.

7    Q.   He was tensing up; right?

8    A.   Tensing up and I could feel him turning his head.

9    Q.   Okay.  All right.  Tensing up.  Is that another way people

10   can resist?

11   A.   Yes.

12   Q.   How is that resisting if I just tense up as opposed to

13   flailing around trying not to give my hands to somebody to be

14   cuffing them?  How is tensing up a form of resistance?

15   A.   In my experience when you tense up, you could either be,

16   you know, holding your arms together or you could be reaching

17   for something.  Along those lines.

18   Q.   Would it be possible to be tensing up so that an officer

19   couldn't grab your hand and affect the cuffs being put on?

20   A.   Yes.

21   Q.   If someone were tensing up, would you necessarily see that?

22   Would you have to feel it to know it?

23   A.   I can't just observe tensing up.

24   Q.   Okay.  Well, what I'm getting at is that --

25   A.   I have to feel it.

AUSTIN ENNIS - CROSS EXAMINATION

1  Q.  On that one point in the video when you come back over and

2  Trooper Kennedy is administering the other compliance strikes,

3  and you are actually standing right there; right?

4  A.  Yes.

5  Q.  The point in the video I'm talking about.  Okay.  If the

6  subject was tensing up, would you have been able to see that as

7  resisting?

8  A.  No, sir.

9  Q.  Okay.  But otherwise you didn't see any active resisting

10  such as pulling his arm away, telling the cop to go take a long

11  jump -- I mean -- strike that.  You didn't see any other signs

12  of resisting?

13  A.  I didn't see it.

14  Q.  Okay.  Do you also recall actually hearing Trooper Kennedy

15  during the engagement to stop resisting to the subject?

16  A.  Which engagement?

17  Q.  Very good.  The one on Langston Drive.  The one on the

18  street.

19  A.  Yes.

20  Q.  Okay.  While we're at it, how about the one in the snow

21  pile?  Do you remember that?  Was there anything there you

22  might remember?

23  A.  Words?

24  Q.  Yes.  As far as stop resisting.  Anything along those lines

25  by Trooper Kennedy?

AUSTIN ENNIS - CROSS EXAMINATION

1    A.  There were multiple times I heard Trooper Kennedy tell him

2    to stay down.

3    Q.  And I take it from your observations and your other

4    testimony that he was not compliant with those directives?

5    A.  No, he was not.

6    Q.  Isn't it true as -- back to -- I should just pull up the

7    video, but we'll just move it along.  Back to the Merson video.

8    The first engagement.  All right.  We'll direct your attention

9    to the compliance strikes Trooper Kennedy is making to the back

10   of J.H.  Are you with me so far?

11   A.  Yes.

12   Q.  There were two sets; right?

13   A.  Yes.

14   Q.  There's a set of five when he sees that Walker is having

15   difficulty cuffing him.  Would that be fair to say?

16   A.  From in the video, yes.

17   Q.  Okay.  Then there were three more after that; correct?  If

18   you --

19   A.  It might have been three.

20   Q.  Whatever is on the video; right?

21   A.  Yes.

22   Q.  Okay.  And isn't it true you really can't say that they

23   were or were not necessary because you weren't engaged in it

24   yourself?

25   A.  Yes.

AUSTIN ENNIS - CROSS EXAMINATION

1  Q.  And also you didn't see a need to intervene in anything

2  Officer Kennedy was doing because he was out of bounds?

3  A.  Out of bounds, sir?  Would you elaborate?

4  Q.  I'm sorry.  Go ahead.  My whole thing -- (indiscernible)

5  just came off for a second.  Please repeat that.

6  A.  You said out of bounds?

7  Q.  Anything that was -- that would cause you concern.  You

8  need to stop him because he's just inflicting too much?

9  A.  I didn't see anything that made me think that, no.

10  Q.  So I guess that was really a -- rephrase the question.

11  Isn't it true that you didn't see anything in either engagement

12  involving Officer Kennedy that was excessive to the point that

13  you thought you needed to intervene?

14  A.  When you say either engagement, do you mean the two sets of

15  strikes to the back?

16  Q.  Well, let's do that one first.  Yes.  How about that

17  one?

18  A.  Now you're asking if I saw anything that made me think I

19  should intervene?

20  Q.  Yes, sir.

21  A.  I didn't see my assistance was necessary at that time.

22  Q.  How about at the snowbank?

23  A.  I didn't think my assistance was needed.

24  Q.  Isn't it true that -- I'm trying to figure out how I phrase

25  this without objection.  Let me see here.  Isn't it true that

AUSTIN ENNIS - CROSS EXAMINATION

1  you wanted the subject to be still and compliant so that you

2  wouldn't have to engage in additional force in any of these

3  engagements?

4  A.  Yes.

5  Q.  You said adrenaline rush.  Why would you have an adrenaline

6  rush?  What was going on?  And is that -- was that -- part one.

7  Go ahead and answer that.

8  A.  Well, it's a very intense and serious situation.

9  Q.  Okay.  Why was it intense for you?

10 A.  Because it's not something that you do every single day as

11 a police officer.

12 Q.  Okay.  Did you feel at any time being in danger?

13 A.  In danger during when?

14 Q.  During the chase, the explosion of the transformer, all

15 that stuff?

16 A.  I found being a police officer danger isn't necessarily

17 something you feel at the time.  Maybe perhaps afterwards.

18 Q.  Okay.  Whatever you witnessed Officer Kennedy do, either

19 the engagement on the Langston Lane or over by the snow pile,

20 you did not deem it appropriate to report him to some higher

21 authority; is that correct?

22 A.  That never crossed my mind.

23 Q.  Okay.  When -- during the toss section of the video or

24 over in the snowbank when Officer Kennedy had a raised

25 voice, do you -- were you able to hear the subject talking as

AUSTIN ENNIS - CROSS EXAMINATION

1  well?

2  A.  I can't remember if he said anything or not.

3  Q.  Okay.  Mr. Douglas characterized the toss as picking up by

4  the collar.  So we're making a record.  I mean this is a

5  collar; right?  Around my tie.  Is -- and you have a vest on;

6  right?

7  A.  Yes.

8  Q.  Okay.  Was it -- could you be more -- wasn't it more

9  grabbing around the chest area and the vest as opposed to up by

10  the collar and neck from what you saw?

11  A.  From the angle I saw, I can't tell you one way or the

12  other.

13  Q.  Okay.

14          MR. MANFORD:  One second, please.

15  BY MR. MANFORD:

16  Q.  Just a couple last questions.  Okay.  When the subject is

17  in the snowbank and you see him being struck by Officer

18  Kennedy, open-hand slap?  Would that be the best way to

19  characterize it?

20  A.  Yes.

21  Q.  Okay.  And to the subject's right -- let's see -- right

22  side of his face?

23  A.  Yes.

24  Q.  Okay.  Do you know if Officer Kennedy is right or left

25  handed?

AUSTIN ENNIS – REDIRECT EXAMINATION

1   A.  Couldn't tell you.

2   Q.  No idea.

3        MR. MANFORD:  All right.  That's all I have.  Thank

4   you, Your Honor.

5        THE COURT:  Redirect, Mr. Douglas?

6        MR. DOUGLAS:  Briefly, Your Honor.

7                    REDIRECT EXAMINATION

8   BY MR. DOUGLAS:

9   Q.  Deputy Ennis, you used force during the first what, 10 or

10  15 seconds of the incident, didn't you?

11  A.  Yes, sir.

12  Q.  And then for the rest, two or three minutes, you didn't use

13  any force, did you?

14  A.  Just --

15  Q.  Did you use force after --

16  A.  I'm sorry --

17      (Simultaneous speech.)

18  Q.  -- after you used force at the beginning?

19  A.  Whenever I picked him up by the arm that would be

20  considered force per my department guidelines.

21  Q.  Other than part of escorting him, did you use any other

22  force after the initial on-the-ground force?

23  A.  No, sir.

24  Q.  So did you see any reason for you, yourself, to use force?

25  A.  No, sir.

AUSTIN ENNIS - REDIRECT EXAMINATION

1    Q.  You didn't use force?

2    A.  No.

3    Q.  And you were asked on cross examination about not

4    interceding or at least that's a strong implication that you

5    didn't restrain Trooper Kennedy; right?

6    A.  Right.

7    Q.  And you were asked on cross examination about the fact you

8    didn't report Trooper Kennedy to anybody; right?

9    A.  Yes.

10   Q.  You find it difficult for one police officer to restrain

11   another or call him out on the scene or report them?

12   A.  It's a difficult situation, yes.

13   Q.  Why is it difficult?

14   A.  Because I wouldn't -- me, personally, I wouldn't want to be

15   looked at as someone who were to betray, you know, another

16   police officer.

17   Q.  Why would it be a betrayal?

18   A.  Because we -- police officers are -- it's a type of family,

19   and I feel like if I were to witness an officer use excessive

20   force, and I went and said to one of my higher-ups that I

21   observed the excessive force, I would -- I just think I would

22   look -- I would feel as if I were just betraying the other

23   officer and setting him up for failure and for disciplinary

24   action.

25   Q.  What if that other officer was from a different agency?

AUSTIN ENNIS - REDIRECT EXAMINATION

1   A.  Well, normally I would always -- I haven't been in the

2   situation, but I would like to think that if I observed clear

3   and blatant excessive force that I would have to go to the

4   officer myself and say, hey, why did you do this and --

5   Q.  Did you ever ask Trooper Kennedy why he did that?  Did the

6   force he did on the scene?

7   A.  No, sir.

8   Q.  Thank you, sir.

9           THE COURT:  Recross?

10          MR. MANFORD:  No thank you, Your Honor.

11          THE COURT:  Thank you, sir.  You're free to go.

12  (Witness excused.)

13          THE COURT:  Counsel, it's about 12:30. I think it's a

14  good time for us to break for lunch.  Why don't we break until

15  1:30 and then pick back up with our evidence.

16          MR. DOUGLAS:  Yes, Your Honor.

17          MR. MANFORD:  Yes, Your Honor.

18          THE COURT:  Anything further before we break from the

19  Government?

20          MR. DOUGLAS:  No, Your Honor.

21          THE COURT:  Anything further on behalf of the

22  defendant, Mr. Manford?

23          MR. MANFORD:  No thank you, Your Honor.

24          THE COURT:  All right.

25          MR. DOUGLAS:  I will grab that last exhibit and give

DAVID RITCHIE - DIRECT EXAMINATION

1   it to the clerk.

2           THE CLERK:  I got it.

3           THE COURT:  Thank you.

4           MR. DOUGLAS:  You already got it?

5           THE COURT:  All right.  We'll pick back up then at

6   1:30, Counsel.  Everyone is excused.

7       (Recess 12:30 P.M. to 1:40 P.M.)

8           THE COURT:  Good afternoon, everyone.  We are

9   reassembled after our lunch break.  The defendant is here in

10  person along with his counsel.  Counsel for the Government are

11  in attendance as well.

12      Should we proceed with the Government's next witness,

13  Mr. Douglas?

14          MR. DOUGLAS:  Yes, Your Honor.

15          THE COURT:  All right.

16          MS. SISCARETTI:  Your Honor, the Government calls

17  David Ritchie.

18          THE COURT:  All right.

19      (The witness was sworn in.)

20          THE WITNESS:  I do, sir.

21          THE CLERK:  You may have a seat in the witness chair,

22  and please watch your step.

23                      DIRECT EXAMINATION

24  BY MS. SISCARETTI:

25  Q.  Good afternoon.  Sir, can you please introduce yourself to

DAVID RITCHIE - DIRECT EXAMINATION

1  the court --

2  A.  Yes.

3  Q.  -- and please spell your name for the court reporter.

4  A.  Yes, ma'am.  Deputy David Ritchie.  D-A-V-I-D

5  R-I-T-C-H-I-E.

6  Q.  And you said deputy?

7  A.  Yes.

8  Q.  And where do you work, Deputy?

9  A.  Berkeley County Sheriff's Department.

10  Q.  And what are your duties and responsibilities as a deputy

11  with the Berkeley County Sheriff's Department?

12  A.  I'm assigned to the Patrol Division so routine patrol,

13  answering calls for service, conducting traffic stops, and any

14  other assignments that's given to me by the sheriff.

15  Q.  How long have you been a deputy in Berkeley County?

16  A.  Four years.

17  Q.  What kind of training did you receive to become a deputy?

18  A.  To start, you're given three to four months of West

19  Virginia State Police Academy.  After that you have another

20  three to four months of field training where you're assigned to

21  an officer and given more in-depth training in the field.

22  Q.  And, specifically, did you receive training on the topic of

23  use of force?

24  A.  Yes, ma'am.

25  Q.  And based on your training and experience as a deputy, can

DAVID RITCHIE - DIRECT EXAMINATION

1    you describe when it's appropriate for a law enforcement

2    officer to use force against a civilian?

3    A.   Yeah.  So any time you have a threat or you're trying to

4    apprehend a subject, you would use force to control and stop

5    any threats.

6    Q.   And based on your training and experience, what's the

7    standard for how much force a law enforcement officer should

8    use against a civilian?

9    A.   Reasonable force necessary to stop a threat.

10   Q.   So once a threat is over, should force also stop?

11   A.   Unless the force were to -- unless the threat were to come

12   back, then, yes, it would stop.

13   Q.   I want to direct your attention to November 19, 2018,

14   around midnight.  Were you working at that time?

15   A.   Yes, ma'am.

16   Q.   What shift were you working?

17   A.   I would be on the evening shift which was 3:00 in the

18   afternoon until 1:00 in the morning.

19   Q.   What was your assignment?

20   A.   Patrol.  Same thing.  Just answering calls of service,

21   conducting traffic stops.

22   Q.   Were you working alone or with a partner?

23   A.   I was in a car by myself.  There were other deputies that

24   were on the shift with me though.

25   Q.   What other deputies were on your shift that day?

DAVID RITCHIE - DIRECT EXAMINATION

1    A.   Corporal Schoppert would have been in-charge supervisor,

2    Deputy Ennis, Deputy Merson, Deputy Kolb.  I believe that's it.

3    Q.   Did there come a time when you responded to a call at a bar

4    called Jack Rabbit's in Martinsburg?

5    A.   Yes, ma'am.

6    Q.   What time was that?

7    A.   Probably 11:00, 11:30 in the evening.

8    Q.   Why were you called there?

9    A.   We had previously gotten calls from an individual that had

10   stated that he was being followed by subjects, and he felt

11   threatened for his life.  We investigated that call prior to

12   the call we got at 11 o'clock.  Deemed that it was probably a

13   fake call or something was going on with the subject.  He was

14   advised to stop calling 911 or he would be placed under arrest.

15   At 11 o'clock -- roughly 11 o'clock he called 911 again so we

16   were going to go out there and detain him.

17   Q.   So you returned to Jack Rabbit's?

18   A.   Yes.

19   Q.   When you got to Jack Rabbit's that second time, did any

20   other officers respond?

21   A.   Deputy Merson, Deputy Ennis, and Deputy Kolb also came with

22   me, all in their own patrol vehicles.

23   Q.   And when you got to the scene, were there any other law

24   enforcement agencies' officers there?

25   A.   West Virginia State Police had two officers already on

DAVID RITCHIE - DIRECT EXAMINATION

1    scene when we arrived.

2    Q.  What two officers were on the scene when you arrived?

3    A.  Trooper Walker and Trooper Kennedy.

4    Q.  Deputy Ritchie, did you have a camera in your police

5    vehicle that night?

6    A.  Yes, ma'am.

7    Q.  Was it recording when you responded to Jack Rabbit's?

8    A.  As I was responding, no, but when we activate our emergency

9    equipment, it goes back a couple minutes.  So it started

10   recording -- I think it's like three minutes prior to me

11   activating my emergency equipment.

12   Q.  And at the time of your response to Jack Rabbit's, was it

13   recording then?

14   A.  As I was -- I'm sorry.  As I was responding or --

15   Q.  As you arrived at the scene --

16   A.  Oh.

17   Q.  -- of Jack Rabbit's.

18   A.  Yeah, it did.  It did, yes.

19           MS. SISCARETTI:  Your Honor, may I approach the

20   witness?

