```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

 3

 4    United States of America,

 5                        Plaintiff,

 6    vs.                         Criminal Action No. 3:19-cr-29

 7    Michael Kennedy,

 8                        Defendant.

 9

10          Proceedings had in the Bench Trial in the

11    above-styled action on October 8th, 2019, before the Honorable

12    Gina M. Groh, Chief Judge, at Martinsburg, West Virginia.

13

14                 VOLUME TWO OF TWO VOLUMES

15    APPEARANCES:

16    On behalf of the United States of America:

17          Jarod J. Douglas
             Assistant United States Attorney
18           United States Attorney's Office
             P.O. Box 591
19           Wheeling, WV  26003

20           Christine M. Siscaretti
             United States Department of Justice
21           601 D Street
             Washington, DC  20530

22

23    The defendant was present in person.

24    Proceedings reported by means of stenotype; transcript produced
       by official court reporter.
25
```

Kate A. Slayden, CCR, RPR
217 West King Street, Room 214, Martinsburg, WV  25401
304-267-5688

```
1    APPEARANCES (Continued)

2

3    On behalf of the Defendant:

4            Byron Craig Manford, Esq.
             P.O. Box 3021
5            Martinsburg, WV  25402

6            Garry G. Geffert, Esq.
             114 S. Maple Avenue
7            P.O. Box 2281
             Martinsburg, WV  25402

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              VOLUME TWO

2

3                         INDEX TO WITNESSES

4                                                        Page

5

6    TESTIMONY OF MICHAEL KENNEDY

7       Direct Examination by Mr. Manford          7

8       Cross Examination by Mr. Douglas           44

9       Redirect Examination by Mr. Manford        85

10      Recross Examination by Mr. Douglas          95

11

12

13

14                          EXHIBIT LIST

15                                                       Page

16

17   Defendant's Exhibit No. 3      Video             21

18   Gov. Exhibit No. 1/Cross       Statement         75

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (October 8, 2019, at 9:00 A.M.)
 3                        -  -  -
 4          THE COURT:  Please be seated, everyone.  Good
 5   morning.  Are we ready to proceed?
 6          MR. DOUGLAS:  United States is ready.
 7          MR. MANFORD:  Yes, Your Honor.
 8          THE COURT:  All right.  We'll call our case.
 9          THE CLERK:  This is the case of the United States of
10   America versus Michael Kennedy.  Criminal number 3:19-cr-29,
11   defendant 1.
12      The Government is represented by counsel, Jarod Douglas and
13   Christine Siscaretti.  The defendant is present in person and
14   by counsel, Craig Manford and Garry Geffert.
15      Are the parties ready to proceed?
16          MR. DOUGLAS:  The United States is ready, Your Honor.
17          MR. MANFORD:  Defendant is ready, Your Honor.
18          THE COURT:  All right.  Yesterday when we broke for
19   the evening -- and yesterday for the record was day one of this
20   trial, the Government had rested, the Court had ruled upon the
21   defendant's motion for judgment of acquittal, and it was our
22   expectation we'd come back and hear the defendant's case in
23   chief.
24      Are there witnesses to call, Mr. Manford?
25          MR. MANFORD:  Yes, Your Honor.
```

```
1            THE COURT:  All right.  Is the defendant going to be
2    testifying?
3            MR. MANFORD:  He will be our only witness.
4            THE COURT:  All right.  Just to review with your
5    client, Mr. Manford -- and you can have a seat, gentlemen.  You
6    don't need to stand for this discussion.
7       Mr. Kennedy, as you've seen, you have the benefit of having
8    a very skilled criminal defense attorney.
9            THE DEFENDANT:  Yes, ma'am.
10           THE COURT:  He has probably advised you whether
11   you should or should not testify during the course of this
12   trial.  However, despite whatever he's recommended for you to
13   do, do you understand that it's your choice and your choice
14   alone whether to exercise your right to testify in this
15   trial?
16           THE DEFENDANT:  I do, ma'am.
17           THE COURT:  Okay.  Do you understand that you have
18   the right not to testify?
19           THE DEFENDANT:  Yes, ma'am.
20           THE COURT:  And if you don't testify, then I can't
21   consider your decision not to testify in any way in determining
22   your guilt or innocence.  Do you understand that?
23           THE DEFENDANT:  I do.  Yes, ma'am.
24           THE COURT:  I have to totally disregard it in other
25   words.  Do you understand that?
```

1               THE DEFENDANT:  Yes, ma'am.

2               THE COURT:  However, if you choose to testify during

3     the course of this trial, which is your right, then once you

4     get on the stand and you answer Mr. Manford's questions, if the

5     going gets tough when Mr. Douglas or Ms. Siscaretti has the

6     opportunity to question you, you can't at that point decide

7     you're not going to answer the questions and take the Fifth; do

8     you understand?

9               THE DEFENDANT:  I do.

10              THE COURT:  All right.  So Mr. Manford has told me

11    that you intend to testify?

12              THE DEFENDANT:  I do, ma'am.

13              THE COURT:  All right.  Mr. Douglas, Mr. Manford,

14    have we covered that sufficiently?

15              MR. DOUGLAS:  Yes, Your Honor.  Thank you.

16              MR. MANFORD:  Thank you, Your Honor.  We have.

17              THE COURT:  You're welcome.  All right then,

18    Mr. Manford, you can call your first witness.

19              MR. MANFORD:  I'd call Michael Kennedy.

20         (The defendant was sworn in.)

21              THE DEFENDANT:  Yes, sir.

22              THE CLERK:  Have a seat in the witness chair and

23    please watch your step.

24              MR. MANFORD:  Ready, Your Honor?

25              THE COURT:  Yes, sir.

MICHAEL KENNEDY - DIRECT EXAMINATION

1                           DIRECT EXAMINATION

2    BY MR. MANFORD:

3    Q.   Please state your name.

4    A.   Michael Kennedy.

5    Q.   Okay.  Michael, how old are you?

6    A.   I'm 29 years old.

7    Q.   Okay.  You were formerly a West Virginia state trooper?

8    A.   That's correct.

9    Q.   Okay.  For how long?

10   A.   I was approaching eight years.

11   Q.   Okay.  You heard testimony yesterday about the West

12   Virginia State Police Academy.  Did you attend that?

13   A.   I did.

14   Q.   Okay.  And how long did you attend that?

15   A.   I believe it was approximately 25 weeks.

16   Q.   Okay.  Did you do the curriculum that was testified by I

17   believe Kevin Lee yesterday?

18   A.   Yes, sir.

19   Q.   Okay.  Was he accurate in what was taught in your

20   curriculum?

21   A.   More or less, yeah.

22   Q.   Okay.  Well, what about less?

23   A.   The PowerPoint presentation was -- they basically clicked

24   through slides.  Explained it very briefly.  Our defensive

25   tactics, I feel like he overemphasized the amount of pressure

MICHAEL KENNEDY - DIRECT EXAMINATION

1  point training received.  It was more or less, in my

2  recollection, that we'd box on Tuesdays and Thursdays.  A lot

3  of training involved.  Dealing strikes, they seemed to -- he

4  seemed to kind of skip over that portion of our training.

5  Q.  Did you agree about his references to the amount of force

6  that would be reasonable in any particular situation?  Did you

7  receive training on that?

8  A.  Yes.  Yes, we did.

9  Q.  Okay.  All right.  So I would like to direct your attention

10  back to November 18th and 19th of 2018.  The whole reason we're

11  here today.  Do you recall that day?

12  A.  I do.

13  Q.  And were you on duty that day?

14  A.  I was.

15  Q.  Okay.  And did you somehow -- we'll just follow everybody

16  else's lead.  Did you somehow find yourself at Jack Rabbit's in

17  Berkeley County that day?

18  A.  I did.

19  Q.  Okay.  You remember what time of day or evening it was?

20  A.  I'd say roughly midnight.

21  Q.  Okay.  Do you recall and do you agree with the testimony of

22  the other law enforcement officers the reason why you were

23  there?  Somebody kept calling 911.  They even called the state

24  police dispatch.  You and I believe Trooper Kennedy showed up

25  for West Virginia State Police?

MICHAEL KENNEDY - DIRECT EXAMINATION

1  A.  Me and Trooper Walker did, yes.

2  Q.  Walker.  I'm sorry.  Yeah.  I'm sorry.  Deprivation of

3  sleep.  So -- okay.  So do you remember what happened that

4  night?

5  A.  I do.

6  Q.  Okay.  Lead us through a little bit --

7         MR. MANFORD:  And, Your Honor, I would ask leave to

8  be able to go to my chair and use my computer to show the video

9  that we have.  The same video the Government gave me.

10     In fact, at this point in time, pursuant to our

11  stipulations, I'm going to move Defendant's Exhibit No. 3 which

12  is an exact copy of what we already have in the Government's

13  exhibit.  It's a full video of Deputy Merson.  It's not -- I

14  didn't cut out certain segments or anything.  It's just the

15  full thing so we can go through it.  Our stipulation was that

16  it was a genuine, authentic document.  To make a record clear,

17  I've got it on a thumb drive so if anyone needs to look at

18  what's on there, they can.  I would move its admission, Your

19  Honor.

20         THE COURT:  Mr. Douglas?

21         MR. DOUGLAS:  No objection, Your Honor.

22         THE COURT:  It's admitted.

23     (Defendant's Exhibit No. 3 was admitted.)

24         THE COURT:  And you can take leave to use your

25  computer over there at counsel table, Mr. Manford.

MICHAEL KENNEDY - DIRECT EXAMINATION

1          MR. MANFORD:  Thank you, Your Honor.  And for the
2  record, I've made an exact duplicate.  I'm sorry.  So I can use
3  my thumb drive.
4          THE COURT:  Okay.
5          MR. MANFORD:  Okay. So -- do I have it plugged in
6  right?
7          THE CLERK:  We tested it.  It was working.
8          MR. MANFORD:  Okay.
9          THE CLERK:  Make sure your connection is --
10          THE COURT:  Mr. Mullen, can we get IT up here?
11          THE CLERK:  We may.  We checked it earlier.
12    (Pause.)
13          THE COURT:  All right, Counsel, we're going to go
14  ahead and take a little recess.  That's fine, Mr. Manford.  We
15  don't have a jury hostage so we're good.
16          MR. MANFORD:  All right.
17          THE COURT:  We're going to take a little recess while
18  we get our IT guy up here and see if we can't get things jump
19  started here.
20    Mr. Kennedy, you can return to your seat with your counsel.
21  Just don't discuss your testimony with anyone because you'll
22  still be under oath when you get back up here.
23          THE DEFENDANT:  Of course.  Thank you, ma'am.
24          THE COURT:  You're welcome.
25    (Recess at 9:11 A.M. - 9:20 A.M.)

MICHAEL KENNEDY - DIRECT EXAMINATION

```
1        (Defendant resumed the witness stand.)

2              THE COURT:  Please be seated, everyone.

3     Mr. Mullen tells me we're back in business so we can

4  proceed.

5     Sir, still remember that you remain under oath.

6              THE DEFENDANT:  Yes, ma'am.

7              THE COURT:  Mr. Manford.

8              MR. MANFORD:  Thanks for the recess, Your Honor.

9              THE COURT:  You're welcome.

10                  DIRECT EXAMINATION (Continued)

11  BY MR. MANFORD:

12  Q.  Okay.  Michael, I have up on the screen --

13              THE COURT:  Can you see that?

14              THE DEFENDANT:  I can just see it up --

15              THE COURT:  Chad --

16              THE CLERK:  Is that better?

17              THE DEFENDANT:  Yes.  Thank you.

18  BY MR. MANFORD:

19  Q.  All right.  Michael, we have on the computer the beginning

20  of the Merson video.  Do you recognize it, sir?

21  A.  I do.

22  Q.  And I would suggest to you, just to move things along, it's

23  right after the rear-ending of Deputy Merson --

24  A.  Yes, sir.

25  Q.  -- and we'll pick it up from there.  Where are you at this
```

MICHAEL KENNEDY - DIRECT EXAMINATION

1   time?

2   A.  I'm standing in the parking lot.  Somewhere off to the

3   right where those cameras were.  I'm actually facing Route 11.

4   I saw the accident happen.

5   Q.  Okay.

6   A.  I recall just the vehicle striking the back of Merson's

7   cruiser.  Being surprised.  The next thought was if Merson was

8   all right.  And then before I knew it, the vehicle was fleeing

9   at a high rate of speed northbound on Williamsport Pike.

10  Q.  Okay.  Fender bender?  Serious accident?  How would you

11  characterize the --

12  A.  I mean I've worked a lot of really, really bad accidents.

13  I would say -- I wouldn't call it overly serious, but it's not

14  minor.

15  Q.  Okay.  All right.  So we're going to play.

16      (Play video.)

17  Q.  So for the record, we're now seeing Deputy Merson in

18  pursuit; is that correct?

19  A.  That's correct.

20  Q.  Okay.  And he's traveling down Williamsport Pike which is

21  Route 11 North?

22  A.  Yes, sir.

23  Q.  The vehicle in front is the vehicle being pursued?

24  A.  Yes, sir.

25  Q.  Do you think by this time you're in pursuit as well?

MICHAEL KENNEDY - DIRECT EXAMINATION

1  A.  Oh, absolutely.  I sprinted over to my cruiser.  Jumped in.

2  I managed to make it into the third position in the pursuit.

3  However, I'm a few hundred feet behind Trooper Walker's cruiser

4  who is directly behind Deputy Merson's.

5  Q.  Stop it for a second.  So you're the third cruiser in

6  pursuit?

7  A.  That's correct.  And I'm having to drive over 110 miles an

8  hour just to try to keep up and gain position into the pursuit.

9  Q.  What's your thought process at this time?

10  A.  Well, naturally it's why is he running?  You know, not

11  often you see somebody strike a police cruiser and then -- so

12  to kind of back up just a second to the actual accident, the

13  car hesitated a second before it ran.  It waited -- it seemed

14  like the driver of the vehicle waited a second until Merson's

15  lights kicked on.  And at that point, they fled down the road.

16  So I'm sitting there thinking he specifically doesn't want to

17  deal with law enforcement.  Why?  It's approaching 1:00 in the

18  morning.  In my experience, it's generally people out and about

19  at that time are intoxicated.  So there's a lot of

20  possibilities running through my head.  What could be going on

21  with this?

22  Q.  All right.  The observations you just testified to, were

23  those from your observations at that time as opposed to

24  reviewing the video?

25  A.  That's what -- yeah.  That's what I'm thinking as I'm

MICHAEL KENNEDY – DIRECT EXAMINATION

1  pursuing the vehicle.

2  Q.  Okay.  Let's continue.  Tell us about Route 11 North.

3  We're making a record.

4  A.  It's not a straight shot.  It's a lot hillier than it

5  appears in this video.  Actually right there you can kind of

6  see a good bump.  The roads are pretty damp at this time

7  because there had been a recent snow.  So driving on it at that

8  rate of speed was more dangerous than it would usually be.  And

9  I believe it's marked 45 miles an hour if I'm not mistaken.

10  Q.  I can't tell you.  All right.  So do you see any erratic

11  driving by the vehicle being pursued in this video?

12  A.  In the video, yes.  It's all over the road.  Like we're

13  bouncing off both fog lines.  I'm not sure if it's curved yet,

14  but he almost strikes several vehicles.  One he actually runs

15  off the road at Bedington Crossroad.

16  Q.  All right.  Well, let's take a look.  For the record, we

17  are just approaching Bedington Crossroads on this video; is

18  that correct?

19  A.  Yes.  Yes.

20  Q.  You can tell by the convenience store on the left?

21  A.  Correct.

22  Q.  Okay.  So is this where you're speaking of a minute ago?

23  A.  Yeah.  You're about to see where he takes this curve way

24  too wide.  Forces that other vehicle well off the roadway.  If

25  I look at the video right, he actually runs through the

MICHAEL KENNEDY - DIRECT EXAMINATION

1    grass -- like the other vehicle has to run through the grass

2    and end up in the intersection.

3    Q.   All right.   So now -- again, for purposes of the record,

4    we're coming up on the salvage yard?

5    A.   Correct.

6    Q.   All right.

7    A.   And through the course of this, Merson and Walker are both

8    putting out radio traffic as to where they're going, what the

9    vehicle is doing.   So that night I had no direct vision on this

10   vehicle, but I was hearing updates over -- so what I scan on my

11   radio is -- I have my in-cruiser radio and my portable radio.

12   Whenever we get into a pursuit and -- like assisting another

13   agency, I'll turn my portable over to Berkeley County Sheriff's

14   Department, which is one click to the right for me, and I leave

15   my in-car radio on state police.   That way I can hear both my

16   fellow department members and the assisting agency's traffic.

17   Q.   Okay.

18   A.   So I'm hearing what Trooper Walker is putting out and

19   catching what Merson is saying on where they're going.   So I'm

20   fairly well aware of what the vehicle is up to even though I

21   don't have eyes on it at this time.

22   Q.   Continue with the video.   I'm going to be looking for some

23   white fencing here because it's going to tell me we're close.

24   All right.   So we're about to get in -- I don't want to lead

25   too much.   I apologize.   I'm just trying to get things to move

MICHAEL KENNEDY - DIRECT EXAMINATION

1  along.  We're about to get into where the crash occurs.

2      Before we get there, could you set that up as far as the

3  transformers and stuff.  What you saw.  What you were feeling.

4  A.  So what that's going to -- that's coming up once the

5  vehicle actually wrecks.  I don't see the actual accident

6  occur.  I hear both -- on both frequencies put out that the

7  vehicle wrecked.  At that time, I'm just -- I'm starting to

8  gain up on Walker.  I've closed the gap.  And once the vehicle

9  strikes a telephone pole, what I see is an initial explosion

10  which startled me.  I slammed my brakes and pulled to a stop.

11  And then a series of -- I can't recall to this day how many

12  explosions but one of which lit the sky up fairly

13  substantially.  I'm thinking at that point, holy shit, this is

14  going to kill me --

15  Q.  Okay.  Let's take a look.

16  A.  Wires coming down.

17  Q.  Let's take -- there was wires coming down?

18  A.  I mean if there's transformers exploding, there's got to be

19  wire.  Wherever there's transformers there's wire.

20  Q.  All right.  So let's take a look.  So for purposes of the

21  record, we just saw two explosions and then a third.  Is that

22  the one you're talking about lit up the sky?

23  A.  Yeah.  That's the -- yeah, the third one is the big one.

24  There's a few cursory explosions after that.

25  Q.  Okay.

MICHAEL KENNEDY - DIRECT EXAMINATION

1   A.  At that point, I'm sitting in my cruiser staring up at it

2   hoping that I don't get fried.  I recall that kind of set me

3   back quite a bit.  And it took me a minute to get out of my

4   cruiser because I'm staring at that waiting for everything to

5   stop exploding.  I kind of look around.  Is there any wires

6   that I can see direct over my cruiser or anything laying on the

7   ground.  Because right now I feel like, okay, I'm not -- I'm

8   grounded if there is a wire on me.  So I open my door, look

9   around.  Don't see anything.  So I get out a little slower

10  which is probably why I'm so late to the -- in getting to the

11  vehicle.

12  Q.  All right.  Let's take a look at that.  So as people come

13  into the frame, would you please identify them for the record?

14  A.  Yes.  There's Deputy Merson.

15  Q.  Okay.  Any noticeable injury to him at that time?

16  A.  I -- at this point in the video that night, I couldn't see

17  him.

18  Q.  Okay.

19  A.  I was -- I think I'm still in my vehicle at this point.

20  Q.  Okay.  Who is that?

21  A.  That's Derek Walker.

22  Q.  Okay.

23  A.  Somewhere around in here is where I'm getting out of my

24  vehicle and jogging up.  I've got my firearm out.

25  (Indiscernible) in the frame right now.  Like here in the next

MICHAEL KENNEDY - DIRECT EXAMINATION

1  two seconds --

2  Q.  Okay.  We don't have a counter on this video so we're going

3  to make record as we go.  So right now it would appear --

4  please tell me if I'm correct that Deputy Merson is using the

5  ASP baton to break the glass of the driver's side --

6  A.  Correct.  He's using his right hand with the ASP baton.  I

7  think he's got his sidearm in his left hand.

8  Q.  Okay.

9  A.  And as I'm walking up, I can hear him yelling at the kid

10  inside the vehicle.  You know, show hands.  Get out of the

11  vehicle.

12  Q.  Is this you?

13  A.  This is me coming in the frame right now.  I have my

14  sidearm in my right hand with my weapon light activated so I

15  can -- I was trying to see a little clearer through smoke.

16  Q.  Okay.  Basically a flashlight?

17  A.  Yes.  It's a weapon-mounted flashlight is all it is.

18  Q.  Okay.  All right.  We'll continue.  The individual has just

19  been -- the subject has been extricated.  Would that be where

20  we're at in the video?