21           THE COURT:  Yes.

22   BY MS. SISCARETTI:

23   Q.  Deputy Ritchie, I've handed you what's marked Government's

24   Exhibit 3.  Do you recognize that?

25   A.  Yes, ma'am.

DAVID RITCHIE - DIRECT EXAMINATION

1   Q.  And what do you recognize that to be?

2   A.  It's a CD that I previously viewed and signed.

3   Q.  And your initials appear on that?

4   A.  Yes, ma'am.

5   Q.  Okay.  And is that the video from your car as you responded

6   to Jack Rabbit's?

7   A.  Yes, ma'am.

8          MS. SISCARETTI:  Your Honor, pursuant to stipulation

9   that the parties have entered into, I'd move Government's

10  Exhibit 3 into evidence.

11         MR. MANFORD:  No objection.

12         THE COURT:  It's admitted.

13     (Government's Exhibit No. 3 was admitted.)

14         MS. SISCARETTI:  If it could be pulled up onto the

15  screen, please.

16  BY MS. SISCARETTI:

17  Q.  And do you see that video pulled up on the screen in front

18  of you, sir?

19  A.  Yes, ma'am.

20  Q.  Can you describe what that shows?

21  A.  It's going to show Route 11.  My car facing northbound.

22  And that's the camera pointed out towards the front of my

23  vehicle.

24         MS. SISCARETTI:  And if it could be played, please.

25  And it could be paused.  Paused at 17.

DAVID RITCHIE - DIRECT EXAMINATION

1   BY MS. SISCARETTI:

2   Q.  Can you describe what was just happening the first 17

3   seconds in this video?

4   A.  That would be me pulling into the parking lot of Jack

5   Rabbit's.  As I come to a stop, you see a West Virginia State

6   Police cruiser off to the right.

7   Q.  To the right side of the screen?

8   A.  Yes.

9         MS. SISCARETTI:  If you could continue playing the

10  video, please.  Pause at 25 seconds.

11  BY MS. SISCARETTI:

12  Q.  The person appearing on the screen, do you know who that

13  is?

14  A.  That's myself.

15        MS. SISCARETTI:  Continue playing, please.  And

16  pause, please, at 30.

17  BY MS. SISCARETTI:

18  Q.  It appears that there was some light that appeared on the

19  screen?

20  A.  Yes, ma'am.

21  Q.  Can you describe what's happening there?

22  A.  That would be the state police cruiser that you just saw

23  off to the right pulling off.  His emergency equipment was

24  activated.  You might also see Deputy Merson's cruiser

25  reflection as he was traveling on Route 11 with his equipment

DAVID RITCHIE - DIRECT EXAMINATION

1    activated as well.

2    Q.  Okay.  You saw that?

3    A.  Yes, ma'am.

4    Q.  Do you know why those vehicles moved?  Why Deputy Merson

5    was going down Route 11?

6    A.  You're going to see in a second where Trooper Kennedy

7    actually passes me and that's where I was advised that his

8    police cruiser had likely just been hit.  The vehicle was

9    taking off which is why they responded northbound with their

10   equipment activated.

11           MS. SISCARETTI:  We can continue playing the video.

12   Pause.

13   BY MS. SISCARETTI:

14   Q.  And it appears someone just ran by and out of the screen.

15   Who was that?

16   A.  Trooper Kennedy.

17   Q.  It was Trooper Kennedy?

18   A.  Yes, ma'am.

19   Q.  And there's another person that appears down the screen

20   wearing jeans.  Who is that?

21   A.  That's the individual that had called 911 that we were out

22   there to detain.

23   Q.  And can you describe again what happened as Kennedy ran by

24   the screen?

25   A.  As he ran past me, he stated something to the effect that

DAVID RITCHIE - DIRECT EXAMINATION

1  Trooper -- that Deputy Merson's vehicle had been struck.  And I

2  actually saw Deputy Merson traveling northbound in his vehicle

3  at a high rate of speed.  So I was -- based on training and

4  experience, I figured that the vehicle was traveling --

5  Q.  So you saw Deputy Merson's car moving --

6  A.  Northbound.

7  Q.  Moving northbound?

8  A.  Yes, ma'am.

9  Q.  Did you see the accident that had happened?

10  A.  No, I did not.

11  Q.  Did you hear anything with regard to the accident?

12  A.  No.

13  Q.  And what did you do after you heard that information from

14  Kennedy?

15  A.  I went to return to my car to get involved in the pursuit

16  for the apprehension.

17          MS. SISCARETTI:  If we could continue playing the

18  video.  Pause at 42 seconds.

19  BY MS. SISCARETTI:

20  Q.  That car that pulled out, whose car is that?

21  A.  Either would have been Deputy Kolb or Deputy Ennis.  I'm

22  note sure which one.

23          MS. SISCARETTI:  We can continue playing.

24  BY MS. SISCARETTI:

25  Q.  And do you know whose car that was that passed at 45

DAVID RITCHIE - DIRECT EXAMINATION

1  seconds?

2  A.  Same thing.  Either Kolb or Ennis.

3        MS. SISCARETTI:  If we can pause at one minute.

4  BY MS. SISCARETTI:

5  Q.  The person that ran in front of the car, can you describe

6  what was happening there?

7  A.  I'm not really sure what he was doing.  He ran out in front

8  of me.  I had my window cracked down a little bit, and he

9  basically yelled stop.  I then stepped back out of the car and

10  told him to get out of the way.

11        MS. SISCARETTI:  We can continue playing.

12  BY MS. SISCARETTI:

13  Q.  And we're watching now at about 110.  What road is your car

14  on?

15  A.  Williamsport Pike, Route 11.

16  Q.  And do you have your lights activated?

17  A.  Yes, ma'am.

18  Q.  About how fast were you driving?

19  A.  About 80 miles an hour I'd say.

20  Q.  Are you getting updates about the pursuit over the

21  radio?

22  A.  Yes, ma'am.

23  Q.  And what kind of updates are you getting?

24  A.  Basically, he's just continuing northbound.  He's just

25  updating intersections as they're traveling north.

DAVID RITCHIE - DIRECT EXAMINATION

1  Q.  And who is giving those updates?

2  A.  Deputy Merson.

3  Q.  This is still Route 11?

4  A.  Yes, ma'am.

5        MS. SISCARETTI:  It's at 155.  And pause, please, at

6  203.

7  BY MS. SISCARETTI:

8  Q.  Can you describe what those lights were?

9  A.  At the time I wasn't really sure what it was so I just saw

10  the blue flashing in the sky probably five or six times.  At

11  the time I was not sure.

12  Q.  After you saw that, did you get any additional updates over

13  the radio?

14  A.  Several seconds after that, Deputy Merson is on the radio

15  and stated that -- he said signal 6 which we refer to as a

16  traffic collision.

17  Q.  That's the radio --

18  A.  Yes.

19  Q.  -- code for it?

20  A.  Yes.

21  Q.  What did you do after you got that information over the

22  radio?

23  A.  Continuing traveling.

24        MS. SISCARETTI:  We can continue to play the

25  video.

DAVID RITCHIE - DIRECT EXAMINATION

1  BY MS. SISCARETTI:

2  Q.  Did you receive any other information after you heard

3  signal 6?

4  A.  Not that I remember, no.

5  Q.  What location were you going to?

6  A.  The 4500 block of Williamsport Pike.  I believe it was a

7  side street, but I can't remember what the name of it is.

8          MS. SISCARETTI:  Pause at 302, 303.

9  BY MS. SISCARETTI:

10 Q.  Can you describe what's being shown here?

11 A.  That's going to be me pulling on scene.  There's two

12 sheriff's office cars already on the scene and a state -- two

13 state police cars on the scene as well.

14         MS. SISCARETTI:  We can keep playing.

15 BY MS. SISCARETTI:

16 Q.  And that person jogging on the left side of the screen, is

17 that you?

18 A.  Yes, ma'am.

19 Q.  And which way are you headed?

20 A.  Off to the left of the screen where you can partially see

21 the vehicle and what's facing back towards Route 11.

22         MS. SISCARETTI:  Exhibit 3 please be taken down.

23 Thank you.

24 BY MS. SISCARETTI:

25 Q.  Now, Deputy Ritchie, as you were jogging up to the scene,

DAVID RITCHIE - DIRECT EXAMINATION

1    can you describe what you saw?

2    A.  I could see the top of a couple of the officers' heads, and

3    I could hear yelling.  I don't remember exactly what was being

4    said.  I could just hear the officers yelling.

5    Q.  You could see the tops of their heads?

6    A.  Yes, ma'am.

7    Q.  What was blocking your view?

8    A.  The vehicle was between me and the officers so I wasn't

9    able to see what was going on.

10   Q.  Which vehicle was --

11   A.  The suspect's vehicle.

12   Q.  What was the condition of the suspect's vehicle?

13   A.  It was wrecked.  It had been spun around and was facing

14   back towards Route 11.

15   Q.  And you said you could hear yelling?

16   A.  Yes.

17   Q.  Do you remember anything about the substance or topic of

18   what was being yelled?

19   A.  No, ma'am.

20   Q.  Did there come a time when you came around the suspect's

21   car?

22   A.  Yeah.  As I was jogging around, the other officers were

23   actually standing up.

24   Q.  Officers were standing up as you got there?

25   A.  Yes, ma'am.

DAVID RITCHIE - DIRECT EXAMINATION

1  Q.  Did you see the suspect when you first got around -- came

2  around the car?

3  A.  Yeah.  He was laying face down on the ground.

4  Q.  Face down?

5  A.  Yes.

6  Q.  Was anybody with him?

7  A.  I believe Trooper Walker was still down on a knee with him.

8  Q.  And what physically was the suspect doing?

9  A.  He had his hands behind his back.  It appeared that Trooper

10  Walker was just holding his hands behind his back.  And the

11  suspect had lacerations and stuff on his face.  It appeared to

12  be from the traffic accident.

13  Q.  Was the suspect saying anything?

14  A.  No.

15  Q.  Was he moving at all?

16  A.  Not that I saw, no.

17  Q.  And you said the other officers.  What other officers were

18  there?

19  A.  Trooper Kennedy, Deputy Ennis, and Deputy Merson.

20  Q.  And they were walking away?

21  A.  Yeah.  They were standing up and were moving off to the --

22  I guess the right from where I was standing.

23        MS. SISCARETTI:  The witness may now be shown Exhibit

24  8 which is already in evidence.  Pause it.

25  BY MS. SISCARETTI:

DAVID RITCHIE - DIRECT EXAMINATION

1   Q.  Deputy Ritchie, do you recognize this?

2   A.  Yes, ma'am.

3   Q.  And what do you recognize this to be?

4   A.  Deputy Merson's dashcam video.

5   Q.  And do you recognize what's in -- being shown in that video

6   right now?

7   A.  That's going to be the suspect vehicle from the pursuit

8   that was wrecked.  You're looking at the front of the vehicle

9   basically.

10  Q.  Going to play the first few seconds of it and ask you

11  to -- if you identify any of the officers coming onto the

12  screen.

13  A.  Okay.

14          MS. SISCARETTI:  If it can be played.  Pause at six

15  seconds.

16  BY MS. SISCARETTI:

17  Q.  Do you recognize that person?

18  A.  Deputy Merson.

19          MS. SISCARETTI:  We can continue playing that.  Pause

20  at ten seconds.

21  BY MS. SISCARETTI:

22  Q.  Do you recognize that person?

23  A.  Trooper Walker.

24          MS. SISCARETTI:  And continue playing.  Pause at 27

25  seconds into the clip.

DAVID RITCHIE - DIRECT EXAMINATION

1  BY MS. SISCARETTI:

2  Q.  Do you recognize that person?

3  A.  Yes, ma'am.  Trooper Kennedy.

4          MS. SISCARETTI:  Continue to play the video.  And

5  pause at 33 seconds.

6  BY MS. SISCARETTI:

7  Q.  Do you recognize that person?

8  A.  Yes, ma'am.  Deputy Ennis.

9  Q.  Now, were you able to see any of this part of the incident?

10 A.  No.

11 Q.  Do you, in fact, appear in this video?

12 A.  I do appear in it, yes.

13         MS. SISCARETTI:  If we can move the video to 58

14 seconds into the clip.  Actually 57.  We can play it.  And

15 pause at 101.

16 BY MS. SISCARETTI:

17 Q.  Another person walked on to the screen.  Who is that?

18 A.  That's myself.

19 Q.  And this is the time you walked out that you described

20 earlier?

21 A.  Yes, ma'am.

22 Q.  And does it, in fact, appear that you're looking at the

23 suspect?

24 A.  Yes, ma'am.

25 Q.  And what was the suspect doing at that time?

DAVID RITCHIE - DIRECT EXAMINATION

1  A.  Laying face down.  The hands behind his back.  Trooper

2  Walker and Trooper Kennedy had just gone back over to him.

3  Q.  Did it appear to you that you were needed to assist in any

4  way?

5  A.  No.

6  Q.  What did you do after that?

7  A.  Walked over to Deputy Merson to basically inquire what had

8  happened.

9         MS. SISCARETTI:  The video can be played again,

10 please.  Pause at 104.

11 BY MS. SISCARETTI:

12 Q.  Who were you speaking to there?

13 A.  Deputy Merson.

14 Q.  And do you recall what Deputy Merson said?

15 A.  Not word for word.  He basically said something to the

16 effect that his back and neck were hurting from the accident.

17 Q.  Did you hear anyone else say anything?

18 A.  No.

19 Q.  Where was Michael Kennedy at this time?

20 A.  He would be directly to the left of me with his knee in the

21 subject's back.

22         MS. SISCARETTI:  Continue playing.  Pause.  If we can

23 go back actually to 108.  Pause at 108.  Sorry.  Okay.

24 BY MS. SISCARETTI:

25 Q.  We're at 108 on the video and where are you at this point?

DAVID RITCHIE - DIRECT EXAMINATION

1  A.  Off to the right standing with Deputy Merson.

2  Q.  And were you still talking to Deputy Merson at that time?

3  A.  Yes, ma'am.

4  Q.  And it appears you're looking over at the suspect?

5  A.  Yes, ma'am.

6  Q.  And what do you see happening at that time?

7  A.  The only thing I remember is a sudden movement from the

8  subject at that time.  I don't remember how many strikes, but I

9  remember Trooper Kennedy delivering strikes to the back area of

10 the subject.

11 Q.  Do you recall what the suspect was doing at the time that

12 Kennedy was striking him?

13 A.  I just saw a sudden movement.  That's all I saw.

14 Q.  Did you see any need to go over and assist?

15 A.  No.

16       MS. SISCARETTI:  We can continue playing.  If we can

17 pause there at 113.

18 BY MS. SISCARETTI:

19 Q.  And what are you doing at that point?

20 A.  That's me still talking to Merson.  I'm trying to get him

21 to lay on the ground to provide neck support for him.

22 Q.  And why are you doing that?

23 A.  Medics had previously told me that, you know, if you want

24 to help out on a traffic collision, if somebody has neck or

25 back pain, it's always good to support their neck and back

DAVID RITCHIE - DIRECT EXAMINATION

1   until they can get there and provide further assistance.

2   Q.   And can you see what's happening with the suspect at this

3   time?

4   A.   I don't remember seeing anything then.

5   Q.   Did you look over at the suspect?

6   A.   Yeah.

7   Q.   And what was the suspect doing?

8   A.   Just laying there.

9   Q.   Face down?

10  A.   Yes, ma'am.

11  Q.   Did you see his hands?

12  A.   I don't remember seeing his hands, no.

13  Q.   Did you see any reason to go over and assist?

14  A.   No.

15          MS. SISCARETTI:   We can continue playing.   We can

16  pause at 119.

17  BY MS. SISCARETTI:

18  Q.   It appears there were a few additional strikes from Michael

19  Kennedy; is that correct?

20  A.   Yes, ma'am.

21  Q.   Did you look over and see that?

22  A.   I don't remember seeing it, no; but from the video, it

23  appears I was looking over there, yes.