21  A.  Correct, sir.

22  Q.  Okay.

23  A.  I'm shining my light and trying to look for his hands and

24  make sure there's not a weapon visible in his hands.  I don't

25  get a good look at his waistline.  So at this point, I don't

MICHAEL KENNEDY - DIRECT EXAMINATION

1   know if there's anything at his waistline.

2            MR. MANFORD:  Okay.  At this point, I'd like to

3   enlarge the area so we can see a little clearer what's going

4   on.  All right.  And for the record also, I'd like to play it

5   at one-fourth speed.

6   BY MR. MANFORD:

7   Q.  And I'd like you to tell us what's going on.  So where are

8   we at right now?  You're shining a flashlight?

9   A.  That's correct.  And I see his hand -- like I get a quick

10  glance at both hands.  I don't see any obvious weapons in his

11  hand at this point.

12  Q.  Okay.

13  A.  Again, I didn't see his waistline.  I really don't even

14  recall seeing Merson coming up.  I think that's Merson behind

15  me.  I don't recall seeing him.  I'm getting some pretty good

16  tunnel vision at this point.  I think that transformer

17  explosion probably put me back on my heels more than what I

18  realized that night --

19  Q.  Okay.

20  A.  -- because I don't remember him even standing that close to

21  me.

22  Q.  Okay.  So let's go through the individuals depicted at this

23  point in time.  First of all, the subject is on the ground; is

24  that correct?

25  A.  Yes.

MICHAEL KENNEDY - DIRECT EXAMINATION

1  Q.  He would have -- how do you think -- how would you say he

2  is oriented, please?

3  A.  He looks like he's oriented perpendicular to the camera's

4  point of view right now.

5  Q.  Left side?  Right side?  Back?  What's he laying on?

6  A.  He's laying on his side.  More or less his legs are kind

7  of -- he's trying to tuck his legs at this point.

8  Q.  Okay.

9  A.  Looks like he's going to attempt to get up as you let the

10  video play.  I -- once I get my -- I think I scoop his feet out

11  from under my foot --

12  Q.  We'll get there.

13  A.  Okay.

14  Q.  Okay.  So would this be Officer Merson who is sort of knelt

15  down or do you know or do you need to see more video?

16  A.  I believe this was Walker kneeling in front of him.  Again,

17  the exact -- I remember seeing officers' lower halves because I

18  was focusing entirely on what I perceived to be a potential

19  threat at that point in time.

20  Q.  Okay.  Why do you perceive it to be a potential threat?

21  A.  He's -- the subject has already shown a propensity to flee

22  at a high rate of speed and endanger everybody else around him

23  and has no regard -- apparently no regard for the safety of

24  others.  I'm hearing commands of give me your hands, and he's

25  just not complying.

MICHAEL KENNEDY - DIRECT EXAMINATION

1  Q.  Okay.  Let's play the video.  So what's going on right now?

2  A.  I see -- like I said, I saw that there's no weapons in his

3  hands.  I see he's struggling to apparently take his hands

4  towards his waistline or tuck them underneath of him.  I

5  decided this probably isn't the best place for a pistol.  I go

6  to try and turn off my light.  I end up not being able to turn

7  it off with my dominate hand so I have to reach across with my

8  left hand in order for it to be activated.  In the coming

9  frames, I'm going to try to holster it.

10 Q.  All right.  So I think you're right.  The gentleman

11 kneeling over or bending over is Derek Walker?

12 A.  Yes.  It's more clear in this frame.

13 Q.  All right.  And then the officer on the -- in the right of

14 the frame, it would be Officer Merson?

15 A.  Correct.

16 Q.  Okay.  Have you engaged the subject in any way at this

17 point?

18 A.  Not at this point.  Like I said, I'm trying to take the

19 lethal implement out of the situation.

20 Q.  All right.  Let's continue.

21      MR. DOUGLAS:  Your Honor, may the record reflect that

22 the video is being shown in slow motion?

23      THE COURT:  Yes.  I think Mr. Manford had made a

24 comment it's one-fourth speed.

25      MR. MANFORD:  Yes, ma'am.

MICHAEL KENNEDY - DIRECT EXAMINATION

1          THE COURT:  Yes.

2          MR. DOUGLAS:  Thank you, Your Honor.

3          MR. MANFORD:  May we continue, Your Honor?

4          THE COURT:  Yes, sir.

5   BY MR. MANFORD:

6   Q.  All right.  I'm continuing to play the video.  So who do

7   you see enter the frame now?

8   A.  That night I had no idea.

9   Q.  All right.

10  A.  I didn't even see him approach.  I know now that it's

11  Deputy Ennis.

12  Q.  Okay.  And he has a flashlight?

13  A.  Appears to be a flashlight.  I don't know if that's a

14  weapon-mounted light or just a flashlight in his hand.

15  Q.  What are you doing at this point?

16  A.  Still struggling to get my weapon back in my holster.

17  Q.  Is that something you normally have trouble with?

18  A.  No.  Again, I believe it was stress induced.  I mean I'm

19  having a hard time getting my weapon back.  So basically my

20  dominant hand is out of play.  I'm still trying to get it away.

21  I think -- the only thing I can say why that is is stress.

22  Q.  Okay.  Let's continue.  All right.  So what's happening

23  now?

24  A.  So while I'm still struggling to get my weapon in, I see

25  that he's got his legs -- he's trying to tuck them up towards

MICHAEL KENNEDY - DIRECT EXAMINATION

1  his center mass.  Looks like he's going to try and stand.  The

2  only thing I'd be able to handle at that right there is -- or

3  at that point right in time right now is my feet.  So I decide

4  to try and kick his legs out from under him.

5  Q.  What are the other officers doing?

6  A.  That night I couldn't see.  If you see in the video, I can

7  describe what they're doing if that's what you want.

8  Q.  Please do so.  We're making a record.

9  A.  Okay.  Merson had dropped a knee back of the suspect's head

10  apparently.  I believe Walker is struggling with one of his

11  hands.  I guess that would be his right hand.  And appears that

12  Ennis is looking for a way to get into the melee.

13  Q.  At this point, let's move the -- a little bit and try to

14  enlarge it again.  All right.  For the record, I just enlarged

15  it again so we can get a better view of what's going on.

16      Can you tell us how the subject is oriented at this time?

17  A.  Still more or less on the side.  Apparently, tucking his

18  hands toward his waistline.  I don't know if it's just

19  maintaining -- keeping his hands away from us or if he's

20  reaching for something in his belt.  He's still tucking.  Got

21  his legs tucked up towards his chest.

22  Q.  At this point, he has not been patted down for weapons or

23  anything?

24  A.  No, he has not.

25  Q.  Okay.  All right.  Continue with the video.  So what do we

MICHAEL KENNEDY - DIRECT EXAMINATION

1  see here?

2  A.  Me still attempting to holster my weapon, and the suspect

3  still pulling away from officers.

4  Q.  All right.  What is Officer Walker doing?

5  A.  He's still yanking on one of his hands.

6  Q.  Okay.  Would you -- other officers talked about active

7  resistance?

8  A.  Yeah.  This was -- this I would classify as active

9  resistance, yes.

10  Q.  Continue.  So what did Walker just do?

11  A.  He's gained control of the right hand.  I can't quite tell

12  what Merson is doing on the opposite side.  Looks like there

13  may have been some sort of a knee strike or maybe he's

14  wrestling the arm.

15  Q.  Okay.

16  A.  That's on the video.

17            MR. DOUGLAS:  Your Honor, when the witness is

18  testifying, the Government would request that he clearly

19  indicate what he did or did not see when he was, in fact,

20  there, and we're not just narrating for the video.

21            THE COURT:  Okay.  It sounds to me like we've got a

22  little of both, Mr. Manford.  That the witness is telling us

23  what he recalls as this video is playing at this time but also

24  then what we see.

25            MR. MANFORD:  Well, Your Honor, since I don't have a

MICHAEL KENNEDY - DIRECT EXAMINATION

1   counter on this, I'm trying to make a record so if somebody

2   looks at this later, they can see exactly where we're at in

3   this video.  That's my purpose.  Otherwise, I'll just have him

4   talk about what he sees.

5           THE COURT:  I think Mr. Douglas' comment or objection

6   was that he wants the witness testifying to make a clear record

7   as to what he recalls was happening at that time.

8           MR. DOUGLAS:  Yes.  In fact --

9           THE COURT:  Did I understand that correct,

10  Mr. Douglas?

11          MR. DOUGLAS:  In fact, the Government objects to him

12  narrating the video at all because it's all about -- the issue

13  in play is what he saw.  What he was thinking.  Not what I now

14  see months -- ten months later on a video that must be what

15  Derek Walker was doing.  So he should not be permitted to

16  testify and narrate the video and talk about things he's only

17  now seeing on the video and not what he saw in person.

18          THE COURT:  Didn't your witnesses testify to what

19  they were seeing on the video?

20          MR. DOUGLAS:  We asked them directly if they saw

21  these things firsthand.

22          THE COURT:  Mr. Manford.

23          MR. MANFORD:  I recall narration yesterday.  And all

24  I'm trying to do is -- based on what he sees the other officers

25  doing, he takes action.  That's where I'm going with this.

MICHAEL KENNEDY - DIRECT EXAMINATION

1          MR. DOUGLAS:  If the Court is amenable to allowing

2     that testimony, we would just ask that the record be clear that

3     he be asked, "Did you see that firsthand?  Yes or no?"

4          THE COURT:  Okay.  Then let's do this.  Let's back it

5     up and let's start over.

6          MR. MANFORD:  Okay.

7          THE COURT:  And then, Mr. Manford, if you can then

8     follow this video along with your witness as to what he was

9     doing --

10         MR. MANFORD:  Okay.

11         THE COURT:  -- and what he saw happening at the time.

12    And I think you're still permitted because Mr. -- or you will

13    be permitted because Mr. Douglas' witnesses testified in that

14    fashion as well as Ms. Siscaretti as to, at this point, Trooper

15    Walker is doing "X" so I did "Y."

16         MR. MANFORD:  May I --

17         THE COURT:  They're kind of meshed together.

18         MR. MANFORD:  Sure.

19         THE COURT:  And that's the way the testimony -- at

20    least the way I perceived the testimony yesterday.

21         MR. MANFORD:  When --

22         THE COURT:  Can you hear me since I'm not --

23         MR. MANFORD:  Yes.  Yes.

24         THE COURT:  -- on top of that microphone?

25         MR. MANFORD:  I understood fine.

MICHAEL KENNEDY - DIRECT EXAMINATION

1    THE COURT:  Okay.

2    MR. MANFORD:  I'm just trying to make sure I phrase

3    all my questions properly on the record.  So am I also allowed

4    to ask my client what he's doing and why?

5    THE COURT:  Yes.

6    MR. MANFORD:  Okay.  That's all I'm asking.

7    THE COURT:  Because I -- yes because it's

8    appropriate.  I find it's appropriate and it's relevant and

9    also because it's not any different than the line of

10   questioning we had with the other officers who were on the

11   scene that we heard from yesterday.

12   MR. MANFORD:  Thank you, Your Honor.  Your Honor, may

13   we just -- would anybody have objection if we just go from here

14   with those rules and guidelines instead of recreate -- because

15   I've got to re -- there's no reversing --

16   MR. DOUGLAS:  No objection.

17   THE COURT:  Mr. Douglas?  Okay.  Proceed.

18   MR. MANFORD:  Thank you, Mr. Douglas.

19   BY MR. MANFORD:

20   Q.  All right.  So, Michael, what are you doing right now at

21   this point in the video?

22   A.  Still -- so at this point, I see still his legs are

23   attempting to -- what we call post up, tucking underneath him

24   as if to stand up.  I'm still trying to put away my firearm.

25   Q.  Okay.  Let's continue.

MICHAEL KENNEDY - DIRECT EXAMINATION

1   A.  At this point, I see his leg is still trying to post up.  I

2   reach down and try and grab one of his feet to pull them out

3   from under him.

4   Q.  Okay.  Is that where we're at right now in the video?

5   A.  Yeah.  I'm grabbing around his ankle trying to pull them

6   out from under him.

7   Q.  Would you tell us where your hand is -- your right hand.

8   A.  If I recall correctly, it's somewhere around the calf,

9   ankle range.

10  Q.  And that's what you recall?

11  A.  That's what I recall, yes, sir.

12  Q.  All right.  Let's continue.  What do you recall doing now?

13  A.  I'm still -- he's pulling his legs against me so offering

14  active resistance against me and trying to pull his legs out

15  from under him so I deliver a compliance strike (indiscernible)

16  --

17          THE COURT REPORTER:  I'm sorry.  Just repeat that.

18  Q.  So are you doing --

19  A.  So I'm --

20  Q.  Tell us -- give us a description after the --

21          THE COURT:  Well, I think the court reporter didn't

22  hear what he said.  If you could repeat it.

23  A.  So he -- I'm trying to pull his legs out from under him.

24  He's offering active resistance pulling against me.  And then I

25  deliver a compliance strike with my foot.

MICHAEL KENNEDY - DIRECT EXAMINATION

1  BY MR. MANFORD:

2  Q.  So, again -- I'm trying not to have objections.  So it

3  looks like some sort of a drop kick.  Would that be a fair

4  estimation at this point as opposed to a stomp we're going to

5  see later?

6  A.  I wouldn't call it a drop kick.  It was just a kick

7  targeted in the nerve ending in his knee to help -- to

8  hopefully deaden his leg is my intent there.  To prevent him

9  from pulling it against me.

10  Q.  Okay.  How many of those types of compliance strikes did

11  you -- do you recall administering?

12  A.  Two, maybe three if I recall.

13  Q.  All right.  Let's continue.

14  A.  And the whole time we're in the stop resisting, of course,

15  I hear other officers ordering "surrender your hands" which

16  gives me the impression that they don't have his hands yet.

17  Q.  All right.  There was a different type of motion with your

18  foot we just witnessed in the last second.

19  A.  So I've got his leg where it's out straight, and I'm trying

20  to, in the course of the scuffle and melee, pin his hips to the

21  ground to prevent him from getting his hips up because if his

22  hips are pinned to the ground, his legs are no longer a threat

23  to kicking at me.  And since he's pulled at me already once,

24  I'm worried about him trying to kick out at all.

25  Q.  Would you tell us what you recall his orientation was in

MICHAEL KENNEDY - DIRECT EXAMINATION

1  relation to the ground at this time.

2  A.  He was more or less getting oriented on his stomach at this

3  point.  And I'm trying to pin his -- so my foot is landed on

4  roughly his buttock area trying to pin his hips to the ground.

5  Q.  All right.  Let's continue.  Are you actively engaged at

6  all right now?

7  A.  Right now, no.  I see his legs stop moving and assume that

8  at least the lower extremities he's done resisting.  I hear

9  Deputy Merson say something about his back seizing.  So I cycle

10  over to take control of that side of the body.  That's the

11  first time I noticed that Deputy Ennis was there.

12  Q.  Okay.

13  A.  And so I decide I'm just going to pull Merson out of this.

14  He's complaining of injury.  Two officers could probably handle

15  the situation from here.  It seems like things were trending

16  towards being done.  Then -- if you want to play the video

17  further -- is when I turned to face Merson and --

18  Q.  Okay.

19  A.  -- I recall telling him like, hey, man, are you okay?  He

20  said something about his back seizing up or something to that

21  effect.

22  Q.  At this point in the video, have you been able to

23  observe -- do you recall was there -- observing any injuries to

24  the subject?

25  A.  I didn't look at the suspect at this time.  I was concerned

MICHAEL KENNEDY – DIRECT EXAMINATION

1  for Deputy Merson at this moment.

2  Q.  Let's continue on.

3  A.  I'm looking at Merson and asking if he's okay.  He's saying

4  his back is seizing up.  I said I got you.  And I don't notice

5  at this point Ennis stand up.  So as far as I'm concerned at

6  this point that night, there were two officers still with the

7  suspect.  Once I see Ennis out of the corner of my eye, I

8  realize Walker is alone with the suspect.  So I look back to

9  make sure he's handcuffed.  I do a quick look over of him.  I

10  see he is cut on the side of his face there towards me.  Then I

11  put a knee in his back to prevent him from getting up if he

12  decides to become combative or resist us again.

13  Q.  Okay.  We see another officer enter the --

14  A.  I don't recall him that night.

15  Q.  Okay.  All right.  So are you able -- do you recall being

16  able to -- at this point in time in the video, do you recall

17  being able to see Officer Walker and what he was doing?

18  A.  As I'm taking a position to place a knee in his back, I do

19  glance down at the hands and see if he's secure or not.

20  Q.  Let's continue.

21  A.  I noticed that he was not secured, and Walker was trying to

22  pin both hands to his back with one hand.  So I took it as --

23  it didn't seem like there was much going on in the way of any

24  kind of resistance at that exact moment.

25  Q.  Okay.  Let's continue.

MICHAEL KENNEDY - DIRECT EXAMINATION

1  A.  So I look back and see Walker attempting to secure one link

2  of the cuffs on the suspect's hands.  Then I start to look away

3  at this point because it looks like things are going the way I

4  think they should have where they're in compliance.  However,

5  he sneaks his hand away from Walker at that point.  I look back

6  because I hear Walker shout out some sort of, you know, stop or

7  something to that effect which causes me to look back.  I

8  realize the suspect is now actively resisting again.  So I

9  transition off his knee -- transition my knee off his back and

10 deliver a series of compliance strikes targeting the smaller --

11 the shoulder or his back.

12 Q.  All right.  So what -- how do you -- how did you deliver

13 those?  Would you tell us are you right hand, left hand --

14 A.  Yeah.  I'm a right-handed person.  I deliver a right-hand

15 compliant -- closed-fist compliance strikes targeting the meaty

16 part of his back.

17 Q.  Okay.  Would you describe your fist.  Are you hitting with

18 the bottom part of the fist or the knuckle part?

19 A.  My intent is to strike with my knuckle.  I believe -- my

20 memory of the night, I should say, is my intent is to deliver

21 closed-fist compliance strikes straight on.

22 Q.  All right.  What's going through your head right now at

23 that time?

24 A.  I don't understand why he's yanked his hands away again,

25 but it all goes very quickly.  But there's now more

MICHAEL KENNEDY - DIRECT EXAMINATION

1   confirmation in my mind that there's something wrong with this
2   individual.  Possibly intoxicated.  Something like that.
3   Because in my experience, they tend to -- resistance tends to
4   ebb and flow when you've got intoxicated suspects.  They'll be
5   combative or resistant, and then they'll kind of tire out or
6   the resistance will die away, and then it will come back again
7   in bursts.
8   Q.  Let's continue playing.  All right.  I -- I'm not going far
9   with this.  I count five strikes.  Do you recall hitting him
10  five times at that time?
11  A.  I recall roughly five, yeah.
12  Q.  Okay.  And I mean these aren't pats on the wrists?
13  A.  No.  They're -- I'm seeking to gain pain compliance.  I'm
14  striking him a little harder than I would have normally because
15  at this point, he's gone noncompliant again.  I'm seeking to
16  end this confrontation quickly because in my experience, they
17  tend to only evolve further if you don't act quickly.
18  Q.  What are you feeling emotionally at this time?
19  A.  Well, I'm still coming off of, you know, fear of the -- you
20  know, the fear I felt during the explosion.  I'm frustrated
21  that we're not getting -- it seems like our compliance strikes
22  are being ineffective and that he's still trying to evade.  I'm
23  worried that Merson is injured.
24  Q.  Were you able to observe at this point in time whether or
25  not Merson was on the ground?

MICHAEL KENNEDY - DIRECT EXAMINATION

1    A.  No, I don't recall that that night.

2    Q.  Were you angry?

3    A.  No, I wouldn't say angry.  No.

4    Q.  Upset?

5    A.  Frustrated is the word I would use to describe it.

6    Q.  Okay.  Let's continue.  And what are you doing right now?

7    A.  So I noticed at this point Walker has managed to secure one

8    hand in cuffs.  I look again after I deliver a series of five

9    compliance strikes.  See what's the status of his hands.  Are

10   they secured yet?  Are they unsecured?  I see that he's broken

11   his left hand free so I help Walker get it back to the small of

12   his back.  I feel tension resistance in his hand and the arm as

13   I do that.  So now as soon as Walker reaches over and grabs

14   that other hand, I deliver three more strikes.  And I recall

15   those strikes being two to three the night of.

16   Q.  So you felt tension.  What -- why does that make you -- how

17   does that play into this?  What are you talking about?

18   A.  Tension indicates to me that he either intends to pull his

19   arm away again -- he's not -- the tension also disallows me

20   from easily placing his hands in the small of his back.  It's

21   an indication of potential attempt to flight.