24  Q.   And do you remember seeing that firsthand?

25  A.   No, ma'am.

DAVID RITCHIE - DIRECT EXAMINATION

1  Q.  What was Trooper Walker doing, if you know?

2  A.  I don't know.

3  Q.  Did you see Trooper Walker use any strikes?

4  A.  No.

5  Q.  How about Deputy Ennis?  Did you see him use any strikes?

6  A.  No.

7  Q.  Did you see the need to use any strikes?

8  A.  No.

9  Q.  What did you do next?

10  A.  At that time, I got down with Deputy Merson and was trying

11  to keep him supported with how I described earlier.

12  Q.  Could you hear any of the other officers talking?

13  A.  I don't remember.  No.

14  Q.  Could you hear Michael Kennedy say anything?

15  A.  No.

16       MS. SISCARETTI:  If we can continue playing the

17  video.  Pause at 121.

18  BY MS. SISCARETTI:

19  Q.  And did you see what happened there?

20  A.  Yes.

21  Q.  Can you describe what happened?

22  A.  I'm not sure what exactly happened.  It looked to me like

23  Trooper Walker was trying to pick up the subject.  He had

24  tripped over his feet or somehow he was tripped onto the

25  ground.

DAVID RITCHIE - DIRECT EXAMINATION

1    Q.  And did you see what the suspect was doing at the time?

2    A.  No.  I just remember seeing both of them fall.  And it was

3    apparent that Trooper Walker had tripped.

4    Q.  Was the suspect in handcuffs at the time?

5    A.  Yes.

6    Q.  Did you hear anyone say anything?

7    A.  No.

8    Q.  Did the suspect say anything?

9    A.  No.

10           MS. SISCARETTI:  We can continue playing.  And pause.

11   Would you play -- I'm sorry -- one or two more seconds.  And

12   pause there.

13   BY MS. SISCARETTI:

14   Q.  Did you see Michael Kennedy pick up the suspect?

15   A.  Yes.

16   Q.  And can you describe how he picked him up?

17   A.  Grabbed him by the shirt and lifted him off the ground.

18   Q.  And what was the suspect doing at the time he grabbed him

19   and picked him up?

20   A.  He was handcuffed.  Just laying there.

21   Q.  Handcuffed behind?

22   A.  Yes, ma'am.

23   Q.  Was he saying anything?

24   A.  Not that I remember.

25   Q.  Do you recall Michael Kennedy saying anything?

DAVID RITCHIE - DIRECT EXAMINATION

1  A.  Not that I remember, no.

2  Q.  Is picking up a suspect like that by the shirt, is that in

3  keeping with your training on how to escort someone who is

4  handcuffed?

5  A.  I've never been trained that way, no.

6  Q.  Based on what you saw as an officer on the scene, did you

7  see any need to pick up the suspect in that manner?

8  A.  No.

9  Q.  Did you see what happened next?

10  A.  I didn't see what happened next.  The next thing I remember

11  was the subject laying on the ground in the grass area just to

12  the right of the roadway.

13  Q.  And what were you doing when you looked over and saw the

14  suspect lying in the grass?

15  A.  That was while I was still trying to deal with Merson.

16  Getting him to lay still and support his neck.

17  Q.  Where was Kennedy when you saw the suspect lying in the

18  grass?

19  A.  I don't remember.  I think he was standing in the gravel

20  area there to the right of me.

21  Q.  Close to the suspect?

22  A.  Yes.

23  Q.  What was the suspect's condition when he was laying in the

24  grass?

25  A.  Laying there handcuffed in the back.

DAVID RITCHIE - DIRECT EXAMINATION

1   Q.  Was he doing anything?

2   A.  No.

3   Q.  Was he moving?

4   A.  Not that I saw, no.  I just glanced over at him for a

5   second and saw him laying there.

6   Q.  Was he saying anything?

7   A.  Not that I remember.

8   Q.  What was the next thing you did?

9   A.  We wait there.  I'm not sure for how long.  It felt like

10  for 30 seconds.  And then I observed that there was smoke

11  coming from the vehicle so I said to Deputy Merson that we

12  should probably move behind his vehicle so that there was

13  something between us if the vehicle was on fire because I

14  didn't want him laying that close to the vehicle if it was on

15  fire.

16          MS. SISCARETTI:  If we can continue playing the

17  video.  If you can pause at 139.

18  BY MS. SISCARETTI:

19  Q.  Do you still appear on the screen at this time?

20  A.  Yes, ma'am.

21  Q.  And where are you?

22  A.  Kneeling down beside Merson.  Still talking to him and

23  trying to figure out if we're going to take any of his clothing

24  off or anything.

25  Q.  And is the suspect also on the screen here?

DAVID RITCHIE - DIRECT EXAMINATION

1  A.  Yeah.  You can see his legs and stuff there on -- to the

2  right from where I am.

3  Q.  Is Michael Kennedy still on that screen as well?

4  A.  Yes.

5  Q.  Approximately how close to where you are with Deputy Merson

6  are the suspect and Kennedy?

7  A.  Five to eight feet I'd say.

8  Q.  Can you hear anything about what's being said at that time?

9  A.  No, ma'am.

10  Q.  Did you hear Kennedy say anything?

11  A.  No, ma'am.

12       MS. SISCARETTI:  If we can continue playing.  If we

13  could pause at two minutes.

14  BY MS. SISCARETTI:

15  Q.  Can you describe what you were just doing there?

16  A.  I was standing up with Merson and that's when we were

17  moving behind his vehicle.

18  Q.  And how were you moving with Deputy Merson or helping him

19  to move?

20  A.  Holding him by his neck so his head didn't whip back.  And

21  then as he sat up, I just stayed right there with my hands

22  right there close to him in case he was to fall over or

23  anything.

24  Q.  Why are you taking those precautions?

25  A.  I wasn't sure of the extent of his injuries.  It was

DAVID RITCHIE - DIRECT EXAMINATION

1  important to me to make sure that he was going to be all right.

2         MS. SISCARETTI:  If we could continue playing.  And

3  the video stopped.  If it could be taken down, please.

4  BY MS. SISCARETTI:

5  Q.  You indicated that you changed locations?

6  A.  Yes, ma'am.

7  Q.  Can you describe again why you did that.

8  A.  I wanted to put Deputy Merson's vehicle between us and the

9  suspect vehicle because I saw smoke.  I wasn't aware if the

10  vehicle was on fire or not.  If we were going to be laying

11  down, I wanted to make sure we had something between us.

12  Q.  And where specifically did you go with Deputy Merson?

13  A.  Just to the right of his passenger side front tire.  So he

14  would have been laying with his head towards the back of the

15  vehicle, and then I would have been behind where his head was

16  holding his neck with my knees in his shoulder -- by the

17  shoulders.

18  Q.  Supporting his neck and back?

19  A.  Yes, ma'am.

20  Q.  Did there come a time when the suspect moved from that

21  location where you saw him lying on the ground?

22  A.  Yes, ma'am.

23  Q.  Where was he moved to?

24  A.  I looked up and he wasn't where he was laying before.  We

25  were transitioned so I really don't remember anything else.

DAVID RITCHIE - DIRECT EXAMINATION

1   And then I was like where did he go?  I looked over my right

2   shoulder, and he was laying 15, 20 feet behind me.

3   Q.   Okay.  And just because you're indicating with your hand,

4   you're motioning behind you?

5   A.   Yes.  Over my right shoulder.

6   Q.   So you're facing in one direction?

7   A.   Yes.  And he was behind me 15 to 20 feet, and I could see

8   over my right shoulder.

9   Q.   So you turned and looked at the suspect?

10   A.   Yes, ma'am.

11   Q.   And what did you see when you turned and looked at him?

12   A.   He was laying face down with his head north laying on a

13   pile of snow, and Trooper Kennedy was standing at his feet.

14   Q.   Could you see what Trooper Kennedy was doing?

15   A.   When I looked back, he was just standing there.

16   Q.   Could you see what the suspect was doing?

17   A.   He was just laying there.

18   Q.   Was he still restrained?

19   A.   Yes, ma'am.

20   Q.   Can you describe what his condition was like?

21   A.   He was just laying there.  His -- he had his boxers on.

22   His shirt appeared that it was pulled up and his pants were

23   down to his ankles.

24   Q.   Did you see any injuries on the suspect?

25   A.   Same ones from before.

DAVID RITCHIE - DIRECT EXAMINATION

1  Q.  Did you hear the suspect saying anything?

2  A.  No.

3  Q.  Did you hear Kennedy saying anything?

4  A.  When I looked back, no.

5  Q.  Did you hear Kennedy say anything at that point?

6  A.  As I was holding Merson, I could hear him yell at the

7  subject at one point in time.

8  Q.  You heard him yelling?

9  A.  Yes.

10  Q.  And what did you hear him yelling?

11  A.  Nothing in particular.  I was in the middle of a

12  conversation with Merson, and I could hear him yelling behind

13  me.  But I couldn't hear exactly what he said.

14  Q.  Did you turn around and look and see what was going on?

15  A.  No.

16  Q.  And why not?

17  A.  I was more worried about Merson.

18  Q.  How long did you look at the suspect when you said you

19  turned over your shoulder and looked behind you?

20  A.  Two or three seconds at the most.

21  Q.  Did you see any need to go over and assist?

22  A.  No.

23  Q.  When you heard Kennedy yelling at the suspect, did you hear

24  the suspect say anything back?

25  A.  No.

DAVID RITCHIE - DIRECT EXAMINATION

1  Q.  Do you remember the substance of what he was yelling?

2  A.  No, I just -- like I said, I was talking so I just heard

3  him yelling.

4  Q.  Did you stay with Deputy Merson at that time?

5  A.  Yes, ma'am.

6  Q.  I want to show you another exhibit, Exhibit 5.  Do you

7  recognize this, Deputy Ritchie?

8  A.  Yes, ma'am.

9  Q.  And what do you recognize this to be?

10  A.  My patrol vehicle dash camera again.

11  Q.  And is this -- a part of that been magnified?

12  A.  Yes, ma'am.

13  Q.  The area on the right?

14  A.  Yes, ma'am.

15  Q.  Does this screen -- the video shown here, does it depict

16  the area, that snowbank area, where you saw the suspect lying?

17  A.  Yes, ma'am.

18  Q.  Can you touch that screen and circle that area?

19  A.  (Complied.)

20  Q.  Thank you.

21          MS. SISCARETTI:  Your Honor, may I have a moment?

22          THE COURT:  Yes.

23          MS. SISCARETTI:  Your Honor, I have no further

24  questions.

25          THE COURT:  Thank you.  Mr. Manford, cross

DAVID RITCHIE - CROSS EXAMINATION

1  examination.

2          MR. MANFORD:  Before you take that down -- thank you,

3  Your Honor.  Thank you.

4                    CROSS EXAMINATION

5  BY MR. MANFORD:

6  Q.  Officer Ritchie, is your vehicle in this video?

7  A.  Yes.  You can see the hood of my car, yes.

8  Q.  Okay.  How about when you took -- when you got Officer

9  Merson away from the scene, and he's at the back of the

10  vehicle, is that his vehicle or yours?

11  A.  It's his vehicle, and we're actually to the side of it.

12  Q.  Okay.  So you're way on up in this video?

13  A.  Yes, sir.

14  Q.  Okay.  So you're up closer to where the area of interest

15  is -- actually -- see where it says the -- square says area of

16  --

17  A.  Yes.  So where that left line on that box is I was probably

18  ten feet to the right of that.

19  Q.  Okay.  Now I understand.

20          MR. MANFORD:  Can we go to number 8 -- I only have

21  one more question and I'm done, Your Honor.

22          THE COURT:  Okay.

23          MR. MANFORD:  I think.

24  BY MR. MANFORD:

25  Q.  All right.  Officer Ritchie, we're back to Government's

DAVID RITCHIE - CROSS EXAMINATION

1    Exhibit No. 8.  The engagement on Langston Drive.  Are you with

2    me?

3    A.  Yes, sir.

4    Q.  And I see you bending over talking to Officer Merson?

5    A.  Yes.

6    Q.  Okay.  And this is where the Government was asking about

7    what could you see over in the area of Officer Kennedy and

8    Officer Walker and the suspect on the ground.  Do you recall

9    that testimony?

10   A.  Yes, sir.

11   Q.  Okay.  It would appear to me that your view is partially

12   blocked of the suspect by Officer Kennedy.  Would that be

13   correct?

14   A.  Yes, sir.

15   Q.  Okay.  So you couldn't see the officer's hands or arms -- I

16   mean excuse me -- the suspect's -- the subject's hands or arms

17   at the time when this video was showing?

18   A.  I could see a sudden movement from him based on his body

19   motion.  It appeared that it was his arms.

20   Q.  Okay.  So you actually did see some body motion from the

21   suspect?

22   A.  Yes, sir.

23   Q.  Okay.

24        MR. MANFORD:  No further questions.  Thank you.

25        THE COURT:  Redirect, Ms. Siscaretti?

DEREK WALKER – DIRECT EXAMINATION

1          MS. SISCARETTI:  No, Your Honor.

2          THE COURT:  All right.  Thank you, sir.  You may step

3    down.  You're free to go.

4          THE WITNESS:  Yes, ma'am.  Thank you.

5          THE COURT:  Do you have any exhibits up there?

6          THE WITNESS:  Yes, ma'am.

7          THE COURT:  Okay.  We can give them to Mr. Mullen

8    here.  Thank you, sir.

9          THE WITNESS:  Yes, ma'am.

10       (Witness excused.)

11          THE COURT:  Next witness.

12          MS. SISCARETTI:  Your Honor, the Government calls

13   Derek Walker.

14       (The witness was sworn in.)

15          THE WITNESS:  I do.

16          THE CLERK:  You may have a seat in the witness chair.

17   Please watch your step.

18                    <u>DIRECT EXAMINATION</u>

19   BY MS. SISCARETTI:

20   Q.  Good afternoon, sir.

21   A.  Good afternoon.

22   Q.  Can you please introduce yourself to the Court and please

23   spell your name for the court reporter.

24   A.  I'm Derek Walker.  D-E-R-E-K.  Last name, W-A-L-K-E-R.

25   Q.  Sir, in November of 2018, how were you employed?

DEREK WALKER – DIRECT EXAMINATION

1  A.  With the West Virginia State Police.

2  Q.  And what was your position with the state police?

3  A.  I was a trooper.

4  Q.  What were your duties and responsibilities as a trooper?

5  A.  Investigations, road law, interdiction.  Pretty much

6  anything that has to do with a police officer.  We're a

7  full-service agency.

8  Q.  By November of 2018 how long had you been with West

9  Virginia State Police?

10  A.  I was entering my 8th year.

11  Q.  In your experience with the West Virginia State Police,

12  what kind of training did you receive?

13  A.  Can you be more specific on that?

14  Q.  When you started with West Virginia State Police, what kind

15  of training did you receive then?

16  A.  We went through the West Virginia State Police Academy for

17  six months.

18  Q.  And during that police academy, did you learn -- were you

19  trained on the appropriate use of force?

20  A.  We were taught a direction to have with use of force, yes.

21  Q.  And can you describe for the Court based on your training

22  and experience with the West Virginia State Police what your

23  understanding of when an officer could use force against a

24  civilian.

25  A.  My understanding of the use-of-force continuum -- was what

DEREK WALKER – DIRECT EXAMINATION

1  they called it when they taught us -- is if the person is

2  resisting you, you can go one level above their actions.  So if

3  the person is resisting you, you can use your hands.  If

4  they're using their hands punching, kicking, things like that,

5  you can resort to an implement on your belt such as an ASP

6  baton, which is a collapsible metal stick essentially, pepper

7  spray, and I believe we have a taser now.  You can use those

8  implements on your tool if that person is actively fighting you

9  with their hands.  And if that person has a weapon in their

10  hands, then you're justified to use deadly force.

11  Q.  So is it fair to say that the amount of force an officer

12  should use is proportional to the threat that -- or resistance

13  that they're facing from a person?

14  A.  Yes.

15  Q.  And once that threat stops, does your force also end?

16  A.  When the for -- when the threat stops, yes.

17  Q.  Do you know a person by the name of Michael Kennedy?

18  A.  I do.

19  Q.  How do you know him?

20  A.  We went to the state police academy together.  We were

21  classmates, and we had also been stationed together for a

22  period of time.