22   Q.  Okay.  Were you, in your thought process, considering

23   whether or not he was beginning to resist again?

24   A.  I'm sorry.  Say that again.

25   Q.  In your thought process at that time, did you think he

MICHAEL KENNEDY - DIRECT EXAMINATION

1  might be resisting again?

2  A.  Yes.  I thought he was -- well, I would say the continued

3  resistance from the first set of strikes.

4  Q.  Okay.  All right.  So you're still oriented as you were

5  before with your left hand on his head?

6  A.  Correct.  I'm shielding his head in case numerous strikes

7  glance off.  I don't want to punch him in the back of the head

8  or anything like that.

9  Q.  Okay.  Let's continue.  Now, we're about to come up on some

10 more strikes.  What's going through your mind right now and

11 what are you seeing as far as the subject?  What's he doing?

12 What isn't he doing?  What's going through your mind?

13 A.  I see he's still not letting Walker place the handcuffs on

14 him easily.

15 Q.  We can't see that --

16 A.  There's still resistance.

17 Q.  We can't see that in the video.

18 A.  It's hard to see tension in videos.  It's hard to see what

19 we call passive resistance in video.  Passive resistance is a

20 step down from active obviously.  Passive is more I tense up.

21 I don't let you move you where you want me to go.  Stuff like

22 that.

23 Q.  Let's continue.  All right.  For the record, on the video

24 you've just delivered three more strikes.

25 A.  Correct.

MICHAEL KENNEDY - DIRECT EXAMINATION

1    Q.  Okay.

2    A.  I looked down at his hands and see that he's in cuffs at

3    this point.

4    Q.  Officer -- I don't know -- who is looking over there?  Who

5    is the deputy --

6    A.  That night I didn't even see that --

7    Q.  Okay.  Okay.  Let's continue.  So what's happening now?

8    A.  Once I looked down and saw he was, in fact, cuffed at that

9    point, after the third set of strikes, I disengaged.  Looks

10   like -- I'm sorry.

11   Q.  All right.  Yeah, you're not -- I'm sorry.  Tough not to

12   narrate.  Okay.  So what's going through your mind now?

13   A.  A slight moment of relief because I'm thinking all right.

14   We've got him secured.  This is finally -- we're done.

15   Q.  Okay.

16   A.  I'm still obviously riding the adrenaline.  My tunnel

17   vision is still in place pretty good except I don't even think

18   I knew that there was a deputy standing that close to me.

19   Q.  Okay.  All right.  So let's play it some more and ask you

20   what's going through your mind.

21        So just for purposes of the record, we just see Officer

22   Merson laying down for the first time in the video; is that

23   correct?

24   A.  Yes.  I see that.

25   Q.  But you don't -- but you didn't see it that night?

MICHAEL KENNEDY - DIRECT EXAMINATION

1  A.  No, I did not.

2  Q.  Got it.  Okay.  Let's keep going.  So, again, try not to

3  narrate too much, but we see Officer Walker attempting to move

4  the subject.  Did you see him pick him up and move him?

5  A.  I recall Walker going to stand the subject up.

6  Q.  Okay.  Where is your attention at that point in time?

7  A.  I start to glance towards the vehicle to see what the

8  status of -- what's going on over there.  Make sure I'm not

9  standing next to -- excuse me -- make sure I'm not standing

10  next to some inferno or something like that.

11  Q.  Is it still smoldering?

12  A.  I don't think my vision ever made it fully over there to

13  check.

14  Q.  All right.  So let's watch it, and then I'll tell you --

15  ask you what's going through your mind.  Now, for purposes of

16  the record again, we just see Officer Walker fall.  Looks like

17  over the top of the subject.  What do you see?  What's going

18  through your mind?

19  A.  I see Walker falling to the ground and their legs are kind

20  of tangled.  I assumed that the suspect had intentionally

21  tripped Walker at that point.  I then noticed how -- like look

22  at the suspect to see what's going on with that.  I notice

23  Merson is laying right next to the suspect who I just assumed

24  tripped Walker intentionally.  Do you want me to continue or --

25  Q.  Go ahead and continue a little bit --

MICHAEL KENNEDY - DIRECT EXAMINATION

1  A.  Okay.

2  Q.  -- and then we'll play the video.

3  A.  At that point, I view him as an active combatant and decide

4  I need to get him away from a possibly injured officer.  So I

5  grabbed him up as quickly as I can.  And I've noticed the pain

6  compliance does not seem to be effective with him at this

7  point.  Like the fact that he's continued to resist now he's

8  even in handcuffs.  I think I need to try and break through a

9  different way.  Maybe he's too high or drunk for any compliance

10  strikes to work.  So I scoop him up off the ground by his front

11  of his shirt.  And I'm telling him you need to stop fighting

12  with us.  I'm trying to break through that way and hope that

13  he's intimidated by my presence and the manner in which I'm

14  physically handling him.

15     And he responds in kind by saying something to the effect

16  of like fuck you or something like that.  I mean he yells that

17  in my face.  Blood strikes my face.  Well, I guess I didn't

18  know it was blood that night, but I felt something wet hit my

19  face assuming blood or spit.  And I, in my mind, just dropped

20  him.  But, again, what happened -- when I seen the video later,

21  I realized I probably was amped up and did it harder than I

22  intended.

23  Q.  All right.  Let's play that.  First let's move this over so

24  we can see it.  All right.  I'm going to stop and move it over

25  again.

MICHAEL KENNEDY - DIRECT EXAMINATION

1    All right.  So did we just see in the video what you

2    described was going through your mind and what you saw that

3    night?

4    A.  Yes.

5    Q.  Okay.  All right.  So what happens at this point?  And at

6    this point, for the record, the subject was just dropped,

7    tossed.  He's on his back.  Looks like his pants are down

8    around his ankles.  His boxers are present.  I can faintly see

9    you.  So what's going on next?

10   A.  I'm thinking why is he acting this way still?  I'm going to

11   end up walking up to him and kneeling down like -- kneeling is

12   not the right word -- bending over at the waist looking down at

13   him and saying are you done?  Are you done now?  Is this over?

14   And he just doesn't respond to me at that point.  I look --

15   eventually someone walks up with a light and shines it over

16   him.  And I see his eyes for the first time.  I get a look at

17   him pretty decent for the first time.  It looks like his eyes

18   are dilated pretty good.  I see blood all over his face.  Which

19   I concluded probably what's on my face is blood.  I noticed

20   that his pants are down around his ankles.  I ask him is he

21   done fighting.  I'm going to try and pull his pants up.  I

22   check his pockets real quick for weapons.  At this point, I now

23   know he's not going to run.

24   Q.  Okay.  Let's watch the video.

25   A.  Okay.

MICHAEL KENNEDY - DIRECT EXAMINATION

1  Q.  All right.  Let's stop.  We know from the previous

2  testimony that he was -- his placement was moved to another

3  location.

4  A.  Correct.

5  Q.  Can you tell us, if you know, who made that decision, what

6  the thought process was at that time, why was he being moved,

7  and who assisted you.

8  A.  I was content to leave him where we were.  I thought we

9  were pretty far, but one of the deputies -- I cannot recall

10 who -- said, hey, we're moving a little further from the

11 vehicle.  I was like, okay, well, we might as well move over

12 there together.  The ambulance was supposed to coordinate --

13 meet us at Williamsport Pike.  He's going to be transported

14 because he was in a pretty bad wreck.  And any time we use

15 force on anybody, we transport people as well.  So we're

16 transporting him.  I decide we're -- and I think another deputy

17 helps me out -- I don't recall who that night -- to move him

18 closer to Williamsport Pike.  So we stand him up because he

19 refuses to stand.  And he refuses to walk also so we end up

20 having to carry him, so to speak, arm and arm over towards

21 Williamsport Pike.

22 Q.  How did you carry him?

23 A.  We both had him under the shoulder blade or under the arm

24 pits, so to speak, carrying him -- like on either side carrying

25 him.  I was standing to his -- it would be right side.

MICHAEL KENNEDY - DIRECT EXAMINATION

1  Q.  Would that be along the lines we heard about yesterday

2  about escorting an arrestee?

3  A.  Correct.

4  Q.  All right.  So does the other -- you don't recall who the

5  other officer was?

6  A.  Not that night, no.

7  Q.  You know now?

8  A.  I do now, yes.

9  Q.  So what happens next?

10 A.  We're having to carry him -- like he's just letting his

11 feet drag.  So once we get to the intersection of Williamsport

12 Pike, I said I've carried him far enough.  If he doesn't want

13 to walk, we'll just set him down right where we're at.  So I

14 lay him down off the roadway.  That way he's -- none of the

15 vehicles risk running over his feet or something like that.

16     And at that point, I look at him.  I bend down and look at

17 him.  Why are you doing this?  Are you aware of what you did?

18 And he just looks at me.  And he's being belligerent towards

19 me.  Saying -- I can't recall any direct quotes, but he's

20 saying things back that further solidified in my mind this guy

21 is on something.  (Indiscernible) won't say the things that I

22 recall him saying.

23     And he tries to sit up.  I don't want to risk him trying to

24 stand up and become combative again so I grabbed him by the

25 front of the shirt and pushed him back down on the ground.  I

MICHAEL KENNEDY - DIRECT EXAMINATION

1  said you need to stay on the ground.  And, again, I'm trying to

2  break through him psychologically -- break through to him

3  psychologically that what he's -- like the scenario that he's

4  done.  I point out that he can paralyze somebody.  That, you

5  know, he could have killed somebody.  And he's telling me he

6  doesn't care.  Stuff to that effect.  And he keeps trying to

7  sit up.  Just kind of repeated.  Instructions to stay down.  I

8  continue to -- I had to push him down onto the ground.  I'd

9  hold him and like lean real close.  Like you need to stop.  And

10  during the course of this interaction, I deliver two open-hand

11  strikes with my left hand to his face.  Just fairly light slaps

12  trying to snap him out of it.  Make the resistance stop.

13  Q.  Are you right handed or left handed?

14  A.  I'm right handed.

15  Q.  All right.  Why did you choose your left hand?

16  A.  Because I saw that he was pretty injured on the other side

17  of his face, and I didn't want to cause -- like I didn't want

18  to rip open anything that was already ripped open any further.

19  I'm just -- I'm not trying to inflict great injury on him.  I'm

20  trying to gain compliance.  I'm trying to break through any way

21  I can.

22  Q.  Why did you pick the snow bank to place him on?

23  A.  Like I said, it was off the roadway.  I didn't even really

24  notice the snow that night.  It wasn't even like a

25  consideration for -- I needed to put him off the roadway.  I

MICHAEL KENNEDY - DIRECT EXAMINATION

1  knew the ambulance was at that intersection.

2  Q.  What was your emotional state at the time over by the

3  snowbank?

4  A.  Still frustrated that it appears that none of my compliance

5  techniques are working and that -- just -- I can't figure out

6  why.  I can only assume at that point that it was -- he was on

7  something.  And it's hard to deal with people who are on any

8  kind of intoxicants, drugs because they're pain compliant -- or

9  their pain compliance generally is ineffective in my

10 experience.

11 Q.  Was any part of your emotional state, mental state -- did

12 any of this factor in the fact that a friend of yours, Officer

13 Merson, had been possibly injured in an automobile accident

14 by -- caused by this individual?

15 A.  Are you asking if I was concerned about Merson at that

16 point?

17 Q.  Was that in your mind at the time?

18 A.  Yes, I was concerned about his well-being.

19 Q.  Okay.  Were you angry at the subject because of striking

20 Merson in his automobile?

21 A.  No.

22 Q.  Did it enter your mind at all that night?

23 A.  I mean I knew that he did that, but I didn't take it into

24 consideration of what I was doing.

25 Q.  Did you at any time try to retaliate against this

MICHAEL KENNEDY – CROSS EXAMINATION

1   individual because your friend was hurt?

2   A.   That was never my intent, no.

3   Q.   Anything we haven't covered that you need the Court to

4   know?

5   A.   I don't think so, sir.

6         MR. MANFORD:  That concludes my direct examination,

7   Your Honor.

8         THE COURT:  Thank you, Mr. Manford.  Mr. Douglas.

9         MR. DOUGLAS:  Thank you, Your Honor.

10                       CROSS EXAMINATION

11  BY MR. DOUGLAS:

12  Q.   Good morning.

13  A.   How are you, sir?

14  Q.   Just after midnight on November 19, 2018, you were on duty

15  as a trooper first class with the West Virginia State Police?

16  A.   That is correct, sir.

17  Q.   You've been a trooper for going on seven, eight years?

18  A.   Yes, sir.

19  Q.   When you first became a trooper, you completed a

20  three-month field training with Corporal J.B. Flannigan; right?

21  A.   Correct, sir.

22  Q.   To become a trooper, you completed a 25-week training at

23  the West Virginia State Police Academy, didn't you?

24  A.   Yes, sir.

25  Q.   You graduated 14th in your class, didn't you?

MICHAEL KENNEDY - CROSS EXAMINATION

1  A.  I don't recall that --

2  Q.  You grad --

3  A.  -- sir.

4  Q.  You graduated very high in your class, didn't you?

5  A.  I don't recall what my placement was, sir.

6  Q.  Your training at the academy included use-of-force and

7  defensive tactics training, didn't it?

8  A.  It did, sir.

9  Q.  In fact, your final grade in defensive tactics was a

10 perfect score of 100, wasn't it?

11 A.  I don't recall that either, sir.

12 Q.  At the academy, you listened very closely to Lieutenant

13 Petry (spelled phonetically) as he was instructing you on the

14 proper use of force, didn't you?

15 A.  I'm sure I did, sir.

16 Q.  At the academy, you learned that your force must be

17 objectively reasonable under the circumstances, didn't you?

18 A.  Yes, sir.

19 Q.  You were trained that those circumstances include the level

20 of threat presented by the subject; right?

21 A.  Correct.

22 Q.  In considering the level of threat, whether a subject is

23 handcuffed is a factor, isn't it?

24 A.  I would say so, yes, sir.

25 Q.  A handcuffed subject is generally less of a threat than a

MICHAEL KENNEDY – CROSS EXAMINATION

1   subject who is not handcuffed?

2   A.   Generally.

3   Q.   You used force against J.H. twice after he was in

4   handcuffs, didn't you?

5   A.   That's correct, sir.

6   Q.   And considering the level of threat, you were trained that

7   the number of officers surrounding a subject was also a factor;

8   right?

9   A.   Yes, sir.

10  Q.   The greater number of officers was generally less of a

11  threat especially dealing with one subject; right?

12  A.   Yes, sir.

13  Q.   At all times that night, there were at least three and

14  often more officers surrounding J.H. during his arrest, weren't

15  there?

16  A.   There were.

17  Q.   In considering the level of threat, the size of the subject

18  is also a factor; right?

19  A.   Yes, sir.

20  Q.   You could at least admit that J.H. was very small in

21  stature; right?

22  A.   I wouldn't say very small.

23  Q.   He wasn't very small?

24  A.   I wouldn't say very small.

25  Q.   Okay.  He was smaller than you, wasn't he?

MICHAEL KENNEDY – CROSS EXAMINATION

1    A.  Yes, sir.

2    Q.  He was smaller than Deputy Ennis, wasn't he?

3    A.  I believe.

4    Q.  He was much, much smaller than Trooper Walker, wasn't he?

5    A.  Yes.

6    Q.  And considering the level of threat, the age of a subject

7    is also a factor; right?

8    A.  Yes.

9    Q.  You could tell that J.H. was young, couldn't you?

10   A.  Not early on, no, sir.

11   Q.  You could tell he was a teenager; right?

12   A.  No, sir.

13   Q.  You learned at the academy that you can't use force against

14   a subject who poses no threat; right?

15   A.  Yes.

16   Q.  You learned at the academy that you cannot use force

17   against a subject because you're upset with the subject, didn't

18   you?

19   A.  Yes, sir.

20   Q.  But on multiple occasions that night, you used force

21   against J.H. even though he posed no threat because you were

22   upset with him; right?

23   A.  No, sir.

24   Q.  You learned at the academy you can't use force just to

25   punish a subject; right?

MICHAEL KENNEDY – CROSS EXAMINATION

1  A.  Yes, sir.

2  Q.  On multiple occasions that night, you used force against

3  J.H. because you wanted to punish him, didn't you?

4  A.  No, sir.

5  Q.  At the academy, you learned that compliance strikes could

6  be considered excessive if made while there is no threat posed

7  by the subject; right?

8  A.  Yes, sir.

9  Q.  But on multiple occasions you gave J.H. compliance strikes

10  even though he posed no threat, didn't you?

11  A.  That's not correct, sir.

12  Q.  At the academy, you were trained that using force

13  improperly could get you terminated; right?

14  A.  That's correct.

15  Q.  You were trained that using force improperly could get you

16  sued?

17  A.  That's correct.

18  Q.  You were trained that using force improperly could get you

19  prosecuted criminally?

20  A.  Yes, sir.

21  Q.  During the arrest of J.H., you kicked and stomped his legs

22  when he was first brought out of his vehicle, didn't you?

23  A.  That's correct.

24  Q.  You agree that the video does not show J.H. attempting to

25  bring his legs up underneath him, don't you?

MICHAEL KENNEDY – CROSS EXAMINATION

1  A.  I do not.

2  Q.  You didn't hear any other officer who was there and came to

3  testify, testify that J.H. was attempting to bring his legs up

4  underneath him, did you?

5  A.  I did not hear that testimony.

6  Q.  When you kicked and stomped J.H.'s legs, there were three

7  officers down on the ground with him, weren't there?

8  A.  I don't recall that that night.

9  Q.  There were multiple officers down on the ground when you

10  were stomping and kicking his legs; correct?

11  A.  What do you mean by multiple?

12  Q.  More than one.

13  A.  Okay.  Well, yeah.  I recall there being Walker and Merson.

14  Q.  Okay.  That's multiple; correct?

15  A.  Yes.

16  Q.  All right.  Now, if you hadn't kicked and stomped J.H.'s

17  legs, Trooper Walker would have still been able to gain control

18  of his hands; right?

19          MR. MANFORD:  Objection.  Speculation.

20          THE COURT:  Mr. Douglas?

21          MR. DOUGLAS:  Withdraw the question.

22  BY MR. DOUGLAS:

23  Q.  Your kicking and stomping J.H.'s legs, including picking

24  them up and kicking them, caused the other officers problems

25  with getting control of him, didn't it?

MICHAEL KENNEDY – CROSS EXAMINATION

1  A.  I don't believe so.

2  Q.  When you kicked and stomped J.H.'s legs, you knew based on

3  your training that your force was unnecessary and unreasonable,

4  didn't you?

5  A.  I did not.

6  Q.  During the cuffing of J.H., you struck him in the back with

7  your closed fist multiple times; right?

8  A.  Correct, sir.

9  Q.  Seeing J.H. pull one of his hands away from Trooper Walker

10  caused you to begin to use force; right?  That's what you said?

11  A.  That's correct, sir.

12  Q.  Would you agree that the video does not show J.H. trying to

13  post up at this point, don't you?

14  A.  I would not agree with that.

15  Q.  And by the time you struck J.H., the first of eight times,

16  Trooper Walker had already gained control of J.H.'s hand that

17  he had pulled away; right?

18  A.  No, sir.

19  Q.  You saw him pull it back on the video; right?

20  A.  One hand.  Correct, sir.

21  Q.  He had control of that right hand that pulled back, didn't

22  he?

23  A.  Are you asking for my recollection of the video or that

24  night, sir?

25  Q.  That night you saw Trooper Walker rip back J.H.'s hand that

MICHAEL KENNEDY - CROSS EXAMINATION

1  he had pulled away; correct?

2  A.  I saw him rip back his right hand, correct.  Not his left

3  hand.

4  Q.  And you saw that his right hand was under control?

5  A.  His right hand was, yes, sir.

6  Q.  And you just testified that the left hand was off, and it

7  was pulled back, and then you still hit him after both hands

8  were under control; isn't that correct?

9  A.  Both hands were not under control, sir.

10  Q.  You knew at that point during the cuffing that based on

11  your training, it was improper to use force against a subject

12  who was under control and posing no threat, didn't you?

13  A.  That is incorrect.

14  Q.  You didn't know at that moment that you couldn't use force

15  against someone who was under control?

16  A.  He was not under control.

17  Q.  Do you recall mentioning during your direct examination

18  that he tensed up during the cuffing?  Right?

19  A.  Correct.

20  Q.  And you actually described it as passive resistance; right?

21  A.  Yes, sir.

22  Q.  You said it was a step down; right?

23  A.  Step down is part of our policy, sir.  However, our

24  use-of-force techniques you're still allowed to use strikes

25  during that.