23  Q.  How long were you stationed together?

24  A.  I believe I moved to Martinsburg in July of 2018 after

25  spending time in Berkeley Springs as well as Charles Town.

DEREK WALKER – DIRECT EXAMINATION

1  Q.  I'm going to direct your attention to November of 2018.

2  Were you working with Michael Kennedy then?

3  A.  Yes, ma'am.

4  Q.  And specifically on November 19, 2018, were you working

5  that day?

6  A.  Yes, ma'am.

7  Q.  What shift were you working?

8  A.  I don't recall which shift it was.  Multiple shifts there

9  to try to cover.  We're low on manpower.

10  Q.  Well, let me ask you this.  Around midnight on

11  November 19th, were you working at that time?

12  A.  Yes, ma'am.

13  Q.  So whatever shift you were working covered that period of

14  time?

15  A.  Yes, ma'am.

16  Q.  Were you working alone or with a partner?

17  A.  There were several other troopers working.  But as far as

18  driving in a vehicle, I was by myself.

19  Q.  Did there come a time when you responded to a radio call

20  for an instance that occurred at Jack Rabbit's in Martinsburg?

21  A.  Yes, ma'am.  Myself and Trooper Kennedy were in the area of

22  that call.  It was a man that was calling 911 repeatedly.

23  Q.  And at some point, did you actually go to Jack Rabbit's?

24  A.  Yes.  From what we understood, he wasn't there at Jack

25  Rabbit's.  We went to the area.  We were on another call that

DEREK WALKER — DIRECT EXAMINATION

1  was literally an eighth of a mile maybe from where this guy was

2  supposed to be.  And we went down to the area, and I believe we

3  actually asked dispatch to have the individual come meet us

4  because we couldn't locate him.

5  Q.  Let me just interrupt you for one moment.  You're saying we

6  and us.  Who else were you working with at that time?

7  A.  Myself and Trooper Kennedy.

8  Q.  Did there come a time where you and Trooper Kennedy both

9  went to Jack Rabbit's?

10  A.  Yes.

11  Q.  Okay.  About when was that?

12  A.  I couldn't tell you an exact time, ma'am.

13  Q.  Approximately around midnight?

14  A.  Yes, ma'am.

15  Q.  When you got to Jack Rabbit's, did you see anybody there?

16  A.  We initially made contact I believe with the owners or the

17  employees of Jack Rabbit's.  They said an individual had been

18  in there causing a scene using their cell phone to call 911.

19  And they ended up kicking him out.

20  Q.  Well, let me ask you specifically.  You're in the parking

21  lot of Jack Rabbit's?

22  A.  I was.

23  Q.  Did any other officers respond?

24  A.  Yes.  After myself and Trooper Kennedy had located the

25  subject, he came across the roadway and was speaking to Trooper

DEREK WALKER – DIRECT EXAMINATION

1  Kennedy.  I was still seated in my cruiser facing Route 11.

2  Q.  When you say he came up, who are you talking about?

3  A.  This individual.  I don't recall his name.

4  Q.  As you and Trooper Kennedy are speaking with this

5  individual, did any other law enforcement officers respond to

6  Jack Rabbit's?

7  A.  Yes, ma'am.  Four deputies.

8  Q.  Four deputies from where?

9  A.  From the Berkeley County Sheriff's Office.

10  Q.  Did you know who these deputies were?

11  A.  Not the first three.  The last cruiser that came into my

12  field of vision, I recognized as Deputy Merson's cruiser.

13  Q.  And how do you recognize Deputy Merson's cruiser?

14  A.  It's distinct because it's a black Ford Taurus.  It doesn't

15  have a light bar on it.  It's got different markings on it than

16  the regular cruiser.

17  Q.  So it's not a standard cruiser?

18  A.  I guess you could say that, yes.

19  Q.  What color is it?

20  A.  It's black.

21  Q.  Does it have any markings on it?

22  A.  It does.

23  Q.  And how do you see those markings?

24  A.  They're what they call ghost lettering.  So the light has

25  to hit it in a certain way for it to reflect.  Otherwise, you

DEREK WALKER - DIRECT EXAMINATION

1   really don't see it.

2   Q.  So if the light is not shining on it, it appears to be a

3   black Ford Taurus?

4   A.  It appears so, yes.

5   Q.  And as you saw Deputy Merson's car come into the area near

6   Jack Rabbit's, what did you see next?

7   A.  I was sitting in my cruiser in the parking lot facing both

8   Trooper Kennedy, the subject that we were dealing with, as well

9   as Route 11.  North was to my right.  South was to my left.

10  And as Deputy Merson came into my field of vision, I saw him

11  slow down.  There's actually two entrances to Jack Rabbit's.  I

12  was in the first one.  They was a second one where the other

13  deputies had pulled into the parking lot.  As he was slowing

14  down to make that turn into the first entrance where I was, a

15  vehicle rear-ended him.

16  Q.  You're talking about Deputy Merson now?

17  A.  Yes.

18  Q.  And can you describe the vehicle that rear-ended Deputy

19  Merson's car?

20  A.  At the time, I just noticed it was a silver -- I don't

21  believe it was a sedan.  It was just a silver car.  And I

22  thought to myself, great, who is going to take care of this

23  paperwork now?

24     I saw Deputy Merson pull off of the roadway and activate

25  his rear deck lights.  They're red and blue lights flashing.

DEREK WALKER – DIRECT EXAMINATION

1  As the vehicle hit Deputy Merson, he also honked his horn.  I

2  saw the vehicle back up.  And I was like all right.  Well, he's

3  going to come over here, and he's going to pull into this

4  parking lot, and we're going to get all the information taken

5  care of and work this wreck.  As I'm watching the vehicle back

6  up and pull around Deputy Merson, I saw the vehicle accelerate.

7  At that point, I don't believe Trooper Kennedy noticed what was

8  going on nor were the other deputies aware of it.  I yelled out

9  the window, hey, Mike, get out of the way.  Get out of the way.

10 He --

11 Q.  Let me stop you for one moment.  After you saw that car

12 accelerate, did you see what Deputy Merson did?

13 A.  Yes.  He activated all of his lights and began to pursue

14 the vehicle.

15 Q.  He did begin to pursue the vehicle?

16 A.  Yes.

17 Q.  Did you join that pursuit?

18 A.  I did.  I activated my lights and sirens immediately and

19 pulled out onto Route 11 northbound.

20 Q.  Where were you in relation to Deputy Merson's car?

21 A.  I was perpendicular to him off to his right.

22 Q.  Were you the first car behind his?

23 A.  I was.

24 Q.  And where did you go?

25 A.  We went northbound on Williamsport Pike.

DEREK WALKER – DIRECT EXAMINATION

1  Q.  And as you're going down Williamsport Pike, are you getting

2  updates over the radio?

3  A.  No, ma'am.  I was on my own police frequency.  So Berkeley

4  County Sheriff's Office has their own frequency.  West Virginia

5  State Police has their own as well.  I had my radio set up to

6  where I would scan Berkeley County so, you know, if a deputy is

7  calling for help or a call that I'm close to comes up, I can

8  take care of that.  But it actually takes a turn of the knob to

9  get on that frequency.

10  Q.  So you're on a different frequency?

11  A.  I was at this time, yes.

12  Q.  Describe where you went behind Deputy Merson during the

13  pursuit.

14  A.  Can you be more specific?

15  Q.  Sure.  Did you stay on Williamsport Pike?

16  A.  Yes.

17  Q.  Okay.  Did you have your lights and sirens going?

18  A.  I did.

19  Q.  Approximately how fast were you driving?

20  A.  Between 90 and 110 miles an hour.

21  Q.  Approximately how long did the pursuit last?

22  A.  I wasn't looking at my watch.  But from what I understand

23  after this investigation, I guess that it was approximately 90

24  seconds.

25  Q.  And is that consistent with your experience of being on

DEREK WALKER – DIRECT EXAMINATION

1  that pursuit?  Does that sound about right?

2  A.  Approximately, yes.

3  Q.  But you weren't checking your watch --

4  A.  No, ma'am.

5  Q.  -- during the pursuit; fair to say?

6  A.  No, ma'am.

7  Q.  How did the pursuit end?

8  A.  Are we allowed to say his name?  What's the rules on that?

9        THE COURT:  Just the initials.

10  A.  Okay.  The individual crashed as a result of what appeared

11  to be going off the side of the road and losing control of the

12  vehicle.

13  Q.  Did you see that crash?

14  A.  I did.

15  Q.  And what did you see of it?

16  A.  I observed the vehicle go off to the side of the road.  Saw

17  some dust kick up.  And then I saw the vehicle cross back

18  across the road, north and southbound lanes, and strike a

19  telephone pole.  It spun around.  I remember seeing that.  It

20  like spun around.

21  Q.  Now, sir, did you have a camera in your car that night?

22  A.  I did not although I requested one.

23  Q.  But you didn't have the capability to record in your car at

24  that time?

25  A.  I did not.

DEREK WALKER – DIRECT EXAMINATION

1   Q.  Do you know if other police vehicles from Berkeley County

2   did have video?

3   A.  I was unaware of any vehicle having video.

4   Q.  Have you since learned that there were videos from other

5   cars?

6   A.  Yes, I have.

7   Q.  And have you seen some of those videos?

8   A.  Yes, ma'am.

9        MS. SISCARETTI:  The witness may be shown Exhibit 8.

10       THE COURT:  And, Counsel, before we go further with

11  questions, I know that we've all during the course of this

12  trial, except for the witness up here on the stand, seen these

13  videos, and we've seen what has been characterized as

14  compliance strikes by the witness who is testifying.  Has this

15  witness been immunized or do we need to over his Fifth

16  Amendment right before we go further into that?

17       MS. SISCARETTI:  Your Honor, may we approach?

18       THE COURT:  Yes.

19    (Bench conference commenced.)

20       MS. SISCARETTI:  Your Honor, the witness has not been

21  immunized and does not have any immunity agreement with the

22  Government.

23       THE COURT:  I noticed -- I believe it may have been

24  Mr. Arnold's name on this witness list, but I don't see him in

25  the courtroom.

DEREK WALKER – DIRECT EXAMINATION

1    MR. DOUGLAS:  Your Honor, Trooper Walker has been

2    assessed to be a witness in this case following the grand jury

3    investigation.  He was informed as much on the open transcript

4    in the grand jury that he had been assessed as such and was not

5    a target in the investigation.

6    THE COURT:  At that point or -- I guess my concern is

7    to protect his rights, do we need to go over his Fifth

8    Amendment right or does he understand regardless of whether

9    he's been immunized that the investigation is over as it

10   pertains to him?  Because I don't see Mr. Arnold in the

11   courtroom, and I don't want to -- should we get Mr. Arnold

12   here?

13   MR. DOUGLAS:  I don't know if this matters, but just

14   for the Court's full information, I did work with Mr. Arnold to

15   get him to appear at -- to get the witness here.  So he knows

16   he's appearing to testify, and he had sat in on prep sessions

17   as well.

18   THE COURT:  Mr. Manford?

19   MR. MANFORD:  Okay.  I haven't heard him say they're

20   not going to pursue prosecution.  That's what scares me.  Not

21   to be -- I mean I'm a defense lawyer, you know.  That's what

22   I'm thinking here.

23   MS. SISCARETTI:  We still consider him to be a

24   witness, Your Honor.

25   MR. DOUGLAS:  As of right this moment, he's

DEREK WALKER – DIRECT EXAMINATION

1   considered by the Government to be a witness.

2          MR. MANFORD:  Well, he could be a target --

3          THE COURT:  Well, but -- I have to admit I've never

4   been in a situation where we've had a witness who has appeared

5   in a case where they could be a target and then testifying

6   without being immunized.  Now, that's the Government's decision

7   on whether they're going to do that or not, but him testifying

8   here without his lawyer present, without being immunized,

9   raises a concern for the Court on whether he has been apprised

10  by his lawyer and understands his rights.  I would be hesitant

11  to advise him of them on the record without his attorney being

12  present.  And what I hear you saying is at this point -- so out

13  of an abundance of caution, if he testifies contrary to what

14  you anticipate him testifying to, he very well could become a

15  target; correct?

16         MS. SISCARETTI:  Well, I believe that would be the

17  same as any witness, Your Honor.  If we felt that they

18  testified untruthfully, any witness would be subject to a

19  perjury charge.

20         THE COURT:  No, that -- what I'm referring to is not

21  a perjury charge for testifying inconsistently with what he may

22  have said to your investigators during the course of the

23  investigation or in front of a grand jury.  But if he testifies

24  inconsistently or what you don't anticipate him to testify

25  about, whether he's going to end up being a defendant charged

DEREK WALKER – DIRECT EXAMINATION

1  with his actions in this case, he opens himself up to that if

2  he testifies as to what happened, does he not?

3        MS. SISCARETTI:  Again, Your Honor, he's –– as far as

4  this criminal case, the Government considers him to be a

5  witness.  I believe, as Mr. Manford knows, that he is still

6  facing an internal investigation which he's currently

7  appealing.

8        THE COURT:  Right.  I'm not referring to whatever is

9  going ––

10       MS. SISCARETTI:  Right.

11       THE COURT:  –– on with the state police.  That's on a

12  civil side rail.  But ––

13       MR. DOUGLAS:  It's hard to say because I mean we're

14  not trying to create Giglio here right in the middle of trial,

15  but the case is over.  This is the single defendant that's

16  being charged for a 242 violation.  We're very well aware

17  obviously of all the videos.  We had him in the grand jury.  We

18  told him he's a witness because we deemed that we could never

19  prove beyond a reasonable doubt that his minimal force that was

20  used only at the very beginning of the encounter would be

21  excessive.  So we're assessing all the officers in fact,

22  including Deputy Ennis who has already testified who also has a

23  criminal defense attorney.

24       MS. SISCARETTI:  Would Your Honor be more comfortable

25  if we were able to contact his attorney?

DEREK WALKER – DIRECT EXAMINATION

1              THE COURT:  I would.

2              MR. DOUGLAS:  Okay.

3              THE COURT:  What I hear you saying, Mr. Douglas, is

4    you assessed everybody else's actions, and you don't find that

5    anybody else's actions raise to the level of --

6              MR. DOUGLAS:  Yes.

7              THE COURT:  -- committing any offense?

8              MR. DOUGLAS:  Yes.  That's both implicit and the

9    presentment of a single defendant in an indictment and also

10   explicit to the extent we told them in front of the grand jury

11   that they're assessed as witnesses.  But certainly --

12             MS. SISCARETTI:  And that there were no promises in

13   connection for their testimony or --

14             THE COURT:  I think I'd feel more comfortable if we

15   took a bit of a break and my office can -- or do you have a

16   phone number to contact Mr. Arnold?

17             MR. DOUGLAS:  Somewhere I have it, yes.

18             THE COURT:  Okay.  Why don't we let your office

19   contact Mr. Arnold --

20             MR. DOUGLAS:  Yes.

21             THE COURT:  -- so my office is out of the middle of

22   this.

23             MR. DOUGLAS:  Yes.

24             THE COURT:  And see if we can't get him here.

25             MR. DOUGLAS:  Will do.

DEREK WALKER – DIRECT EXAMINATION

1          THE COURT:  All right.  Thank you.

2          MR. DOUGLAS:  Thanks.

3          MR. MANFORD:  Thank you, Your Honor.

4      (Bench conference concluded.)

5          THE COURT:  We're going to take a bit of a recess.

6      Mr. Walker, you're technically on the stand.  We're going

7   to go ahead and take a recess here so remember not to discuss

8   your testimony with anyone.

9          THE WITNESS:  Yes, ma'am.

10          THE COURT:  Okay.

11      (Recess 2:30 P.M. – 3:10 P.M.)

12          THE COURT:  Please be seated, everyone.

13      We are back on the record.  The defendant and his counsel,

14   along with the Government lawyers are here present.  We've

15   taken a brief recess.

16      Mr. Arnold, thank you for letting us rustle you up here in

17   short order.  Would Counsel approach, please.  You can bring

18   the defendant with you as well, Mr. Manford.

19      (Bench conference commenced.)