MICHAEL KENNEDY – CROSS EXAMINATION

1  Q.  Well, you're trained to follow your policy, aren't you?

2  A.  Yes, sir.

3  Q.  So isn't it fair to say that J.H. stepped down, but you

4  kept at the same level of force by striking him in the back?

5  A.  Yes, sir.

6  Q.  You knew, based on your training, at that moment that it

7  was improper to punch a subject multiple times simply because

8  he had tensed up?

9  A.  That's incorrect.

10  Q.  You were striking him at that moment even though Trooper

11  Walker had control of him?

12  A.  He did not have complete control of him.

13  Q.  You agree it is not reasonable to strike J.H. as punishment

14  for pulling his right hand away; right?

15  A.  As punishment, no, it is not.

16  Q.  But you were punishing J.H., weren't you?

17  A.  I was not.

18  Q.  When you were striking J.H. during the cuffing, you knew,

19  based on your training, that your force was unnecessary and

20  unreasonable, didn't you?

21  A.  That is incorrect, sir.

22       MR. MANFORD:  Your Honor, I'm going to pose an

23  objection.  I apologize for being rude.  This really isn't

24  cross examination.  This is more accusation.  We're not asking

25  questions about direct.  You know, we're making conclusions of

MICHAEL KENNEDY - CROSS EXAMINATION

1    law, and I just generally object.  Thank you.

2              THE COURT:  Mr. Douglas.

3              MR. DOUGLAS:  Your Honor, the Government has the

4    burden of proof beyond a reasonable doubt to prove willfulness.

5    The highest level of intent.  I'm asking him what he was

6    thinking at that time.  All those questions are directed at

7    that.

8              THE COURT:  It's also cross examination.  Overruled.

9    Please continue, Mr. Douglas.

10             MR. DOUGLAS:  Thank you.

11   BY MR. DOUGLAS:

12   Q.  After J.H. was cuffed, you picked him up by the front of

13   his shirt, didn't you?

14   A.  That's correct.

15   Q.  You lifted him up off the ground; right?

16   A.  That's correct.

17   Q.  You pulled his face close to yours; right?

18   A.  That's correct.

19   Q.  You carried him this way for a couple steps; right?

20   A.  That's correct.

21   Q.  While carrying him this way, you were yelling in his face,

22   weren't you?

23   A.  Yes.

24   Q.  You were angry at J.H. at that moment, weren't you?

25   A.  Incorrect.

MICHAEL KENNEDY - CROSS EXAMINATION

1  Q.  So picking somebody up by their shirt, holding them up to

2  your face and yelling at them is not you being angry?

3  A.  It is not, sir.

4  Q.  After carrying him this way for a couple steps, you tossed

5  him down to the ground, didn't you?

6  A.  I dropped him on the floor, yes.

7  Q.  That was you just dropping him?

8  A.  That's my memory of the night, yes, sir.

9  Q.  He went right down onto his back, didn't he?

10 A.  Say that again, sir.

11 Q.  When you tossed him to the ground --

12 A.  Yes, sir.

13 Q.  -- you tossed him down onto his back; correct?

14 A.  I dropped him on his back, yes, sir.

15 Q.  He was cuffed behind his back; right?

16 A.  Correct, sir.

17 Q.  And because he was he cuffed behind his back, he couldn't

18 brace his fall, could he?

19 A.  No, sir.

20 Q.  Surely you agree that this was not a proper police escort

21 of a cuffed arrestee?

22 A.  It's not what you would teach in the academy, no, sir.

23 Q.  It's not what you were taught either, was it?

24 A.  I've seen it done in the field, sir.

25 Q.  You were not taught at the academy to escort in that

MICHAEL KENNEDY – CROSS EXAMINATION

1  manner, were you?

2  A.  At the academy, no, sir.

3  Q.  You have never been trained to escort a cuffed subject in

4  that manner, have you?

5  A.  Yes.

6          THE COURT:  Yes, you haven't -- were never trained

7  or, yes, you have been trained?

8  A.  I have been trained in the field to pick people up in a

9  manner such as that, ma'am.

10  BY MR. DOUGLAS:

11  Q.  And toss them to the ground you've been trained?

12  A.  Not tossed to the ground, sir.

13  Q.  So you've never been ever trained to toss somebody to the

14  ground who is cuffed behind their back?

15  A.  No, sir.

16  Q.  In fact, you were trained to take special care of a cuffed

17  subject because he's in a vulnerable position cuffed behind his

18  back; right?

19  A.  So long as they're cooperative, yes.

20  Q.  A cuffed subject could be injured if not careful; right?

21  A.  That's correct.

22  Q.  But here you wanted to hurt J.H. by throwing him in

23  handcuffs to the ground, didn't you?

24  A.  That's incorrect.

25  Q.  With J.H. you had finally encountered a subject small

MICHAEL KENNEDY - CROSS EXAMINATION

1   enough for you to manhandle; right?

2   A.  No, sir.

3   Q.  You could tell by this time, at least this time, that you

4   were dealing with a lightweight teenager?

5   A.  I could, sir.

6   Q.  When you tossed J.H. to the ground --

7   A.  Oh, excuse me.  I couldn't tell he was a teenager, but I

8   could tell he was lightweight.  Sorry.  I didn't hear you say

9   that last word.

10  Q.  When you tossed J.H. to the ground, he wasn't posing any

11  threat, was he?

12  A.  Well, when the blood struck my face that's what caused that

13  reaction.  So it can be considered a threat, yeah.  Spitting or

14  whatever is an act of aggression.

15  Q.  Are you now saying for the first time that he spit blood in

16  your face?

17  A.  In the moment, I don't know if it was intentional or not.

18  No, sir.

19  Q.  Is it your testimony that he spat blood in your face?

20  A.  My testimony is blood struck my face.

21          THE COURT:  What did you think at the time?

22          THE WITNESS:  I just reacted.  I don't recall

23  thinking it was deliberate or non-deliberate.  It was just a

24  knee-jerk response, ma'am.

25          THE COURT:  What have you been trained to do when a

MICHAEL KENNEDY - CROSS EXAMINATION

1  strange individual either spits in your face or you get blood,

2  from an individual you're handling, in your face?

3          THE WITNESS:  Well, if you're -- if it's -- if you

4  know that it's intentional, you would handle it as a -- as the

5  same as if they're striking at you, ma'am.  And since I was

6  unsure, I didn't treat it as immediate aggression.  So I didn't

7  bring out any kind of implements or OC spray or any of those

8  next level steps.  Instead I just created space.  Like I said,

9  my memory is I dropped him.  But apparently it was a little

10  rougher than I intended.

11          THE COURT:  Mr. Douglas.

12          MR. DOUGLAS:  Thank you, Your Honor.

13  BY MR. DOUGLAS:

14  Q.  When you tossed J.H. to the ground, he was handcuffed;

15  right?

16  A.  Yes.

17  Q.  When you tossed J.H. to the ground, he was surrounded by

18  five officers; right?

19  A.  No.

20  Q.  There were multiple officers still around the subject,

21  weren't there?

22  A.  Around I suppose you could say, yes.

23  Q.  Now, even assuming that J.H. resisted standing up and

24  intentionally caused Trooper Walker to fall, your response did

25  not reasonably require picking him up and tossing him to the

MICHAEL KENNEDY – CROSS EXAMINATION

1  ground, did it?

2  A.  I believe it did.

3  Q.  You were trained that verbal abuse by a subject is not

4  justification for using force; right?

5  A.  Correct.

6  Q.  So even assuming that J.H. said fuck you to you while you

7  were holding him up in the air, do you agree that it went

8  against your training to toss him to the ground for that

9  reason; right?

10  A.  That was not the reason.

11  Q.  There was no law enforcement reason for tossing J.H. to the

12  ground; was there?

13  A.  Yes, sir, there was.

14  Q.  If fact, you were punishing J.H., weren't you?

15  A.  That is incorrect, sir.

16  Q.  When you tossed J.H. to the ground, you knew based on your

17  training and experience that your force was unnecessary and

18  unreasonable, didn't you?

19  A.  Can you rephrase that question?

20  Q.  When you tossed J.H. to the ground, you knew based on your

21  training that your force was unnecessary and unreasonable under

22  the circumstances, didn't you?

23  A.  That's incorrect, sir.

24  Q.  You picked J.H. up a second time and moved him over to a

25  snowbank, didn't you?

MICHAEL KENNEDY - CROSS EXAMINATION

1   A.  That's correct, sir.

2   Q.  And you testified on direct that that wasn't your idea?

3   A.  I recall it being -- we were moving further away so I

4   helped move everyone further away, sir.

5   Q.  Because you did hear officers testify, including Deputy

6   Ennis specifically, that it was your idea to move the subject

7   that second time?

8   A.  It was my idea to stop carrying him so far, yes, sir.

9   Q.  You could have placed J.H. in your cruiser; right?

10  A.  No, sir.

11  Q.  Arrestees can be placed in your cruiser, can't they?

12  A.  They can be placed in a cruiser, yes, sir.

13  Q.  If you arrested somebody out on Interstate 81, you would

14  place them in your cruiser; right?

15  A.  If it was my arrest, yes, sir.

16  Q.  Okay.  You could have placed J.H. in one of the four county

17  cruisers on the scene; right?

18  A.  No, sir, I didn't have access to their cruisers.

19  Q.  You could have asked Deputy Ennis, who was helping you at

20  that very moment, to transport J.H., to place him in his

21  cruiser, couldn't you?

22  A.  I suppose I could have.

23  Q.  You didn't, did do?

24  A.  No, sir.

25  Q.  Instead you dropped J.H. down on a pile of snow because you

MICHAEL KENNEDY - CROSS EXAMINATION

1   wanted him to be uncomfortable, didn't you?

2   A.   That's incorrect, sir.

3   Q.   You told Deputy Ennis this is a good place for him, didn't

4   you?

5   A.   I don't recall saying that, sir.

6   Q.   You heard Deputy Ennis testify under oath that that is what

7   you said, didn't you?

8   A.   I heard -- I recall that testimony.

9   Q.   By this is a good place for him, you meant the cold snow

10  was a good place for someone who had rear-ended an officer and

11  led officers on a pursuit; right?

12  A.   That is incorrect.

13  Q.   Dropping J.H. down on the snow was part of your punishment

14  for him, wasn't it?

15  A.   That is incorrect.

16  Q.   At the snowbank, you grabbed J.H. again by the front of his

17  shirt and pulled his face to yours, didn't you?

18  A.   That's incorrect.

19  Q.   So two officers who said you did, they're mistaken?  Is

20  that what you're telling me?

21  A.   They are mistaken.

22  Q.   And at that point, you then yelled in J.H.'s face that he

23  could have paralyzed or killed Deputy Merson, didn't you?

24  A.   I did tell him that, yes, sir.

25  Q.   You were angry at J.H., weren't you?

MICHAEL KENNEDY – CROSS EXAMINATION

1    A.   I was not.

2    Q.   You were concerned about Deputy Merson at that very moment,

3    weren't you?

4    A.   I was concerned about his safety, yes.

5    Q.   Then you proceeded to strike J.H. two times; right?

6    A.   That's correct.

7    Q.   In the face; right?

8    A.   That is correct.

9    Q.   He was still cuffed behind his back; right?

10   A.   Yes, sir.

11   Q.   He was still surrounded by multiple officers, wasn't he?

12   A.   I don't recall him being surrounded by multiple officers.

13   Q.   There were some multiple officers very close to where he

14   was, weren't there?

15   A.   I don't recall that.

16   Q.   J.H. was not posing any threat when you were striking him

17   at the snowbank, was he?

18   A.   I disagree.

19   Q.   Even assuming J.H. was raising his torso off the cold snow,

20   your response did not reasonably require striking him in the

21   face, did it?

22   A.   I disagree.

23   Q.   There was no law enforcement reason for striking J.H. in

24   the face, was there?

25   A.   I believe there was.

MICHAEL KENNEDY – CROSS EXAMINATION

1  Q.  You were punishing J.H.?

2  A.  I was not.

3  Q.  When you struck J.H. at the snowbank, you knew based on

4  your training that your force was unnecessary and unreasonable,

5  didn't you?

6  A.  I did not.

7  Q.  J.H. was bleeding during the arrest; right?

8  A.  That's correct, sir.

9  Q.  In fact, you got his blood on your face?

10  A.  Yes, sir.

11  Q.  You agree that you worsened his bleeding by tossing him to

12  the ground, don't you?

13  A.  I do not.

14  Q.  You agree that you worsened his bleeding by striking him in

15  the face from which he was bleeding at the snowbank?

16  A.  I do not.

17  Q.  You heard the EMT testify that he found contusions on

18  J.H.'s body after cutting off his shirt, didn't you?

19  A.  I recall that testimony, yes.

20  Q.  You agree that being tossed down on the ground can cause

21  contusions, don't you?

22  A.  I suppose, yes.

23  Q.  You can't rule out that your tossing J.H. to the ground

24  caused him to sustain contusions; right?

25  A.  I don't believe it did though.

MICHAEL KENNEDY – CROSS EXAMINATION

1  Q.  You can't rule it out, can you?

2  A.  I don't think it did.

3  Q.  You can't rule it out, can you?

4  A.  I suppose not.

5  Q.  In fact, your tossing J.H. to the ground is what caused him

6  to sustain contusions; right?

7  A.  I don't believe so.

8  Q.  You didn't inspect J.H.'s body for contusions, did you?

9  A.  No.

10  Q.  You also heard the EMT testify that J.H. complained to him

11  about a headache, didn't you?

12  A.  I recall the testimony, yes.

13  Q.  Being tossed to the ground and slapped in the face can

14  cause someone to have a headache; right?

15  A.  I suppose.

16  Q.  You can't rule out that your tossing J.H. to the ground and

17  slapping in the face caused him to have a headache?

18  A.  No, I can't.

19  Q.  Assuming a person has a headache from a car accident, being

20  tossed to the ground and slapped in the face could worsen that

21  headache; right?

22  A.  I suppose so.

23  Q.  You can't rule out that your tossing J.H. to the ground and

24  slapping him in the face worsened his headache; right?

25  A.  I suppose not.

MICHAEL KENNEDY - CROSS EXAMINATION

1   Q.   I mean you didn't ask the kid during this whether he had a

2   headache and, if so, when he first got it; right?

3   A.   No, sir.

4   Q.   When you kicked and stormed J.H.'s legs at the beginning,

5   your goal was to cause him pain; right?

6   A.   That is incorrect.  I'm sorry, to cause pain?  Yes, sir --

7   Q.   Yes, sir.

8   A.   -- it was.  Sorry.

9   Q.   Yes, sir.  And your kicking and stomping must have caused

10  J.H. pain because as you just testified on direct under oath,

11  he stopped moving his legs after you kicked him?

12  A.   I don't know if it did cause him pain or not.  I just know

13  he stopped kicking.

14  Q.   Okay.  So in your experience when you issue what you're

15  saying is a pain compliance and they comply, then you assume

16  that they felt pain; right?

17  A.   You can assume that I suppose.

18  Q.   It had its intended effect; right?

19  A.   I don't know that for a fact.

20  Q.   I mean you saw him lying down, face down on the ground like

21  a rag doll after this initial force, didn't you?

22  A.   After which initial force, sir?

23  Q.   After the extrication and the force when everybody backed

24  away.  You saw him just lying there motionless.

25  A.   So are you talking about immediately after he was

MICHAEL KENNEDY - CROSS EXAMINATION

1   extricated or are you talking about after Merson stepped aside?

2   Q.   After Merson stepped away --

3   A.   Okay.  Okay.

4   Q.   -- you saw J.H. motionless on the ground?

5   A.   No.  I was looking at Merson.

6   Q.   You were concerned about Merson?

7   A.   Yeah, I was checking on his welfare.

8   Q.   I mean if someone kicked and stomped your legs that would

9   hurt, wouldn't it?

10  A.   I suppose so, yeah.

11  Q.   When you struck J.H. in the back during the cuffing, your

12  goal was to cause him pain; right?

13  A.   During the cuffing process, the compliance strikes in the

14  back is what we're talking about now?

15  Q.   Yes, sir.

16  A.   Okay.  Sorry.  You're kind of hopping around.  I'm trying

17  to make sure I'm on the same page as you.

18  Q.   Yes, sir.

19  A.   Yes.  I was trying -- my intent was to inflict pain

20  compliance, yes.

21  Q.   And your striking of J.H.'s back must have caused him pain

22  because Trooper Walker was able to get the cuffs on after your

23  strikes; correct?

24  A.   I don't know if it actually caused him pain, but we managed

25  to get him cuffed during the process, yes.

MICHAEL KENNEDY - CROSS EXAMINATION

1  Q.  If someone was striking you in the back eight times that

2  would hurt, wouldn't it?

3  A.  It would hurt, yeah.

4  Q.  You surely agree that your strikes to J.H.'s back could

5  have been what caused him to tense up, don't you?

6  A.  No.

7  Q.  His tensing up during the cuffing could have been him

8  bracing for your strikes; right?

9  A.  I don't think so.

10  Q.  And J.H. was tensing up as you were striking him; right?

11  A.  I don't -- I felt tension in his neck, but I don't recall

12  seeing -- I can't see tension.  I know that Walker was

13  struggling to put his handcuffs on.

14  Q.  Well, on direct didn't you just say that you can see

15  tensing?  That you can't see it on a video, but if you're

16  there, you can see it?  And now you're saying you didn't see

17  tensing?

18  A.  You can feel tensing.

19  Q.  Okay.  So you felt him tensing up while you were striking

20  him?

21  A.  I felt him tense up when I handed his hands over to Walker.

22  Q.  Tensing up while you're striking him is proof that he was

23  feeling pain, isn't it?

24  A.  No.

25  Q.  You agree that it had to hurt J.H. to be tossed down on his

MICHAEL KENNEDY - CROSS EXAMINATION

1  back while in cuffs, don't you?

2          MR. MANFORD:  I think we've been there.  I object.

3          THE COURT:  Mr. Douglas.

4          MR. DOUGLAS:  We have not been there.  This is

5  completely about pain.

6          THE COURT:  I think we've been there, but it's cross

7  examination so I'm not going to limit it.  Overruled.

8      Please continue, Mr. Douglas.

9  BY MR. DOUGLAS:

10  Q.  The question was, you agree it had to hurt J.H. to be

11  tossed down on his back while in cuffs, don't you?

12  A.  I do not.

13  Q.  If you were cuffed behind your back, tossed back on your

14  back to the ground, a hard surface, that would hurt you,

15  wouldn't it?

16  A.  It's possible.

17  Q.  Are you saying it's possible it wouldn't hurt you?

18  A.  It's possible.

19  Q.  You wouldn't feel pain?

20  A.  It depends.

21  Q.  And when you struck J.H. in the face at the snowbank, your

22  goal there also was to cause him pain; right?

23  A.  I was trying to inflict pain compliance.

24  Q.  Whether you slap someone across the face or punch them in

25  the face that must hurt either way, wouldn't it?

MICHAEL KENNEDY - CROSS EXAMINATION

1  A.  It's distinctly different but yeah.

2  Q.  Your strikes to J.H.'s face in the snowbank must have

3  caused him pain because he stopped raising his torso after the

4  strikes, right, and you walked away?

5  A.  That may not be the reason.  Maybe because he got tired of

6  pushing against me and pushing him down.

7  Q.  He stopped raising his torso off the snowbank; right?

8  A.  Eventually, yes.

9  Q.  It happens after your strikes; right?

10  A.  Sometime after.

11  Q.  If you're laying there with your hands cuffed behind your

12  back and somebody slaps you in the face a couple times that

13  hurts, doesn't it?

14  A.  Depends, sir.

15  Q.  Are you saying it's possible that you wouldn't feel pain if

16  somebody slapped you in the face twice?

17  A.  If the factor is an intoxicator, then it's possible I will

18  not feel pain.

19  Q.  On the night in question, state police policy requires you

20  to report any use of force to your sergeant; correct?

21  A.  Correct, sir.

22  Q.  You used force on that night in question, didn't you, which

23  we've seen?

24  A.  Yes, sir.

25  Q.  But you didn't report your use of force to Sergeant Cole,

MICHAEL KENNEDY – CROSS EXAMINATION

1   did you?

2   A.   Incorrect, sir.

3   Q.   You didn't call Sergeant Cole that night?

4   A.   I personally did not, no, sir.

5   Q.   Trooper Walker called Sergeant Cole, didn't he?

6   A.   That's correct, sir.

7   Q.   But you saw Trooper Walker, after the trip, went over to

8   the vehicle and was searching it; right?

9   A.   That night, no, sir.  In the video, yes.

10  Q.   You did not know that Trooper Walker saw your force over at

11  the snowbank; right?