20          THE COURT:  Counsel, I may have been overthinking

21   this.  Mr. Arnold, we had this witness on the stand, and we've

22   looked at these videos quite a number of times during the

23   course of this trial.  It's very clearly within the picture

24   your client, this witness's, actions as well as Mr. Kennedy's

25   actions can clearly be seen.

DEREK WALKER – DIRECT EXAMINATION

1          MR. ARNOLD:  Right.

2          THE COURT:  Given that, out of an abundance of

3   caution, I asked counsel -- and I'm sure Mr. Douglas has filled

4   you in on this, but just to repeat it for the record, I asked

5   counsel if this witness, your client, Mr. Walker, had been

6   immunized or whether we should have you here present because

7   you were listed as his lawyer on the witness list and have the

8   Court review his Fifth Amendment right with him before he gets

9   any further into his testimony.

10      The point we are in the testimony is the Government was

11   just setting up his testimony to testify to what was going on

12   on the videos as they have with other witnesses.

13      You've waived your right to be present for his testimony,

14   but I guess that's academic now because we've got you here.

15   Sorry we had to pull you out of --

16          MR. ARNOLD:  That's okay, Your Honor.  I appreciate

17   the Court's concern.  I have had an ongoing relationship with

18   the AUSAs in this case for a long time now.  And Mr. Walker and

19   I did do a proffer many months ago.  And after that proffer,

20   the Government informed me that he was a fact witness, and then

21   that's the end of the analysis.  I know he's been to the grand

22   jury and testified, and so I'm completely comfortable with my

23   client simply testifying today as a fact witness.

24          THE COURT:  Okay.

25          MR. DOUGLAS:  And, Your Honor, if I can just

DEREK WALKER - DIRECT EXAMINATION

1  supplement the record.  When we informed counsel that we had

2  assessed Trooper Walker as a witness and also made a record of

3  that on the grand jury transcript that was a final assessment.

4          THE COURT:  Okay.

5          MR. DOUGLAS:  It was tantamount to the declination of

6  prosecution --

7          THE COURT:  Okay.

8          MR. DOUGLAS:  -- as it pertains to Trooper Walker in

9  committing a 242 violation based on misconduct.

10         THE COURT:  Given that -- I appreciate that.  Given

11 that, do we need to review the Fifth with him?

12         MR. ARNOLD:  I don't believe it's necessary, Your

13 Honor.

14         THE COURT:  Doesn't sound like we do.

15         MR. DOUGLAS:  To the extent we found insufficient

16 evidence of a violation of law, there would be nothing to

17 immunize him about.

18         THE COURT:  Okay.  All right.  I think we're good

19 then.  All right.  Thank you, Mr. Arnold --

20         MR. ARNOLD:  Certainly, Your Honor.

21         THE COURT:  -- for running you out here.

22         MR. ARNOLD:  Certainly, Your Honor.  Thank you.

23         THE COURT:  Thank you, Counsel.

24    (Bench conference concluded.)

25         THE COURT:  All right.  We'll proceed.  Yes, you're

DEREK WALKER – DIRECT EXAMINATION

1    free to go, Mr. Arnold.  Thank you.  We'll proceed.

2            MS. SISCARETTI:  Thank you, Your Honor.

3                 DIRECT EXAMINATION (Continued)

4            MS. SISCARETTI:  I believe when we left off, we were

5    showing the Government's Exhibit 8 to the witness.  May that be

6    pulled up on the screen?

7            THE COURT:  Yes.

8            MS. SISCARETTI:  Thank you.

9    BY MS. SISCARETTI:

10   Q.  Mr. Walker, do you see that screen in front of you?

11   A.  Yes, ma'am.

12   Q.  And do you recognize that video that's paused right now in

13   front of you?

14   A.  I do.

15   Q.  And what do you recognize that to be?

16   A.  That appears to be the dashcam video from Deputy Merson's

17   cruiser.

18   Q.  Have you seen that before?

19   A.  Yes.

20   Q.  And do you actually appear in the video?

21   A.  I do.

22   Q.  I'm going to start to play it.  I'm going to ask you to

23   identify people as they come onto the screen.

24   A.  Okay.

25            MS. SISCARETTI:  Can you play it.  Pause at five

DEREK WALKER – DIRECT EXAMINATION

 1  seconds.

 2  BY MS. SISCARETTI:

 3  Q.  Do you recognize that person?

 4  A.  That's Deputy Merson.

 5  Q.  Did you know him before that night?

 6  A.  I did.

 7      MS. SISCARETTI:  We can continue playing.  Pause at

 8  ten seconds.

 9  BY MS. SISCARETTI:

10  Q.  Another person appears on the screen.  Who is that?

11  A.  That's me.

12  Q.  And what are you doing at ten seconds on the screen?

13  A.  I'm putting on my gloves.

14  Q.  Why are you doing that?

15  A.  Because this person hasn't exited the vehicle and started

16  running yet or anything like that so my inclination is that

17  we're going to have to take him out of the vehicle.

18      MS. SISCARETTI:  We can continue playing.  If we can

19  pause.  It's paused at 19 seconds.

20  BY MS. SISCARETTI:

21  Q.  It appears you're next to the suspect's car; is that

22  correct?

23  A.  Nearby, yes.

24  Q.  Were you able to see into the driver's side window?

25  A.  Not initially.

DEREK WALKER – DIRECT EXAMINATION

1  Q.   Is there a point where you were able to?

2  A.   Partially.  There was a lot of smoke coming from the

3  vehicle.

4  Q.   Was the smoke blocking your view initially?

5  A.   Yes.

6  Q.   Was there a point you could see through some of the smoke

7  to see the suspect?

8  A.   Relatively, yes.

9  Q.   What could you see of the suspect?

10  A.   As the smoke was clearing, myself and Deputy Merson were

11  telling the subject to get out of the vehicle.  And at that

12  point, I was able to see -- again, not very well, but I was

13  able to see that he was facing us.  Was conscious and alert and

14  was just staring at us as we were giving him commands to get

15  out of the vehicle.

16  Q.   Was he responding to the commands?

17  A.   No.

18  Q.   He didn't say anything?

19  A.   No.

20  Q.   Could you see any injuries on him?

21  A.   Not that I recall off the bat.

22  Q.   Any injuries on his face?

23  A.   I don't recall seeing one, no.

24  Q.   Is that something you would recall?

25  A.   I believe so.

DEREK WALKER – DIRECT EXAMINATION

1   Q.   Could you see the suspect's hands?

2   A.   Partially.  It appeared that he didn't have anything in his

3   hands although I couldn't see very clearly.

4   Q.   Could you see what he was doing with his hands?

5   A.   I don't recall exactly if they were sitting on his lap

6   or -- he wasn't waving them in the air or anything like that.

7   I don't recall exactly what position they were in.

8   Q.   Did you see him moving at all in the driver's seat?

9   A.   No.  I don't recall him moving.  Just staring at us.

10          MS. SISCARETTI:  And continue playing.  If we could

11   pause.  It's paused at 24.

12   BY MS. SISCARETTI:

13   Q.   Can you describe what's happening there?

14   A.   Appears that Deputy Merson has already broken the window

15   out, and he's given him commands to get out of the vehicle.

16   Q.   And do you recall seeing Deputy Merson do that as you're

17   standing there?

18   A.   I don't recall his exact movements.  I wasn't really

19   focused on him, no.

20   Q.   What were you focused on?

21   A.   The subject in the vehicle.

22   Q.   Was the suspect in the vehicle moving at that time?

23   A.   No.  He was just sitting there staring at us.

24          MS. SISCARETTI:  If we can continue playing.  If we

25   could pause.

DEREK WALKER - DIRECT EXAMINATION

1  BY MS. SISCARETTI:

2  Q.  At 28 seconds another person has appeared on the screen.

3  Do you recognize that person?

4  A.  That's Trooper Kennedy.

5         MS. SISCARETTI:  If we could continue.  Pause at 31

6  seconds.

7  BY MS. SISCARETTI:

8  Q.  Can you describe what you just did there?

9  A.  Yes.  I extricated the subject from the vehicle.  At that

10  point, we were putting him in handcuffs.  He was under arrest.

11  He is going to be arrested for the string of events that

12  occurred before this.

13  Q.  Let me just ask you specifically what you were doing.  Why

14  did you extricate the suspect from the car in that way?

15  A.  Because he needed to go in handcuffs immediately.

16  Q.  He was under arrest?

17  A.  Yes.

18  Q.  What did he say as you pull him out of the car, if

19  anything?

20  A.  I don't recall him saying anything.

21  Q.  When he was on the ground at this point, 31 seconds, is he

22  face up or face down?

23  A.  Looks like he's on his left side and maybe belly down in

24  between those positions.  And I've got a hold of his right

25  hand.

DEREK WALKER – DIRECT EXAMINATION

1  Q.  You have a hold of his hand?

2  A.  I do.

3  Q.  What else physically?  Is he moving in any way?

4  A.  He's trying to tuck his arms up underneath of his body.

5  Q.  His arms underneath him?

6  A.  Yes.

7       MS. SISCARETTI:  If we can continue playing.  Pause.

8  BY MS. SISCARETTI:

9  Q.  At 34 seconds another person has come up on the scene.  Do

10  you recognize that person?

11  A.  I didn't at the time but through the course of this, I

12  learned that it was Deputy Ennis.

13  Q.  That's another law enforcement officer?

14  A.  Yes.

15  Q.  And what agency is that person with?

16  A.  Berkeley County Sheriff's Office.

17       MS. SISCARETTI:  If we can continue playing.  If we

18  can pause at 40 seconds.

19  BY MS. SISCARETTI:

20  Q.  Where are you on the screen at this time?

21  A.  I'm to the left of Deputy Ennis who is on his knees.

22  Q.  You're sort of leaning over the suspect?

23  A.  Yes.

24  Q.  And you're looking down at the suspect?

25  A.  Yes.

DEREK WALKER – DIRECT EXAMINATION

1  Q.  And what are you --

2  A.  I was trying to get a hold of his arm to put it in place

3  behind his back to place him in handcuffs.

4  Q.  What was he doing with his arm?

5  A.  He was resisting and trying to pull it underneath of his

6  body.

7  Q.  He was trying to pull it underneath himself?

8  A.  Yes.

9  Q.  Was he striking out at anybody?

10  A.  No, I don't recall any strikes or anything like that, no.

11  Q.  Kicking or anything like that?

12  A.  I don't recall a kick although I wasn't looking at his

13  legs.

14  Q.  Where is your focus at that time?

15  A.  I've got a hold of his right hand which he actually broke

16  my grip a couple times as I'm trying to place it behind his

17  back.  I didn't have access to his left hand at the point so I

18  was concerned about his right arm or right hand at that point.

19  Q.  When you broke your grip, was that to pull his hand

20  underneath him?

21  A.  Yes.  It appeared to be so.

22  Q.  Why are you focusing on his hands?

23  A.  Because I've had a situation before where I was placed in a

24  predicament where I could have gotten myself killed.

25  Q.  Let me ask you specifically about this suspect.

DEREK WALKER - DIRECT EXAMINATION

1    A.  Yes.

2    Q.  Were you focusing on his hands to put handcuffs on him?

3    A.  Yes.

4           MS. SISCARETTI:  We can continue playing.  If we can

5    pause at 44.

6    BY MS. SISCARETTI:

7    Q.  The person standing kicking in the back, who is that?

8    A.  The officer in the back is Trooper Kennedy.

9    Q.  Did you see Officer Kennedy kicking at that time?

10   A.  I did not.

11          MS. SISCARETTI:  We can continue to play.  Pause at

12   46.

13   BY MS. SISCARETTI:

14   Q.  The officer in the back that's stomping down, who is that?

15   A.  The officer in the back is Trooper Kennedy.

16   Q.  What were you doing at this time?

17   A.  Still trying to get his hands behind his back and place him

18   in handcuffs.

19          MS. SISCARETTI:  We can continue playing.  If we

20   could pause at 57 seconds.

21   BY MS. SISCARETTI:

22   Q.  What are you doing now in the video?

23   A.  Just gaining control of his left arm and placed it

24   behind his back.  And I'm getting ready to place handcuffs on

25   him.

DEREK WALKER – DIRECT EXAMINATION

1  Q.  Do you have both of the suspect's hands in yours?

2  A.  I do at this point.

3  Q.  In one hand or two hands?

4  A.  Both hands at this point.

5  Q.  Did you have both of the suspect's hands?

6  A.  Yes, at this point.

7  Q.  And are you holding both of his hands with one of your

8  hands?

9  A.  No.  It looks like I've got both hands on his hands at this

10  point.

11  Q.  Is the suspect lying face up or face down?

12  A.  He is face down.

13  Q.  Is he saying anything at this time?

14  A.  I don't recall him saying anything this entire event.

15  Q.  What did the other officers do?

16  A.  At this point, I do recall Deputy Merson saying that his

17  back had seized up or something to the like of that.

18  Q.  You heard that?

19  A.  I remember something like that, yes.  I don't know verbatim

20  but...

21  Q.  And the officers it appears physically moved away from you

22  and the suspect?

23  A.  Yes.

24  Q.  Did you hear any of their conversation other than --

25  A.  I did not.  My focus was back on the subject there on the

DEREK WALKER – DIRECT EXAMINATION

1   ground.

2          MS. SISCARETTI:  If we could continue playing.  If we

3   could pause.

4   BY MS. SISCARETTI:

5   Q.  Now, two things about this spot at one minute in.  Appears

6   another officer appeared on the scene.  Do you know who that

7   was?

8   A.  I have no clue.

9   Q.  Was it another law enforcement officer?

10  A.  It appears to be somebody from the Berkeley County

11  Sheriff's Office.

12  Q.  Was that based on their uniform?

13  A.  Yes, ma'am.

14  Q.  And then it appears that Michael Kennedy moved at that

15  point.  What's he doing now?

16  A.  He's placed his knee on the back of the subject to hold

17  him down to the ground because he had just been resisting

18  us.

19  Q.  When you say resisting, you're referring to when he was

20  putting his hands underneath him --

21  A.  Yes, active resistance to not be handcuffed.

22  Q.  At this point, one minute in, what was the suspect doing

23  then?

24  A.  He was lying on the ground.  I had both arms behind his

25  back.  And you can see that I deliberately -- I had his hands

DEREK WALKER – DIRECT EXAMINATION

1  down with my left hand.  I deliberately switched my hands so

2  that he would not bring his arms out from back behind.  Had I

3  let his arms go completely, he would have brought them back out

4  around him.

5  Q.  So you were able to hold both of his hands in your left

6  hand?

7  A.  Initially.

8          MS. SISCARETTI:  All right.  If we can continue

9  playing.  If we can pause at 107.

10  BY MS. SISCARETTI:

11  Q.  Can you describe what was happening there?

12  A.  Yes, ma'am.  So I had his hands with my right hand.

13  Trooper Kennedy was just applying pressure to his back to hold

14  him down on the ground.  I got my handcuffs out.  They're on my

15  left side.  I had to switch my hands.  When I got the handcuffs

16  out and was getting ready to put handcuffs on him, the subject

17  released or broke my grip with his right hand and tried to put

18  it up in front of him.  I don't know exactly what it was.

19  Whether he was trying to post up or get it back underneath of

20  his body.  And then I went after his hand with my right hand to

21  get it back behind his back.

22  Q.  So you were able to get his right hand back behind his

23  back?

24  A.  Yes.

25  Q.  And how were you able to do that?

DEREK WALKER – DIRECT EXAMINATION

1    A.  Through yanking it back with force.

2    Q.  So you grabbed his hand with your right hand and pulled it

3    back?

4    A.  Yes.

5    Q.  And then it was back under your control?

6    A.  Pretty much.  He still tensed up the entire time.  Had I

7    ever let his hands go at any point, they would have not stayed

8    where I put them.

9    Q.  And at this point, 107, you have control of his hands?

10   A.  At this point, yes.

11          MS. SISCARETTI:  We can continuing playing.  If we

12   can pause at 113.

13   BY MS. SISCARETTI:

14   Q.  It appears that Kennedy struck the suspect five times?

15   A.  Yes.  Just before he struck him also the subject moved his

16   right arm again and looked like an attempt to bring the arm

17   back out where he just broke my grip.