12  A.   No, sir.

13  Q.   He couldn't report your snowbank force, could he?

14  A.   I suppose not, sir.

15  Q.   You didn't want your snowbank force reported, did you?

16  A.   Absolutely I did.

17  Q.   Over the next ten days, you didn't report your force to

18  Sergeant Cole, did you?

19  A.   Just to clarify that last question, I did want to report

20  that force.

21  Q.   Okay.

22  A.   I didn't catch that.  Sorry.  Ask that second question.

23  Q.   Yes, sir.  Over the next ten days, after the incident, you

24  didn't report your force to Sergeant Cole, did you?

25  A.   My understanding was that it had already been reported.

MICHAEL KENNEDY - CROSS EXAMINATION

1   Q.   During that timeframe, you didn't report --

2   A.   No, sir.

3   Q.   -- the force to Sergeant Cole; right?

4   A.   Correct, sir.

5   Q.   You saw Sergeant Cole multiple times in those ten days

6   following the incident; right?

7   A.   I'm sure I saw him at least a couple.

8   Q.   I mean his office is in the same building; right?

9   A.   I work night shift though.

10  Q.   Okay.  You saw him during that timeframe, didn't you?

11  A.   At least once, yes, sir.

12  Q.   You had his phone number, didn't you?

13  A.   That's correct.

14  Q.   You had his e-mail, didn't you?

15  A.   That's correct.

16  Q.   In fact, at no point did you personally report any force to

17  Sergeant Cole on your own initiative, did you?

18  A.   No, sir.

19  Q.   You didn't tell Sergeant Cole because you didn't want him

20  to know, did you?

21  A.   That's incorrect.

22  Q.   You didn't tell Sergeant Cole because you knew you weren't

23  justified in your force; right?

24  A.   That is also incorrect.

25  Q.   Your failure to report your use of force to Sergeant Cole

MICHAEL KENNEDY – CROSS EXAMINATION

1   was a violation of state policy, wasn't it?

2   A.   No, sir.

3   Q.   In fact, you only reported your use of force to Sergeant

4   Cole after he directed you to do so, didn't you?

5   A.   I gave a statement after I was directed to give a

6   statement, sir.

7   Q.   And that statement was the first time you're telling

8   Sergeant Cole, yes, I -- I'm telling you, Sergeant Cole -- used

9   force that night?

10   A.   Yes.

11   Q.   And Sergeant Cole only directed you to provide him a

12   written statement regarding your force after he was given video

13   evidence of your force from the Berkeley County Sheriff's

14   Office; isn't that correct?

15   A.   That was also correct.

16   Q.   The Berkeley County Sheriff's Office video was the first

17   indication to Sergeant Cole that you had used force against

18   J.H.?

19   A.   That's correct.

20   Q.   Sergeant Cole permitted you to watch the Merson dashboard

21   camera video prior to providing him your written statement,

22   didn't he?

23   A.   Yes.

24   Q.   In addition, before you turned in your written statement to

25   Sergeant Cole, he told you that video from another deputy's

MICHAEL KENNEDY – CROSS EXAMINATION

1  dashboard camera existed, didn't he?

2  A.  I don't recall being told there was another video that

3  night.

4  Q.  When you wrote your statement, you knew you had better

5  include all of the force you used and you had better justify

6  it?

7  A.  That's what we do --

8  Q.  That's the purpose of the statement, isn't it?

9  A.  Yes, sir.

10  Q.  That wasn't a typical statement, was it?

11  A.  Yeah.  Fairly typical.

12  Q.  So you knew that this was coming down from headquarters;

13  right?

14  A.  Yeah.

15  Q.  That Sergeant Cole, himself, had been directed from above

16  him to get a statement from you?

17  A.  Yes.

18  Q.  This is the most important statement you ever wrote in your

19  career, isn't it?

20  A.  I disagree.

21  Q.  So it's very often that it comes down from the colonel that

22  you write a statement?

23  A.  No.

24  Q.  This is the first and only time, isn't it?

25  A.  I don't believe so.

MICHAEL KENNEDY - CROSS EXAMINATION

1  Q.  You've had other times where the colonel has you write a
2  written statement?
3  A.  I believe so.
4  Q.  You added information in that statement that is not
5  corroborated by the video, didn't you?
6  A.  No.
7  Q.  You stated in that statement that immediately following the
8  extrication from the vehicle that J.H. attempted to bring his
9  legs up underneath him to stand up; right?
10  A.  In that statement?  Is that what you're asking me?
11  Q.  Yes, sir.
12  A.  Without looking at it, I'll take your word for it, sir.  I
13  haven't seen it for a while.
14  Q.  You stated in your statement that J.H. attempted to post up
15  during the cuffing, didn't you?
16  A.  Correct, sir.
17  Q.  But that's not true, is it?
18  A.  It is true.
19          THE COURT:  Can you define post up?
20          THE WITNESS:  It's any attempt to stand up.  Trying
21  to get your body under -- your extremities underneath of you as
22  if to get yourself up off the ground or potentially put
23  yourself in a combative position.
24  BY MR. DOUGLAS:
25  Q.  You also used language in your statement to put you in a

MICHAEL KENNEDY – CROSS EXAMINATION

1  better light, didn't you?

2  A.  I don't believe so, sir.

3  Q.  You said you, quote, dropped J.H. to the ground, didn't

4  you?

5  A.  That's my recollection.

6  Q.  But you tossed him?

7  A.  My recollection was I dropped him.

8  Q.  You received training on writing statements and reports at

9  the academy?

10  A.  Yes.

11  Q.  You had seven, eight years' experience writing reports?

12  A.  No, sir.

13  Q.  You've written reports over your entire career; right?

14  A.  Yes, sir.

15  Q.  Okay.  And in these particular reports, you're going to

16  include everything that happened; right?

17  A.  Yes, sir.

18  Q.  You're going to be careful to make sure you're indicating

19  to your sergeant this was justified; right?

20  A.  Make sure he understands why I did what I did, sir.

21  Q.  Right.  You're trying to explain your actions; correct?

22  A.  Yes, sir.

23  Q.  And because we're talking about use of force, you're going

24  to talk about levels of threat?

25  A.  Yes, sir.

MICHAEL KENNEDY - CROSS EXAMINATION

1   Q.  You're going to try to include everything in there, aren't
2   you, that goes to why you used force?
3   A.  Generally.
4   Q.  Okay.
5           MR. DOUGLAS:  Your Honor, may I approach the witness?
6           THE COURT:  Yes, sir.
7           MR. DOUGLAS:  I'm showing, for the record, defense
8   counsel the statement which is Bates numbered 5801 and 5802.
9           MR. MANFORD:  Okay.
10          MR. DOUGLAS:  I'm handing the witness that statement,
11  Your Honor.
12  BY MR. DOUGLAS:
13  Q.  Mr. Kennedy, please take your time to review that two-page,
14  seven-paragraph statement.
15          THE COURT:  It's been marked for identification?
16          MR. DOUGLAS:  It has not, Your Honor.  I'm going to
17  mark it as Government Exhibit 1 with "cross" written
18  underneath.
19          THE COURT:  Thank you, Mr. Douglas.  We'll keep the
20  record straight --
21          MR. DOUGLAS:  Thank you.
22  A.  Yeah, this looks like my statement, sir.
23  BY MR. DOUGLAS:
24  Q.  Did you take your time to read it?
25  A.  Yes, sir.

MICHAEL KENNEDY - CROSS EXAMINATION

1  Q.  Please point out to the Court where you put in there you

2  thought the kid was under the influence of some narcotics or

3  something --

4  A.  I seem to have forgotten to have put that in there, sir.

5  Q.  Oh, you didn't put it in there?

6  A.  No, sir.

7  Q.  In fact, you just came up with that during the trial,

8  didn't you?

9  A.  That's incorrect, sir.

10  Q.  In preparing for trial, you came up with that idea, didn't

11  you?

12  A.  That's incorrect, sir.

13  Q.  Please point out to the Court where you put in there the

14  kid spat blood in your face.

15  A.  I never said he spat blood in my face, sir.

16  Q.  Please point out to the Court where you put in there you

17  got blood on your face.

18  A.  I did not, sir.

19  Q.  In fact, you just came up with that for trial, didn't you?

20  A.  That's incorrect, sir.

21  Q.  Because you had to come up with a reason to justify tossing

22  a kid to the ground so you came up with the blood thing?

23  A.  That's incorrect, sir.

24          MR. DOUGLAS:  One moment, Your Honor.

25          THE COURT:  Yes, sir.

MICHAEL KENNEDY - CROSS EXAMINATION

1  BY MR. DOUGLAS:

2  Q.  You also testified on direct that during the initial

3  encounter, right after extrication --

4  A.  Okay.

5  Q.  -- that you were checking his waistband for a weapon;

6  right?

7  A.  I attempted to look for it, yes, sir.

8  Q.  But you didn't state that in your report, did you?

9  A.  No, sir.

10  Q.  In fact, you just added that for trial purposes, didn't

11  you?

12  A.  That's incorrect, sir.

13  Q.  You were the only officer who used force during the

14  cuffing; right?

15  A.  During the second attempt at cuffing him, yes.  But when he

16  was being extricated, they were trying to put his hands back

17  behind his back.  I would count those as part of the cuffing

18  process.

19  Q.  When you came over and put your knee into J.H.'s back --

20      (Simultaneous speech.)

21  Q.  -- at that point during the cuffing process, you're the

22  only officer on scene using force at that time; right?

23  A.  Incorrect, sir.

24  Q.  You're the only officer striking the subject at that point?

25  A.  That is correct.

MICHAEL KENNEDY - CROSS EXAMINATION

1  Q.  Because you consider putting cuffs on him to be force;

2  right?

3  A.  Yes.

4  Q.  That's why you're hedging on that?

5  A.  Yes, sir.  That's correct.

6  Q.  Okay.  You were the only officer who used force after the

7  cuffs were on; right?

8  A.  Incorrect, sir.

9  Q.  Are you considering the escort of Deputy Ennis to be force?

10  A.  Any time you put hands on people it's force, sir.

11  Q.  Okay.  You're the only one who tossed him, you're the only

12  one who hit him, right, after he had cuffs on?

13  A.  Yes, sir.

14  Q.  Okay.  You were the only officer that grabbed J.H. by the

15  front of his shirt and pulled his face close to yours?

16  A.  That's correct, sir.

17  Q.  You did that on two occasions, didn't you?

18  A.  No, sir.

19  Q.  You were the only officer who was yelling at J.H. after he

20  was cuffed, weren't you?

21  A.  I don't believe so, sir.

22  Q.  You're pretty good friends with Deputy Merson, aren't you,

23  at that -- during that night?

24  A.  Yes, sir.  We served together for a while.

25  Q.  What do you mean by serve together?

MICHAEL KENNEDY - CROSS EXAMINATION

1  A.  We were in the military together, and we served in Berkeley
2  County together my entire career.
3  Q.  You're saying you served together before becoming a
4  trooper?
5  A.  Yes, sir.
6  Q.  How long?
7  A.  Since I was 18 years old.
8  Q.  So you've known Deputy Merson since you were 18 years old?
9  A.  Yes, sir.
10  Q.  And Deputy Merson was lying on the ground in pain, wasn't
11  he?
12  A.  That's correct, sir.
13  Q.  You were concerned about him, weren't you?
14  A.  That's correct, sir.
15  Q.  Deputy Merson told you that his back was seizing up after
16  the initial force, the initial extrication, and stood up?  He
17  told you his back was seizing up?
18  A.  Yes, sir.
19  Q.  In fact, you checked on Deputy Merson right before placing
20  your knee in J.H.'s back during the cuffing; right?
21  A.  That's correct, sir.
22  Q.  While Deputy Merson was lying on his back, injured from
23  what you called a not-overly-serious car accident, you were
24  tossing to the ground J.H. who had been in a major car
25  accident, weren't you?

MICHAEL KENNEDY – CROSS EXAMINATION

1   A.  That's correct, sir.

2   Q.  I mean you talked considerably about seeing the vehicle run

3   off the road and things like that?

4   A.  Yes, sir.

5   Q.  It rolled through a power pole; right?

6   A.  I don't believe it rolled.

7   Q.  You saw the damage of the car when you got there, didn't

8   you?

9   A.  After the fact, yes.

10  Q.  At the snowbank you saw and heard that Deputy Merson was in

11  pain, didn't you?

12  A.  Yes, sir.

13  Q.  He was lying on the ground just behind you, wasn't he?

14  A.  Yes, sir.

15  Q.  And at the snowbank, you yelled at J.H. that he could have

16  paralyzed or killed Deputy Merson at that point?

17  A.  I did tell him that, yes.

18  Q.  You were mad at J.H. because of Deputy Merson, weren't you?

19  A.  Incorrect, sir.

20  Q.  You wanted to punish J.H. because of Deputy Merson, didn't

21  you?

22  A.  Incorrect, sir.

23  Q.  You've known Deputy Merson for a while, but you've also

24  known Trooper Walker for a pretty good amount of time too;

25  right?

MICHAEL KENNEDY – CROSS EXAMINATION

1   A.   A lesser amount of time but yes.

2   Q.   For several years?

3   A.   Yes, sir.

4   Q.   You attended the academy together for about six months?

5   A.   That's correct.

6   Q.   And you both had been working at the state police since

7   2012?

8   A.   That's correct.

9   Q.   You were stationed at the same detachment for several

10  months?

11  A.   That's correct.

12  Q.   You responded to numerous calls together with Trooper

13  Walker?

14  A.   That's fair to say.

15  Q.   So is it fair to say you have a pretty good sense for how

16  Trooper Walker operates on the scene?

17  A.   Yeah.

18  Q.   Is all that true?

19  A.   That's correct.

20  Q.   During the cuffing, it was Trooper Walker from whom J.H.

21  pulled his hand away; right?

22  A.   Correct.

23  Q.   After the cuffing, it was Trooper Walker who tripped over

24  J.H.; right?

25  A.   Correct.

MICHAEL KENNEDY - CROSS EXAMINATION

1    Q.  After tripping, Trooper Walker was probably mad at J.H.,
2    wasn't he?
3    A.  I can't speculate to how he felt.
4    Q.  You sat there at the defense table, and you heard Trooper
5    Walker testify under oath that he was upset at J.H. at that
6    point in time?
7    A.  I heard that testimony.
8    Q.  In fact, you heard -- I'm sorry.  Strike that.  But Trooper
9    Walker walked away from J.H., didn't he?
10   A.  He did.
11   Q.  Trooper Walker did not lose his cool, did he?
12   A.  Until he walked away, I would say that he did.
13   Q.  Trooper Walker kept his composure, didn't he?
14   A.  I don't know.  I wasn't -- I didn't see that --
15   Q.  Trooper Walker applied his training, didn't he?
16   A.  I don't know.  I didn't see him after that.
17   Q.  Trooper Walker didn't use force against J.H. because he was
18   angry, did he?
19   A.  He did not.
20   Q.  Trooper Walker didn't use force against J.H. to punish him;
21   right?
22   A.  I don't know what his intent for using force was, but I'd
23   assume that, sir.
24   Q.  After Trooper Walker tripped over J.H., you didn't walk
25   away, did you?

MICHAEL KENNEDY - CROSS EXAMINATION

1  A.  I did not.

2  Q.  You didn't keep your composure, did you?

3  A.  I did.

4  Q.  You lost your cool, didn't you?

5  A.  I did not.

6  Q.  You disregarded your training and used unlawful force on

7  J.H. because you were angry and wanted to punish him.  Isn't

8  that the simple truth?

9  A.  You said a lot there, but I'm going to say no.  Overall,

10 it's my understanding of the question.

11         MR. DOUGLAS:  May I have one moment, Your Honor?

12         THE COURT:  Yes, sir.

13         MR. DOUGLAS:  No further questions, Your Honor.

14         THE COURT:  All right.  Mr. Walker, at some point

15 during your testimony --

16         THE WITNESS:  Are you talking to me, ma'am?

17         THE COURT:  I'm sorry.  Mr. Kennedy, I'm sorry.  At

18 some point during your testimony during cross examination, in

19 answering Mr. Manford's questions, you -- it was somewhere in

20 the area where you were talking about Trooper Walker tripping,

21 and then you had picked up the male that was involved in the

22 fleeing and the crash and --

23         THE WITNESS:  Yes, ma'am.

24         THE COURT:  -- removed him to another area.

25         THE WITNESS:  Yes, ma'am.

MICHAEL KENNEDY - CROSS EXAMINATION

1          THE COURT:  You said at some point during that

2    testimony that you then checked to see if he was armed or

3    assessed to see if he was armed?

4          THE WITNESS:  Yes, ma'am.  I checked his -- I checked

5    his pants and waistline and made sure there wasn't any weapons.

6    And I attempted to pull his pants up for a moment, but he

7    wasn't helping me help him get his pants up around his ankles.

8    You know what I'm saying, ma'am?

9          THE COURT:  Right.  So what was the first point

10   during all of this from when you arrived at that scene to that

11   point that we've just discussed that you knew that he wasn't

12   armed?

13         THE WITNESS:  When I checked his pockets and

14   waistline at that point, ma'am.

15         THE COURT:  Was that a factor at all in anything

16   you did that night before you assessed whether he was armed or

17   not?

18         THE WITNESS:  The unknown is always a factor.  If I

19   don't check you personally for weapons, it's always a thing in

20   my mind.  And even after I've checked you, you miss stuff

21   sometimes.  So like we've dropped -- we've had people drop

22   people off at the jail that were searched multiple times, and

23   they end up having a gun on them.  So it's always a factor,

24   even after checking them, to some degree or another.

25         THE COURT:  Okay.  Thank you.

MICHAEL KENNEDY - REDIRECT EXAMINATION

1    THE WITNESS:  Yes, ma'am.

2    THE COURT:  Mr. Manford.

3    REDIRECT EXAMINATION

4  BY MR. MANFORD:

5  Q.  Have you ever received an injury from someone in handcuffs?

6  A.  Yes, sir.

7  Q.  Tell us about that.

8  A.  Which time?

9  Q.  Just generally.

10  A.  The one that stands out most is I've been headbutted by

11  someone in handcuffs.  I actually had to use butterfly stitches

12  to close up the wound.  And I still have a scar on my forehead

13  today from it.  I've been kicked multiple times by people in

14  handcuffs.  So I don't view -- while being handcuffed does

15  reduce their ability to be combative, it's easier to win that

16  combative situation.  Because they don't have hands, they can

17  still attempt to do you harm.

18  Q.  These instances that you've just related to the Court, did

19  they happen prior to November 19th of 2018?

20  A.  Yes, sir.

21  Q.  Okay.  During the initial engagement where there were kicks

22  by you, where it was compliance, where there was additional

23  strikes by you, did you perceive J.H. to be any threat?  If so,

24  how?

25  A.  The word threat has been used very broadly --

86

MICHAEL KENNEDY - REDIRECT EXAMINATION

1   Q.   Okay.

2   A.   -- throughout this testimony.  I feel like -- threat is any

3   kind of resistance.  Any kind be it passive or be it active.

4   So, yes, he was showing threat.

5   Q.   One of the Graham factors that we've heard about, did you

6   deem him to be an immediate threat during those times?

7   A.   Yes.

8   Q.   What about when he was dropped, tossed, and on the ground?

9   A.   Yes.

10  Q.   Okay.  The ground, was it grass ground?  Was it asphalt?

11  What was it?

12  A.   I do not recall, sir.

13  Q.   Okay.  Do you recall after you see the video?

14  A.   Upon reviewing the video, it looks like it might have been

15  grass.

16  Q.   Okay.  Did he pose any type of immediate threat when you

17  put him in the snow pile in your opinion -- in your --

18  A.   Upon his attempt to get up, yes.

19  Q.   All of the force you used that night, with the exception of

20  when you admitted that you stepped down when he tensed up --

21  but I guess -- remember in your cross examination with

22  Mr. Douglas at some point in time, you admitted that he had

23  stepped down?  He was just tensing up I think instead of --

24  A.   Oh, yeah.  Okay.  You're talking -- okay.  Yeah, I remember

25  that.

MICHAEL KENNEDY - REDIRECT EXAMINATION

1  Q.  Other than that particular time, do you feel that your use

2  of force was in response to active aggression --

3  A.  Yes, sir.

4  Q.  -- or active resisting I should say?

5  A.  Yes, sir.

6  Q.  Okay.  So you've also told us that you used force in

7  response to passive aggressive when he tensed up.  Why?

8  A.  We use force one level above what they're doing.  The

9  passive/active resistance is something we bring up in the West

10  Virginia State Police policy.  I don't believe it's in the

11  academy's slide show that they presented.  And as long as

12  there's any kind of tensing -- and even in the slide show where

13  it shows that closed-fist strikes to large muscle groups are an

14  acceptable means of force against both passive and active

15  resistance.