18   Q.  He moved his arm?

19   A.  Yes.

20   Q.  Did you still have your hands on him?

21   A.  I had my hands on him, yes.

22   Q.  And you had your hands on the suspect's hands?

23   A.  Yes.  But not under control.

24          MS. SISCARETTI:  Pull up Exhibit 8 again.  I believe

25   at 113.  If we could continue playing.  Pause.

DEREK WALKER – DIRECT EXAMINATION

1  BY MS. SISCARETTI:

2  Q.  And at 118 there was a pause and then another three strikes

3  from Trooper Kennedy; is that correct?

4  A.  Yes, ma'am.

5  Q.  What was the suspect doing at that time?

6  A.  So at that point, I had the handcuff on his right hand, and

7  then I had my handcuffs wrapped like this with the chain in

8  between getting ready to put the other handcuff on his left

9  arm.  You can see Trooper Kennedy readjust his arm so I can get

10  a hold of it.  Because, again, as I was putting on the -- the

11  handcuffs on the right arm, I had let go of his left arm to do

12  that.  I needed both hands.  And his arm had moved again.  He

13  gave his arm to me.  I was able to handcuff him with a couple

14  seconds.

15  Q.  So you were in the process of handcuffing the suspect?

16  A.  I was in the process, yes.

17  Q.  At the time of those strikes?

18  A.  Yes.

19         THE COURT:  Who gave his arm to you?

20         THE WITNESS:  Trooper Kennedy did.

21  BY MS. SISCARETTI:

22  Q.  Was that before the strikes?

23  A.  That was just before the strike, yes.

24  Q.  And at 118 on the screen, where is Deputy Merson?  Is he

25  still on the video?

DEREK WALKER – DIRECT EXAMINATION

1  A.  Yes.  It appears he's on the right on the ground in a

2  seated position.

3          MS. SISCARETTI:  If we can continue playing.  If we

4  can pause at 122.

5  BY MS. SISCARETTI:

6  Q.  Can you describe what just happened there?

7  A.  Yes.  I went to stand the subject up and place him in a

8  cruiser, a secure location.  As I picked him up, his whole body

9  tensed up.  And he jerked, and I lost my footing.

10  Q.  Did you trip at that point?

11  A.  Yes.

12  Q.  Did the suspect say anything at that time?

13  A.  I don't recall him saying anything.

14  Q.  Other than tensing up, did he move in any way?

15  A.  Yes.  He jerked.

16  Q.  Jerked?

17  A.  Yes.

18  Q.  And he's handcuffed at this time?

19  A.  Yes.  Immediately before I go to pick him up is when I got

20  the handcuff locked in.

21  Q.  Was he handcuffed in front or behind?

22  A.  Behind his back.

23  Q.  And you said your intention at that point was to put him in

24  a cruiser?

25  A.  Yes.  That's the normal things I do.  As soon as somebody

DEREK WALKER - DIRECT EXAMINATION

1  gets in handcuffs, I go put them in the cruiser.  That's just

2  what I do.

3  Q.  That's your regular routine or practice --

4  A.  Yes.

5  Q.  -- at the time?  And you said -- and correct me if I'm

6  wrong.  Did you testify earlier because that was a secure

7  location for a suspect?

8  A.  Yes, that's my training although we don't have partitions

9  in our cruisers so once you do put somebody in your cruiser,

10  you have to stay with them.

11        MS. SISCARETTI:  If we can continue playing and

12  pause.

13  BY MS. SISCARETTI:

14  Q.  Do you see Trooper Kennedy on the screen at this point?

15  A.  Yes.

16  Q.  And what's he doing?

17    (Screen blank.)

18        THE CLERK:  Is anybody accidentally touching the

19  screen?

20  BY MS. SISCARETTI:

21  Q.  Where is Michael Kennedy on the screen at this time, 124?

22  A.  It appears that he's over top of the subject.

23  Q.  Did you see that?

24  A.  No, I don't recall that.

25  Q.  Where are you on the screen?

DEREK WALKER – DIRECT EXAMINATION

1    A.  I'm behind them.  I just had gotten up off the ground.

2         MS. SISCARETTI:  If we can continue playing.  If we

3    could pause at 130.

4    BY MS. SISCARETTI:

5    Q.  And did it appear that Michael Kennedy just tossed the

6    suspect at that point?

7    A.  That's what it appears, yes.

8    Q.  Did you see that?

9    A.  No.  I don't recall seeing that.

10   Q.  What were you doing at this time?

11   A.  I was walking over to the vehicle as we were extricating

12   the subject.

13   Q.  Why -- and just to back you up for one moment.  Why did you

14   turn and walk away at that point?

15   A.  Because I was upset.

16   Q.  What were you upset about?

17   A.  I had just fallen to the ground because of this person.

18   Q.  And you walked away from the person?

19   A.  Yes.

20   Q.  Did you have any other physical contact with that person?

21   A.  No.  I don't recall any.

22   Q.  Did you, yourself, see any other need for physical contact

23   with the suspect after you got up and walked away?

24   A.  I didn't see the suspect after that.

25   Q.  Did you see if the suspect was moved at any point after

DEREK WALKER - CROSS EXAMINATION

1  that?

2  A.  I don't -- I didn't see him.

3  Q.  Did you see anything that Michael Kennedy did after that

4  point?

5  A.  No.

6  Q.  Fair to say you stayed by the car?

7  A.  Yes.  I was searching the vehicle.

8       MS. SISCARETTI:  Your Honor, may I have a moment?

9       THE COURT:  Yes, ma'am.

10       MS. SISCARETTI:  Your Honor, I have no further

11  questions.

12       THE COURT:  Cross.

13                  CROSS EXAMINATION

14  BY MR. MANFORD:

15  Q.  Good afternoon, Derek.  How are you?

16  A.  Good, sir.  How about yourself?

17  Q.  Good.  Thank you.  Okay.  You said that you actually had

18  training with Michael Kennedy back in the day?

19  A.  Yes.  We were also on special operations with the state

20  police together.

21  Q.  Okay.  And do you remember having scenario training?

22  A.  Yes.

23  Q.  Okay.  And what the heck was that?

24  A.  In the academy it was just scenarios that you would go --

25  they would put together like a domestic, and you would have to

DEREK WALKER - CROSS EXAMINATION

1    go deal with the people or the role players in that scenario.

2    And several things could happen.  They could all bust loose on

3    you and you got chaos or you could have a good dialogue with

4    that person, and you just had to work your way through these

5    scenarios.

6    Q.  Okay.  And was that -- you were at the academy for six

7    months?

8    A.  Yes.

9    Q.  How -- what portion of your six-month training involved the

10   scenario training?

11   A.  It was sporadic.

12   Q.  Okay.  Were you also -- in scenario training when you had

13   to use force, do you remember the type of teaching you received

14   about how to -- you use force?  Is it martial arts?  Is it

15   boxing?  What was it?

16   A.  We did a lot of boxing in the academy --

17   Q.  Okay.

18   A.  -- as well as when the decision is made to arrest somebody,

19   you do so by whatever means you need to do that.

20   Q.  Okay.  The situation dictates the means?

21   A.  Yes.

22   Q.  Okay.  All right.  Okay.  So when you saw the crash, you

23   were the second cruiser in line?

24   A.  I was.

25   Q.  Okay.  And did the explosion of the transformer make an

DEREK WALKER – CROSS EXAMINATION

1   impact upon you?

2   A.  Yes.  Very much so.

3   Q.  And it --

4   A.  It was right above my cruiser.

5   Q.  Tell us about that.

6   A.  So when he lost control of the vehicle and hit the

7   telephone pole, there was a small explosion that startled me.

8   And you actually see in the video where Deputy Merson jerks the

9   wheel of his vehicle.  And then as I'm trying to get pulled up

10  to the suspect's vehicle, a second larger explosion happens.

11  Looked just like daylight.  It was loud.  And I was looking

12  around my cruiser to look for falling lines coming down to make

13  sure when I stepped out, I didn't get electrocuted.  That was a

14  huge concern for me at that point.

15  Q.  Was it a tense situation?

16  A.  Absolutely.

17  Q.  Okay.  Were you worried about your safety and the safety of

18  the other officers?

19  A.  Absolutely.

20  Q.  Okay.  All right.  So when the subject was extricated from

21  the vehicle, is it your testimony that you don't recall seeing

22  any injuries on him at that time?

23  A.  No, I don't recall any injuries on him at that time.

24  Q.  Okay.  Do you recall any injuries at any time?

25  A.  Yes.

DEREK WALKER - CROSS EXAMINATION

1  Q.  Okay.  And when is the first time that you observed an
2  injury?
3  A.  As I'm trying to handcuff him, you can see in the video
4  where he looks up and it looks like -- appears that he has
5  blood running down his face.
6  Q.  Okay.  That would be on the left side of his face?
7  A.  I believe so.  I would have to look at the video again just
8  to make sure.
9  Q.  Okay.  Let's see here.
10         MR. MANFORD:  Well, number 8.  At -- let's just do it
11  -- start at the one-minute mark.  I could do mine but she's
12  better at it.  Okay.  So I hope I'm right.
13         MS. MURRAY:  You said where at?
14         MR. MANFORD:  One minute.
15         MS. MURRAY:  One minute?
16         MR. MANFORD:  Yes, ma'am.  That's great.  Thank you.
17  I hope I'm right.  Let's see here.  Well, let's -- yeah, that
18  will work.
19  BY MR. MANFORD:
20  Q.  So we're here at the one-minute mark on this Merson video.
21  Are you with me, Derek?
22  A.  Yes.
23  Q.  Okay.  And at this point in time, we have -- I think maybe
24  we had -- that's -- we've had that.  That's Officer Ritchie I
25  think right in front of the --

DEREK WALKER - CROSS EXAMINATION

1      (Simultaneous speech.)

2   Q.  And would you agree with me that at this point in time,

3   we've got -- Trooper Kennedy has his right knee on the

4   subject's back?

5   A.  That's correct.

6   Q.  And you're attempting -- there's been no compliance strikes

7   by Officer Kennedy at this time; would you agree with me?

8   A.  No that I had seen, no.

9   Q.  All right.  And at this time, you're trying to cuff him

10  from behind?

11  A.  Yes.

12  Q.  And the subject is laying face down or belly down as you

13  said --

14  A.  Yes.

15  Q.  -- on the surface of the road?

16  A.  Yes.  That's correct.

17  Q.  All right.  So --

18          MR. MANFORD:  Okay.  If we could play that until I

19  tell you to stop.  Thank you.  And stop.

20  BY MR. MANFORD:

21  Q.  All right.  So do you see the subject's head?

22  A.  I do.

23  Q.  Okay.  Is -- on the left side of his face, is that what you

24  were referring to as the injury you saw?

25  A.  Yes.

DEREK WALKER – CROSS EXAMINATION

1  Q.  Okay.  Had Trooper Kennedy touched him or struck him in any
2  way at that time or used any force other than his knee at that
3  point in time and a couple of kicks we saw earlier?
4  A.  Not that I had seen or after watching the video.  He had
5  not been around this whatsoever.
6  Q.  Okay.  Right now you're still trying to handcuff the
7  subject?
8  A.  I am.
9  Q.  And you have his right hand in your hand?
10 A.  Yes.  I'm trying to keep his arms behind his back at this
11 point.  I'm using both hands.
12 Q.  Okay.  All right.
13         MR. MANFORD:  Go ahead and start.  And stop.
14 BY MR. MANFORD:
15 Q.  All right.  I just saw you just jerk his right arm back.
16 A.  Yes.
17 Q.  Okay.  Is he resisting at this point?
18 A.  Actively resisting, yes.
19 Q.  Actively.  There's passive resisting too?
20 A.  Yes.
21 Q.  Okay.  But this would be something much more serious?
22 A.  Yes.
23 Q.  Okay.  Trooper Kennedy appeared to be looking in the
24 opposite direction, and then got the attention of what was
25 going on.  Would you agree or disagree with that?

DEREK WALKER - CROSS EXAMINATION

1    A.  That -- I agree with that.  It appears that he is looking

2    elsewhere.

3    Q.  Okay.

4         MR. MANFORD:  And if you go ahead and roll some more,

5    please.  And stop.

6    BY MR. MANFORD:

7    Q.  All right.  There's five strikes by Trooper Kennedy?

8    A.  I didn't count them but, yes, I believe you on that.

9    Q.  Do you recognize those as -- we've been -- before you took

10   the stand, we've been calling these compliance strikes.  Would

11   you agree or disagree they're compliance strikes?

12   A.  I would agree.

13   Q.  Okay.  To the muscle area of the subject, would that be a

14   compliance strike to deliver some pain to get them to the

15   comply with orders?

16   A.  Yes.

17   Q.  Okay.  So while this is going on, did it have any effect on

18   the subject?  Did he become compliant?

19   A.  Didn't appear so.  As you can see right before Trooper

20   Kennedy starts striking him, I have to readjust his right arm

21   again.  And then after the first set of strikes, he has to

22   readjust his left arm for me to get a hold of him.

23   Q.  Okay.  In a second I'll ask them to play it again.  And can

24   you see Trooper Kennedy's leg kind of out there at an angle to

25   the right side of the officer in the middle of the screen?

DEREK WALKER – CROSS EXAMINATION

1    A.  Yeah, it appears he's in that position, yes.

2    Q.  Okay.  I'd like you to focus in on that and see if you can

3    tell me whether or not you see the subject's left hand free.

4    A.  Okay.

5             MR. MANFORD:  Okay.  You can play.  Stop.

6    BY MR. MANFORD:

7    Q.  Did you see what Officer Kennedy just did?

8    A.  Yes, he readjusted his left arm so that I could get a hold

9    of it and put him in handcuffs.

10   Q.  Okay.  So not only is his right hand loose, but his left

11   hand is loose as well?

12   A.  Yes.

13   Q.  Okay.  All right.  So would that be considered active

14   resistance?

15   A.  That -- yes.  That the -- what I was explaining earlier is

16   that he was tensed up the entire time.  Had I let go of his

17   hands like I did with his left hand to get it in handcuffs, he

18   would have moved it from the small of his back where I had

19   placed them.

20   Q.  Okay.  You were there and tried to cuff him at the time;

21   right?

22   A.  Yes.

23   Q.  Okay.  So is he tensing up at this point?

24   A.  Yes.  He is tense just about the entire time.

25   Q.  All right.

DEREK WALKER – CROSS EXAMINATION

1        MR. MANFORD:  If you would please play it again.  And

2    stop.

3    BY MR. MANFORD:

4    Q.  So we see three more strikes by Trooper Kennedy?

5    A.  Yes.

6    Q.  Okay.  So do you see Officer Merson on all fours?

7    A.  Yes.

8    Q.  Okay.  And you see Officer Ennis right beside him?

9    A.  Umm --

10   Q.  Not sure?

11   A.  I'm not real sure, no.

12   Q.  All right.  Can the other officers from your review of the

13   video and from your recollection that night, could they see

14   whether or not the subject was resisting at this point in time?

15       MS. SISCARETTI:  Objection as to what other officers

16   saw, Your Honor.

17       THE COURT:  Mr. Manford.

18       MR. MANFORD:  Looks like Officer Ennis if I'm not

19   mistaken.

20       THE COURT:  No.  I think your question was can the

21   other officers see what was happening --

22       MR. MANFORD:  Oh, oh, I agree.  I agree.

23       THE COURT:  And that's the objection.  Sustained.

24   BY MR. MANFORD:

25   Q.  Would Officer Kennedy have blocked other officers' views at

DEREK WALKER - CROSS EXAMINATION

1   this point?

2   A.  Potentially.

3           MS. SISCARETTI:  Objection.

4           THE COURT:  Mr. Manford?

5           MR. MANFORD:  Yes, ma'am?  Is there an objection?

6   I'm sorry.  I don't hear very well.  You know that.

7           THE COURT:  That's -- all right.  We'll let you give

8   the full objection, Ms. Siscaretti.

9           MS. SISCARETTI:  Objection calling for speculation

10  about what other officers could have seen and what was blocking

11  their view.