16  Q.  All right.  I understand all that.  What was your thought

17  process in giving the three additional compliance strikes?

18  A.  Trying to disrupt his ability to pull away.  Trying to

19  distract.  Anything I can do to help Walker get him in cuffs

20  faster.

21  Q.  Okay.  Are you retaliating at any time during your use of

22  force against J.H. or, as I asked you before, were injuries you

23  perceived that were inflicted by him on Officer Merson?

24  A.  No, my strikes were not retaliatory.

25  Q.  Okay.  Were you mad?  You were going to thump him because

MICHAEL KENNEDY - REDIRECT EXAMINATION

1   he hurt a person?

2   A.  No, sir, that was not my intent.

3   Q.  You also told Mr. Douglas on cross examination -- and it

4   was hard.  It was coming pretty fast.  Something about when --

5   the reason you tossed him into the grass was not because he

6   said fuck you.  What was the reason you tossed him?

7   A.  I felt blood in my face, sir.

8   Q.  Okay.

9   A.  And it was reactionary.

10  Q.  Okay.  So were you trying to gain compliance at that time

11  or was --

12  A.  Trying to create space.

13  Q.  Create space.  What do you mean by that?

14  A.  I just wanted to drop him and get him away from me because

15  I felt something strike me in the face.

16  Q.  Okay.  Well, were you mad at that time you had to create

17  space?

18  A.  No.

19  Q.  Were you fearful what you might do if he continued to spit

20  in your face?

21  A.  If he continued to spit in my face, I would have had to

22  respond to that aggression, yes.

23  Q.  All right.  Were you trying to defuse the situation by

24  tossing him?

25  A.  I was just trying to get -- create space.  Get away and

MICHAEL KENNEDY - REDIRECT EXAMINATION

1   make sure was that intentional or was it not.  I don't know.

2   Q.  So was it your belief that night there were multiple

3   instances of active -- actively resisting arrest by J.H.?

4   A.  Yes, sir, there was.

5   Q.  Okay.  And is that why you used force?

6   A.  That is, sir.

7   Q.  Why would you not put him in your cruiser and instead sit

8   him on a snowbank?

9   A.  So my cruiser was pretty far away, and I don't have a cage

10  in my cruiser.  I don't like to secure potential flight risks

11  in my car because I'll have to stand by and babysit him so to

12  speak.  And it's not my -- he's not my arrest.  It's the

13  sheriff's department arrest.  So I'm waiting for a deputy to

14  take command or control of the subject at which point I -- once

15  a deputy is there, I say, hey, he's all yours now.  He's here.

16  He's not trying to run now.  And I disengaged at that point and

17  had no further contact.

18  Q.  There were multiple -- and we've covered this, but I'm

19  going to make my record.  There were multiple times you were

20  asked on cross examination if someone did what you did to the

21  subject, you would feel pain; correct?  And you said not

22  necessarily or words to that effect.

23  A.  That's correct, sir.

24  Q.  Why do you say that?

25  A.  Because there's a lot of factors that go into whether or

MICHAEL KENNEDY - REDIRECT EXAMINATION

1  not I would feel pain.  Am I intoxicated?  Am I not?  So if I'm

2  heavily intoxicated, I may not feel anything.  But if I'm

3  perfectly sober, then, yeah, I would feel the pain.

4  Q.  All right.  So you must have written -- you've written --

5  you wrote a report later; correct?

6  A.  No, I did not personally write a report.  I wrote -- the

7  first thing I wrote about was this statement.

8  Q.  That's what I'm talking about.

9  A.  Okay.  Yes, sir.

10  Q.  And you passed it up the chain of command to whom?

11  A.  Sergeant Cole, sir.

12  Q.  Okay.  And Mr. Douglas made many points that you left

13  things out?

14  A.  Yes, sir.  When I wrote the statement, it was ten days

15  after the fact, and I had just come off of a 12-hour shift.  I

16  was writing this about 11 o'clock at night.

17  Q.  Okay.

18  A.  Trying to do it from memory after doing a 12-hour shift

19  over in Keyser actually and drove to Martinsburg.

20  Q.  Had you had the opportunity to review the video before you

21  wrote your statement?

22  A.  I wrote it, reviewed -- I wrote a rough draft statement,

23  reviewed the video, and then added things I had forgotten.

24  Q.  Why did you leave some stuff out?

25  A.  Forgot about it until a long time of sitting back and

MICHAEL KENNEDY - REDIRECT EXAMINATION

1  reflecting over the next coming weeks.

2  Q.  This also was brought up on cross examination.  Some sort

3  of delay in reporting.

4  A.  Yes.

5  Q.  Okay.  So tell us about that.  Why?

6          THE COURT:  If I can stop you.

7          MR. MANFORD:  I'm sorry.

8          THE COURT:  When was that statement that you wrote --

9          THE WITNESS:  Yes, ma'am.

10          THE COURT:  -- prepared?  What's the date on it?

11          THE WITNESS:  November 29th, ma'am.  There's not a

12  time on it, but it was roughly around 10- or 11 o'clock at

13  night that I wrote it.

14          THE COURT:  Okay.  Mr. Manford.

15          MR. MANFORD:  Thank you, Your Honor.

16  BY MR. MANFORD:

17  Q.  Where did we leave off?

18  A.  You were asking --

19  BY THE COURT:  I'm sorry.

20  BY MR. MANFORD:

21  Q.  Why the delay?

22  A.  Oh.  So the night of the actual incident, I heard Walker

23  call for a supervisor during the pursuit.  So we're still in

24  pursuit.  And he says, hey, we're in pursuit.  Notified.  On

25  call.  Then later that night back at the office, I asked him,

MICHAEL KENNEDY - REDIRECT EXAMINATION

1  hey, I heard you yelling for a supervisor.  Did you talk to

2  Cole and tell him what's up?  He said, yeah, I told him about

3  what we did and about the incident in general.  And he said

4  that it's sheriff's department pursuit, sheriff's department

5  arrest.  The way he inferred policy was that we don't need to

6  do a state police report or use of force because the sheriff's

7  department will document it.  And when I left the scene that

8  night, I recall telling the deputy -- I believe it was Jones --

9  I'm not 100 percent sure on that -- that, hey, if whoever is

10 working this needs a statement from me for the accident or

11 anything else, let them know.  So I also talked to the

12 sheriff's department.  If they needed me for a statement for

13 documentation of any force or accident because I witnessed the

14 accident as well.

15 Q.  So in a situation where you're required to use force, do

16 you have to report this to higher ups?

17 A.  Yes.  That's when I was talking about Walker.  I made

18 contact with Walker.  And Walker told me he had contacted the

19 supervisor and the supervisor said that he wasn't going to come

20 out.

21 Q.  All right.  Well, the inference was made on cross

22 examination that you only -- that you conveniently did not tell

23 them about the snowbank incident.  You know what I'm referring

24 to?

25 A.  Oh, I know the question you're talking about.

MICHAEL KENNEDY - REDIRECT EXAMINATION

1   Q.  Because officers -- you're relying on Officer Walker to

2   report he didn't see the snowbank incident, therefore, you were

3   covering it up.  So tell us about that.

4   A.  I didn't see like any need to talk about any additional

5   force that was used beyond -- like as far as the need for a

6   supervisor to come out is well established.  Just extricating

7   him from the vehicle.  If the state police was going to do any

8   kind of documentation that alone was enough cause to have a

9   report done.  Now, whether or not Sergeant Cole felt that

10  policy -- because of, like I said before, with the sheriff's

11  department supposedly being responsible for documenting it.

12  I'm not so sure on policy with all that stuff.  My

13  understanding is that Sergeant Cole inferred to reviewing

14  policy that there was no need for a state police report to be

15  done.

16      So I guess the short answer to your question would be there

17  is already plenty of cause for a supervisor to come out.  There

18  is no need to mention every little detail that night.

19  Q.  Okay.  And you knew that was going to occur?

20  A.  I just -- I'd expected a supervisor to come out, yes.

21  Q.  You were repeatedly asked whether or not you were punishing

22  J.H. for a variety of reasons on cross examination, and you

23  repeatedly said no.

24  A.  That's correct, sir.

25  Q.  Okay.  So objectively someone could argue that why is that

MICHAEL KENNEDY - REDIRECT EXAMINATION

1  incorrect?

2  A.  I'm sorry.  I'm not sure I understand the question, sir.

3  Q.  Okay.  So -- I mean someone looking at the scene

4  objectively, when you use excessive force and you were punching

5  him, why were you not?

6  A.  My intent was to gain control of what I viewed as a

7  resistant subject, noncompliant subject.

8  Q.  This may be my last question.  We'll see in a second.

9  During this whole situation that we've been discussing, the

10  three different times -- the initial engagement, and the toss,

11  and the snow bank -- was it ever in your mind, your thought

12  process, you still had a risk of flight by J.H.?

13  A.  During the snowbank -- the snowbank incident --

14  Q.  Yeah.

15  A.  -- when he's trying to repeatedly sit up and is being

16  verbally noncompliant, I inferred that to be he's attempting to

17  get up so I was trying to keep him on the ground.

18        MR. MANFORD:  Just one second, please, Your Honor.

19  BY MR. MANFORD:

20  Q.  You were also asked on cross examination isn't it true that

21  during the cuffing process, you were the only one using

22  compliance strikes or something along those lines.  Do you

23  recall that?

24  A.  I recall that question.

25  Q.  Do you also recall seeing in the video Officer Merson with

MICHAEL KENNEDY - RECROSS EXAMINATION

1  his compliance strikes with his right hand when he's at the

2  head of the individual at the same time?

3  A.  Are we talking about when it's just me and Walker or are we

4  talking about Merson?

5  Q.  When you -- the initial engagement.

6  A.  Oh, during the initial engagement?

7  Q.  Yes.

8  A.  Yeah.  There were -- I recall from the video, reviewing the

9  video, that it was Deputy Ennis delivering a series of

10  closed-fist strikes.  It appears to be on the side of his head.

11  I know -- I saw that Deputy Merson delivers a knee strike to

12  the suspect's head that also caused the suspect's head to hit

13  the pavement.

14          MR. MANFORD:  All right.  Those are all my questions.

15  Thank you.

16          THE COURT:  Recross?

17          MR. DOUGLAS:  Briefly, Your Honor.

18                      RECROSS EXAMINATION

19  BY MR. DOUGLAS:

20  Q.  Sir, you were asked again on redirect about your suspicion

21  that the subject was intoxicated; right?

22  A.  Yes, sir.

23  Q.  But you didn't include that detail in your report, did you?

24  A.  No, sir.

25  Q.  Even though earlier you testified that when someone is on

MICHAEL KENNEDY - RECROSS EXAMINATION

1  something, it's hard to deal with them through pain compliance

2  because it's ineffective; right?

3  A.  That's correct, sir.

4  Q.  But you didn't include any of that in your report?

5  A.  No, sir.

6  Q.  You were also asked on redirect about when someone is in

7  handcuffs, it could still be a dangerous situation; right?

8  A.  That's correct, sir.

9  Q.  You talked about someone could headbutt you; right?

10  A.  It's all possible, sir.

11  Q.  Someone could kick you; right?

12  A.  Yes, sir.

13  Q.  J.H. didn't try to headbutt you, did he?

14  A.  Not that I recall, sir.

15  Q.  You would recall if someone tried to headbutt you, wouldn't

16  you?  And you'd put that in your report too?

17  A.  Possibly, sir.

18  Q.  And J.H. didn't try to kick you, did he?

19  A.  Not that I recall, sir.

20  Q.  In fact, if you were concerned that J.H. was going to

21  headbutt you, you wouldn't pull him up to your face, would you?

22  A.  It's possible, sir.

23  Q.  But you did pull him up to your face?

24  A.  Yes, sir, I did.

25          MR. DOUGLAS:  Thank you, Your Honor.  No further

MICHAEL KENNEDY - RECROSS EXAMINATION

1  questions.

2          THE COURT:  Is that it for this defendant?

3          MR. MANFORD:  That is, Your Honor.

4          THE COURT:  All right.  Thank you, sir.  You may

5  return to your seat.  And if you have that statement there, we

6  can give it to Mr. Mullen on the way.  Thank you.

7     (Witness excused.)

8          MR. DOUGLAS:  Your Honor, we did not move to admit

9  that.

10          THE COURT:  I think we need to make it part of the

11  record.  That would be my preference.  I won't review it as an

12  exhibit --

13          MR. MANFORD:  Yes, Your Honor.

14          THE COURT:  -- but to make the record clear in case

15  of an appellate record, I think that it should be part of the

16  record unless you all disagree.

17          MR. DOUGLAS:  That's fine, Your Honor.

18          MR. MANFORD:  It was referenced in cross.  It should

19  be.

20          THE COURT:  All right.  We'll just make sure it's

21  filed as -- it's marked for identification only.  It's not

22  entered into evidence.

23          MR. DOUGLAS:  Thank you, Your Honor.

24          THE COURT:  You're welcome.  Further witnesses,

25  Mr. Manford?

```
1              MR. MANFORD:  Defense rests.

2              THE COURT:  All right.  Any case in rebuttal,

3    Ms. Siscaretti or Mr. Douglas?

4              MR. DOUGLAS:  No, Your Honor.

5              THE COURT:  All right.  Then why don't we go ahead --

6    it's going -- it's about 11 o'clock.  Why don't we take about a

7    20-minute break.  Let you all collect your thoughts, and you

8    can come back if you choose for a brief summation of what we've

9    heard during the course of this past day and a half.  And then

10   we'll move on to setting a time -- I think we already did

11   yesterday for getting those final arguments submitted.  Sound

12   good?

13             MR. DOUGLAS:  Yes, Your Honor.

14             THE COURT:  All right.  Then we'll get back on the

15   record about 20 after eleven.

16       (Recess 11:00 A.M. - 11:35 A.M.)

17             THE COURT:  Please be seated, everyone.

18       We're back on the record.  The defendant with his counsel.

19   The Government's counsel here as well and ready for summations.

20       Mr. Douglas.

21             MR. DOUGLAS:  Your Honor, Ms. Siscaretti will be

22   giving the closing argument.

23             THE COURT:  Okay, Ms. Siscaretti.

24             MR. DOUGLAS:  We're going to reserve some time for

25   rebuttal.
```

1           THE COURT:  All right.

2           MS. SISCARETTI:  Thank you, Your Honor.  May I

3   proceed?

4           THE COURT:  Yes, ma'am.

5           MS. SISCARETTI:  Punishment and retaliation.  That's

6   what this case is about, Your Honor.  On November 19, 2018, the

7   defendant, a West Virginia state trooper, Michael Kennedy,

8   grabbed a handcuffed 16 year old by the front of his shirt and

9   picked him up, lifting him off his feet, and then with both

10  hands just threw him away.  A few minutes later, the defendant

11  came back and grabbed the teenager again.  This time he dropped

12  him on a snowbank.  And he hit him multiple times in the face

13  while yelling, "You could have hurt this officer."

14      As we now know, this entire incident came to light days

15  later when Captain Willy Johnson from the Berkeley County

16  Sheriff's Department was gathering videos from dashboard

17  cameras about the pursuit and crash that happened earlier in

18  the night on November 19th.

19      Captain Johnson told you about how he first watched that

20  grainy video from Deputy Ritchie's dashboard camera.  And when

21  he first saw it, he thought he saw someone throwing a bag of

22  trash to the ground.  As he continued to watch, he saw strikes.

23  As Captain Johnson told you, he knew that something just wasn't

24  right.  And he hit pause, and he went down the hallway to find

25  the sheriff and tell him there was a problem.

1          THE COURT:  Is that where the Government believes the

2     unreasonable use of force comes in --

3          MS. SISCARETTI:  Your Honor --

4          THE COURT:  -- during these circumstances at the

5     point where the defendant picked the juvenile up?

6          MS. SISCARETTI:  Your Honor, as I'll explain further

7     in my argument, the Government submits that the defendant's

8     unreasonable force began earlier.

9          THE COURT:  When?

10         MS. SISCARETTI:  At the time of the takedown and his

11    actions at that point.

12         THE COURT:  So at -- so the juvenile was already down

13    at the time he showed up; right?  We've seen that on the tape.

14         MS. SISCARETTI:  Yes.

15         THE COURT:  So which action of the defendant that we

16    saw on the videotape began the Government's view of

17    unreasonable force?

18         MS. SISCARETTI:  Your Honor, it's the Government's

19    view that defendant's unreasonable force began with the kicking

20    and stomping during the takedown and became increasingly more

21    unreasonable during the night.

22         THE COURT:  So every action was unreasonable?

23         MS. SISCARETTI:  Yes, Your Honor.

24         THE COURT:  Okay.  Please continue.

25         MS. SISCARETTI:  Thank you.  Captain Johnson knew

1    when he first saw that video of the end of the night.  He knew

2    that there was a problem and went to tell the sheriff.  And

3    during the trial, the Government proved that there was a

4    problem captured on the videos that we saw during this trial.

5    The problem was the defendant broke the law by abusing his

6    powers of a law enforcement officer.  He used unreasonable

7    force against a 16 year old because he was mad.  He was mad

8    because the teenager led officers on a car chase, and he was

9    mad because another officer got hurt in the process.

10        Punishment and retaliation.  As the Court is well aware,

11   the law does not allow this.  An officer can't use force

12   because he's angry to punish or retaliate against someone.  But

13   that's exactly what the evidence proves this defendant did on

14   November 19th.

15        Now, the defendant wasn't the only officer that was mad

16   that night.  Trooper Walker was pretty upset too.  He was mad

17   that officers had to engage in a car chase, and he was mad the

18   teenager didn't give his hands after he was pulled from the

19   wrecked car.  But even though he was mad, Trooper Walker did

20   his job.  He handcuffed J.H. and then he walked away with the

21   situation under control.  Because Trooper Walker knew, based on

22   his training and experience, that an officer cannot use force

23   against a person who is under control and not a threat.  An

24   officer can't use force to punish a person.

25            THE COURT:  Wasn't Ennis seen on the videotape around

1   the same time as the kicks that we saw also applying compliance

2   strikes?

3           MS. SISCARETTI:  Sure.  And I will --

4           THE COURT:  What's the difference?

5           MS. SISCARETTI:  -- also explain that further in my

6   argument, Your Honor.  Those -- that type of force was directed

7   to a very particular goal.  It was directed at J.H.'s hands in

8   order to handcuff him.  But I would submit to you that the

9   evidence shows the kicking, the stomping, that exceeded what

10  was needed in that moment in time.

11      Trooper Walker walked away after J.H. was handcuffed.  He

12  knew that based on his training and experience, an officer

13  cannot use force against a person just to punish them.  And

14  Captain Johnson, an officer with 35 years of law enforcement

15  experience, he knew that too.  That's why he went down the hall

16  to tell the sheriff there was a problem.  And the defendant, a

17  trained, experienced state trooper, also knew that he couldn't

18  use force against a person to punish them.  That he couldn't,

19  as a law enforcement professional, act on his anger.  But on

20  November 19th he just didn't care.  He was mad, and he wanted

21  to get even with a 16 year old.

22      Your Honor, in this country law enforcement officers are

23  allowed to get mad.  But an officer is not allowed to stop

24  caring about the law he swore to uphold.  And the law simply

25  does not allow an officer to use force, to use violence to

1  punish a person because they are mad.  An officer doesn't get

2  to toss a handcuffed teenager around as if he were a bag of

3  trash.

4     This defendant took the law into his own hands.  And in

5  doing so, he made himself not just an officer but the judge and

6  jury too.  The defendant believed that the law didn't apply to

7  him even as he treated a 16 your old like trash.  And that's

8  why we're here today.

9          THE COURT:  What if the defendant wasn't mad and

10 didn't want to get even with the juvenile?  Setting that aside,

11 does the Government still view all of his actions as

12 unreasonable use of force?

13         MS. SISCARETTI:  Yes, Your Honor.  I think looking at

14 the totality of the circumstances, his actions throughout the

15 night still exceeded what was reasonably necessary.

16         THE COURT:  Please continue.

17         MS. SISCARETTI:  Thank you.  Now, Your Honor is

18 familiar with the elements of the charge in this indictment,

19 but I just want to spend a few moments going through each

20 element and talking about the evidence that applies to each.

21    I submit to you the Government has proven all three

22 elements of 18, United States Code, Section 242.  One, that the

23 defendant was acting under color of law; two, that the

24 defendant deprived J.H. of a constitutional right; and, three,

25 that the defendant acted willfully.

 1          Proving those three elements proves that the defendant

 2    committed a violation of 18, United States Code, Section 242.

 3    But during the trial, the Government also proved a fourth

 4    element.   That the defendant caused J.H. to suffer pain and

 5    injuries when he tossed him handcuffed to the ground, when he

 6    hit him multiple times across the face when he was handcuffed

 7    on the snowbank, when he kicked and stomped during the

 8    takedown, and when he delivered what I'll submit to you are

 9    unnecessary compliance strikes at the time he was being

10    handcuffed.