12          MR. MANFORD:  Okay.  We'll move on.

13          THE COURT:  Okay.

14  BY MR. MANFORD:

15  Q.  Okay.  So I guess the sixty-four-dollar question.  Right

16  now, right before those three compliance strikes were

17  delivered, you're trying to cuff the subject; is that correct?

18  A.  I'm actively trying to handcuff him, yes.

19  Q.  Is he actively resisting at that time?

20  A.  Yes.  He is tensed up.

21  Q.  And that's how he's resisting, tensing up?

22  A.  Yes.

23  Q.  Okay.  So I understand your testimony before, if you had

24  not -- if he had not tensed up, you wouldn't have had a

25  problem?  He would not be actively resisting?

DEREK WALKER – CROSS EXAMINATION

1    A.  It would have only taken one officer to handcuff him.

2          MR. MANFORD:  Okay.  So if we can continue playing.

3    Okay, stop.

4    BY MR. MANFORD:

5    Q.  So this is the trip, the fall.  You fell onto the subject;

6    correct?

7    A.  Yes.

8    Q.  Okay.  Now, you were attempting to pick him up at the time?

9    A.  Yes.

10   Q.  Okay.  And did you feel he was resisting at that time?

11   A.  At that point when I fell down, yes.

12   Q.  Okay.  And how was he resisting?

13   A.  By tensing up his entire body, and then he jerked as I went

14   to pick him up.

15   Q.  Okay.  Tensing up and becoming just dead weight you had to

16   pick up?

17   A.  Essentially, pick -- becoming like a board.

18   Q.  Okay.  All right.  And when he jerked, did we see that on

19   the video?

20   A.  I don't think you can see that very well, but I could feel

21   it.

22   Q.  Okay.  So like jerked his body --

23   A.  Yes.

24   Q.  -- in a different direction you were taking him?

25   A.  Yes.

DEREK WALKER - CROSS EXAMINATION

1  Q.  Okay.  And would you characterize that as active resistance

2  as well?

3  A.  Yes.

4  Q.  Okay.  And it appears Trooper Kennedy is watching the whole

5  thing at least at this point in time.  Would you -- well, you

6  don't know.  You're there.  What's the video look like?

7  A.  It appears that he had seen me fall.  I'm not sure what --

8  at what point --

9          MS. SISCARETTI:  Objection.

10          MR. MANFORD:  Okay.

11          THE COURT:  Sustained.

12  BY MR. MANFORD:

13  Q.  Okay.  So you don't have a cage in your cruiser?

14  A.  We do not.

15  Q.  Okay.  And so I understand your testimony, if you were to

16  have secured the subject and put him under arrest and put him

17  in your cruiser, you would have to stay with him?

18  A.  Yes.  That's correct.

19  Q.  Because you don't have a cage?

20  A.  That is correct.

21  Q.  There's other -- are there weapons in your car and things

22  of that nature too?

23  A.  Absolutely.

24  Q.  Okay.

25          MR. MANFORD:  Just one second please.

DEREK WALKER - CROSS EXAMINATION

1          No further questions, Your Honor.  Thank you.

2               THE COURT:  Redirect, Ms. Siscaretti?

3               MS. SISCARETTI:  No, Your Honor.

4               THE COURT:  Thank you, sir.  You're free to go.

5               THE WITNESS:  Thank you.

6               THE COURT:  Next witness.

7               MS. SISCARETTI:  Your Honor, may the witness still be

8     subject to the subpoena in the event he's needed for any

9     rebuttal case?

10              THE COURT:  Okay.  Mr. Walker, you're subject to

11    recall so I'll ask you not to discuss your case with anyone

12    else -- your testimony with anyone else at this point.  Okay?

13              THE WITNESS:  Yes, ma'am.

14              THE COURT:  You may be recalled by the Government.

15    Do you want him to hang around then?

16              MS. SISCARETTI:  Would Your Honor think it's

17    necessary for today or --

18              THE COURT:  That depends upon whether you all think

19    it's necessary for today.

20         Mr. Douglas, do you want him to just stay in contact with

21    your office or hang out in the hall until we're done?  We're

22    going to break around 5:00.

23              MR. DOUGLAS:  Just stay in contact should be

24    sufficient.

25              THE COURT:  Okay.

WILBUR JOHNSON - DIRECT EXAMINATION

1      MR. DOUGLAS:  He does not need to stay in the
2  courthouse.
3      THE COURT:  All right.  You're free to leave the
4  courthouse.  Just make sure they have a number where they can
5  find you if they need to recall you.
6      THE WITNESS:  Yes, ma'am.  May I sit in the gallery?
7      THE COURT:  Well, you're about -- you may be recalled
8  again so given that, no.
9      THE WITNESS:  Yes, ma'am.
10     (Witness excused.)
11     THE COURT:  Next witness.
12     MR. DOUGLAS:  The United States calls Wilbur Johnson.
13     (The witness was sworn in.)
14     THE WITNESS:  I do, sir.
15     THE COURT:  You may have a seat in the witness chair
16  and please watch your step.
17                      DIRECT EXAMINATION
18  BY MR. DOUGLAS:
19  Q.  Sir, please speak into the microphone and introduce
20  yourself to the Court and spell your name for the court
21  reporter.
22  A.  My name is Willy Johnson.  J-O-H-N-S-O-N.
23  Q.  Sir, where do you currently work?
24  A.  I currently work for the Berkeley County Sheriff's
25  Department.

WILBUR JOHNSON - DIRECT EXAMINATION

1  Q.  How long have you worked for the department?

2  A.  Since 1989.

3  Q.  How long have you been in law enforcement?

4  A.  Thirty-five years.

5  Q.  What is the current position that you hold in the

6  department?

7  A.  I currently hold the rank of administrative captain.

8  Q.  How long have you held that position?

9  A.  Three years maybe.

10  Q.  What are your duties and responsibilities as the

11  administrative captain?

12  A.  Personally assigned to accident reconstruction and taking

13  care of the clerks and the evidence room and then any other

14  details given to me by the sheriff or the chief.

15  Q.  Do your duties and responsibilities include, in addition,

16  video collection?

17  A.  Kind of.  We have a video program that collects it.  I'm

18  just the administrator.

19  Q.  Is that video from dashboard cameras?

20  A.  Yes, sir.

21  Q.  And were those your duties and responsibilities in or

22  around November of 2018?

23  A.  Yes, sir.

24  Q.  Sir, I would like to direct your attention to just after

25  midnight on November 19, 2018.  Were you on duty then?

WILBUR JOHNSON - DIRECT EXAMINATION

1  A.  No, sir.

2  Q.  Were you on call?

3  A.  Yes, sir.

4  Q.  What does that mean that you're on call?

5  A.  It means I'm not working, but if a major crash occurs or a

6  crash involving a county cruiser, I'm the one that comes out to

7  work it.

8  Q.  That night did you receive notification regarding an

9  accident on Route 11?

10  A.  Yes, sir.

11  Q.  How did you receive that notification?

12  A.  The on-call supervisor called me to notify me there was a

13  vehicle involved in a crash.

14  Q.  What information did you receive about the crash?

15  A.  At the time, I was just told that it was an officer

16  involved, and there was a pursuit, and there was a crash.  I

17  didn't have a whole lot on the phone.  And the location

18  obviously for me to get there.

19  Q.  After you got that call, what did you do?

20  A.  Acknowledged that I'd be en route and got dressed and went

21  to the scene.

22  Q.  How long did it take you to arrive approximately?

23  A.  Probably a half hour from my house to where the crash

24  occurred.

25  Q.  Did you ultimately make it to the scene?

WILBUR JOHNSON - DIRECT EXAMINATION

1  A.  Yes, sir.

2  Q.  Could you describe what the scene looked like when you

3  arrived?

4  A.  The two main vehicles involved in the crash were on a side

5  road and Route 11 was the main road.  And it was pretty well

6  shut down with fire equipment, telephone and power company, and

7  police cars.

8  Q.  Who all was there on the scene?

9  A.  The power people I don't know by name.  They had an engine

10  on the scene with two firemen.  The OIC met me on the scene

11  which would have been Corporal Schoppert.

12  Q.  What does OIC mean?

13  A.  Officer in charge.

14  Q.  Okay.

15  A.  And I don't remember any other officer there other than

16  they had one of our new officers there.  And I didn't -- I

17  can't remember which one it was.

18  Q.  Did you talk to anyone at the scene to learn additional

19  information about the incident?

20  A.  The OIC, his normal protocol, would give me a briefing on

21  what he was told.  And then I talked to the power company.  And

22  then I started my investigation.

23  Q.  What did you learn from the OIC who was Corporal Schoppert?

24  A.  Corporal Schoppert advised me that they were on a call and

25  Deputy Merson was rear-ended.  And then that started the

WILBUR JOHNSON - DIRECT EXAMINATION

1  pursuit.  And then during the pursuit, there was a crash, and

2  that's where the scene was.

3  Q.  So what did you do while on scene?

4  A.  The first thing I did was start taking pictures.  Make sure

5  I get photographs of everything that's going on.  I then start

6  taking measurements.  And a lot of people was asking me

7  questions from the power company and what all I needed done and

8  stuff like that.

9  Q.  How long were you on scene?

10  A.  I'm going to say roughly two hours.

11  Q.  Where did you go next after you left the scene after a

12  couple of hours?

13  A.  I went to the hospital.  I thought my -- I thought

14  everybody that was involved was at the hospital.

15  Q.  What hospital are you talking about?

16  A.  Berkeley Medical Center.

17  Q.  Had you learned that Deputy Merson was at that hospital

18  receiving treatment?

19  A.  They told me he went to the hospital.  That's the only one

20  we have.  So when I got there, he wasn't there.  He had already

21  been discharged.

22  Q.  Okay.  What did you do next?

23  A.  Left the hospital and went to the office.

24  Q.  When you arrived at the office, who was there?

25  A.  Initially, I went to my office.  There was really nobody

WILBUR JOHNSON - DIRECT EXAMINATION

1    there on my side.  And then I walked over to the squad room

2    just to make sure everybody was okay.

3    Q.  Did you see Deputy Merson at the office?

4    A.  Yes, sir.

5    Q.  So he'd been discharged from the hospital and returned to

6    work?

7    A.  He returned to the office.  He had a bandaid on one of his

8    hands from the injury he sustained.

9    Q.  Okay.  And Deputy Merson was still on duty then?

10   A.  Yes, sir.

11   Q.  That night at the office, did you take any further steps in

12   regards to your investigation into the crash?

13   A.  No, sir.

14   Q.  You testified earlier that one of your duties and

15   responsibilities as captain is collect video evidence, is that

16   correct, or to run the program?

17   A.  Yes, sir.  To run the program.

18   Q.  Did you obtain any video from the accident that you

19   responded to on November 19, 2018?

20   A.  No, sir.

21   Q.  Did you ultimately obtain video?

22   A.  Yes, sir.

23   Q.  Why did you get the video?

24   A.  Just to look at to make sure it was a clean crash.  I mean

25   I was told there was pursuit and the officer involved with the

WILBUR JOHNSON - DIRECT EXAMINATION

1    fleeing vehicle.  It wrecked on its own.

2    Q.  Home many videos did you get?

3    A.  Eventually got two.

4    Q.  What two videos were those?

5    A.  We have a Deputy Ritchie who had a video and Deputy Merson

6    had a video.

7    Q.  Which video did you obtain first?

8    A.  Deputy Ritchie.

9    Q.  About how long after that night did you obtain Deputy

10   Ritchie's video?

11   A.  It was about a week.  We were having medical -- medical --

12   technical difficulties with the program, and I didn't actually

13   get to Ritchie's video until like seven days afterwards.

14   Q.  So how were you ultimately able to get to it?

15   A.  I put a ticket in for IT.  The videos weren't downloading.

16   They eventually got them to work.

17   Q.  When did you obtain Deputy Merson's video --

18   A.  Probably --

19   Q.  -- from the accident?  How long after?

20   A.  Probably got Merson's video probably another four or five

21   days after that.

22   Q.  And how did you obtain it?

23   A.  Well, when we got -- first of all, my computer was down so

24   I had to get that up and running.  And then when I got the

25   videos loaded down, Merson's did not download.  So when we got

WILBUR JOHNSON - DIRECT EXAMINATION

1  in Merson's car, we found out there was a lot of -- the car

2  itself wasn't downloading any videos.

3  Q.  How is it supposed to be working?

4  A.  They're automatic.  The officer doesn't have any control

5  over it.  They pull in the station.  It goes into the cloud,

6  and it goes to the computer.

7  Q.  When you ultimately determined or discovered that hadn't

8  downloaded, how many videos hadn't downloaded for Deputy

9  Merson?

10  A.  Over 160.

11  Q.  And one of the ones was for this night?

12  A.  Yes, sir.

13  Q.  Okay.  Now, let's talk about the first video you viewed.

14  Which video did you view first?

15  A.  Ritchie's video.

16  Q.  And where did you view it?

17  A.  Sitting at my disk.  The program itself is called Watch

18  Guard, and it comes right into my computer.

19  Q.  Was anyone with you when you viewed it?

20  A.  No, sir.

21  Q.  I would like to bring up and show you what has been

22  admitted as Government's Exhibit No. 4.  First of all before

23  playing it, we're leaving it here at zero zero.  Do you

24  recognize this video?

25  A.  Yes, sir.

221

WILBUR JOHNSON - DIRECT EXAMINATION

1  Q.  What video is this?

2  A.  This is the view of the camera in Deputy Ritchie's cruiser.

3         MR. DOUGLAS:  Let's play it, please.  And let's stop

4  it at 20 seconds, please.  That's fine.

5  BY MR. DOUGLAS:

6  Q.  Is this a part of the video that you viewed in your office

7  alone?

8  A.  Yes, sir.

9  Q.  Now, once you saw this part of the video, what did you do

10 next?

11 A.  Well, it appeared to me that something was there on the

12 ground, and they were striking it so I notified the sheriff.

13 Q.  Did you sit there for a while and finish the video and

14 watch it for a few minutes or how did that go?

15 A.  I'm pretty sure I paused it at the point where I thought

16 somebody else needs to be notified.

17 Q.  Why did you do that?

18 A.  Just to let my supervisors know what I was seeing.

19 Q.  Why did you tell the sheriff?

20 A.  He's my supervisor.

21 Q.  Did you tell the chief?

22 A.  I think I told the chief, too, but I'm not really sure.

23 Q.  Did you all then sit down and watch this video together?

24 A.  They all came to my office, and I replayed some of it

25 because it was a long video.  And I played it to where I saw

WILBUR JOHNSON - DIRECT EXAMINATION

1   the problem, and what I saw was a larger problem.

2   Q.  What do you mean by that?

3   A.  It just -- something told me it wasn't right.  Why is

4   everybody standing by this white ground and striking at the

5   ground.

6   Q.  The first time you saw this, did you think that was a

7   person being stricken or a person being tossed down?

8   A.  No.  At a distance I thought it was a big bag of garbage of

9   some kind.

10  Q.  Why would there be a bag of garbage?

11  A.  Because I don't know what they're doing, and it just looked

12  like a bag of garbage being tossed all over the ground.

13  Q.  This sit-down with the sheriff and the replay, did this

14  occur right after you went and notified them?

15  A.  I'm pretty sure it was within 10 or 15 minutes of me

16  notifying them.

17          MR. DOUGLAS:  Okay.  If we can bring down Exhibit 4

18  and bring up what has been admitted as Government's Exhibit

19  No. 8.

20  BY MR. DOUGLAS:

21  Q.  We're just going leave it at the beginning here where it's

22  still zero zero.  Do you recognize this frame and what it

23  depicts?

24  A.  Yes, sir.

25  Q.  What do you recognize it to be?

WILBUR JOHNSON - DIRECT EXAMINATION

1   A.   This is now a view of the camera inside Deputy Merson's

2   vehicle.

3   Q.   What were the circumstances under which you watched this

4   video for the first time?

5   A.   I watched the video because the first video said something

6   is going on, and I thought I'd watch the second video to see if

7   there was any other clue as to what was going on.  So I watched

8   it by myself at first.

9   Q.   And after you watched it by yourself at first, what did you

10  do next?