11          First, I'll just talk briefly about color of law.  Here the

12    defendant was representing the state of West Virginia as a

13    state trooper.  He was on duty, in uniform, and responding to a

14    radio call when he joined the pursuit of J.H.  I submit to you

15    that the evidence proves beyond any reasonable doubt that the

16    defendant was acting under color of law.

17          Moving on to the second element, deprivation of right.

18    Your Honor, the Government has also proved this element.

19    Specifically, the evidence proved that the defendant deprived

20    J.H., a 16 year old, of his right to be free from a law

21    enforcement officer's use of unreasonable force during an

22    arrest.

23          Now, the law is clear on what an officer can do.  An

24    officer can use force to maintain his safety, the safety of

25    other officers, to prevent escape.  And as you learned during

1  this trial, there were other officers on scene that night who

2  used force.  Who used force against J.H. for legitimate law

3  enforcement purposes.

4      But the law is also clear on what an officer cannot do.  An

5  officer cannot use more force that is reasonably necessary to

6  accomplish a legitimate law enforcement objective regardless of

7  his motive.  And under no circumstance can an officer use force

8  solely to punish or retaliate against an arrestee.  But punish

9  and retaliate is exactly what this defendant did when he kicked

10  and stomped on J.H. during the takedown and when he delivered

11  unnecessary so-called pain compliance strikes to J.H.'s back

12  while he was being handcuffed.

13      And punish and retaliate against an arrestee is exactly

14  what the defendant did when he picked up J.H., a handcuffed

15  teenager, by the front of his shirt and with both hands threw

16  him down in the road.  And punish and retaliate against a

17  teenager is exactly what the defendant did when he reached back

18  and hit the handcuffed J.H. at least twice more in the face

19  while yelling, "You could have hurt this officer," or words to

20  that effect.

21      Any one of these instances, Your Honor, and the defendant

22  has committed an unreasonable use of force.  The Government

23  submits that all three were -- all aspects of this incident

24  were unreasonable though.

25      Let's talk a little bit more about the difference that Your

1  Honor asked about earlier.  The difference between what the

2  other officers did and the actions of the defendant.  Because

3  the test is, of course, whether his actions were objectively

4  reasonable and, as Your Honor knows, the standards to be

5  determined from the perspective of a reasonable officer on the

6  scene.

7      So I ask you to look carefully at the videos and compare

8  the actions of the other officers to those of the defendant.

9  The videos show that Trooper Walker and Deputies Ennis and

10 Merson did use some force against J.H.  And as they explained

11 to you, and as you can see in the video, those officers used

12 force against J.H. during the initial takedown only.  They used

13 force after they pulled J.H. from the car, and they -- J.H. was

14 -- had his hands curled up underneath him.  The force used by

15 those other officers is directed at J.H.'s hands.  It's aimed

16 to get his hands out from him and to handcuff him.

17      By comparison, the defendant's actions in that moment.

18 Picking up J.H.'s leg.  Rearing back and kicking him multiple

19 times.  Reaching up and stomping down on him.  Only the

20 defendant took those extreme measures.  Markedly different from

21 the other officers who are focused on his hands to cuff him.

22      The kicking, the stomping.  Your Honor, those actions

23 weren't intended to get J.H. into handcuffs.  I submit to you

24 they were vindictive actions that the defendant took advantage

25 of that moment because he was angry at J.H. for leading the

1    officers on the chase.  And he took that time to start exacting

2    punishment against J.H.  And more importantly, after J.H. was

3    under Trooper Walker's control, all the other officers stopped

4    using force because that was what a reasonable officer on the

5    scene should have done.  In fact, Deputies Merson and Ennis

6    both felt secure enough about the situation to walk away

7    altogether.

8        The defendant also walked away for a moment.  But after the

9    defendant heard his good friend, Deputy Merson, who he has been

10   friends with since they were 18 years old by his own admission,

11   when he heard that Deputy Merson hurt his back, he became

12   angry.  He lost his temper.  And it was after he spoke to

13   Merson that he went back over to J.H. and Trooper Walker.

14       Trooper Walker at the time had J.H. under control.  He was

15   lying face down, and Trooper Walker had his hands.  He wasn't

16   cuffed yet, but he was subdued and under control.

17           THE COURT:  So he was angry after he heard Merson had

18   hurt his back?

19           MS. SISCARETTI:  He was angry about the chase, Your

20   Honor, and he was angry about Deputy Merson hurting his back.

21   And I believe the evidence shows the moment that he heard about

22   Deputy Merson was when J.H. was subdued and when Deputy Merson

23   stepped away as shown in the video.  The defendant is seen

24   going over and talking to Deputy Merson, and there's evidence

25   that he had heard Deputy Merson complaining about his back at

1    that point.  He's then seen going back over after that

2    conversation to where Trooper Walker has J.H.

3       And as you can see at that moment, I submit to you J.H. is

4    not actively resisting.  He's not kicking.  He's not striking.

5    He's not trying to escape.  He was not a threat to anyone.

6    Yes, he slipped one of his hands away from Trooper Walker.  But

7    Trooper Walker reached up, as you can see in the video, grabbed

8    his hand, and pulled it back, and had him back under control.

9    Reaching up and grabbing his hand and pulling it back.  That's

10   all the force was necessary for Trooper Walker to get his hands

11   back under control.  And it was after Trooper Walker pulled his

12   hand back that's when the defendant delivered the first five

13   so-called pain compliance strikes.  Then there was a pause.

14   And then as Trooper Walker is handcuffing him, the defendant

15   delivers three more pain compliance strikes.

16      Trooper Walker didn't use any additional force other than

17   grabbing J.H.'s hand and putting cuffs on him.  Neither did any

18   other officer on the scene, including Deputy Ennis who was

19   standing right next to Trooper Walker, the subject, J.H., and

20   the defendant.  Deputy Ennis had a clear view of what the

21   suspect was doing.  He didn't see any need to use force as he

22   told this Court.

23      No one used any more force because I submit to you it was

24   not reasonable to do so at that point.  And, Your Honor, if

25   force was reasonable and necessary, I submit to you that those

1    other officers on the scene would not have hesitated to use it.

2       Deputies Ennis and Kolb both testified about how strong the

3    bond is among law enforcement officers.  About how they have to

4    look out for each other.  If they had seen that J.H. was a

5    threat, those deputies would have rushed over and done whatever

6    they reasonably needed to do to end the threat.  If they had

7    seen that J.H. was not under control, I submit to you that

8    those deputies would have done whatever they reasonably needed

9    to do to bring J.H. under control.  The other deputies did not

10   use any more force because there was simply no legitimate law

11   enforcement reason to do so.

12      While the other officers stopped, the defendant chose to

13   keep going even after the use of force became even more

14   objectively unreasonable.  The defendant kept going, picking up

15   a fully-restrained, handcuffed 16 year old and throwing him

16   away as if he were a bag of trash.  Picking him up and putting

17   him in a snowbank saying, "This is a good spot for you."  Not a

18   safe spot like a police cruiser like Trooper Walker would have

19   done.  He left him on a snowbank with his pants down around his

20   ankles for added humiliation, yelling at J.H. about how he hurt

21   a law enforcement officer.

22      Now, in this case, the defendant chose to testify.  Of

23   course, he absolutely had the right not to, but he chose to

24   exercise that right to do so.  And having chosen to exercise

25   that right, his testimony gets the same scrutiny as any other

1    witness.  So I want to turn and look at his testimony now, Your

2    Honor.  Especially about the toss.  Because I submit to you

3    that looking at all of the evidence shows that his testimony

4    does not make sense and could not have happened the way he said

5    it was.

6        Let's look specifically at the toss.  The defendant took

7    the stand and said that he dropped -- he picked up J.H. and

8    held him up and then thought he got blood or spit on his face,

9    and he instinctively dropped him.  But look at the video, Your

10   Honor.  Well, first of all, I would like to point out that he

11   didn't include that information in a report he wrote just ten

12   days later.  He said he forgot.  Your Honor, I submit to you if

13   an officer got a stranger's blood or bodily fluids on their

14   face during an incident, they would certainly remember that.

15   They would remember that just ten days later, and it would be

16   in that report.

17       And then look at the defendant's own actions on the video.

18   He's on the video claiming that at the time, he thought he got

19   blood or spit on his face.  You never see him wiping his face.

20   I submit that would have been instinct, Your Honor, to do so.

21   There's no evidence that he walked around and said, "Hey, does

22   anyone have any Purell?" or went up to an EMT and said, "Hey,

23   are there any health concerns?  I have someone's bodily fluids

24   on my face.  I don't know where this kid has been."  No, Your

25   Honor.

1    But even more importantly, the defendant said on the stand

2  that he tossed away instinctively to create space.  To get away

3  from J.H.  But, again, look at that video.  The video that the

4  defense themselves used.  What happened after the defendant

5  tossed J.H. away?  He walked right back over to him, leaned

6  down, and got in his face.  He wasn't creating space between

7  him and J.H.  He was constantly invading J.H.'s space.  He was

8  reengaging with him.  He went down and got into the face of

9  someone he claims just spit at him.  Your Honor, that makes no

10  sense.  And he continued to invade J.H.'s space.  Picking him

11  up.  Bringing him to the snowbank.  Picking him up by his own

12  admission while he was on the snowbank and bringing his face

13  back up to his.

14    Your Honor, looking at all those circumstances, the way the

15  defendant described that incident simply does not make sense.

16  And I submit to you, it doesn't make sense because that's not

17  the way it happened.

18    The defendant kept using force against J.H. long after the

19  teenager stopped resisting.  Long after the other officers

20  walked away.  The defendant did all that simply because he was

21  mad and wanted to get even with the kid who fled from the

22  police and caused an officer to get hurt.

23    The evidence proves beyond any reasonable doubt the second

24  element.  That the defendant deprived J.H. of the

25  constitutional right by using unreasonable force against him

1    during a seizure.

2        The third element, which the Government proved during this

3    trial, is that the defendant acted willfully during the

4    incident.  That simply means that the defendant knew what he

5    did was wrong but chose to do it anyway.  And this defendant, a

6    trained state trooper with seven years of law enforcement

7    experience, going on eight, he knew that it was wrong to use

8    force that was unreasonable, that was unnecessary against an

9    arrestee.  He knew that it was wrong to use force to punish

10   someone because he was angry.

11       Captain Lee described the training that the defendant

12   received at the State Police Academy.  He talked about the

13   appropriate use of force that the defendant was taught.  The

14   training spelled out for the defendant that he could only use

15   force that was reasonable.  He was explicitly told that even

16   what are deemed to be pain compliance strikes can be

17   unreasonable depending on the circumstances in which they're

18   used.  And as is shown in this slide from Government's exhibit,

19   Captain Lee also talked about how the defendant was taught that

20   he could not use force against an arrestee because even if he

21   was angry because he attacked an officer, a law enforcement

22   professional cannot act on that anger.

23       The defendant didn't need all this law enforcement training

24   and experience to know that it was unlawful to use force

25   because he was mad.  For all kids in school know they can't

1  punch someone because they're mad.  Teachers know they can't

2  punch a teenager who is acting up.

3      Now, of course, law enforcement officers are humans.  They

4  are humans with a tough job.  And they can experience emotions

5  on the job.  They can get upset.  They can get angry.  Trooper

6  Walker testified he got angry that night.  But what did Walker

7  do when he got mad?  He walked away.  He walked away from J.H.

8  just like his training told him to do because J.H. was

9  handcuffed, and he was not a threat.  The incident was over,

10  and there was no reason to use any further force against the

11  teenager.

12      But the defendant did not walk away.  He chose to keep

13  using force all while yelling at the teenager.  And remember

14  what he was yelling at J.H.  Multiple witnesses -- Deputy Ennis

15  and Deputy Kolb both said they heard him yelling something to

16  the effect of "You could have hurt this officer.  You could

17  have paralyzed him."  And the defendant admits yelling at him.

18  He wasn't giving the teenager legitimate law enforcement

19  commands.  Show me your hands.  Get down.  No.  He was yelling

20  at him about what happened to Deputy Merson.  His own words

21  tell you that he was mad and that he was acting and using force

22  against the teenager because he was mad at him.  Not because

23  there was a legitimate law enforcement reason to do so.  And

24  that was the exact opposite of how he, a West Virginia state

25  trooper, had been trained to handle such a situation.

1    The evidence during this trial proves that the defendant

2    knew his actions were wrong, but he chose to take them anyway.

3    And the evidence during this trial proves that the Government

4    established beyond a reasonable doubt that he acted willfully.

5    Finally, Your Honor, let's talk about the element of

6    injury.  So I submit to you that the Government proved that

7    beyond a reasonable doubt too.  Yes, J.H. had been in a car

8    accident, and he did have some injuries because of that car

9    accident.  But J.H. also suffered injuries from the defendant's

10   actions.

11   First, he told -- J.H. told EMT Ed Brown that his head

12   hurt, and Ed Brown also observed bruises on the left side

13   around the hip area of J.H.  And that's consistent with where

14   the defendant -- where J.H. landed after the defendant threw

15   him down to the ground.  And those bruises are sufficient to

16   establish physical injury, Your Honor, under the law.

17   But I submit to you that J.H. also felt pain.  First, let's

18   talk about the compliance strikes.  And the defendant

19   acknowledged -- claims that many uses of force, multiple uses

20   of force, he was doing for compliance reasons.  For pain

21   compliance reasons.  He admitted that he was intending to cause

22   pain to J.H. to get him to comply.  And, again, I submit to you

23   that just calling something a pain compliance technique does

24   not mean it's reasonable as we talked about earlier.  But just

25   specifically on the element of injury and pain, pain alone is

1  sufficient.  The defendant admits he was trying to cause pain

2  to J.H. to get him to do things.

3     And let's look at the defendant's own actions that we can

4  see in the video.  He's seen picking up J.H., lifting him off

5  the ground, and throwing him with both hands, landing on the

6  ground on his back.  He couldn't even protect himself from the

7  fall as he landed hard on the ground.  Your Honor, I submit to

8  you we've all had that experience of slipping and falling

9  unexpectedly.  Slipping on a patch of ice and falling on

10 asphalt.  We all know that pain that shoots through us.

11    And it wasn't just the throw, Your Honor.  We're talking

12 about the pain compliance strikes, the so-called pain

13 compliance strikes, during the handcuffing.  Eight of them.

14 And you can see on the video the force used by the defendant.

15 Strikes that he says were intended to cause pain.  And also the

16 slaps at the snowbank.  Your Honor, I submit the suggestion

17 that J.H. did not suffer pain from those multiple acts of force

18 is simply unreasonable.  The evidence proves that J.H. suffered

19 pain, and he suffered injury.  He suffered pain, and he

20 suffered bruising.

21        THE COURT:  Do I determine that he suffered pain or

22 that he -- that the defendant's acts resulted in bodily injury

23 to J.H.?

24        MS. SISCARETTI:  Your Honor, that the defendant's

25 actions resulted in injury to J.H., and injury does include

1    pain alone.

2         THE COURT:  Okay.  You're asking me to view

3    circumstantial evidence of bodily injury; correct?  I have no

4    direct evidence such as medical records, testimony of the

5    juvenile with regard to his injuries.  Does that get me to

6    beyond a reasonable doubt?

7         MS. SISCARETTI:  Yes, Your Honor, I believe --

8         THE COURT:  Why?

9         MS. SISCARETTI:  -- circumstantial evidence can be

10   used to prove an element beyond a reasonable doubt.  I would

11   also note that it's not just viewing the video but also the

12   testimony of Ed Brown who observed contusions on J.H. which

13   were consistent with where he landed after the defendant threw

14   him, his report to Ed Brown that his head hurt, as well as the

15   circumstantial common sense inferences of the force that was

16   used and the pain that that caused.

17        THE COURT:  Please continue.

18        MS. SISCARETTI:  Thank you, Your Honor.

19   Your Honor, on November 19, 2018, all the law enforcement

20   officers on the scene did their job.  Every officer at the

21   scene except the defendant.  The other officers pursued a

22   teenager following a traffic accident, pulled him from the car,

23   and handcuffed him.  When the job was complete, they walked

24   away even though one of them had been injured.  But not the

25   defendant.  The defendant was angry about the chase.  He was

1  angry about his friend's injury.  And he stopped enforcing the

2  law, and he started abusing his power.  Taking it upon himself

3  to punish and retaliate against the teenager.  To use force

4  that wasn't reasonably necessary.  The defendant kicked,

5  stomped, threw, punched, and slapped J.H. because the defendant

6  was mad.  There was no legitimate law enforcement reason for

7  his actions that night.  The defendant was mad, and he wanted

8  to get even with the teenager.

9     Punishment and retaliation.  In this country that's simply

10 against the law and no one, not even a state trooper, is above

11 the law.  The United States Constitution is only as good as the

12 men and women who are trusted to enforce it.  When a law

13 enforcement officer abuses that trust and breaks the law as the

14 defendant did here, he must be held accountable.  Without that

15 accountability, people lose face -- lose faith in the integrity

16 of law enforcement.

17    Your Honor, we ask that you return the only verdict

18 supported by the evidence, the law, and common sense.  That the

19 defendant is guilty as charged.

20         THE COURT:  Thank you, Ms. Siscaretti.

21    Mr. Manford.  Mr. Manford, before you get started, it's not

22 contested that the defendant was acting in his official

23 capacity and that he acted willfully; correct?

24         MR. MANFORD:  That is correct, Your Honor.

25         THE COURT:  All right.  So we're only contested with

1  regard to unreasonable force and then the bodily injury?

2          MR. MANFORD:  That's correct, Your Honor.

3          THE COURT:  Okay.

4          MR. MANFORD:  All right.  May it please the Court,

5  counsel -- I would usually say ladies and gentlemen, but we're

6  not there.  That's weird.  Have you ever done a bench trial?  I

7  shouldn't go there.  It's totally crazy.  I just -- anyway.

8  And I apologize, Your Honor.

9      Okay.  So sitting here listening to the Government's

10 closing, the thing that strikes me -- of course they say it's

11 punishment and retaliation.  What I see from the videos is I

12 see action and reaction.  I see something happening and him

13 taking some action.  All right.  If he was just to punish and

14 retaliate, he would just go up and punch him when nobody is

15 looking.  Okay.  But every time we have an action and a

16 reaction.  And if it was based on anger, as the Government

17 says, they want to say everything he did was excessive, okay,

18 based on anger.  The kicking and the stomping.  He didn't even

19 know Merson was hurt at that point.  Merson is never laying on

20 the ground.  He is helping him restrain the defendant -- I mean

21 the victim.  Excuse me.  Okay.  So that's a fallacy.

22     It's a whole new argument that he did this to get even with

23 the kid because he hurt his friend.  His friend is right there

24 effecting an arrest.  Trying to effect an arrest on a resisting

25 individual.  So it makes no sense.

1    So every time we look at this video, we can see active

2  resistance, and we can see my client doing something in

3  response to that as opposed to the toss -- I'll get to that in

4  a minute.  But, yeah, that's the worst thing I see in all this.

5  I mean that personally.  I think he -- well, I'm getting ahead

6  of myself.  I'm sorry.  So I want to point that out to the

7  Court.

8    The other thing about being angry, when I look at the

9  video -- and wanting to get back at this kid for hurting his

10 friend -- and I'll go through these three areas.  We've got the

11 first engagement where there's five compliance strikes.  And

12 the subpart of that is three compliance strikes afterwards.

13 Then we've got the toss, and we've got the snow pile.  So

14 that's what I think we're talking about, Your Honor.  Of

15 course, the Government says all of it's wrong.  But let's break

16 it down.

17    Before I get there -- I've told juries many times -- and

18 you've heard this -- actions speak louder than words.  We can

19 say whatever we want, but we actually do show what's in our

20 mind and heart.  So one of the biggest things in that video

21 that impressed me that he was not mad at this kid.  After it

22 looks -- remember he said he ebbs and flows.  It's been his

23 experience, especially with people he thinks might be

24 intoxicated -- not going there -- but they ebb and flow.  They

25 resist.  They take a break.  Then they resist again.

1    If you'll remember when the first engagement -- and then

2  the other officers get up.  All three officers get up, and

3  Derek Walker is right there.  Got one hand on him.  And he's

4  just laying there.  The individual is right there.  And Michael

5  walks over, and he's talking to Merson and seeing everything,

6  and then he comes back over in the video and just nonchalantly

7  doing what he's taught.  Puts his knee down on his back to hold

8  him in place while he finishes cuffing him.  And he's not

9  sneering at him.  He's not saying wait until I get you buddy.