11  A.   Immediately stopped it and notified the sheriff.

12  Q.   Why did you do that?

13  A.   I needed to let my supervisor know what I was seeing.

14  Q.   Did you see an individual being taken into custody?

15  A.   Yes, sir.

16  Q.   Was the state police also notified?

17  A.   Eventually.

18  Q.   How soon?

19  A.   I think the sheriff notified them the next day.

20  Q.   Were you involved in any meetings where the two agencies

21  met?

22  A.   Yes, sir.

23  Q.   What were the circumstances?

24  A.   The following day the sheriff made arrangements with the

25  post-commander to report to the office to see the video.  And I

WILBUR JOHNSON - DIRECT EXAMINATION

1   was in charge of making a copy of the video.

2   Q.  Did you ultimately give to the state police a copy of the

3   Merson and the Ritchie videos?

4   A.  Technically, I gave them to the sheriff, and he gave them

5   to all.  But, yes, eventually, that happened.

6   Q.  Do you know who at the state police they were given to?

7   A.  The first meeting was Sergeant Cole and Captain Platt

8   (spelled phonetically) I believe.  And then the next meeting

9   was a lieutenant that was doing some kind of (indiscernible).

10  And I'm not sure who the other trooper was.

11  Q.  After those meetings, did you have any other involvement

12  into the investigation into the circumstances surrounding the

13  crash?

14  A.  The crash alone, yes, I worked the crash.

15  Q.  And what did that entail?

16  A.  Just basically doing a report through IBR.  I'm sorry.

17  Report being is what the state uses and completing a report to

18  be filed.

19  Q.  And otherwise after you found those videos and turned them

20  over, you weren't going to be involved in that part?

21  A.  That's correct.

22          MR. DOUGLAS:  One moment, Your Honor, please.

23          THE COURT:  Okay.

24          MR. DOUGLAS:  No further questions, Your Honor.

25          THE COURT:  Cross?

WILBUR JOHNSON – DIRECT EXAMINATION

1          MR. MANFORD:  No thank you, Your Honor.

2          THE COURT:  Thank you, sir.  You're free to go.

3          THE WITNESS:  Thank you, ma'am.

4          THE COURT:  You're welcome.

5     (Witness excused.)

6          THE COURT:  Next witness.

7          MR. DOUGLAS:  The Government rests.

8          THE COURT:  Mr. Manford?

9          MR. MANFORD:  Thank you, Your Honor.  I'd like to

10   make a motion.  Going to move for a directed verdict or

11   acquittal based on Rule 29.

12          MR. DOUGLAS:  Your Honor, I'm sorry.  Can we make

13   sure that Captain Johnson knows he's excused completely?

14          THE COURT:  Yeah.

15          MR. DOUGLAS:  Captain Johnson.  May this witness be

16   fully excused, Your Honor?

17          THE COURT:  He is.  You're free to go.  We're not

18   going to be calling you back, Captain.

19          THE WITNESS:  Thank you, ma'am.

20          THE COURT:  You're welcome.  As you were saying,

21   Mr. Manford, you have a motion?

22          MR. MANFORD:  Yes, Your Honor.  I'd like the Court to

23   consider a Rule 29 at this juncture since the Government has

24   rested.  And as the Government has simply set forth in its

25   proposed instructions, it has to prove bodily injury.  That by

1    various cases in other sections, other statutes, which other

2    courts have ruled applies to 242 prosecution, bodily injury

3    means a cut, abrasion, bruise, burn, physical pain, or other

4    injuries to the body no matter how temporary.  The injury not

5    be significant -- not be significant, severe, or permanent.

6        So we have really no evidence to support an injury to J.H.

7    We have the testimony of Mr. Brown.  He was the EMT, paramedic

8    who first saw him.  He noted abrasions and cut to the forehead,

9    but there's been no clear testimony that that was caused by

10   Officer Kennedy.  In fact, it was Mr. Brown's opinion that they

11   were consistent with MVA, motor vehicle accident injuries that

12   were sustained.

13       We know we have a very serious motor vehicle accident.

14   We've seen it repeatedly on Government's Exhibit No. 8.  After

15   a high-speed chase in excess of 100 miles per hour, we saw the

16   vehicle in a state of disarray.  The vehicle being basically

17   totaled.  It was so bad they couldn't even open the

18   passenger-side door.

19       All of the injuries that we've heard about today are on the

20   left side of the individual indicating that's where he

21   sustained trauma in the impact.  The vehicle in the video is

22   actually 180 degrees different orientation from when it

23   impacted -- whatever powerful impact.  We know that from the

24   explosions that happened.  We've noticed that the EMT also said

25   there was some bruising to the left arm and left hip.  We've

1  had no evidence that that was caused by Trooper Kennedy.

2  Again, consistent with -- just as consistent -- not even a

3  probability, Your Honor.  It's not even preponderance of the

4  evidence that it could be caused by Trooper Kennedy.

5      Pain is the next thing we look at.  The EMT, Mr. Brown,

6  said that J.H. told him he was in no pain at that time.  There

7  was some cross examination about, well, could he be in pain

8  later, and the EMT said sure you could.  But no one testified

9  that there was any evidence before this Court that the next day

10  or any time later J.H. was suffering pain.

11      So I believe an essential element under 18 U.S.C. 242, even

12  when viewed in the light most favorable to the Government, is

13  absent in this case.  And I would ask the Court to accordingly

14  find that the Government has not proved injury and move for

15  judgment of acquittal, Your Honor.

16          THE COURT:  Who is arguing this for the Government?

17          MS. SISCARETTI:  I will, Your Honor.

18          THE COURT:  All right.  Ms. Siscaretti.

19          MS. SISCARETTI:  Your Honor, looking at the evidence

20  in the light most favorable to the Government, which of course

21  is the standard here, the Government has proved each -- or

22  presented evidence on each element of this case.  That the

23  defendant willfully deprived J.H. of his right to be free from

24  excessive force and that he did so willfully while under the

25  color of law.

1    In addition to those three elements, the Government also

2    presented sufficient evidence to prove injury.  You heard from

3    EMT Ed Brown who testified that he observed bruises on J.H.'s

4    body on the left side.  Well, Your Honor, that's consistent

5    with where the defend -- the -- J.H. fell after the defendant

6    threw him to the ground while he was handcuffed as seen on the

7    video.  And Ed Brown also testified that the victim said that

8    he was in pain.  That his head hurt.  And, again, he fell to

9    the ground and fell back.  The defendant was also seen earlier

10   holding his head down while hitting him in the upper body.

11   In addition, Your Honor, as the finder of fact, we can draw

12   common sense inferences from the evidence that is presented.

13   And you can see on the video that J.H. was thrown with

14   significant force to the ground.  Another witness has also

15   testified about seeing the defendant slap him in the face.

16   Well, Your Honor, common experience, many of us have at some

17   point slipped on the ground and fallen back unexpectedly.  And

18   that pain is a common experience, and that evidence is clear on

19   the video.  That J.H. fell hard to that ground.  And I think

20   Your Honor can also draw the inference that J.H. felt pain from

21   doing so and that's consistent with what he told Ed Brown as

22   well.  And looking at that evidence in the light most favorable

23   to the Government, Your Honor, we submit that the motion should

24   be denied.

25              THE COURT:  Mr. Manford.

```
 1              MR. MANFORD:  Your Honor, I would note that the

 2   Government's argument regarding pain or injury is just

 3   speculative conjecture at best.  I mean this young man was in a

 4   horrific accident.  When he's receiving -- when he's being

 5   noncompliant and receiving strikes from other officers, it's

 6   always on the left side of his body.  The video shows strikes

 7   in the back, opposite side of the body.

 8        The Government wants to take a common sense approach, but

 9   we can't make a leap of faith if there's no proof.  Certainly

10   common sense shouldn't be thrown out the window in any

11   situation.  But still the Government has the burden to prove

12   that there was at least pain or injury.  We don't have that.

13        Thrown with significant force.  He was tossed.  He landed

14   on his back.  He was feeling no pain as the officer said.

15   That's why I tried to bring up -- well, I'm going to leave

16   that.

17        So I would -- I mean even in the light most favorable to

18   the Government, they just haven't presented that.  They haven't

19   presented the juvenile to come in and say I was hurting or they

20   haven't produced any records -- medical records showing that

21   the defendant complained -- not the defendant -- the subject

22   complained to medical personnel, which would be a reliable

23   non-hearsay source of evidence, that he was in pain.

24        And I apologize but I've got a job to do.  I think they

25   have intentionally skirted around that.  Not wanting to bring
```

1    the juvenile in in this situation which I understand.  But they

2    just haven't proved it, Your Honor.  So I'd ask for a directed

3    verdict.

4              THE COURT:  Thank you, Mr. Manford.

5        We're going to take a brief recess and get back out here on

6    the record in about ten minutes or so, Counsel.

7        (Recess 4:05 P.M. to 4:30 P.M.)

8              THE COURT:  Please be seated, everyone.

9        Mr. Manford, anything further on your motion?  And I'll

10   tell you, Counsel, I will say I am giving this motion

11   additional thought because it's unusual for the Court to have a

12   criminal trial as a bench trial.  And ordinarily my

13   consideration would be is the evidence sufficient for the jury

14   to return a verdict here on the trier of fact.  So I have

15   wrapped my mind around that, and I do believe it's proper to

16   make the motion for judgment of acquittal at a bench trial in a

17   federal criminal matter; but now that I'm there, Mr. Manford,

18   anything further on your motion?

19             MR. MANFORD:  I gave you my best argument, Your

20   Honor.  I could argue about there wasn't enough for excessive

21   force and through the testimony of Derek Walker that there was

22   resisting and that's not been rebutted.  I'd just remind the

23   Court that -- but I thought my best argument was the one I made

24   so thank you.

25             THE COURT:  Anything further?

1          MS. SISCARETTI:  Yes, Your Honor, if I may add to my

2    earlier arguments.  I'd like to draw the Court's attention

3    specifically to the closed-fist strikes that the defendant is

4    seen administering to J.H. during the handcuffing process.

5       Now, several witnesses specifically describe those strikes

6    as pain-compliance strikes and so -- and Captain Lee in

7    particular described pain-compliance techniques as ones that

8    are specifically designed to cause pain to someone in order to

9    gain compliance.  So that's how those closed-fist strikes --

10   there were eight of those strikes, and it was during the course

11   of those strikes that Trooper Walker did, in fact, put

12   handcuffs onto J.H.  So his compliance was gained at an early

13   stage of those compliance strikes being delivered.

14      So I just submit to you, Your Honor, that based on that

15   evidence that is another point at which there's evidence to

16   show that the defendant intended to cause pain and did cause

17   pain to J.H.

18          THE COURT:  Last word, Mr. Manford, since it's your

19   motion.

20          MR. MANFORD:  Well, Your Honor, I mean I guess it's a

21   circular argument.  I mean we have compliance strikes -- I mean

22   clearly there is reasonable uses of force every day for people

23   that are noncompliant that are resisting.  And those are

24   designed -- that's not what 242 is designed to prevent.  It's

25   unreasonable or excessive force.  So I can't -- okay.  So

1  you're damned if you do.  Damned if you don't.  You know, you

2  have to apply compliance strikes to get somebody to quit

3  resisting arrest so they won't flee or harm somebody else.  So

4  we're going to say that that's enough pain for a 242

5  prosecution?  I don't get it.  I think that's sort of the dog

6  wagging the tail.  Thank you, Your Honor.

7            MR. DOUGLAS:  May I respond to that argument, Your

8  Honor?  With regard to pain-compliance techniques, it is

9  still -- it has -- the totality of the circumstances still has

10  to be considered to determine whether the strikes were

11  excessive.  Just calling them pain-compliance techniques

12  doesn't automatically make them justified under the situation.

13     And, in fact, there's evidence from Captain Lee that

14  Michael Kennedy was specifically taught during his academy that

15  there are circumstances under which pain-compliance techniques

16  would be excessive.

17            THE COURT:  Mr. Manford.

18            MR. MANFORD:  I know you've ruled in limine that we

19  can't bring -- but I mean the EMT said -- he said I was feeling

20  no pain.  On a scale of zero to ten, zero.  And we know why,

21  but we can't really consider that.

22            THE COURT:  I'm not considering that.

23            MR. MANFORD:  Okay.  But I mean that's the evidence.

24  That he didn't complain about any pain.  Specific -- the first

25  medical person that's on the scene is this Mr. Brown.  And he

1  gets there.  He's sitting up.  He's just -- you know.  And he
2  goes over his injuries.  They're all consistent with the motor
3  vehicle accident.  Are you in pain?  No.
4     So that's all I got to say about that, Your Honor.  Thank
5  you.
6          THE COURT:  At this stage in the trial, viewing the
7  evidence as I must with regard to a motion for judgment of
8  acquittal, I find that the Government has introduced sufficient
9  evidence for a reasonable trier of fact to return a verdict in
10  favor of the Government.  Granted -- and I think we all
11  understand that the standard by which the Court will finally
12  rule on this case is much different than the standard that I
13  have now, but I'm denying the motion.  And I'll note your
14  exception to the Court's ruling here today, Mr. Manford, on
15  behalf of the defendant.
16          MR. MANFORD:  Thank you, Your Honor.
17          THE COURT:  The Government has rested.  Are there
18  witnesses to be called or further evidence to be introduced by
19  the defendant?
20          MR. MANFORD:  There is, Your Honor.  Would the Court
21  consider us instead of breaking it all off just come in and get
22  started bright and early in the morning?  The only -- the only
23  witness I anticipate is Mr. Kennedy.  And I would much prefer,
24  instead of breaking up direct and cross, but I mean I'm sure
25  there's going to be objection from the Government.  I can see.

```
1              MR. DOUGLAS:  No objection.

2              MR. MANFORD:  No objection?  Oh, then --

3              THE COURT:  No objection.  Okay.

4              MR. MANFORD:  -- I apologize.

5              THE COURT:  All right.  Then we'll have the

6     defendant's case in chief tomorrow.  We'll recess for the

7     evening.  If there's a case in rebuttal, then we'll hear that

8     as well tomorrow.

9        As we stated in our order previously, I'm going to give you

10    all the opportunity and order that you have findings of fact

11    and conclusions of law in written form for us a week after the

12    final conclusion of the bench trial.  However, I'll also give

13    you the opportunity for summation of the evidence in a closing

14    argument to the Court as well if you so choose.

15             MR. MANFORD:  Thank you, Your Honor.

16             MR. DOUGLAS:  Your Honor, regarding that one-week

17    deadline, we would like to be able to obtain transcripts that

18    we could cite and be helpful to the Court and cite pages and

19    lines in proposing our findings of fact.  Could it be one

20    following --

21             THE COURT:  After you receive the transcript?

22             MR. DOUGLAS:  Yes, Your Honor.

23             THE COURT:  That's helpful for me, too, because I've

24    got my notes, but I prefer to highlight portions of the

25    transcript that I find important as well.  So that's fine.  One
```

```
1   week after the court reporter files the official transcript.

2   How is that?

3           MR. DOUGLAS:  Thank you, Your Honor.

4           MR. MANFORD:  Thank you, Your Honor.

5           THE COURT:  Okay.  Anything further on behalf of the

6   Government before we break?

7           MR. DOUGLAS:  No, Your Honor.

8           THE COURT:  Anything further on behalf of your

9   client, Mr. Manford?

10          MR. MANFORD:  No thank you, Your Honor.

11          THE COURT:  All right.  We'll see you all tomorrow at

12  9 o'clock.

13

14      (Court adjourned at 4:40 P.M., continuing the bench trial

15      to Tuesday, October 8, 2019, at 9:00 A.M.)

16

17                      (END OF VOLUME ONE)

18

19

20

21

22

23

24

25
```

<u>CERTIFICATE</u>

        I, Kate A. Slayden, Registered Professional Reporter and Official Court Reporter of the United States District Court for the Northern District of West Virginia, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the above-styled action on October 7, 2019, as reported by me.

        I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

        Given under my hand this 16th day of October 2019.


                                    /s/Kate A. Slayden
                        _____
                        Kate A. Slayden, RPR
                        Official Reporter, United States
                        District Court for the Northern
                        District of West Virginia