10  He's over talking to his friends.  He just looks like it's

11  another day at the office.

12    And not until the individual, the young man, breaks his

13  right arm free and pulls his head up now, okay -- it's right

14  there on the video -- and he starts to feel -- I mean remember,

15  Michael Kennedy is right here.  This is a video.  These guys

16  were right here in the middle of it.  They can feel what's

17  going on.  It's right there.  And we don't have that luxury.

18  Like I said in opening, we don't have the five camera angles in

19  the NFL.  He's right there.  He is looking over here and all of

20  a sudden, after he feels what happened, he looks back, and he

21  sees him actively resisting.  He sees Derek Walker trying to

22  grab that arm again.  And in response to that active

23  resistance, he delivers the first compliance strikes.  All

24  right.

25    I thought at first he was doing these with the bottom of

1  his fists like this, but he even -- I even gave him the

2  opportunity and said, oh, yeah, that's what I was doing because

3  you're like he had seen the video.  But he told the truth.  I

4  meant to hit him with closed fists.  That's how I was taught.

5      And then, while we're on it, when he comes up to assist the

6  other officer, he being Michael, he's so nervous from

7  everything that has happened he can't even holster his weapon.

8  And look.  The video might not tell everything, but it does

9  tell some things.  That young man's feet are right here in

10  front of the video.  And they're flailing around.  And he told

11  you he was fearful he was going to post up.  I asked him, too,

12  what the heck does that mean, post up?  And so did Derek

13  Walker.

14      All right.  Those guys are right there.  He first takes his

15  legs, and he picks him up.  Doesn't kick him.  Doesn't stomp

16  him.  And he tries to pull him over here out of the way of the

17  other officers.  But, no, he continues to flail with his legs,

18  continues to kick, and that's when he administers -- the first

19  kicks, they aren't -- you know, they're just these old swoopy

20  -- I call them drop kicks.  Okay.  And if you look at the

21  video, he's kicking underneath his legs to push them back

22  toward his body so he can't post up.  I mean that's what the

23  video shows.  And only after that, when he doesn't gain

24  compliance then, does he do the stomp.

25      And I asked him when was he on his -- where was he?  On his

1  back when you stomped him?  Was he on his stomach?  So I -- he

2  kicked him right in the glutes.  The way he's taught to.

3  Compliance strikes.  Again, action, reaction.

4      So this is a red herring event.  All this stuff before the

5  toss.  The Government is just adding that in to try to bolster

6  the toss we'll get to in a minute.

7      All right.  I guess I should actually talk about some

8  evidence.  All right.  So we're here with Luther Brown -- and I

9  apologize.  You know I ramble.  I'll try to make it more

10  succinct.  And I know this is -- I know we get conclusions of

11  law and findings of fact so I'll just try to highlight things.

12      I think one of the most telling people in this whole thing

13  is Luther Brown, the EMT.  All right.  So when he gets there,

14  this kid who is so beaten the hell out of -- excuse me, the

15  crap out of, whatever, he's sitting up in the snowbank.  He's

16  just sitting there.  Okay.  So if he'd been feeling pain, if

17  he'd been injured as bad as the Government says, he'd be lying

18  there, oh, my God, you know.  He's sitting up in the snowbank.

19  That's first thing I noticed.

20      He just was in a vehicle -- motor vehicle accident.  He

21  struck a pole, maybe two when you look at that video.  He

22  caused transformers to blow up.  He's going 100-plus miles down

23  the road, and he's unrestrained in a vehicle.  Yet, they want

24  you to think there's some other injury to him than what was

25  caused in that motor vehicle accident.  They want you to think

1    when he was dropped on the grass -- not on the asphalt or the

2    road -- dropped on the grass, he somehow suffers contusions.

3    And they want you to think that there is no way -- well, okay,

4    is it just -- I hate to even say this, but I'll say it.  It's

5    just as likely -- it's not just as likely -- but it's just as

6    likely that he received those contusions in being an

7    unrestrained person in a motor vehicle than being tossed on the

8    grass.  I mean anybody can see that.

9        Okay.  Had a headache.  All right.  Well, we understand

10   motor vehicle passenger.  Okay.  No pain.  He said he wasn't in

11   pain to Mr. Brown.  On a scale of one to zero -- one to ten,

12   zero.  What was he complaining to Mr. Brown about?  My

13   handcuffs are too tight.  They hurt.  So I'm not being

14   facetious, but that was his main complaint as far as pain goes.

15       So I would submit to the Court if he was roughed up and in

16   pain, what's the first thing a 16-year-old kid is going to say

17   to somebody?  He hurt me.  I'm sorry.  I'm being overdramatic.

18   I know.  But that's what they would do, a 16 year old today.

19   That would be the first words out of his mouth.  Not my cuffs

20   are too tight.

21       So, anyway, let's keep going.  All the injuries to the left

22   side consistent with motor vehicle wreck.  Oh, my God.  Don't

23   forget about the extrication.  Michael Kennedy is involved in

24   that.  All right.  And it's the juvenile's fault because he

25   won't get out of the car.

1        What did Derek Walker say?  He's just sitting there looking

2   at us, staring at us.  Okay.  Just staring at as.  Get out of

3   the vehicle.  Get out of the vehicle.  Put your hands -- show

4   us your hands.  He's got cops with guns pointed at him, and

5   he's just sitting there staring at them.  So they extricate him

6   from the vehicle because the handle is broke.  You can't even

7   open the vehicle.  My God.  Did you see that on the video?

8   That two officers are just pulling him out of the -- Merson cut

9   his hand on the glass when he's breaking it out.  Yet these two

10  officers extricate him and throw his body on the ground.

11  That's where he got all the injuries.  That and the motor

12  vehicle accident.

13       Let me keep going.  I know we're going along here.  Ryan

14  Kolb.  In his testimony, he kept saying he kept trying to get

15  up during the first engagement.  He also said he did see a

16  threat posed.  He told us about, you know, even if you're

17  cuffed, you can still be a threat.  I'll get to that in a

18  minute.

19       He said use of force -- whatever you're dealing with --

20  whoever you're dealing with dictates the amount of force that

21  you use.  There's no set rules.  You have to determine -- you

22  use the -- the situation dictates the amount of force that you

23  use.  That was another officer.  His take on it.  Okay.

24       So he also told us about -- let's see, where was it -- the

25  toss and also I believe about the snowbank.  And he said

1   something I thought was important.  It's just not Michael

2   Kennedy talking to the juvenile.  It's the juvenile having

3   words.  He said they exchanged words.  And I even think I asked

4   him or maybe it was Ennis.  I forget.  Well, because everybody

5   was saying he's talking in a loud voice to Michael Kennedy.  I

6   said what about the juvenile?  Is he talking in a loud voice

7   too?  Yeah.  So he wasn't fearful.  All these compliance things

8   weren't working.

9       One of the most telling things is after the eight

10  compliance strikes, after the toss, after he goes over and says

11  do you have enough -- that's Michael -- another officer helps

12  him take him to the snow pile.  Why?  Because he's still

13  resisting.  He won't walk on his own.  But yet we know just a

14  few minutes later he's sitting up.  Okay.  He's fine.  It's not

15  because he's disabled.  It's because he's still resisting after

16  all of this stuff that happened.  After a 100-mile-an-hour

17  chase.

18      Anyway.  Ennis.  He saw the snow pile.  He kept -- and this

19  was with no coaching from me.  Did you see him strike him?  I

20  was trying to get -- was it open hand or closed fist?  He said

21  open hand.  But he said, right out of his mouth without any

22  coaching, a light slap.  That's what he said.  And he didn't

23  see anything wrong.  One of these guys turned him in to higher

24  authorities -- let me make sure that that's right because I see

25  you're looking through your notes, Your Honor.  I'm pretty sure

1  that's what he said.

2       Oh, yeah, I got -- light strike to the face.  That was his

3  -- that I wrote down.  I don't hear everything.  But light

4  strike to the face is what I wrote down.  And I think that's

5  what he said.  Like I'm sure that's what he said.  And he said

6  he did see a reason for face-to-face encounter to be used at

7  that time because the kid kept trying to get up.  Throughout

8  this entire melee, he continues to resist.  In fact, the only

9  time he stopped was that one time when Derek Walker has his

10 hands on him and everybody leaves because they all think it's

11 over.  And if it was retal -- now I'm repeating myself.  But if

12 it was retaliation of punishment, he would still be there

13 wailing on him.

14      Okay.  So another reason for the snowbank, pushing him

15 down, and the slap was so that he would stop resisting, and

16 they wouldn't have to again try to use compliance against him.

17 That was Mr. Ennis.

18      Okay.  Let me see what else, Your Honor.  Okay.  Derek

19 Walker.  I kind of made this point before, but he's right

20 there.  He's trying to cuff this guy, and he still says he

21 tensed up.  And he says he tensed up and jerked when he picked

22 him up and was moving him away.  And Michael in the video -- at

23 one point in time, he's looking away, and then he starts to

24 look back over.  And that's right about when Officer Walker

25 trips over the individual who also Walker said had tensed up

1 and had jerked. Okay. And that's when the next action and

2 reaction -- that's when Officer Kennedy picks him up and takes

3 him over.

4 Now, Officer Kennedy tells him -- I think that was his

5 testimony but whatever it is, it is. We're going to get

6 transcripts to make our closing arguments which is pretty good.

7 You know, you need to stop this. You need to stop resisting.

8 And then -- I mean I don't know how much more honest a man can

9 be. He said I felt something in my face. He told me "F" off,

10 and I dropped him. Now, he said he dropped him. And then he

11 said but when I saw the video -- that was what I thought I did

12 that night. When I saw the video, it was more of a toss. So

13 he was being honest. So I submit to you very credible,

14 competent testimony.

15 The Court picked up on something that I totally forgot.

16 And that was you asked Officer Kennedy on the stand was that --

17 when was the first chance you had to check for weapons? And

18 that was after the toss, and he's going through his pockets.

19 And I do remember I asked -- I don't know if it was this

20 officer -- I don't know if it was Officer Kennedy or some other

21 officer -- had he been patted down yet. And, you know, he

22 hadn't. So, again, these guys are right there at the scene.

23 They still did not know if he might be armed. We hear every

24 day about things like that happening. So still, it's in their

25 mind, and it's something that they had to consider.

1    Okay.  This report that was used to try to impeach my

2  client on his cross examination.  This is a Response to

3  Resistance or Aggression Officer's Statement.  This is an

4  internal document written for his superior.  It wasn't written

5  to be used -- I mean obviously it was used as impeachment, but

6  it wasn't -- when it was authored ten days later, it was

7  basically an internal document explaining what happened.  I

8  don't know -- I didn't hear any evidence as to whether or not

9  Officer Kolb followed up on this.  Is there anything you

10  missed?  Anything you left out?  It only became important later

11  when the litigation took place.  But at the time, I don't see

12  any intent to deceive or leave things out that were important.

13  So that's a point I'll make about that, Your Honor.

14    All right.  Again, I apologize for being a little all over

15  the board.  You've sat through all this.  You've heard all this

16  testimony.  Let me see.  I don't think -- I don't think there's

17  been any pain proven, Your Honor, or any physical injury.

18  Certainly, there was physical injury, but they -- the

19  Government cannot -- I'll borrow a civil phrase -- proximately

20  -- show proximate causation between anything that Michael

21  Kennedy did and the injuries that were prevalent on the young

22  man.  In fact, by preponderance by clear and convincing

23  evidence beyond a reasonable doubt, I would submit to the Court

24  that injury, pain, and everything was a result of the motor

25  vehicle accident or the extrication from the vehicle as opposed

1    to anything that Michael Kennedy did.  So I've covered that.

2        Also Mr. Brown, he was qualified -- when he gave his

3    testimony, you know, he's there to look for injuries.  He's

4    there to look for problems.  So he has some qualifications that

5    we can rely on.

6        I've gone through a lot of this.  All right.  So Michael

7    also told you that we -- when he had face to face, it was more

8    of a psychological technique.  And I can see that because

9    nothing else was working at that time.  And I don't submit to

10   you he suffered any injury or pain.  At least all of the

11   devices he was taught to gain compliance to the pain, none of

12   them clearly worked at this situation.

13       So let's see what else here.  So back to the -- oh, here's

14   another thing.  Actions speak louder than words.  Okay.  So if

15   he really -- if Michael Kennedy really wanted to punish this

16   kid in retaliation, when he's on the snowbank, he wouldn't have

17   stopped and thought he's right handed.  He wouldn't have used

18   his left hand to smack him on the right side of his face where

19   there are no injuries.  I think that's very telling.  So if

20   he's just acting because he's madder than hell, and he's going

21   to let this kid have it, he wouldn't have thought about that.

22   He would have just gone ahead and struck him with his right

23   hand on the left side of his face where he's already boogered

24   up from the motor vehicle accident, Your Honor.

25       Okay.  I'd ask the Court when you review all the

1    evidence -- and I said in opening, it's sort of a continuum

2    here, a totality of the circumstances situation.  These guys

3    are on a high-speed chase.  They're -- while they're doing

4    their pursuit, they're wondering -- this was just a little MVA

5    action.  You know, it happens all the time.  They have to write

6    up their reports.  I think Derek said now I'm thinking about

7    the paperwork I'm going to have to write.  But they deal with

8    this all the time.

9        Why on earth would this person driving this vehicle, after

10   they bump in -- I mean you saw on the video, you know.  They

11   bump into this -- it's got that ghost writing.  The kid doesn't

12   even realize it's a cruiser.  Okay.  So, you know, I can see

13   more if I'm driving along, and I'm 16, and I run into a

14   cruiser, and I got the headlights and everything going on

15   thinking, oh, crap.  Okay.  But he runs into a vehicle he

16   doesn't even know is a cruiser.  It's got the ghost writing.

17   You know, you've got to shine a light a certain way before you

18   can tell.  I see now where I'm driving.  Oh, Lord.  Okay.  So

19   he doesn't bolt until he sees the lights go off, the emergency

20   lights.  That's what Trooper Kennedy said.  We didn't ask

21   anybody else.  But that's what he said.

22       So then he bolts.  And it's not just like he bolts on foot

23   or around the corner.  He's going down Williamsport Pike at

24   105-plus miles an hour.  These guys got to be thinking what's

25   up with that?  This is a dangerous situation, you know, and

1   they have to pursue it.  But obviously they're thinking what's

2   going on with that?  They see the crash.  They see these series

3   of explosions.  There are live wires all over the place.  I

4   mean thank God I didn't have to deal with something like that.

5   I mean too many things going through their mind at one time.

6   And they're still human beings.  We have a constitution to

7   defend.  Of course we do.  I try to do that every day.  But

8   they're still human beings pressed into situations where it's

9   immediately you have to do something.  And we've come in with a

10  video -- and this day and age everybody has got one of those

11  cameras I was telling you about.  We come in with a video, and

12  we have the luxury of hindsight.  We weren't there at the time.

13      So I ask you to take all that into consideration and

14  determine whether or not his actions were reasonable under the

15  circumstances.  And I think it leaves to one inexplicable

16  conclusion -- I can't talk -- inescapable conclusion.  You

17  know, at first blush, yeah, wow.  But when you actually take it

18  bit by bit and consider the continuum, the totality of the

19  circumstances, he's just trying to do his job to the best of

20  his ability.  He's just a human being.

21      So I don't see deprivation of constitutional rights.

22  Clearly I don't see any injury or pain that they're able to

23  prove.  It's circumstantial.  And, yeah, you can prove -- boy,

24  do I know it.  You can get convicted on circumstantial

25  evidence.  But when you get convicted on circumstantial

1   evidence, the circumstances generally tend to rule out any

2   other possibilities.  Okay.  That's why we -- you know, that's

3   why circumstantial evidence is just as good as direct evidence.

4   But the less it rules out other possibilities, the less weight

5   you need to give it.  And right here we have two big

6   possibilities, motor vehicle accident and extrication.

7        So, Judge, I haven't rambled on in front of you for a long

8   time.  Thank you for listening to me and that's all I can say.

9           THE COURT:  Thank you.  Mr. Douglas.

10          MR. DOUGLAS:  Thank you, Your Honor.  Your Honor, I'm

11  not going to get in a tit for tat about every little piece of

12  evidence of course with Mr. Manford because we're going to be

13  submitting written proposed findings of fact and conclusions of

14  law in this case.

15       But there are three absolutes here.  Number one, we do not

16  have to prove anger, punishment, or any motive at all.  Period.

17  Number two, any one of these uses of force can support a

18  violation of 242.  The toss alone is enough.  That Mr. Manford

19  in his candor, which he's always candid, says that's a problem.

20  The toss is a problem.  The toss alone is enough.  And, three,

21  we can't get away from it.  Pain is enough for injury.

22       Your Honor, regarding the anger and punishment.  Again, we

23  don't have to prove a motive.  All we have to prove, which we

24  have proved, is that his force was unreasonable because it was

25  not really in response to a threat.  At times there was no

1   threat.  At times maybe there was a small threat, and he was

2   using too much force.  That's really the state of mind we have

3   to prove.  That's really the actions we have to prove.

4       There's no evidence that he tossed the kid down because

5   there was a potential for weapons.  No officer testified to

6   that.  It wasn't in his statement.  This is being added in.

7       We're kind of talking about circumstantial evidence like

8   it's a bad word.  Circumstantial evidence can sustain a factual

9   finding.  In fact, I've heard many times this Court instruct

10  jurors that they don't have to check their common sense at the

11  door.  You don't have to forget about falling down might hurt.

12  In fact, using the little acting here about the handcuffs

13  hurting, I'm sure they hurt more when he got tossed down on

14  them than just sitting in the frigging ambulance.

15      Your Honor, this document that was used to impeach, it's

16  not an Internal Affairs document.  This is the document that he

17  had his opportunity to tell his supervisors this is what force

18  I used and this is why I did it.  And it is very telling what

19  only has come out at the trial as a reason.  The spitting in

20  the face.  The blood on my face.  None of that was in there.

21  It's only self-serve --

22          THE COURT:  Didn't one of the other --

23          MR. DOUGLAS:  Yes, Your Honor.

24          THE COURT:  -- officers see blood on his face when

25  they testified?

1              MR. DOUGLAS:  Yes, Your Honor.  Deputy Kolb said he

2    saw blood on the face over at the snowbank on his face.  But as

3    being a reason for why --

4              THE COURT:  I understand.

5              MR. DOUGLAS:  -- he took action that was never

6    explained.

7         And, finally, yes, Your Honor, I'm a federal prosecutor.  I

8    go to work every day.  I sit in an office.  I don't do this.

9    But there is no adrenaline pass for force.  He doesn't get a

10   pass.  We've proved all the elements.  We'll supplement that

11   further, and we'll ultimately ask the Court to find him guilty

12   as charged.  Thank you.

13             THE COURT:  Thank you.  All right, Counsel, we've

14   come to the end of this proceeding.  As the Court had ordered

15   previously thanks to some practical suggestion by Mr. Douglas,

16   I'm going to order that the findings of fact and conclusions of

17   law in the form of an argument be filed within one week after

18   the court reporter files the final copy of the transcript of

19   this bench trial.  That will give everyone more sufficient time

20   to review it and get everything put together for the Court's

21   consideration.  Then I'll try to get an order out as soon as I

22   can after that.  I am most concerned with reviewing the

23   transcript myself to make sure that what I have in my notes is

24   accurate so I don't misquote anyone, and it will be helpful for

25   my consideration as well.  And we'll go back in chambers and

1    review the law as well as it pertains to this case as I need to

2    apply it.

3        Anything further on behalf of the Government?

4            MR. DOUGLAS:  No, Your Honor.  Thank you.

5            THE COURT:  Anything further on behalf of your

6    client, Mr. Manford?

7            MR. MANFORD:  No thank you, Your Honor.

8            THE COURT:  All right.  Mr. Kennedy, you are

9    continued on your pretrial release even though we're post-trial

10   at this point.

11           THE DEFENDANT:  Yes, ma'am.

12           THE COURT:  Thank you, Counsel.

13

14               (Court adjourned at 12:35 P.M.)

15

16                   (END OF VOLUME TWO)

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2

3           I, Kate A. Slayden, Registered Professional Reporter

4   and Official Court Reporter of the United States District Court

5   for the Northern District of West Virginia, do hereby certify

6   that the foregoing is a true and correct transcript of the

7   proceedings had in the above-styled action on October 8, 2019,

8   as reported by me.

9           I certify that the transcript fees and format comply

10  with those prescribed by the Court and the Judicial Conference

11  of the United States.

12          Given under my hand this 16th day of October 2019.

13

14                              /s/Kate A. Slayden
                                _____
15                              Kate A. Slayden, RPR
                                Official Reporter, United States
16                              District Court for the Northern
                                District of West Virginia
17

18

19

20

21

22

23

24

25